1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DREW MACEWEN, ANDREW BARKIS,
CHRIS CORRY, BRANDON VICK,
MICHAEL MCKEE, LEE PFLUGER, FRAN
WILLS, AND BRUCE RUSSELL,

*Plaintiffs*,

v.

JAY INSLEE, in his official capacity as the
Governor of Washington,

*Defendant*.

No. 3:20-cv-05423

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

JURY DEMAND

## I.     INTRODUCTION

1.  In late 2019 or early 2020, a novel viral infection began circulating in Washington. The first hint of problems came in early 2020, when dozens of residents of two nursing homes in King County fell sick and died, and were confirmed to have been infected with COVID-19, then running rampant in Hubei province, China.

2.  Available evidence and modeling suggested a potential disaster: the virus spread by aerosol, quickly, and resulted in so many serious illnesses that the state's hospital capacity would soon be overwhelmed.

3.  Models suggested that within weeks, even with social distancing, Washington state would run out of hospital beds, ICU beds, and ventilators.

4.  People who contracted COVID—or had other pressing medical needs—would die from lack of access to care, where they would have survived if only we could save the hospital system.

5. Many measures were implemented to avert this budding crisis. The U.S. Army built a field hospital at a sports stadium in downtown Seattle; health care workers mobilized; businesses began mandating work-at-home for workers whenever possible. Downtown Seattle became a ghost town.

6. Before long, in response to the predicted disaster, Governor Inslee began mandating ever tighter controls on movement and gathering. Washington pulled together to "flatten the curve."

7. The goal of these constraints—voluntary and mandated—was to spread the rate of infection, illness, and death out over time. Experts in epidemiology cautioned that the virus' spread was not really controllable, and the most we could hope for was to slow the rate.

8. This way, while the same number of people would eventually get infected, get sick, or get very sick, fewer would die *from lack of access to medical care*.

9. In other words, with a limited stock of hospital beds, ICU beds, and ventilators, and knowing that more people would need them than was available, the only course of action was to take drastic steps to ensure the need was spread over time, instead of everyone needing the same beds at the same time.

10. Based on available estimates of viral spread rates, severity of illness, percentage of infected who needed hospitalization, length of hospital stays, and need for ventilators, a looming threat was identified.

11. The Governor's "Stay Home, Stay Healthy" order intended to eliminate that threat to public order by slowing the spread of disease.

12. Over the weeks since the state has imposed limits on its citizens' Constitutional rights, more and more data have emerged regarding COVID-19. It has been almost unabated good news.

13. Far fewer infected people need major medical intervention than expected at the outset.

14. The rate of spread has slowed beyond even early predictions of transmission under "social distancing."

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

15. Ventilators, far from being in short supply in Washington, became a surplus. We were fortunate to be able to send 500 to New York, where the disease spread far more rapidly in the cramped city, with its extreme reliance on public transportation.

16. The Army field hospital was dismantled without ever being used.

17. More good news emerged. Testing and study around the world developed treatment protocols for those severely affected.

18. Among other things, many physicians urged far less use of mechanical ventilators than initially suggested.

19. This greatly reduces the potential threat to Washington's health care system of a lack of capacity of ventilators.

20. Yet more good news emerged. Testing has repeatedly revealed that far more people have been infected—but were completely asymptomatic—than initially assumed possible.

21. While it remains possible that an asymptomatic infection does not result in immunity, this nonetheless shows that the ratio of infections to cases, of infections to severe cases, of infections to cases requiring hospitalization, is lower than initially feared.

22. The predictive models have adopted these new facts—and they reveal yet more good news. It appears that the feared threat to Washington's hospital system, of being overwhelmed by people suffering from COVID-19, is gone.

23. More good news: there have been far fewer COVID-19 deaths in Washington than any early model predicted.

24. More good news: there have been ZERO deaths in Washington from COVID-19 of people under age 20.

25. In fact, about 50% of the approximately 800 deaths in Washington have been among people over age 80.

26. It appears that Washington is like just about every state expect New York: COVID-19, feared as a threat to the life and health of anyone in the state, turns out to be a selective killer, targeting

MacEwen v. Inslee Complaint - 3
No. 3:20-cv-05423

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

the very old and infirm, those with serious other illnesses, and particularly those in nursing homes and other long-term care facilities.

27. Unfortunately, the Washington Department of Health has, to date, refused to disclose to the public the most relevant data: what percentage of the state's deaths are from the nursing home and long term care population? What percentage have serious co-morbidities? What is the detailed age breakdown?

28. What we have learned over the course of the last month and a half is this: COVID-19 presents a statistically insignificant threat to the health of children, young adults, and healthy adults of middle and even slightly advanced age.

29. It spreads with many, many asymptomatic cases.

30. In nursing homes, and among Washingtonians with pre-existing illnesses, it can be a devastating and lethal disease.

31. Unfortunately, the Department of Health has clouded the issue, while failing for weeks to protect the vulnerable populations in Washington.

32. Today, we know far more than we knew in early March about COVID-19. We know that the emergency has been averted. We know that the threat to vulnerable populations remains. We know that there is no longer an emergency in the State.

33. That should be viewed as great news: we can address the vulnerable population with targeted measures. We can declare victory.

34. Unfortunately, the Governor insists that he, and he alone, can determine whether an emergency exists. He claims that it's an emergency if he says it's an emergency, and that no one—not the legislature, and not the courts—can gainsay him. He claims that the emergency can continue as long as he thinks it continues, and no one but he can say otherwise.

35. The Governor has assumed the sole power to determine whether a person in Washington can worship, can peaceably assemble, can work, can build needed housing, can offer living space for rent, can engage in any activity.

MacEwen v. Inslee Complaint - 4
No. 3:20-cv-05423

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

36. But the facts, and the science, are clear: when the entirety of public knowledge is examined, there is no public disorder or threat to public order in the State of Washington. The governor's claim to the contrary is demonstrably false.

37. The State was slow in its initial response to COVID-19 in nursing homes, but the hospitals turned their expertise over to helping staunch the infection in those vulnerable spaces. We have learned best practices for keeping those spaces as safe as possible in light of the serious health needs of the residents.

38. While our older and sicker relatives remain at greater risk, we now know that the emergency has been contained.

39. Worse yet, as a result of the Proclamation, many residents of Washington are unable to secure desperately needed medical care, often deemed "elective" and barred by the proclamations.

40. Hospitals, far from overwhelmed, are suffering from lack of revenue.

41. Residents of the state are forced to forego or delay medical attention, gravely harming their health, sometimes irreparably.

42. Hospitals are forced to lay off skilled staff, lose revenue, and are being put under enormous financial strain, all because the success of limiting COVID-19 spread has not moved the governor to back off his shutdown and lift the state of emergency.

43. While the governor says otherwise, the facts don't lie, and the Constitution does not authorize him to maintain infringements on Constitutionally guaranteed civil liberties on his mere say-so, with no avenue of review or redress.

44. Judicial review of the governor's claim of emergency must be available. Without review, a legitimate statute designed with flexibility to allow quick response to true emergent threats becomes a tool for long-term imposition on Constitutionally guaranteed civil liberties from the mere whim of the state's executive.

## II.   JURISDICTION AND VENUE

45. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the suit arises under the Fifth and Fourteenth Amendments to the United States Constitution.

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

46. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1343 because the suit arises under the Civil Rights Act of 1871, 42 U.S.C. § 1983, to redress the deprivation, under color of state law, of rights, privileges, and immunities secured to Plaintiffs by the Fifth and Fourteenth Amendments to the U.S. Constitution.

47. Under 28 U.S.C. § 1367 this Court has supplemental jurisdiction over any claims stated in this Complaint that arise under state law but are so related to the federal claims as to form part of the same case or controversy.

48. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and LCR 3(e), and intra-district assignment to the Tacoma Division is proper because a substantial part of the events and omissions that give rise to Plaintiffs' claims arose in this judicial district and division, and at least Plaintiff MacEwen lives in this judicial district and division.

### III.  PARTIES

49. Plaintiff Drew MacEwen is a resident of Mason County Washington, and elected state representative for the 35th Legislative District. He has directly suffered harm due to the challenged Proclamations, and continues to suffer such harm. He will suffer harm until the Proclamations are voided.

50. Plaintiff Andrew Barkis is a resident of Thurston County Washington, and elected state representative for the 2d Legislative District. He has directly suffered harm due to the challenged Proclamations, and continues to suffer such harm. He will suffer harm until the Proclamations are voided.

51. Plaintiff Chris Corry is a resident of Yakima County Washington, and elected state representative for the 14th Legislative District. He has directly suffered harm due to the challenged Proclamations, and continues to suffer such harm. He will suffer harm until the Proclamations are voided.

52. Plaintiff Brandon Vick is a resident of Clark County, Washington, and elected state representative for the 18th Legislative District. He has directly suffered harm due to the

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

challenged Proclamations, and continues to suffer such harm. He will suffer harm until the Proclamations are voided.

53. Plaintiff Michael McKee is a resident of Washington. He has directly suffered harm due to the challenged Proclamations, and continues to suffer such harm. He will suffer harm until the Proclamations are voided.

54. Plaintiff Lee Pfluger is a resident of Washington. He has directly suffered harm due to the challenged Proclamations, and continues to suffer such harm. He will suffer harm until the Proclamations are voided.

55. Plaintiff Fran Wills is a resident of Washington. She has directly suffered harm due to the challenged Proclamations, and continues to suffer such harm. She will suffer harm until the Proclamations are voided.

56. Plaintiff Bruce Russell is a resident of Washington. He has directly suffered harm due to the challenged Proclamations, and continues to suffer such harm. He will suffer harm until the Proclamations are voided.

## IV.  FACT ALLEGATIONS

### A.    Relevant Public Health Data

57. In determining whether there exists a state of emergency in Washington, ands whether the infringement on civil liberties is addressed at steps that remedy that state of emergency, it is imperative to review the facts about relevant conditions in the state.

58. As of May 3, 2020, 841 people have died of COVID-19 in the State of Washington.[1]

59. Of those, 52% are over age 80; 91% over age 60. Exactly zero are under age 20.

60. Whether or not this constitutes a state wide emergency justifying infringements on the civil liberties of all residents must be evaluated by, among other things, comparison to the similar status of normal public health issues in the sate each year.

---

[1] Washington State Department of Health, COVID-19 in Washington State, Cumulative Confirmed Cases and Deaths, https://www.doh.wa.gov/Emergencies/NovelCoronavirusOutbreak2020COVID19/DataDashboard , (last visited May 5, 2020).

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

61. If the usage of health care resources in 2020 is roughly identical to past years, then any year is an emergency. If the death rate in 2020 is roughly identical to past years, then any year is an emergency. If the threat to public health posed by COVID-19 is not extremely dissimilar than other threats to public health that regularly arise in the state, then "emergency" ceases to have meaning other than simply "Governor's fiat."

62. Thus, it is relevant to see, for example, that in 2018, 56,913, people died in the State of Washington, of which 988 died of Influenza and Pneumonia, the ninth leading cause of death in Washington.[2]

63. In 2017, 57,012 people died in the State of Washington, of which 1,037 died of Influenza and Pneumonia, the ninth leading cause of death in Washington.[3]

64. In 2016, 54,748 people died in the State of Washington, of which 809 died of Influenza and Pneumonia, the tenth leading cause of death in Washington.[4]

65. Whether or not a state of emergency exists across the entire state of Washington, among all residents and people, requiring impositions on the civil liberties of everyone in the state, must depend on the actual nature of the asserted emergency.

66. If any emergency is confined to certain small subsets of the population, the Governor's statewide edict cannot be justified.

67. However, the Washington State Department of Health has thus far refused to release data on the number of COVID-19 deaths or cases among residents of nursing homes or long-term care facilities.

---

[2] Washington State Department of Health, Washington State Vital Statistics, DOH 422-099. (2018), https://www.doh.wa.gov/Portals/1/Documents/Pubs/422-099-2018-2010-VitalStatHighlights.pdf

[3] Washington State Department of Health, Washington State Vital Statistics, DOH 422-099. (2017),https://www.doh.wa.gov/Portals/1/Documents/Pubs/422-099-2018-2010-VitalStatHighlights.pdf

[4] Washington State Department of Health, Washington State Vital Statistics, DOH 422-099. (2016),https://www.doh.wa.gov/Portals/1/Documents/Pubs/422-099-2018-2010-VitalStatHighlights.pdf.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

68. Looking at data from states which have been more transparent and open, it appears highly likely that the threat posed by COVID-19 in Washington is almost exclusively confined to long term care facilities and elderly, sick residents of the state.

69. By way of example, in the State of Illinois, there are 7,555 cases of COVID-19 at Long-Term care facilities among residents and staff, as of May 1, 2020. As of May 1, 2020, in the State of Illinois there have been 1,082 COVID-19 deaths among residents and staff at Long-Term care facilities.[5] As of May 3, 2020, there are a total of 61,499 cases of COVID-19 in the entire State of Illinois, and have been a total of 2,618 deaths.[6]

70. By way of example, in the State of Maryland, there are 3,218 confirmed cases of COVID-19 at nursing, assisted living, and group home facilities among residents (not including prisons or jails), and there have been 525 confirmed COVID-19 deaths among residents, as of April 29, 2020. As of April 29, 2020, there have been 1,489 confirmed cases of COVID-19 among staff at nursing, assisted living, and group home facilities, and 8 confirmed deaths of staff.[7] As of May 3, 2020, in the State of Maryland, there have been a total of 26,408 confirmed cases of COVID-19, and 1,216 confirmed deaths. 2,144 COVID-19 cases and 519 COVID-19 confirmed deaths have been among those 80 years old or older; 5,993 COVID-19 cases, and 487 COVID-19 confirmed deaths have been among those who are between the ages of 60 and 79. There have been no confirmed deaths from COVID-19 for anyone under the age of 30, and no possible COVID-19 deaths for anyone under the age of 20.[8]

71. Emerging medical consensus tracks the lack of any COVID-19 deaths among children and youth in Washington.

[5] Illinois Department of Public Health, Long-Term Care Facility Outbreaks COIVD-19, (2020), http://www.dph.illinois.gov/covid19/long-term-care-facility-outbreaks-covid-19.

[6] Illinois Department of Public Health, Coronavirus Disease 2019, http://www.dph.illinois.gov/covid19 (last visited May 4, 2020).

[7] State of Maryland, Maryland COVID-19 in Congregate Facility Settings, https://coronavirus.maryland.gov/pages/hcf-resources (last visited May 4, 2020).

[8] State of Maryland, COVID-19 statistics in Maryland, https://coronavirus.maryland.gov/ (last visited May 4, 2020).

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

72. Study after study has confirmed that there is practically no threat to youth and children from COVID, that they have extremely low risk of transmission to adults, and when symptomatic, have generally very mild symptoms.[9]

73. As Dr. Anthony Fauci has said, describing the lack of any data to support excluding children from normal activities:

> "One interesting feature of this novel coronavirus pandemic is that very few children have become sick with COVID-19 compared to adults," said NIAID Director Anthony S. Fauci, M.D. "Is this because children are resistant to infection with SARS-CoV-2, or because they are infected but do not develop symptoms? The HEROS study will help us begin to answer these and other key questions."[10]

74. If COVID-19, as a matter of fact, poses little to no threat to children and young adults, while those same people also pose little to no threat to themselves or others, there cannot be a state of emergency justifying impositions on their civil liberties.

75. If, in fact, COVID-19 illnesses and deaths are almost exclusively confined to those who are older or have serious existing illnesses, there cannot be a state of emergency justifying impositions on the civil liberties of every other resident of the state of Washington.

76. All evidence shows that the threat of COVID-19 is focused on long term care settings.

77. Yet the State's response has not only been overbroad, by locking down healthy and unthreatened people, it has also been slow and inadequate in those areas of greatest threat.

78. For example, in Pierce County with just over 40 cumulative deaths and 1400 cases, a few congregate care settings made up the bulk of concentrations of the positive cases.

79. As hospitals and long-term care settings realized the problem, they shifted focus with hospitals attempting to help unprepared long-term care facilities. But personal protective equipment ("PPE") and testing has not followed.

---

[9] *See, e.g.*, https://www.medrxiv.org/content/10.1101/2020.03.26.20044826v1; https://journals.lww.com/pidj/Fulltext/2020/05000/Coronavirus_Infections_in_Children_Including.1.aspx

[10] https://www.nih.gov/news-events/news-releases/study-determine-incidence-novel-coronavirus-infection-us-children-begins

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

80. Even last week, nursing homes, rehab facilities and adult family homes were still struggling to obtain the proper PPE they need to care for their residents.

81. In some instances, the Department of Health has ordered a halt to testing of staff and residents at long-term care facilities for bureaucratic and paperwork related reasons, not in the interest of health of staff or residents.

82. The DOH has found vendors to offer long-term care staff the needed training on dealing with COVID-19, but then decide to allow the vendor to charge the struggling facilities, instead of making the training available free as a matter of public health.

83. The DOH has fallen woefully short in guidance for staff treating person in those at-risk setting so that they can take the most appropriate and effective precautions to care for residents.

84. The state has also not disclosed which facilities have had outbreaks.

85. Nor has the state prioritized testing of workers in the long term care settings—in fact, it has blocked private testing in at least one instance!

86. Because workers in long-term care settings have the most direct contact with the highest-risk population in the state, testing them should be an imperative. Instead, the Governor has locked down the healthy population of the state while ignoring easy solutions that could address the actual health risks.

87. Long term care works plainly have the greatest potential to spread COVID-19 from client to client or from client to home.

88. Worse yet, the state has not disclosed the any information regarding the comorbidities of those who have dies with COVID-19.

89. Minnesota, by contrast, has made clear that over 99% of deaths in the state are among people with at least one serious co-morbidity.

90. In the face of a virus that poses an extreme risk to a narrow subset of the population, and one which is largely confined, immobile, and readily identifiable, there can not be, as a matter of fact, a state wide emergency.

91. The Governor has asserted otherwise.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

**B.** **Proclamations**

**1.** **Proclamation 20-25**

92. Governor Inslee issued Proclamation 20-25 on March 23, 2020.

93. The Proclamation's full title reads: "Proclamation By The Governor Amending Proclamation 20-05."

94. The Proclamation's subtitle reads: "Stay Home—Stay Healthy."

95. The Proclamation identifies an earlier Proclamation issued by Governor Inslee, Proclamation 20-05, issued on February 29, 2020.

96. Proclamation 20-25 describes Proclamation 20-05 as "proclaiming a State of Emergency for all counties throughout the state of Washington."

97. Proclamation 20-25 describes Proclamation 20-05 as having proclaimed the State of Emergency "as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State."

98. Proclamation 20-25 identifies amendatory Proclamations 20-06, 20-07, 20-08, 20-09, 20-10, 20-11, 20-12, 20-13, 20-14, 20-15, 20-16, 20-17, 20-18, 20-19, 20-20, 20-21, 20-22, 20-23, and 20-24.

99. Proclamation 20-25 describes these amendatory Proclamations as "prohibiting certain activities and waiving and suspending specified laws and regulations."

100.    Proclamation 20-25 describes these prohibitions, waivers and suspensions as an exercise of Governor Inslee's emergency powers.

101.    Proclamation 20-25 cites RCW 43.06.220 as the law authorizing Governor Inslee to exercise his emergency powers in this manner.

102.    Proclamation 20-25 gives "the continued worldwide spread of COVID-19, its significant progression in Washington State, and the high risk it poses to our most vulnerable populations" as the rationale for this alleged exercise of Governor Inslee's emergency powers.

103.    Paragraph 4 of Proclamation 20-25 cites "at least 2,221 cases of COVID-19 in Washington State and, tragically, 110 deaths of Washingtonians associated with COVID-19."

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

104.    Paragraph 7 of Proclamation 20-25 describes the COVD-19 pandemic as "a public disaster affecting life, health, property or the public peace."

105.    Paragraph 8 of Proclamation 20-25 states:

[T]he Washington State Department of Health continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident[.]

106.    Paragraph 9 of Proclamation 20-25 states:

[T]he Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support the Department of Health and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with the Department of Health in assessing the impacts and long-term effects of the incident on Washington State and its people.

107.    Paragraph 10 of Proclamation 20-25 proclaims that the State of Emergency continues.

108.    Paragraph 10 of Proclamation 20-25 also proclaims that "Proclamation 20-05 and all amendments thereto remain in effect as otherwise amended."

109.    Paragraph 10 of Proclamation 20-25 also proclaims that "Proclamations 20-05, 20-07, 20-11, 20-13, and 20-14 are amended and superseded by" Proclamation 20-25.

110.    Paragraph 10 of Proclamation 20-25 identifies "prohibit[s] all people in Washington State from leaving their homes or participating in social, spiritual and recreational gatherings of any kind regardless of the number of participants, and all non-essential businesses in Washington State from conducting business, within the limitations provided herein."

111.Paragraph 5 of Proclamation 20-25 states:

WHEREAS, models predict that many hospitals in Washington State will reach capacity or become overwhelmed with COVID-19 patients within the next several weeks unless we substantially slow down the spread of COVID-19 throughout the state;

112.    The Governor's reasoning for issuing Proclamation 20-25 was that hospitals in Washington state could have become overwhelmed with COVID-19 patients within several weeks, according to models as of March 23, 2020.

113.    The potential overwhelming of hospital resources constituted the threat to public order that justified the exercise of the governor's emergency powers.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

## 2.    May 4, 2020 Proclamation

114.    That threat has faded. But Inslee continues on.

115.    On May 4, 2020, Inslee extended Proclamation 20-25 through May 31.

116.    The goal posts shifted drastically, as would be necessary to claim any continued emergency.

117.    With no threat to overwhelming hospitals, no threat to lack of beds or ICE space, no threat of a shortage of ventilators, Inslee instead cited "the continued worldwide spread of COVID-19, its significant progression in Washington State, and ***the high risk it poses to our most vulnerable populations*** . . ." (Emphasis added.)

118.    Inslee also cited that "through May 2, 2020, the Department of Health confirmed another 1,664 cases and 85 more deaths, for a total of 15,185 cases with 834 associated deaths, demonstrating the ongoing, present threat of this lethal disease . . ."

119.    Inslee made no attempt to inform the public about the percentage of deaths among the over-80 year old population, nor did he mention that over 90% of such deaths are among people over 60.

120.    Inslee did not remark on the fact that zero deaths were among young people, under 20.

121.    Inslee did claim that "In addition, modelers agree that fully relaxing social distancing measures will result in a sharp increase in the number of cases . . ."

122.    Inslee has never released any such model for public consideration.

123.    Inslee has never identified whether any such model asserts that deaths will rise among any group other than the most vulnerable population—sick, elderly people in long term care.

124.    Inslee makes no effort to identify whether any less restrictive measure would protect this group, while nonetheless allowing assembly, worship, and liberty for Washington.

125.    In fact, plaintiffs believe that Inslee's careful omission of even attempting to justify greater restrictions as opposed to lesser ones is because the threat is almost exclusively confined to certain vulnerable groups, and because the State can make ample protection measures available for them with targeted interventions, not a broad-brush approach favored by Inslee.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

126.   Inslee has made no effort to inform the public whether fully relaxing social distancing measures will result in an overwhelmed hospital system.

127.   In fact, plaintiffs believe that Inslee's careful omission of this justification for his continued Proclamation is because no such threat exists.

128.   Inslee tosses a fig leaf to the First Amendment when he asserts that "some [religious] services can be conducted in a manner similar to comparable secular activities to prevent prolonged exposure to individuals outside of their immediate household while ensuring safe social distancing and hygiene practices."

129.   In fact, any and all religious services that are "similar to comparable secular activities" can be performed with no greater threat to public health than secular activities.

130.   Indeed, any religious service in the state can be conducted with less threat to public health than the potential threat Inslee has allowed by deigning to permit certain casinos to open.

131.   Mass gatherings of revelers at a casino poses at least the same threat to public health (meaning: nearly none) as would gathering for Mass at a Catholic church, or any other gathering of people to freely exercise their religion.

132.   By allowing certain casinos to open, while limiting the right of people to freely exercise religion, and doing so with no factual or scientific bases, Inslee's Proclamation demonstrates its unconstitutionality on its own terms.

133.   Inslee concludes that, of COVID-19, "its progression in Washington State continue to threaten the life and health of our people as well as the economy of Washington State, and remain a public disaster affecting life, health, property or the public peace . . ."

134.   This misstates the known facts.

135.   By now, it is well known that COVID-19 threatens the life and health of a subset of Washington that is uniquely at high risk and needs particular, focused attention to avoid infection and death.

136.   It is now known, and is a fact, that COVID-19 is not a threat to the life or health of nearly all the population of Washington State, nor the economy of Washington State.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

137.   There remains no COVID-19 public disaster affecting life, health, property or the public peace.

138.   Inslee's omission of relevant facts, that show the threat of disaster and any actual disaster, has been resolved and no longer remains, cannot be used to justify his continued infringement of rights and liberties in Washington.

### C.   Harm To Each Plaintiff

#### 1.   Drew MacEwen

139.   Mr. MacEwen owns two restaurants in Washington state.

140.   The first is Smokin Mo's.

141.   The second is the Dock Bar and Eatery.

142.   Both restaurants are limited to take out which severely limits operations and revenue, constraining the ability to pay obligations, as a result of the Proclamation.

143.   But for the Proclamation, both restaurants would be fully open and operating.

144.   Mr. MacEwen is losing money every day due to the Proclamation.

145.   Mr. MacEwen thereby has been harmed and is still being harmed by the Proclamation.

#### 2.   Andrew Barkis

146.   Mr. Barkis owns Hometown Property Management, Inc. ("Hometown").

147.   Hometown is a property management company doing business in Washington state.

148.   Hometown's ordinary course of business sometimes involves evicting tenants, raising rent, charging late fees, serving compliance notices, and collecting debts.

149.   Hometown is now prohibited from evicting tenants as a result of the Proclamation for any reason.

150.   Hometown is also now restricted in its ability to raise rents, charge late fees, serve compliance notices, and collect debts as a result of the Proclamation.

151.   But for the Proclamation, Hometown could elect to raise rents, could charge late fees, could serve compliance notices, and collect debts, as it might elect to do in the ordinary course of business.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

152.   After the pandemic passes, Hometown will also remain restricted in its ability to collect debts incurred during the pandemic, as a result of the Proclamation.

153.   But for the Proclamation, Hometown would collect more and larger shares of debts after the pandemic passes.

154.   Mr. Barkis is losing money every day due to the Proclamation.

155.   Mr. Barkis has suffered a 32% loss on Hometown's net revenue due to the Proclamation.

156.   Mr. Barkis has had to furlough almost 20% of Hometown's fulltime staff due to the Proclamation.

157.   Mr. Barkis has had to change the payroll schedule from salaried to hourly for almost an additional 20% of Hometown's fulltime staff due to the Proclamation.

158.   Mr. Barkis has had to alter the entire structure of Hometown's core operating procedures due to the Proclamation.

159.   Mr. Barkis will not be able to recoup a great deal of the money lost due to the Proclamation because the Proclamation also restricts Hometown's ability to collect debt.

160.   Mr. Barkis thereby has been harmed, is still being harmed, and will continue to be harmed by the Proclamation.

### 3.   Chris Corry

161.   Mr. Corry works as a salesman in Washington state.

162.   Mr. Corry normally meets with clients and potential clients in person as part of his business.

163.   Mr. Corry is prohibited from meeting with clients and potential clients in person as a result of the Proclamation.

164.   Many of Mr. Corry's clients and potential clients find remote meeting technology inadequate to their needs.

165.   Mr. Corry cannot make sales to his clients or potential clients without meeting with them.

166.   Mr. Corry is unable to make sales as a result of the Proclamation.

167.   But for the Proclamation, Mr. Corry would be able to make sales.

168.   Mr. Corry is losing money every day due to the Proclamation.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

169.    Mr. Corry normally receives medical and dental care in Washington state.

170.    Mr. Corry's medical and dental health providers are closed as a result of the Proclamation.

171.    But for the Proclamation, Mr. Corry's medical and dental health providers would be open.

172.    Mr. Corry is deprived of medical and dental care due to the Proclamation.

173.    Mr. Corry's children also live in Washington state.

174.    Mr. Corry's children also normally receive medical and dental care in Washington state.

175.    Mr. Corry's children's medical and dental health providers are closed as a result of the Proclamation.

176.    But for the Proclamation, Mr. Corry's children's medical and dental health providers would be open.

177.    Mr. Corry's children are deprived of medical and dental care due to the Proclamation.

178.    Mr. Corry's foster daughter wears dental braces.

179.    Mr. Corry's foster daughter's braces are currently faulty.

180.    Mr. Corry's foster daughter needs prompt dental attention in order to have her braces fixed.

181.    Getting his foster daughter's braces fixed is among the medical and dental care that Mr. Corry's children are unable to receive due to the Proclamation.

182.    Mr. Corry's foster daughter is forced to wear faulty dental braces due to the Proclamation.

183.    Mr. Corry's children normally attend school in Washington state.

184.    Mr. Corry's children's schools are closed as a result of the Proclamation.

185.    But for the Proclamation, Mr. Corry's children's schools would be open.

186.    Mr. Corry's children are deprived of the ability to attend school due to the Proclamation.

187.    The distance learning alternatives offered for Mr. Corry's children are wholly inadequate.

188.    Mr. Corry's children are functionally being deprived of an education due to the Proclamation.

189.    Mr. Corry's children also normally participate in sports and extramural activities in Washington state.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

190.   Mr. Corry's children's sport and extramural activities are cancelled as a result of the Proclamation.

191.   But for the Proclamation, Mr. Corry's children's sport and extramural groups would be active.

192.   Mr. Corry's children are deprived of the ability to participate in sports and extramural activities due to the Proclamation.

193.   Mr. Corry normally attends church in Washington state.

194.   Mr. Corry's church is closed as a result of the Proclamation.

195.   But for the Proclamation, Mr. Corry's church would be open.

196.   Mr. Corry is deprived of the ability to worship in church due to the Proclamation.

197.   Mr. Corry is also deprived of the fellowship he normally enjoys at church due to the Proclamation.

198.   Mr. Corry thereby has been harmed and is still being harmed by the Proclamation.

### 4.   Brandon Vick

199.   Mr. Vick lives in Washington state.

200.   Mr. Vick's daughter normally attends public school in Washington state.

201.   Mr. Vick's daughter also relies on her school to provide education supplies and educational resources aside from direct instruction.

202.   Mr. Vick's daughter's school is closed as a result of the Proclamation.

203.   But for the Proclamation, Mr. Vick's daughter would still be attending school.

204.   Mr. Vick's daughter is deprived of her ability to attend school due to the Proclamation.

205.   The school district has provided virtually no alternative means of education.

206.   The burden of educating Mr. Vick's daughter has been placed wholly upon Mr. Vick.

207.   Mr. Vick is not equipped or qualified to educate his daughter on his own.

208.   Mr. Vick's daughter is also deprived of educational supplies and educational resources aside from direct instruction due to the Proclamation.

209.   Mr. Vick's daughter is functionally being deprived of an education due to the Proclamation.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

210. Mr. Vick normally also relies on childcare for his children.

211. Mr. Vick's childcare providers are closed as a result of the Proclamation.

212. But for the Proclamation, Mr. Vick would be placing his children in childcare while fulfils his other obligations.

213. Mr. Vick is deprived of his ability to place his children in childcare due to the Proclamation.

214. Mr. Vick is deprived of his ability to fulfil his other obligations due to the Proclamation.

215. Mr. Vick also normally attends church in Washington state.

216. Mr. Vick's church is closed as a result of the Proclamation.

217. But for the Proclamation, Mr. Vick's church would be open.

218. Mr. Vick is deprived of the ability to worship at church due to the Proclamation.

219. Mr. Vick is also deprived of the fellowship he normally enjoys at church due to the Proclamation.

220. Mr. Vick also normally donates his time and services to events held by nonprofit organizations.

221. The events held by nonprofit organizations to which Mr. Vick donates his time and services are cancelled as a result of the Proclamation.

222. But for the Proclamation, Mr. Vick would be donating his time and services to the events held by nonprofit organizations.

223. Mr. Vick is deprived of his ability to donate his time and services to events held by nonprofit organizations due to the Proclamation.

224. Mr. Vick thereby has been harmed and is still being harmed by the Proclamation.

### 5.    Michael McKee

225. Mr. McKee owns a catering business in Washington state.

226. Mr. McKee's catering business normally services events such as weddings and business conferences.

227. As a result of the Proclamation, most of the events that are normally serviced by Mr. McKee's catering business are cancelled.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

228.   Because Mr. McKee's catering business has almost no remaining clients, it has been functionally bankrupted.

229.   Mr. McKee has been deprived of most of his income from his catering business.

230.   But for the Proclamation, Mr. McKee would still be earning a significant income from his catering business.

231.   Mr. McKee also owns a shop in Washington state.

232.   Mr. McKee's shop is still under construction.

233.   Mr. McKee is unable to finish constructing his shop as a result of the Proclamation.

234.   But for the Proclamation, Mr. McKee would be finishing the construction of his shop.

235.   Mr. McKee is also an avid shooter.

236.   Mr. McKee normally hones his abilities at a local gun range.

237.   Mr. McKee's local gun range is closed as a result of the Proclamation.

238.   Mr. McKee normally purchases gun parts and ammunition at his local gun shop.

239.   Mr. McKee's local gun shop is closed as a result of the Proclamation.

240.   But for the Proclamation, Mr. McKee would be free to exercise his Second Amendment right to bear arms.

241.   Mr. McKee is deprived of his Second Amendment right to bear arms due to the Proclamation.

242.   Mr. McKee also normally attends church in Washington state.

243.   Mr. McKee's church is closed as a result of the Proclamation.

244.   But for the Proclamation, Mr. McKee's church would be open.

245.   Mr. McKee is deprived of the ability to worship at church due to the Proclamation.

246.   Mr. McKee is also deprived of the fellowship he normally enjoys at church due to the Proclamation.

247.   Mr. McKee also has family, friends, and coworkers in Washington state.

248.   Mr. McKee normally socializes with his family, friends, and coworkers on a regular basis.

249.   Social events have been banned as a result of the Proclamation.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

250. But for the Proclamation, Mr. McKee would be socializing regularly with his family, friends, and coworkers.

251. Mr. McKee is deprived of the ability to socialize with his family, friends, and coworkers due to the Proclamation.

252. Mr. McKee thereby has been harmed and is still being harmed by the Proclamation.

### 6. Lee Pfluger

253. Mr. Pfluger is the CEO of Building North Central Washington ("BNCW").

254. BNCW is a construction company doing business in Washington state.

255. BNCW normally takes on many construction jobs in Washington state.

256. BNCW is unable to take on many construction jobs as a result of the Proclamation.

257. But for the Proclamation, BNCW would take on these construction jobs.

258. Because of the inability to take on construction jobs, BNCW has suffered a severe loss of business.

259. Because of the loss of business, BNCW has been forced to sharply reduce the number of hours that its employees work.

260. Mr. Pfluger has had his hours reduced to 20 per week.

261. Mr. Plfuger has suffered significant loss of individual income due to having his hours reduced.

262. Because of the loss of business, BNCW has also suffered a severe loss of income.

263. Because of the loss of income, BNCW's operating account has been reduced from approximately $60,000 to under $10,000.

264. As CEO of BNCW, Mr. Pfluger has an interest in the financial health of the company.

265. Mr. Pfluger also normally attends church in Washington state.

266. Mr. Pfluger's church is closed as a result of the Proclamation.

267. But for the Proclamation, Mr. Pfluger's church would be open.

268. Mr. Pfluger is deprived of the ability to worship at church due to the Proclamation.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

269.   Mr. Pfluger is also deprived of the fellowship he normally enjoys at church due to the Proclamation.

270.   Mr. Pfluger thereby has been harmed and is still being harmed by the Proclamation.

**7.   Fran Wills**

271.   Ms. Wills lives in Washington state.

272.   Ms. Wills suffers from secondary progressive multiple sclerosis, a continual decline in nervous function.

273.   Ms. Wills' multiple sclerosis has gotten worse over recent years: for example, she has gone from being able to use a cane to being forced to use a walker.

274.   Ms. Wills is also seventy years old.

275.   As a result of her multiple sclerosis and the general infirmity that comes with her age, Ms. Wills has extreme difficulty exercising normally.

276.   Like many seniors, and like many people with multiple sclerosis, Ms. Wills also does not get much incidental muscle stimulation.

277.   Failure to get either regular exercise or regular incidental muscle stimulation can cause severe muscle atrophy.

278.   Muscle atrophy, in turn, can seriously worsen the effects of multiple sclerosis.

279.   Because Ms. Wills, as a septuagenarian with multiple sclerosis, does not get much incidental muscle stimulation, she must exercise regularly in order to avoid severe muscle atrophy and worsening of her multiple sclerosis.

280.   Like many people who have extreme difficulty exercising normally, Ms. Wills relies on aquatic exercise in order to avoid severe muscle atrophy and worsening of her multiple sclerosis.

281.   Since 2014, Ms. Wills has participated in the "Water Fit" aquatic exercise program at an athletic club, on a thrice-weekly basis.

282.   The athletic club has been shut down since March 13, 2020, due to the Proclamation.

283.   But for the Proclamation, it would be open.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

284. Ms. Wills has already suffered accelerated muscle atrophy during the time of the shutdown, as a result of the Proclamation.

285. Ms. Wills will continue to suffer accelerated muscle atrophy for as long as the shutdown persists, as a result of the Proclamation.

286. Although Ms. Wills's Water Fit classes are effective at slowing her muscle atrophy, they cannot reverse atrophy that has already occurred for a person in Ms. Wills's condition.

287. The muscle atrophy that Ms. Wills has suffered as a result of the Proclamation is most likely permanent.

288. The muscle atrophy that Ms. Wills will continue to suffer as a result of the Proclamation will most likely be permanent as well.

289. Because of her already serious infirmity, Ms. Wills faces a significant risk of losing her ability to walk if her muscles atrophy any further.

290. Ms. Wills faces a significant risk of permanently losing her ability to walk as a result of the Proclamation.

291. Because of her already serious infirmity, Ms. Wills's also faces a significant risk of death due to multiple sclerosis complications if her muscles atrophy any further.

292. Ms. Wills faces a significant increased risk of earlier death as a result of the Proclamation.

293. Ms. Wills also has difficulty performing many basic household tasks as a result of her multiple sclerosis and muscle atrophy.

294. These tasks become more difficulty as her multiple sclerosis and muscle atrophy progress.

295. Ms. Wills faces a significant risk of becoming incapable of performing basic household tasks due to the Proclamation.

296. Normally, Ms. Wills socializes with other students in her Water Fit classes, dines out with friends, visits with relatives who live in the area, sees movies with other people, plays poker at the local casino, and goes to the mall.

297. Every single one of the activities on which Ms. Wills relies for her human interaction has been banned by the Proclamation.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

298. Ms. Wills has been deprived of virtually all human contact as a result of the Proclamation.

299. But for the Proclamation, Ms. Wills would be participating in her normal, active social life.

300. Ms. Wills has suffered and is still suffering significant injury to her emotional and psychological health as well as her physical health from the isolation as a result of the Proclamation.

301. Ms. Wills thereby has been harmed and is still being harmed by the Proclamation.

### 8. Bruce Russell

302. Bruce Russell owns and operates Lake Bowl.

303. For over 60 years and 3 generations of working family members, Lake Bowl has successfully and steadily grown its business.

304. It started from a small bowling center and snack bar in 1957 to a business that now includes the bowling center with a 250 seat full service restaurant and tap house, a Washington state enhanced card room, 4 redemption arcades across the state, a 60 room hotel, and a 7500 barrel Microbrewery that retails product across Washington state.

305. Due to the forced closures by the Governor due to COVID-19, all of Lake Bowl's businesses have been severely impacted.

306. Russell has had to furlough over 100 employees.

307. He has lost more than 95% of business income throughout this period.

308. Aside from current losses, he also anticipates that business won't "get back to normal" under the reopening phases proposed by Governor Inslee for several months, if at all.

309. Never in history have Lake Bowl and the Russells faced such financial hardship.

310. Now he has learned that Tribal casinos (including their restaurants, spas, and retail shops) in Washington are opening their doors several weeks before many Washington businesses, including Lake Bowl, are able to open under theirs under the Governor's plan.

311. Furthermore, Russell and his family has not been able to attend church services which have been restricted due to the lockdown.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

312.    Now, people will be able to congregate in large crowds to entertain themselves at a competitor business just down the road, while Lake Bowl will continue to be shuttered and Mr. Russell and his family cannot go to church.

313.    Mr. Russell is harmed by the Proclamations.

## V.    Causes Of Action

314.    The allegations of the previous paragraphs are incorporated as if fully set forth in each of the following Counts and Causes of Action.

### A.    Count I: Declaratory Relief That The Proclamations Infringe The First Amendment Right To Free Exercise Of Religion.

315.    By issuing and enforcing the Proclamations, Inslee has infringed the first amendment rights of Plaintiffs to free exercise of religion.

### B.    Count II: Declaratory Relief That Proclamations Infringe The First Amendment Right To Peaceable Assembly.

316.    By issuing and enforcing the Proclamations, Inslee has infringed the first amendment rights of Plaintiffs to assembly peacably.

### C.    Count III: Declaratory Relief That Proclamations Infringe The Fifth Amendment Right To Liberty, Which Has Been Deprived Of Plaintiffs Without Due Process Of Law.

317.    By issuing and enforcing the Proclamations, Inslee has infringed the fifth amendment rights of Plaintiffs to liberty, and done so without due process of law.

### D.    Count IV: Declaratory Relief That Proclamations Infringe The Constitutional Right Of People To Work For A Living.

318.    By issuing and enforcing the Proclamations, Inslee has infringed the rights of Plaintiffs to work for a living.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

**E.     Count V: Declaratory Relief That Proclamations Deprive Citizens Of Property Without Due Process Of Law.**

319.    By issuing and enforcing the Proclamations, Inslee has deprived the Plaintiffs of property without due process of law.

**F.     Count VI: Violation of Civil Rights (42 U.S.C. § 1983).**

320.    Inslee has stated his intention to enforce the Proclamations, including continuing to bar activities described above that each Plaintiff desires to engage in.

321.    In doing so, Inslee will act under color of state law.

322.    The enforcement of the Proclamations will deprive Plaintiffs of civil rights guaranteed by the First and Fifth Amendments to the United States Constitution, as applied to states by the Fourteenth Amendment to the United States Constitution.

**G.     Count VII: Constitutionality of State Statutes**

323.    RCW 43.060210 and RCW 43.06.220 are unconstitutional to the extent they allow Inslee to infringe civil rights and civil liberties without any review, on the simple basis that he alone elects to assert the existence of an emergency, whether or not the facts demonstrate that such an emergency exists.

**H.     Count VIII: Injunctive Relief**

324.    Plaintiffs have suffered, and in the absence of injunctive relief, will continue to suffer the deprivation of Constitutional rights.

325.    Plaintiffs do not have an adequate remedy at law.

## VI.   JURY DEMAND

326.    Plaintiffs demand a trial by jury of all issues so triable.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

327.    A declaration that the Proclamations are unconstitutional;

328.    An order enjoining Inslee, and anyone acting on his behalf or in concert with him, from enforcing the Proclamations;

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

329.    Plaintiffs' costs and attorneys' fees; and

330.    Such other and further relief as the court shall deem just and appropriate.

///

///

///

May 5, 2020.

ARD LAW GROUP PLLC                          ALBRECHT LAW PLLC

BY:                                         BY:
JOEL B. ARD, WSBA # 40104                   DAVID K. DEWOLF, WSBA #10875
P.O. Box 11633                              421 W. RIVERSIDE AVE., STE. 614
BAINBRIDGE ISLAND, WA 98110                 SPOKANE, WA 99201
(206) 701-9243                              (509) 495-1246
ATTORNEYS FOR PLAINTIFFS                    ATTORNEYS FOR PLAINTIFFS

MACEWEN V. INSLEE COMPLAINT - 28
No. 3:20-cv-05423

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243