UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DREW MACEWEN, ANDREW BARKIS,
CHRIS CORRY, BRANDON VICK, KELLY
CHAMBERS, PHIL FORTUNATO,
MICHAEL MCKEE, FRAN WILLS, BRUCE
RUSSELL, DAVE MCMULLAN, AND ISAAC
VELLEKAMP,

               *Plaintiffs*,

    v.

JAY INSLEE, in his official capacity as the
Governor of Washington,

               *Defendant*.

No. 3:20-cv-05423-BHS

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF

JURY DEMAND

## I.   INTRODUCTION

1.  In late 2019 or early 2020, a novel viral infection began circulating in Washington. The first hint of problems came in early 2020, when dozens of residents of two nursing homes in King County fell sick and died, and were confirmed to have been infected with COVID-19, then running rampant in Hubei province, China.

2.  Available evidence and modeling suggested a potential disaster: the virus spread by aerosol, quickly, and resulted in so many serious illnesses that the state's hospital capacity would soon be overwhelmed.

3.  Models suggested that within weeks, even with social distancing, Washington state would run out of hospital beds, ICU beds, and ventilators.

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

4. People who contracted COVID-19—or had other pressing medical needs—would die from lack of access to care, whereas they would have survived if only we could save the hospital system.

5. Many measures were implemented to avert this budding crisis. The U.S. Army built a field hospital at a sports stadium in downtown Seattle; health care workers mobilized; businesses began mandating work-at-home for workers whenever possible. Downtown Seattle became a ghost town.

6. Before long, in response to the predicted disaster, Governor Inslee began issuing Proclamations mandating ever tighter controls on movement and gathering. Washington pulled together to "flatten the curve."

7. The goal of these constraints—voluntary and mandated—was to spread the rate of infection, illness, and death out over time. Experts in epidemiology cautioned that the virus' spread was not really controllable, and the most we could hope for was to slow the rate.

8. This way, while the same number of people would eventually get infected, get sick, or get very sick, fewer would die *from lack of access to medical care*.

9. In other words, with a limited stock of hospital beds, ICU beds, and ventilators, and knowing that more people would need them than was available, the only course of action was to take drastic steps to ensure the need was spread over time, instead of everyone needing the same beds at the same time.

10. Based on available estimates of viral spread rates, severity of illness, percentage of infected who needed hospitalization, length of hospital stays, and need for ventilators, a looming threat was identified.

11. The Governor's "Stay Home, Stay Healthy" order, issued on March 23, 2020, was intended to eliminate that threat to public order by slowing the spread of disease.

12. Over the weeks since the state has imposed limits on its citizens' Constitutional rights, more and more data have emerged regarding COVID-19. It has been almost unabated good news.

13. Far fewer infected people need major medical intervention than expected at the outset.

MacEwen v. Inslee FAC - 2
No. 3:20-cv-05423

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

14. The rate of spread has slowed beyond even early predictions of transmission under "social distancing."

15. Ventilators, far from being in short supply in Washington, became a surplus. We were fortunate to be able to send 500 to New York, where the disease spread far more rapidly in the cramped city, with its extreme reliance on public transportation.

16. The Army field hospital was dismantled without ever being used.

17. More good news emerged. Testing and study around the world developed treatment protocols for those severely affected.

18. Among other things, many physicians urged far less use of mechanical ventilators than initially suggested.

19. This greatly reduces the potential threat to Washington's health care system of a lack of capacity of ventilators.

20. Yet more good news emerged. Testing has repeatedly revealed that far more people have been infected—but were completely asymptomatic—than initially assumed possible.

21. While it remains possible that an asymptomatic infection does not result in immunity, this nonetheless shows that the ratio of infections to cases, the ratio of infections to severe cases, and the ratio of infections to cases requiring hospitalization, are all lower than initially feared.

22. The predictive models have adopted these new facts—and they reveal yet more good news. It appears that the feared threat to Washington's hospital system, of being overwhelmed by people suffering from COVID-19, is gone.

23. More good news: there have been far fewer COVID-19 deaths in Washington than any early model predicted.

24. More good news: as of May 14, 2020, there have been ZERO deaths in Washington from COVID-19 of people under age 20.

25. In fact, as of May 14, 2020, 52% of the 975 deaths in Washington have been among people over age 80.

MacEwen v. Inslee FAC - 3
No. 3:20-cv-05423

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

26. Further, as of the May 12, 2020 IHME predictions, only 1,193 people in the state will die from COVID, with their predictive models ceasing as of August 4, 2020.

27. This is a significant drop from the peak claims from IHME, which asserted that as many as over 3,200 people would die even while the state remained on a complete lockdown.

28. It appears that Washington is like just about every other place: COVID-19, feared as a threat to the life and health of anyone in the state, turns out to be a selective killer, targeting the very old and infirm, those with serious other illnesses, and particularly those in nursing homes and other long-term care facilities.

29. Unfortunately, the Washington Department of Health has, to date, withheld from the public the most relevant data. It only publicized the overwhelmingly high percentage of nursing home deaths after the filing of this lawsuit.

30. The DOH, unlike departments of health in other states that practice transparency in government, has not disclosed the exact ages of decedents. Among those Washington counties which have done so, it is clear the median age is well above 80. And DOH, unlike county health departments, makes no statement on comorbidities, an important fact for understanding the actual threat of COVID-19, and the government interest addressed by countermeasures.

31. Governor Inslee has made, and continues to make, grave impositions on the civil liberties of residents on the purported claim that blocking productive work, dining at restaurants, praying at church services, gathering for weddings and funerals, enjoying the conviviality of backyard barbecues, and limiting practically basic human activity is the least restrictive means available to satisfy the government interest in preventing more nursing home deaths from COVID-19.

32. The Governor appears uninterested in ensuring that the public knows that the health problem the state faces due to COVID-19 is a crisis of the very elderly, infirm, ailing population— primarily residents of those very nursing homes that the DOH leaves struggling to secure basic personal protective equipment and COVID-19 tests for residents and staff.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

33. What we have learned, despite the state DOH, over the course of the last month and a half is this: COVID-19 presents a statistically insignificant threat to the health of children, young adults, and healthy adults of middle and even slightly advanced age.

34. It spreads with many, many asymptomatic cases.

35. In nursing homes, and among Washingtonians with preexisting illnesses, it can be a devastating and lethal disease.

36. Unfortunately, the Department of Health has clouded the issue, while failing for weeks to protect the vulnerable populations in Washington.

37. Today, we know far more than we knew in early March about COVID-19. We know that the emergency has been averted. We know that the threat to vulnerable populations remains. We know that there is no longer an emergency in the State.

38. That should be viewed as great news: we can address the vulnerable population with targeted measures. We can declare victory.

39. Unfortunately, the Governor insists that he, and he alone, can determine whether an emergency exists. He claims that it's an emergency if he says it's an emergency, and that no one—not the legislature, and not the courts—can gainsay him. He claims that the emergency can continue as long as he thinks it continues, and no one but he can say otherwise.

40. The Governor has assumed the sole power to determine whether a person in Washington can worship, can peaceably assemble, can work, can build needed housing, can offer living space for rent, can engage in any activity.

41. But the facts, and the science, are clear: when the entirety of public knowledge is examined, there is no public disorder or threat to public order in the State of Washington. The governor's claim to the contrary is demonstrably false.

42. The State was slow in its initial response to COVID-19 in nursing homes, but the hospitals turned their expertise over to helping staunch the infection in those vulnerable spaces. We have learned best practices for keeping those spaces as safe as possible in light of the serious health needs of the residents.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

43. While our older and sicker relatives remain at greater risk, we now know that the emergency has been contained.

44. Yet, while COVID continues to threaten nursing homes, the DOH will not focus ongoing testing on nursing home staff and residents.

45. While tests for active infections are in short supply in Washington, the Governor has proposed a massive, privacy-invading track and trace scheme that wastes valuable COVID-19 tests on perfectly healthy—and perhaps even uninfected—people, those who face nearly no risk of any serious consequence from infection, namely, the entire general public.

46. In doing so, he continues to deny access to much-needed tests from nursing home staff, who deal daily with the highest risk population in the state.

47. The Governor's unnecessary invasion of the privacy of state residents who simply wish to dine at restaurants has no rational relationship to preserving the life and health of people actually at risk from COVID-19.

48. Worse yet, as a result of the Proclamations, many residents of Washington are unable to secure desperately needed medical care, often deemed "elective" and barred by the Proclamations.

49. Hospitals, far from overwhelmed, are suffering from lack of revenue.

50. Residents of the state are forced to forego or delay medical attention, gravely harming their health, sometimes irreparably.

51. Hospitals are forced to lay off skilled staff, lose revenue, and are being put under enormous financial strain, all because the success of limiting COVID-19 spread has not moved the governor to end the shutdown and lift the state of emergency.

52. While the governor says otherwise, the facts don't lie, and the Constitution does not authorize him to maintain infringements on Constitutionally guaranteed civil liberties on his mere say-so, with no avenue of review or redress.

53. Judicial review of the governor's claim of emergency must be available. Without review, a legitimate statute designed with flexibility to allow quick response to true emergent threats

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

becomes a tool for long-term imposition on Constitutionally guaranteed civil liberties from the mere whim of the state's executive.

## II.   JURISDICTION AND VENUE

54. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the suit arises under the Fifth and Fourteenth Amendments to the United States Constitution.

55. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1343 because the suit arises under the Civil Rights Act of 1871, 42 U.S.C. § 1983, to redress the deprivation, under color of state law, of rights, privileges, and immunities secured to Plaintiffs by the Fifth and Fourteenth Amendments to the U.S. Constitution.

56. Under 28 U.S.C. § 1367 this Court has supplemental jurisdiction over any claims stated in this Complaint that arise under state law but are so related to the federal claims as to form part of the same case or controversy.

57. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and LCR 3(e), and intra-district assignment to the Tacoma Division is proper because a substantial part of the events and omissions that give rise to Plaintiffs' claims arose in this judicial district and division, and at least Plaintiff MacEwen lives in this judicial district and division.

## III.   PARTIES

58. Plaintiff Drew MacEwen is a resident of Mason County Washington, and elected state representative for the 35th Legislative District. He has directly suffered harm due to the challenged Proclamations, and continues to suffer such harm. He will suffer harm until the Proclamations are voided.

59. Plaintiff Andrew Barkis is a resident of Thurston County Washington, and elected state representative for the 2d Legislative District. He has directly suffered harm due to the challenged Proclamations, and continues to suffer such harm. He will suffer harm until the Proclamations are voided.

60. Plaintiff Chris Corry is a resident of Yakima County Washington, and elected state representative for the 14th Legislative District. He has directly suffered harm due to the

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

challenged Proclamations, and continues to suffer such harm. He will suffer harm until the Proclamations are voided.

61. Plaintiff Brandon Vick is a resident of Clark County, Washington, and elected state representative for the 18th Legislative District. He has directly suffered harm due to the challenged Proclamations, and continues to suffer such harm. He will suffer harm until the Proclamations are voided.

62. Plaintiff Kelly Chambers is a resident of Pierce County, Washington, and elected state representative for the 25th Legislative District. She has directly suffered harm due to the challenged Proclamations, and continues to suffer such harm. She will suffer harm until the Proclamations are voided.

63. Plaintiff Phil Fortunato is a resident of King County, Washington, and elected state senator for the 31st Legislative District. He has directly suffered harm due to the challenged Proclamations, and continues to suffer such harm. He will suffer harm until the Proclamations are voided.

64. Plaintiff Michael McKee is a resident of Washington. He has directly suffered harm due to the challenged Proclamations, and continues to suffer such harm. He will suffer harm until the Proclamations are voided.

65. Plaintiff Fran Wills is a resident of Washington. She has directly suffered harm due to the challenged Proclamations, and continues to suffer such harm. She will suffer harm until the Proclamations are voided.

66. Plaintiff Bruce Russell is a resident of Washington. He has directly suffered harm due to the challenged Proclamations, and continues to suffer such harm. He will suffer harm until the Proclamations are voided.

67. Plaintiff Dave McMullan is a resident of Washington. He has directly suffered harm due to the challenged Proclamations, and continues to suffer such harm. He will suffer harm until the Proclamations are voided.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

68. Plaintiff Isaac Vellekamp is a resident of Washington. He has directly suffered harm due to the challenged Proclamations, and continues to suffer such harm. He will suffer harm until the Proclamations are voided.

## IV.    FACT ALLEGATIONS

### A.    Relevant Public Health Data

#### 1.    Washington State Generally

69. In determining whether there exists a state of emergency in Washington, and whether the infringement on civil liberties is addressed in ways that remedy that state of emergency, it is imperative to review the facts about relevant conditions in the state.

70. As of May 14, 2020, 975 people have died of COVID-19 in the State of Washington.[1]

71. Of those, 52% are over age 80; 91% over age 60. Exactly zero are under age 20.

72. Furthermore, as detailed below, while the state DOH has only grudgingly released relevant data, and done so in a manner designed to cloud the true problem posed by COVID-19, county health department data make explicit that COVID-19 poses a health threat to the very old, the very sick, and residents of long term care facilities (who are often both old and sick).

73. The few people in Washington who pose a risk to the health of others if infected with COVID-19 are those front-line health care workers who spend every day working to protect the lives and health of those at risk of dying: medical and assistant staff at long term care facilities, and those who otherwise serve the vulnerable population.

74. The vast majority of people in Washington face minimal personal risk from COVID-19, and present virtually no threat to the health of others, for the simple reason that only a few important and readily identifiable health care workers routinely interact with the at-risk older population.

---

[1] Washington State Department of Health, COVID-19 in Washington State, Cumulative Confirmed Cases and Deaths, https://www.doh.wa.gov/Emergencies/NovelCoronavirusOutbreak2020COVID19/DataDashboard , (last visited May 14, 2020).

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

75. It is undoubtedly true that more people will contract COVID-19—after all, it transmits by aerosol and there is no vaccine.

76. But whether or not the possibility that healthy people might fall ill and readily recover constitutes a state wide emergency justifying infringements on the civil liberties of all residents must be evaluated by, among other things, comparison to the similar status of normal public health issues in the state each year.

77. If the usage of health care resources in 2020 is roughly identical to past years, then any year is an emergency. If the death rate in 2020 is roughly identical to past years, then any year is an emergency. If the threat to public health posed by COVID-19 is not extremely dissimilar than other threats to public health that regularly arise in the state, then "emergency" ceases to have meaning other than simply "Governor's fiat."

78. Thus, it is relevant to see, for example, that in 2018, 56,913 people died in the State of Washington; 988 died of Influenza and Pneumonia, the ninth leading cause of death in Washington.[2]

79. In 2017, 57,012 people died in the State of Washington; 1,037 died of Influenza and Pneumonia, the ninth leading cause of death in Washington.[3]

80. In 2016, 54,748 people died in the State of Washington; 809 died of Influenza and Pneumonia, the tenth leading cause of death in Washington.[4]

81. Whether or not a state of emergency exists across the entire state of Washington, among all residents and people, requiring impositions on the civil liberties of everyone in the state, must depend on the actual nature of the asserted emergency.

---

[2] Washington State Department of Health, Washington State Vital Statistics, DOH 422-099. (2018), https://www.doh.wa.gov/Portals/1/Documents/Pubs/422-099-2018-2010-VitalStatHighlights.pdf

[3] Washington State Department of Health, Washington State Vital Statistics, DOH 422-099. (2017),https://www.doh.wa.gov/Portals/1/Documents/Pubs/422-099-2018-2010-VitalStatHighlights.pdf

[4] Washington State Department of Health, Washington State Vital Statistics, DOH 422-099. (2016),https://www.doh.wa.gov/Portals/1/Documents/Pubs/422-099-2018-2010-VitalStatHighlights.pdf.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

82. If any emergency is confined to certain small subsets of the population, the Governor's statewide edict cannot be justified.

83. After this lawsuit was filed, the Washington State Department of Health finally released data showing that over 60% of COVID-19 deaths were among residents of nursing homes or long-term care facilities.

84. While many county health departments continue to release data on comorbidities, showing that deaths are overwhelmingly concentrated among people with serious additional illnesses, the state insists that gathering and reporting that data statewide is too difficult.

85. For example, as of May 13, 2020, Chelan and Grant Counties together had seen 7 deaths from COVID-19, with a median age of 91.

86. Chelan and Grant Counties reported other unsurprising statistics: "So far there have been seven deaths among residents of our counties, all with advanced age and/or significant comorbidities . . ."

87. It also identified a recent cluster of confirmed cases, noting that "Almost all of the positive cases in this cluster were asymptomatic at the time of testing, and all have since returned to work."

88. This is the very kind of good news about COVID-19 that the state Department of Health and governor work assiduously to hide from the public eye.

89. Grant and Chelan counties, as of May 13, 2020, show death rates similar to other counties in Washington: 0.004% of the combined population has died of COVID-19.

90. Those unfortunate deaths struck seven people with a median age of over 90 years old.

91. Many also had "significant comorbidities."

92. As another example, as of May 14, King County has reported a total of 518 deaths from COVID.

93. Of these 518 deaths, 321 (approximately 62%) have been residents of nursing homes.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

94. A total of just 191 people who are not residents of nursing homes have died of COVID-19 in King County as of May 14.[5]

95. Similarly, in Pierce County, as of May 14, 95% of all the 68 in-county COVID-19 deaths were of people with underlying health conditions. 43% were people over 80. Over 75% were over 70. 60% of all deaths were of people who lived or worked in a care facility.[6]

96. Pierce County, like Chelan-Grant County, reports the comorbidity date for COVID-19 deaths, demonstrating that even in a large, more urban, and harder-hit county, COVID-19 threatens older, ailing residents, primarily of nursing homes.

97. Yakima County, too, releases data showing that COVID-19 does not pose a state-wide, general emergency for all. It reported 69 deaths as of May 14, 2020; 31 of those (45%) were over age 80; 74% were over 60. 66 of them, or 96%, had underlying health conditions.[7]

98. Again, the state Department of Health insists it is too difficult to properly amass and report comorbidity information that every local heath district has at its fingertips and many make available on the internet.

99. In Clark County, 21 of 24 deaths, or over 87%, were over age 70; 67% over age 80.

100.   Snohomish County, unlike the state Department of Health, reports comorbidities for COVID-19 deaths.[8] As of May 14, 2020, 122 people had died in Snohomish County, of which 115 had underlying conditions: 94%!

101.   Snohomish, like the rest of the state, has COVID-19 deaths overwhelmingly focused among the aged and long-term care residents: 45.9% over age 80; 75% over age 70.

102.   Notably, while many county health departments report age breakdowns by decade, demonstrating that the risk of COVID-19 is overwhelmingly focused on those over 70, the state

---

[5] https://www.kingcounty.gov/depts/health/covid-19/data/LTCF.aspx

[6] https://www.tpchd.org/healthy-people/diseases/covid-19-pierce-county-cases/

[7] https://www.yakimacounty.us/2404/Data-Summary

[8] https://www.snohd.org/499/COVID-19-Case-Count-Info

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Department of Health attempts to cloud that fact by reporting in twenty-year blocks, artificially skewing the perception of risk to a lower age group.

103.   County health department data makes plain that the threat posed by COVID-19 in Washington is almost exclusively confined to long term care facilities, and to elderly, sick residents of the state.

104.   Emerging medical consensus tracks the lack of any COVID-19 deaths among children and youth in Washington.

105.   Study after study has confirmed that there is practically no threat to youth and children from COVID-19, that they have extremely low risk of transmission to adults, and when symptomatic, have generally very mild symptoms.[9]

106.   As Dr. Anthony Fauci has said, describing the lack of any data to support excluding children from normal activities:

"One interesting feature of this novel coronavirus pandemic is that very few children have become sick with COVID-19 compared to adults," said NIAID Director Anthony S. Fauci, M.D. "Is this because children are resistant to infection with SARS-CoV-2, or because they are infected but do not develop symptoms? The HEROS study will help us begin to answer these and other key questions."[10]

107.   If COVID-19, as a matter of fact, poses little to no threat to children and young adults, while those same people also pose little to no threat to themselves or others, there cannot be a state of emergency justifying impositions on their civil liberties.

108.   If, in fact, COVID-19 illnesses and deaths are almost exclusively confined to those who are older or have serious existing illnesses, there cannot be a state of emergency justifying impositions on the civil liberties of every other resident of the state of Washington.

109.   All evidence shows that the threat of COVID-19 is focused on long term care settings, and very old, already ailing residents.

---

[9] See, e.g., https://www.medrxiv.org/content/10.1101/2020.03.26.20044826v1; https://journals.lww.com/pidj/Fulltext/2020/05000/Coronavirus_Infections_in_Children_Including.1.aspx

[10] https://www.nih.gov/news-events/news-releases/study-determine-incidence-novel-coronavirus-infection-us-children-begins

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

110.    Yet the State's response has not only been overbroad, by locking down healthy and unthreatened people, it has also been slow and inadequate in those areas of greatest threat.

111. For example, in Pierce County, a few congregate care settings made up the bulk of concentrations of the positive cases.

112.    As hospitals and long-term care settings realized the problem, they shifted focus with hospitals attempting to help unprepared long-term care facilities. But personal protective equipment ("PPE") and testing has not followed.

113.    Nursing homes, rehab facilities and adult family homes still struggle to obtain the proper PPE they need to care for their residents.

114.    In some instances, the Department of Health has ordered a halt to testing of staff and residents at long-term care facilities for bureaucratic and paperwork related reasons, not in the interest of health of staff or residents.

115.    The DOH has found vendors to offer long-term care staff the needed training on dealing with COVID-19, but then decided to allow the vendor to charge the struggling facilities, instead of making the training available free as a matter of public health.

116.    The DOH has fallen woefully short in guidance for staff treating person in those at-risk setting so that they can take the most appropriate and effective precautions to care for residents.

117.    The state has also not disclosed which facilities have had outbreaks—a step many county health departments have now taken.

118.    Nor has the state prioritized testing of workers in the long term care settings—in fact, it has blocked private testing in at least one instance!

119.    Because workers in long-term care settings have the most direct contact with the highest-risk population in the state, testing them should be an imperative. Instead, the Governor has locked down the healthy population of the state while ignoring less restrictive solutions that could address the actual health risks.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

120.   Long term care works plainly have the greatest potential to spread COVID-19 from client to client or from client to home.

121.   In the face of a virus that poses an extreme risk to a narrow subset of the population, and one which is largely confined, immobile, and readily identifiable, there can not be, as a matter of fact, a state wide emergency.

122.   The Governor has asserted otherwise.

**B.   Proclamations**

**1.   Proclamation 20-25**

123.   Governor Inslee issued Proclamation 20-25 on March 23, 2020.

124.   Proclamation 20-25 cites RCW 43.06.220 as the law authorizing Governor Inslee to exercise his emergency powers in this manner.

125.   Proclamation 20-25 gives "the continued worldwide spread of COVID-19, its significant progression in Washington State, and the high risk it poses to our most vulnerable populations" as the rationale for this alleged exercise of Governor Inslee's emergency powers.

126.   Paragraph 4 of Proclamation 20-25 cites "at least 2,221 cases of COVID-19 in Washington State and, tragically, 110 deaths of Washingtonians associated with COVID-19."

127.   Paragraph 7 of Proclamation 20-25 describes the COVD-19 pandemic as "a public disaster affecting life, health, property or the public peace."

128.   Paragraph 8 of Proclamation 20-25 states:

[T]he Washington State Department of Health continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident[.]

129.   Paragraph 9 of Proclamation 20-25 states:

[T]he Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support the Department of Health and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with the Department of Health in assessing the impacts and long-term effects of the incident on Washington State and its people.

130.   Paragraph 10 of Proclamation 20-25 proclaims that the State of Emergency continues.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

131.  Paragraph 10 of Proclamation 20-25 also proclaims that "Proclamation 20-05 and all amendments thereto remain in effect as otherwise amended."

132.  Paragraph 10 of Proclamation 20-25 also proclaims that "Proclamations 20-05, 20-07, 20-11, 20-13, and 20-14 are amended and superseded by" Proclamation 20-25.

133.  Paragraph 10 of Proclamation 20-25 identifies "prohibit[s] all people in Washington State from leaving their homes or participating in social, spiritual and recreational gatherings of any kind regardless of the number of participants, and all non-essential businesses in Washington State from conducting business, within the limitations provided herein."

134.  Paragraph 5 of Proclamation 20-25 states:

WHEREAS, models predict that many hospitals in Washington State will reach capacity or become overwhelmed with COVID-19 patients within the next several weeks unless we substantially slow down the spread of COVID-19 throughout the state;

135.  The Governor's reasoning for issuing Proclamation 20-25 was that hospitals in Washington state could have become overwhelmed with COVID-19 patients within several weeks, according to models as of March 23, 2020.

136.  The potential overwhelming of hospital resources constituted the threat to public order that justified the exercise of the governor's emergency powers.

**2.  May 4, 2020 Proclamation**

137.  The threat identified in the previous paragraph faded. But Inslee continues on.

138.  On May 4, 2020, Inslee extended Proclamation 20-25 through May 31.

139.  The goal posts shifted drastically, as would be necessary to claim any continued emergency.

140.  With no threat to overwhelming hospitals, no threat to lack of beds or ICE space, no threat of a shortage of ventilators, Inslee instead cited "the continued worldwide spread of COVID-19, its significant progression in Washington State, and ***the high risk it poses to our most vulnerable populations*** . . ." (Emphasis added.)

141.  Inslee also cited that "through May 2, 2020, the Department of Health confirmed another 1,664 cases and 85 more deaths, for a total of 15,185 cases with 834 associated deaths, demonstrating the ongoing, present threat of this lethal disease . . ."

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

142.    Inslee made no attempt to inform the public about the percentage of deaths among the over-80 year old population, nor did he mention that over 90% of such deaths are among people over 60.

143.    Inslee did not remark on the fact that zero deaths were among young people, under 20.

144.    Inslee did claim that "In addition, modelers agree that fully relaxing social distancing measures will result in a sharp increase in the number of cases . . .".

145.    Inslee has never released any such model for public consideration.

146.    Inslee has never identified whether any such model asserts that deaths will rise among any group other than the most vulnerable population—sick, elderly people in long term care.

147.    Inslee makes no effort to identify whether any less restrictive measure would protect this group, while nonetheless allowing assembly, worship, and liberty for Washington.

148.    In fact, plaintiffs believe that Inslee's careful omission of even attempting to justify greater restrictions as opposed to lesser ones is because the threat is almost exclusively confined to certain vulnerable groups, and because the State can make ample protection measures available for them with targeted interventions, not a broad-brush approach favored by Inslee.

149.    Inslee has made no effort to inform the public whether fully relaxing social distancing measures will result in an overwhelmed hospital system.

150.    In fact, plaintiffs believe that Inslee's careful omission of this justification for his continued Proclamation is because no such threat exists.

151.    Inslee makes a nod toward the First Amendment when he asserts that "some [religious] services can be conducted in a manner similar to comparable secular activities to prevent prolonged exposure to individuals outside of their immediate household while ensuring safe social distancing and hygiene practices."

152.    In fact, any and all religious services that are "similar to comparable secular activities" can be performed with no greater threat to public health than secular activities.

153.    Indeed, any religious service in the state can be conducted with less threat to public health than the potential threat Inslee has allowed by deigning to permit certain casinos to open.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

154.    Mass gatherings of revelers at a casino pose at least the same threat to public health (meaning: nearly none) as would gathering for Mass at a Catholic church, or any other gathering of people to freely exercise their religion.

155.    By allowing certain casinos to open, while limiting the right of people to freely exercise religion, and doing so with no factual or scientific bases, Inslee's Proclamation demonstrates its unconstitutionality on its own terms.

156.    Inslee concludes that, of COVID-19, "its progression in Washington State continue to threaten the life and health of our people as well as the economy of Washington State, and remain a public disaster affecting life, health, property or the public peace . . ."

157.    This misstates the known facts.

158.    By now, it is well known that COVID-19 threatens the life and health of a subset of Washington that is uniquely at high risk and needs particular, focused attention to avoid infection and death.

159.    It is now known, and is a fact, that COVID-19 is not a threat to the life or health of nearly all the population of Washington State, nor the economy of Washington State.

160.    There remains no COVID-19 public disaster affecting life, health, property or the public peace.

161.    Inslee's omission of relevant facts, that show the threat of disaster and any actual disaster, has been resolved and no longer remains, cannot be used to justify his continued infringement of rights and liberties in Washington.

C.    **Harm To Each Plaintiff**

1.    **Drew MacEwen**

162.    Drew MacEwen owns two restaurants in Washington state.

163.    The first is Smokin Mo's.

164.    The second is the Dock Bar and Eatery.

165.    Both restaurants are limited to take out which severely limits operations and revenue, constraining the ability to pay obligations, as a result of the Proclamations.

MacEwen v. Inslee FAC - 18
No. 3:20-cv-05423

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

166.   But for the Proclamations, both restaurants would be fully open and operating.

167.   Mr. MacEwen is losing money every day due to the Proclamations.

168.   Mr. MacEwen thereby has been harmed and is still being harmed by the Proclamations.

       **2.**    **Andrew Barkis**

169.   Andrew Barkis is a Member of the Washington House of Representatives representing the 2nd Legislative District.

170.   Rep. Barkis owns Hometown Property Management, Inc. ("Hometown").

171.   Hometown is a property management company doing business in Washington state.

172.   Hometown's ordinary course of business sometimes involves evicting tenants, raising rent, charging late fees, serving compliance notices, and collecting debts.

173.   Hometown is now prohibited from evicting tenants as a result of the Proclamations for any reason.

174.   Hometown is also now restricted in its ability to raise rents, charge late fees, serve compliance notices, and collect debts as a result of the Proclamations.

175.   But for the Proclamations, Hometown could elect to raise rents, could charge late fees, could serve compliance notices, and collect debts, as it might elect to do in the ordinary course of business.

176.   After the pandemic passes, Hometown will also remain restricted in its ability to collect debts incurred during the pandemic, as a result of the Proclamations.

177.   But for the Proclamations, Hometown would collect more and larger shares of debts after the pandemic passes.

178.   Rep. Barkis is losing money every day due to the Proclamations.

179.   Rep. Barkis has suffered a 32% loss on Hometown's net revenue due to the Proclamations.

180.   Rep. Barkis has had to furlough almost 20% of Hometown's fulltime staff due to the Proclamations.

181.   Rep. Barkis has had to change the payroll schedule from salaried to hourly for almost an additional 20% of Hometown's fulltime staff due to the Proclamations.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

182.   Rep. Barkis has had to alter the entire structure of Hometown's core operating procedures due to the Proclamations.

183.   Rep. Barkis will not be able to recoup a great deal of the money lost due to the Proclamations because the Proclamation also restricts Hometown's ability to collect debt.

184.   Rep. Barkis thereby has been harmed, is still being harmed, and will continue to be harmed by the Proclamations.

### 3.   Chris Corry

185.   Chris Corry works as a salesman in Washington state.

186.   Mr. Corry normally meets with clients and potential clients in person as part of his business.

187.   Mr. Corry is prohibited from meeting with clients and potential clients in person as a result of the Proclamations.

188.   Many of Mr. Corry's clients and potential clients find remote meeting technology inadequate to their needs.

189.   Mr. Corry cannot make sales to his clients or potential clients without meeting with them.

190.   Mr. Corry is unable to make sales as a result of the Proclamations.

191.   But for the Proclamations, Mr. Corry would be able to make sales.

192.   Mr. Corry is losing money every day due to the Proclamations.

193.   Mr. Corry normally receives medical and dental care in Washington state.

194.   Mr. Corry's medical and dental health providers are closed as a result of the Proclamations.

195.   But for the Proclamations, Mr. Corry's medical and dental health providers would be open.

196.   Mr. Corry is deprived of medical and dental care due to the Proclamations.

197.   Mr. Corry's children also live in Washington state.

198.   Mr. Corry's children also normally receive medical and dental care in Washington state.

199.   Mr. Corry's children's medical and dental health providers are closed as a result of the Proclamations.

200.   But for the Proclamations, Mr. Corry's children's medical and dental health providers would be open.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

201.    Mr. Corry's children are deprived of medical and dental care due to the Proclamations.

202.    Mr. Corry's foster daughter wears dental braces.

203.    Mr. Corry's foster daughter's braces are currently faulty.

204.    Mr. Corry's foster daughter needs prompt dental attention in order to have her braces fixed.

205.    Getting his foster daughter's braces fixed is among the medical and dental care that Mr. Corry's children are unable to receive due to the Proclamations.

206.    Mr. Corry's foster daughter is forced to wear faulty dental braces due to the Proclamations.

207.    Mr. Corry's children normally attend school in Washington state.

208.    Mr. Corry's children's schools are closed as a result of the Proclamations.

209.    But for the Proclamations, Mr. Corry's children's schools would be open.

210.    Mr. Corry's children are deprived of the ability to attend school due to the Proclamations.

211.    The distance learning alternatives offered for Mr. Corry's children are wholly inadequate.

212.    Mr. Corry's children are functionally being deprived of an education due to the Proclamations.

213.    Mr. Corry's children also normally participate in sports and extramural activities in Washington state.

214.    Mr. Corry's children's sport and extramural activities are cancelled as a result of the Proclamations.

215.    But for the Proclamations, Mr. Corry's children's sport and extramural groups would be active.

216.    Mr. Corry's children are deprived of the ability to participate in sports and extramural activities due to the Proclamations.

217.    Mr. Corry normally attends church in Washington state.

218.    Mr. Corry and his fellow congregants are Bible-believing Christians who are compelled, as a matter of religious conscience, to "not forsak[e] the assembling of ourselves together" in physical, corporate worship. Hebrews 10:25 (KJV).

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

219.    Mr. Corry's church is closed as a result of the Proclamations.

220.    But for the Proclamations, Mr. Corry's church would be open.

221.    Mr. Corry is deprived of the ability to worship at church due to the Proclamations.

222.    Mr. Corry is moreover deprived of the ability to fulfil a critical religious obligation due to the Proclamations.

223.    Mr. Corry is also deprived of the fellowship he normally enjoys at church due to the Proclamations.

224.    Mr. Corry thereby has been harmed and is still being harmed by the Proclamations.

### 4.    Brandon Vick

225.    Brandon Vick lives in Washington state.

226.    Mr. Vick's daughter normally attends public school in Washington state.

227.    Mr. Vick's daughter also relies on her school to provide education supplies and educational resources aside from direct instruction.

228.    Mr. Vick's daughter's school is closed as a result of the Proclamations.

229.    But for the Proclamations, Mr. Vick's daughter would still be attending school.

230.    Mr. Vick's daughter is deprived of her ability to attend school due to the Proclamations.

231.    The school district has provided almost no avenues for Mr. Vick's daughter to continue meaningful interactions with a trained educator.

232.    The burden of educating Mr. Vick's daughter has been placed wholly upon his shoulders.

233.    Mr. Vick does not have any professional credentials as a formal educator, nor does he have any training in educating children.

234.    Mr. Vick's daughter is also deprived of educational supplies and educational resources aside from direct instruction due to the Proclamations.

235.    Mr. Vick's daughter is functionally being deprived of an education due to the Proclamations.

236.    Mr. Vick also normally relies on childcare for his children.

237.    Mr. Vick's childcare providers are closed as a result of the Proclamations.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

238.   But for the Proclamations, Mr. Vick would be placing his children in childcare while fulfils his other obligations.

239.   Mr. Vick is deprived of his ability to place his children in childcare due to the Proclamations.

240.   Mr. Vick is deprived of his ability to fulfil his other obligations due to the Proclamations.

241.   Mr. Vick also normally attends church in Washington state.

242.   Mr. Vick and his fellow congregants are Bible-believing Christians who are compelled, as a matter of religious conscience, to "not forsak[e] the assembling of ourselves together" in physical, corporate worship. Hebrews 10:25 (KJV).

243.   Mr. Vick's church is closed as a result of the Proclamations.

244.   But for the Proclamations, Mr. Vick's church would be open.

245.   Mr. Vick is deprived of the ability to worship at church due to the Proclamations.

246.   Mr. Vick is moreover deprived of the ability to fulfil a critical religious obligation due to the Proclamations.

247.   Mr. Vick is also deprived of the fellowship he normally enjoys at church due to the Proclamations.

248.   Mr. Vick also normally donates his time and services to events held by nonprofit organizations.

249.   The events held by nonprofit organizations to which Mr. Vick donates his time and services are cancelled as a result of the Proclamations.

250.   But for the Proclamations, Mr. Vick would be donating his time and services to the events held by nonprofit organizations.

251.   Mr. Vick is deprived of his ability to donate his time and services to events held by nonprofit organizations due to the Proclamations.

252.   Mr. Vick thereby has been harmed and is still being harmed by the Proclamations.

MacEwen v. Inslee FAC - 23
No. 3:20-cv-05423

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

### 5.    Kelly Chambers

253.    Kelly Chambers is a Member of the Washington House of Representatives representing the 25th Legislative District.

254.    Rep. Chambers owns Visiting Angels.

255.    Visiting Angels is a caregiver agency doing business in Washington state.

256.    Visiting Angels services seniors and disabled persons in both individual homes and congregate living facilities.

257.    Visiting Angels is deemed an essential service, and has continued operating during the shutdown.

258.    Visiting Angels' caregivers are required by the Proclamations to use PPE in their administration of long-term care.

259.    Visiting Angels normally keeps a stock of PPE on hand for its caregivers, but not enough to equip all its caregivers with PPE every single day during the present pandemic.

260.    Visiting Angels is in need of additional PPE in order to effectively carry out its mission as an essential service for seniors and disabled persons.

261.    Visiting Angels has requested PPE from the Thurston County Public Health and Social Services Department.

262.    Despite being an essential service working with the demographics most vulnerable to COVID-19, Visiting Angels has not received any PPE from Thurston County.

263.    In fact, Thurston County never even responded to Visiting Angels' request for PPE.

264.    Because Visiting Angels never received PPE from Thurston County, Visiting Angels ran out of disposable masks.

265.    Because Visiting Angels ran out of disposable masks, its staff were forced to make fabric masks out of pieces of cloth.

266.    Visiting Angels has also requested PPE from the Tacoma–Pierce County Health Department.

MacEwen v. Inslee FAC - 24
No. 3:20-cv-05423

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

267. Visiting Angels has received some PPE from Pierce County, but not enough to cover its needs during the present pandemic.

268. Visiting Angels needs to be able to test both its caregivers and clients.

269. Visiting Angels has not received any testing kits.

270. Because Visiting Angels has not received any testing kits, it has been unable to test its caregivers and clients for COVID-19.

271. Many caregivers also work in multiple client settings.

272. Washington State has not disclosed which long-term care facilities or caregiver agencies have experienced outbreaks.

273. Because Washington State has not disclosed which long-term care facilities or caregiver agencies have experienced outbreaks, other long-term care facilities and caregiver agencies such as Visiting Angels do not know which of their caregivers have a high chance of transmitting COVID-19 from other environments.

274. Because Visiting Angels does not know which of its caregivers have a high chance of transmitting COVID-19 from other environments, and because Visiting Angels cannot test all its caregivers and clients for COVID-19, its caregivers must operate in an atmosphere of extreme uncertainty.

275. Visiting Angels' caregivers and clients are unable to be tested for COVID-19 except at a hospital or other medical facility, and only if they believe they may have already been exposed.

276. The Proclamations also require Visiting Angels' caregivers to undergo special training in how to prevent the spread of COVID-19.

277. Initially, the Washington State Department of Health paid for a private vendor to train long-term caregivers like Visiting Angels' staff in COVID-19 prevention.

278. However, Washington State has withdrawn its subsidization of the vendor's fees.

279. Because Washington State has withdrawn its subsidization of the vendor's fees, the vendor is now charging Visiting Angels and other caregiver agencies for COVID-19 prevention training.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

280. Visiting Angels must pay for the very training which the Proclamations have made it mandatory to undertake.

281. Additionally, many of Visiting Angels' clients live in long-term facilities which do not permit entry from outside caregivers as a result of the Proclamations.

282. Because Visiting Angels is unable to provide care to these clients, Visiting Angels is losing revenue due to the Proclamations.

283. Rep. Chambers thereby has been harmed and is still being harmed by the Proclamations.

### 6. Phil Fortunato

284. Phil Fortunato is Member of the Washington Senate representing the 31st Legislative District.

285. Sen. Fortunato owns Eco-3.

286. Eco-3 is an environmental compliance company doing business in Washington state.

287. Eco-3 normally services construction contractors in the private residential and commercial construction fields.

288. Private residential and commercial construction have been halted as a result of the Proclamations.

289. Private residential and commercial construction have been halted even though construction in other fields, such as low-income government housing and other government-preferred fields, is permitted to continue.

290. But for the Proclamations, Eco-3's clients would be continuing construction.

291. Because the majority of Eco-3's clients have been forced to halt work, there is no need for Eco-3's environmental compliance services.

292. Sen. Fortunato is losing money every day due to the Proclamations.

293. Eco-3's revenues have declined by over 80% due to the Proclamations.

294. Sen. Fortunato thereby has been harmed and is still being harmed by the Proclamations.

### 7. Michael McKee

295. Michael McKee owns a catering business in Washington state.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

296.    Mr. McKee's catering business normally services events such as weddings and business conferences.

297.    As a result of the Proclamations, most of the events that are normally serviced by Mr. McKee's catering business are cancelled.

298.    Because Mr. McKee's catering business has almost no remaining clients, it has been functionally bankrupted.

299.    Mr. McKee has been deprived of most of his income from his catering business.

300.    But for the Proclamations, Mr. McKee would still be earning a significant income from his catering business.

301.    Mr. McKee also owns a shop in Washington state.

302.    Mr. McKee's shop is still under construction.

303.    Mr. McKee is unable to finish constructing his shop as a result of the Proclamations.

304.    But for the Proclamations, Mr. McKee would be finishing the construction of his shop.

305.    Mr. McKee is also an avid shooter.

306.    Mr. McKee normally hones his abilities at a local gun range.

307.    Mr. McKee's local gun range is closed as a result of the Proclamations.

308.    Mr. McKee normally purchases gun parts and ammunition at his local gun shop.

309.    Mr. McKee's local gun shop is closed as a result of the Proclamations.

310.    But for the Proclamations, Mr. McKee would be free to exercise his Second Amendment right to bear arms.

311.    Mr. McKee is deprived of his Second Amendment right to bear arms due to the Proclamations.

312.    Mr. McKee also normally attends church in Washington state.

313.    Mr. McKee and his fellow congregants are Bible-believing Christians who are compelled, as a matter of religious conscience, to "not forsak[e] the assembling of ourselves together" in physical, corporate worship. Hebrews 10:25 (KJV).

314.    Mr. McKee's church is closed as a result of the Proclamations.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

315.    But for the Proclamations, Mr. McKee's church would be open.

316.    Mr. McKee is deprived of the ability to worship at church due to the Proclamations.

317.    Mr. McKee is moreover deprived of the ability to fulfil a critical religious obligation due to the Proclamations.

318.    Mr. McKee is also deprived of the fellowship he normally enjoys at church due to the Proclamations.

319.    Mr. McKee also has family, friends, and coworkers in Washington state.

320.    Mr. McKee normally socializes with his family, friends, and coworkers on a regular basis.

321.    Social events have been banned as a result of the Proclamations.

322.    But for the Proclamations, Mr. McKee would be socializing regularly with his family, friends, and coworkers.

323.    Mr. McKee is deprived of the ability to socialize with his family, friends, and coworkers due to the Proclamations.

324.    Mr. McKee thereby has been harmed and is still being harmed by the Proclamations.

### 8.    Fran Wills

325.    Fran Wills lives in Washington state.

326.    Ms. Wills suffers from secondary progressive multiple sclerosis, a continual decline in nervous function.

327.    Ms. Wills' multiple sclerosis has gotten worse over recent years: for example, she has gone from being able to use a cane to being forced to use a walker.

328.    Ms. Wills is also seventy years old.

329.    As a result of her multiple sclerosis and the general infirmity that comes with her age, Ms. Wills has extreme difficulty exercising normally.

330.    Like many seniors, and like many people with multiple sclerosis, Ms. Wills also does not get much incidental muscle stimulation.

331.    Failure to get either regular exercise or regular incidental muscle stimulation can cause severe muscle atrophy.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

332.   Muscle atrophy, in turn, can seriously worsen the effects of multiple sclerosis.

333.   Because Ms. Wills, as a septuagenarian with multiple sclerosis, does not get much incidental muscle stimulation, she must exercise regularly in order to avoid severe muscle atrophy and worsening of her multiple sclerosis.

334.   Like many people who have extreme difficulty exercising normally, Ms. Wills relies on aquatic exercise in order to avoid severe muscle atrophy and worsening of her multiple sclerosis.

335.   Since 2014, Ms. Wills has participated in the "Water Fit" aquatic exercise program at an athletic club, on a thrice-weekly basis.

336.   The athletic club has been shut down since March 13, 2020, due to the Proclamations.

337.   But for the Proclamations, it would be open.

338.   Ms. Wills has already suffered accelerated muscle atrophy during the time of the shutdown, as a result of the Proclamations.

339.   Ms. Wills will continue to suffer accelerated muscle atrophy for as long as the shutdown persists, as a result of the Proclamations.

340.   Although Ms. Wills's Water Fit classes are effective at slowing her muscle atrophy, they cannot reverse atrophy that has already occurred for a person in Ms. Wills's condition.

341.   The muscle atrophy that Ms. Wills has suffered as a result of the Proclamations is most likely permanent.

342.   The muscle atrophy that Ms. Wills will continue to suffer as a result of the Proclamations will most likely be permanent as well.

343.   Because of her already serious infirmity, Ms. Wills faces a significant risk of losing her ability to walk if her muscles atrophy any further.

344.   Ms. Wills faces a significant risk of permanently losing her ability to walk as a result of the Proclamations.

345.   Because of her already serious infirmity, Ms. Wills's also faces a significant risk of death due to multiple sclerosis complications if her muscles atrophy any further.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

346. Ms. Wills faces a significant increased risk of earlier death as a result of the Proclamations.

347. Ms. Wills also has difficulty performing many basic household tasks as a result of her multiple sclerosis and muscle atrophy.

348. These tasks become more difficulty as her multiple sclerosis and muscle atrophy progress.

349. Ms. Wills faces a significant risk of becoming incapable of performing basic household tasks due to the Proclamations.

350. Normally, Ms. Wills socializes with other students in her Water Fit classes, dines out with friends, visits with relatives who live in the area, sees movies with other people, plays poker at the local casino, and goes to the mall.

351. Every single one of the activities on which Ms. Wills relies for her human interaction has been banned by the Proclamations.

352. Ms. Wills has been deprived of virtually all human contact as a result of the Proclamations.

353. But for the Proclamations, Ms. Wills would be participating in her normal, active social life.

354. Ms. Wills has suffered and is still suffering significant injury to her emotional and psychological health as well as her physical health from the isolation as a result of the Proclamations.

355. Ms. Wills thereby has been harmed and is still being harmed by the Proclamations.

### 9. Bruce Russell

356. Bruce Russell owns and operates Lake Bowl.

357. For over 60 years and 3 generations of working family members, Lake Bowl has successfully and steadily grown its business.

358. It started from a small bowling center and snack bar in 1957 to a business that now includes the bowling center with a 250 seat full service restaurant and tap house, a Washington state enhanced card room, 4 redemption arcades across the state, a 60 room hotel, and a 7500 barrel Microbrewery that retails product across Washington state.

359. Due to the forced closures by the Governor due to COVID-19, all of Lake Bowl's businesses have been severely impacted.

MacEwen v. Inslee FAC - 30
No. 3:20-cv-05423

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

360.   Russell has had to furlough over 100 employees.

361.   He has lost more than 95% of business income throughout this period.

362.   Aside from current losses, he also anticipates that business won't "get back to normal" under the reopening phases proposed by Governor Inslee for several months, if at all.

363.   Never in history have Lake Bowl and the Russells faced such financial hardship.

364.   Now he has learned that Tribal casinos (including their restaurants, spas, and retail shops) in Washington are opening their doors several weeks before many Washington businesses, including Lake Bowl, are able to open under theirs under the Governor's plan.

365.   Furthermore, Russell and his family has not been able to attend church services which have been restricted due to the lockdown.

366.   Now, people will be able to congregate in large crowds to entertain themselves at a competitor business just down the road, while Lake Bowl will continue to be shuttered and Mr. Russell and his family cannot go to church.

367.   Mr. Russell thereby has been harmed and is still being harmed by the Proclamations.

### 10.   Dave McMullan

368.   David James McMullan lives in Washington state.

369.   Mr. McMullan normally attends church in Washington state.

370.   Mr. McMullan and his fellow congregants are Bible-believing Christians who are compelled, as a matter of religious conscience, to "not forsak[e] the assembling of ourselves together" in physical, corporate worship. Hebrews 10:25 (KJV).

371.   Mr. McMullan's church is closed as a result of the Proclamations.

372.   But for the Proclamations, Mr. McMullan's church would be open.

373.   Mr. McMullan is deprived of the ability to worship at church due to the Proclamations.

374.   Mr. McMullan is moreover deprived of the ability to fulfil a critical religious obligation due to the Proclamations.

375.   Mr. McMullan is also deprived of the fellowship he normally enjoys at church due to the Proclamations.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

376.   Mr. McMullan also works as an exterminator in Washington state.

377.   Although extermination is deemed an essential business by the Proclamations, the jobs of most of Mr. McMullan's clients are not.

378.   Most of Mr. McMullan's clients are prevented form working as a result of the Proclamations.

379.   Mr. McMullan's clients are no longer earning money, and can no longer afford to hire Mr. McMullan's services due to the Proclamations.

380.   But for the Proclamations, Mr. McMullan's clients would be hiring him for extermination.

381.   Mr. McMullan is losing money every day due to the Proclamations.

382.   Mr. McMullan has had to stop paying himself in order to afford his one employee's paycheck.

383.   Mr. McMullan thereby has been harmed and is still being harmed by the Proclamations.

### 11.   Isaac Vellekamp

384.   Isaac "Mike" Vellekamp is the owner of VNives, LLC.

385.   VNives is a manufacturer, importer, distributor, and retailer of knives and tools doing business in Washington state.

386.   VNives normally makes and sells safety tools and lifesaving emergency tools for government employees such as police, firemen, and first responders, all of whom are designated "essential workforce" by the Appendix to Proclamation 20-25.

387.   VNives also normally engraves medical devices for doctors and nurses, many of whom are also designated "essential workforce" by the Appendix to Proclamation 20-25.

388.   Despite this, VNives' application for its employees to be designated as "essential workforce" was denied.

389.   VNives is closed as a result of the Proclamations.

390.   VNives is closed as a result of the Proclamations even though it is fully capable of complying with relevant hygienic and social distancing requirements.

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

391. VNives is forced to cease selling lifesaving tools even though fast food restaurants, coffee shops, liquor stores, and marijuana dispensaries in Washington state are permitted to remain open.

392. But for the Proclamations, VNives would be selling lifesaving tools.

393. VNives applied for, and was denied, both Paycheck Protection Program and other Small Business Administration loans.

394. Because VNives was denied all loans, Mr. Vellekamp has been forced to continue paying VNives' employees out of his own pocket, at a time when the business is not producing any revenue.

395. Mr. Vellekamp is losing money every day due to the Proclamations.

396. Because Mr. Vellekamp has been forced to shut down VNives while continuing to pay VNives' employees, he has already lost $60,000.

397. Mr. Vellekamp thereby has been harmed and is still being harmed by the Proclamations.

## V.  CAUSES OF ACTION

398. The allegations of the previous paragraphs are incorporated as if fully set forth in each of the following Counts and Causes of Action.

### A.  Count I: Declaratory Relief That The Proclamations Infringe The First Amendment Right To Free Exercise Of Religion.

399. By issuing and enforcing the Proclamations, Inslee has infringed the first amendment rights of Plaintiffs to free exercise of religion.

### B.  Count II: Declaratory Relief That Proclamations Infringe The First Amendment Right To Peaceable Assembly.

400. By issuing and enforcing the Proclamations, Inslee has infringed the first amendment rights of Plaintiffs to assemble peaceably.

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

**C.      Count III: Declaratory Relief That Proclamations Infringe The Fifth Amendment Right To Liberty, Which Has Been Deprived Of Plaintiffs Without Due Process Of Law.**

401.    By issuing and enforcing the Proclamations, Inslee has infringed the fifth amendment rights of Plaintiffs to liberty, and done so without due process of law.

**D.      Count IV: Declaratory Relief That Proclamations Infringe The Constitutional Right Of People To Work For A Living.**

402.    By issuing and enforcing the Proclamations, Inslee has infringed the rights of Plaintiffs to work for a living.

**E.      Count V: Declaratory Relief That Proclamations Deprive Citizens Of Property Without Due Process Of Law.**

403.    By issuing and enforcing the Proclamations, Inslee has deprived the Plaintiffs of property without due process of law.

**F.      Count VI: Violation of Civil Rights (42 U.S.C. § 1983).**

404.    Inslee has stated his intention to enforce the Proclamations, including continuing to bar activities described above that each Plaintiff desires to engage in.

405.    In doing so, Inslee will act under color of state law.

406.    The enforcement of the Proclamations will deprive Plaintiffs of civil rights guaranteed by the First and Fifth Amendments to the United States Constitution, as applied to states by the Fourteenth Amendment to the United States Constitution.

**G.      Count VII: Constitutionality of State Statutes**

407.    RCW 43.060210 and RCW 43.06.220 are unconstitutional to the extent they allow Inslee to infringe civil rights and civil liberties without any review, on the simple basis that he alone elects to assert the existence of an emergency, whether or not the facts demonstrate that such an emergency exists.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

**H.      Count VIII: Injunctive Relief**

408.    Plaintiffs have suffered, and in the absence of injunctive relief, will continue to suffer the deprivation of Constitutional rights.

409.    Plaintiffs do not have an adequate remedy at law.

## VI.   Jury Demand

410.    Plaintiffs demand a trial by jury of all issues so triable.

## VII.   Prayer For Relief

Wherefore, Plaintiffs pray for the following relief:

411.    A declaration that the Proclamations are unconstitutional;

412.    An order enjoining Inslee, and anyone acting on his behalf or in concert with him, from enforcing the Proclamations;

413.    Plaintiffs' costs and attorneys' fees; and

414.    Such other and further relief as the court shall deem just and appropriate.

///

///

///

May 26, 2020.

Ard Law Group PLLC

By:

Joel B. Ard, WSBA # 40104
P.O. Box 11633
Bainbridge Island, WA 98110
(206) 701-9243
Attorneys for Plaintiffs

Albrecht Law PLLC

By:

David K. DeWolf, WSBA #10875
421 W. Riverside Ave., Ste. 614
Spokane, WA 99201
(509) 495-1246
Attorneys for Plaintiffs

MacEwen v. Inslee FAC - 35
No. 3:20-cv-05423

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1

### Certificate Of Service

2      I certify under penalty of perjury under the laws of the United States of America that on

3  May 26, 2020, I filed the foregoing First Amended Complaint in *MacEwen et al. v. Inslee*,

4  No. 3:20-cv-05423-BHS, with the Court's CM/ECF system, which will give notice to all parties

5  and counsel of record.

6                          Ard Law Group PLLC

7

8                      By

9

10                         Joel B. Ard, WSBA # 40104
                           P.O. Box 11633
11                         Bainbridge Island, WA 98110
                           (206) 701-9243
12                         Joel@Ard.law

13                         Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27