1

2

3

4

5

6

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DREW MACEWEN, ANDREW BARKIS,
CHRIS CORRY, BRANDON VICK, KELLY
CHAMBERS, PHIL FORTUNATO,
MICHAEL MCKEE, FRAN WILLS, BRUCE
RUSSELL, DAVE MCMULLAN, AND ISAAC
VELLEKAMP,

                    *Plaintiffs*,

     v.

JAY INSLEE, in his official capacity as the
Governor of Washington,

                    *Defendant.*

No. 3:20-cv-05423-BHS

MOTION FOR PRELIMINARY
INJUNCTION

NOTING DATE: JUNE 19, 2020

ORAL ARGUMENT REQUESTED

CAPTION - i
No. 3:20-cv-05423-BHS

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II. FACTS IN SUPPORT OF MOTION ................................................................. 3

    A. Proclamations ........................................................................................... 3

    B. Harm to Plaintiffs .................................................................................... 7

        1.  Harm to Freedom of Religion .......................................................... 7

        2.  Harm to Freedom of Assembly ........................................................ 9

        3.  Harm to Physical and Mental Health ............................................ 10

        4.  Harm to Material Assets ................................................................ 11

    C. Adequacy and Superiority of Existing County Health Plans ..................... 13

III.    ARGUMENT ................................................................................................ 19

    A. Standard of Review.................................................................................. 19

    B. State Law Provides A Less Restrictive Means To Address Any Asserted
       Government Interest ................................................................................. 20

    C. Plaintiffs Are Likely To Succeed On The Merits......................................... 21

        1.  Governor Inslee's Proclamations Subject Religious Exercise to Less
           Favorable Treatment Than Commercial Activity .............................. 21

        2.  Governor Inslee Cannot Defend Restrictions On Peaceable Assembly
           And Political Gatherings as the Least Restrictive Means of Promoting
           Public Health. ................................................................................ 23

        3.  Governor Inslee Has Placed Unconstitutional Restrictions On The
           Right To Gainful Employment. ....................................................... 23

        4.  Governor Inslee's Proclamations Violate the Takings Clause. .......... 27

    D. Plaintiffs Are Suffering Irreparable Harm................................................. 30

    E. The Balance Of Equities Tips In Plaintiffs' Favor....................................... 32

    F. A Preliminary Injunction Is In The Public Interest...................................... 33

IV. CONCLUSION ............................................................................................... 34

Caption - ii
No. 3:20-cv-05423-BHS

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

## MOTION

Plaintiff respectfully moves the Court pursuant to Rule 65(a) of the Federal Rules of Civil Procedure for a preliminary injunction that would prevent the Defendant, Governor Jay Inslee, from enforcing the orders he has issued pursuant to his Proclamations regarding COVID-19, to the extent they are based on his declaration of a state of emergency pursuant to RCW 43.06.220. State law provides an alternative legal and regulatory regime for addressing a novel viral pandemic, and the relevant health officials are ready, willing, and able to execute their obligations without the severe and often random impositions on civil liberties flowing from the Governor's Proclamations. Even according to the Governor's own words, there is no longer a "disaster" or other emergency that justifies the suspension of the Plaintiffs' constitutional rights, including their right to the free exercise of religion, the right to peaceably assemble, and their right to earn a livelihood, the Governor's declaration of a power to suspend those rights and the threats to impose criminal penalties for exercising those rights, are unconstitutional.

For the reasons set forth in the following Memorandum of Law, Plaintiffs respectfully request that the Court GRANT the Motion for a Preliminary Injunction.

## MEMORANDUM OF LAW

### I.   INTRODUCTION

State law has long provided for a scaled, targeted response to a novel viral pandemic, focusing efforts on county health officials. That relevant body of law is less restrictive to individual rights than the Governor's Proclamations, and the Governor can make no conceivable showing that it is not an adequate and appropriate response. After all, the Governor's administration has approved those local plans routinely for the last eight years. As one responsible local official, Dr. Malcolm Butler, the Chief Medical Officer at Chelan Valley Community Health and the Health Officer of the Chelan–Douglas Health District, has stated, "[i]f permission were granted, our office ***would impose fewer restrictions on residents*** within the boundaries of the Chelan–Douglas Health District than are currently imposed by the Governor's proclamations. . . . My office,

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

together with local health officials, is prepared for and capable of dealing with the threat to public health currently posed by COVID-19, as well as the additional threat posed by a phased reopening of the economy." Ard Dec. Ex. B at 7, 8 (emphasis added). Less restrictive means are available to protect the citizens of Washington. All that is required is for the Governor to be enjoined from continuing to violate Constitutional rights. When that happens, the reins will be taken by local health officials, designated by the Legislature as the appropriate parties to address this pandemic.

Since 2006, those officials have crafted plans for responding to a novel, spreading virus like COVID-19. The plans, all repeatedly and routinely approved by the state's Department of Health, are fully adequate to address COVID-019, and yet would impose far fewer restrictions on protected liberty than the Governor's Proclamations. They are, in other words, less restrictive means for addressing the threat of COVID-19.

No one doubts the authority of the Governor to act on behalf of the people of Washington in the case of an emergency. However, as the Wisconsin Supreme Court recently held when invalidating that state's statewide stay-home order, a governor's power to declare an emergency is not unlimited: "The Governor could declare an emergency and respond accordingly. But in the case of a pandemic, which lasts month after month, the Governor cannot rely on emergency powers indefinitely." *Wisconsin Legislature v. Palm*, 2020 WL 2465677, at *9 (Wis. May 13, 2020). As the U.S. Supreme Court reminded us years ago, "we are heirs to a tradition given voice 800 years ago by Magna Carta, which, on the barons' insistence, confined executive power by 'the law of the land.'" *Hamdi v. Rumsfeld*, 542 U.S. 507, 552 (2004) (Souter and Ginsberg, JJ., concurring in part and concurring in judgment).

A similar situation of executive overreach is presented in Washington State. On February 29, 2020, through Proclamation 20-05, Governor Inslee declared a State of Emergency to exist in all counties of Washington due to COVID-19, and in succeeding Proclamations renewed that declaration and resulting burdens on Washington citizens. However, COVID-19 is no longer an "emergency" that justifies the sweeping powers claimed by Governor Inslee in his many Proclamations concerning COVID-19. Although RCW 43.06.220 grants the Governor power to

Motion for Preliminary Injunction - 2
No. 3:20-cv-05423-BHS

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

protect health and safety in the event of a disaster, riot, or public insurrection, it does not displace governing state law, nor the United States Constitution and its protection of the civil rights of Washington citizens. The Washington Legislature has granted the Governor certain police powers to be exercised in the event of an emergency, but the Legislature also enacted a statute (Chapter 70.26 RCW) directed specifically at the preparation for and response to a pandemic such as COVID-19.

Governor Inslee pretends that RCW 70.26 does not exist. He has made no mention of it in any of his public statements or Proclamations. When, at the beginning of the epidemic, there were fears that the health care resources of the state would be overwhelmed by a high number of patients who needed treatment (such that the state would need to "flatten the curve"), an emergency may have existed to justify the Governor's extraordinary assertion of power. But while the original perception of emergency may have been justified by an information vacuum and sense of unpreparedness, things are different now.

Indeed, the Governor's own statements as well as statements from public health officials confirm that the threat of an overwhelmed healthcare system no longer exists in most, if not all, counties in the State. Consequently, Governor Inslee must abide by RCW 43.06.210, which requires him to terminate the state of emergency proclamation now that the actual and perceived need to exercise emergency powers no longer exists.

## II.   FACTS IN SUPPORT OF MOTION

### A.   Proclamations

On February 29, 2020, the Governor issued Proclamation 20-05,[1] which declared the ongoing COVID-19 pandemic as a "State of Emergency" in all counties, pursuant to RCW 43.06. Proclamation 20-05 invoked the Governor of Washington's emergency powers under RCW 38.08, 38.52 and 43.06, under which the Governor directed various State organs to implement emergency protocols. Beginning with Proclamation 20-06 on March 10, Proclamation 20-05 has been followed

---

[1] Available at https://www.governor.wa.gov/sites/default/files/proclamations/20-05%20Coronavirus%20%28final%29.pdf

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

over the past three months by several dozen additional amendatory Proclamations addressing the pandemic; the most recent at the time of this filing is Proclamation 20-55,[2] issued on May 7, 2020. Each of these Proclamations has expanded upon, amended, extended, or superseded a provision or provisions of one or several of the Proclamations before it. These Proclamations have continually reasserted that Washington remains in a state of emergency, and have directed individuals as well as public and private entities to adopt certain protocols to combat the spread of the virus, such as social distancing and limiting group interaction.

Of particular note is Proclamation 20-25[3], issued on March 23, 2020 with the subtitle "Stay Home – Stay Healthy". Proclamation 20-25 includes a stay-at-home order "prohibiting all people in Washington State from leaving their homes or participating in social, spiritual and recreational gatherings of any kind regardless of the number of participants, and all non-essential businesses in Washington State from conducting business, within the limitations provided herein." Exceptions are made for "essential activities" and "essential business services", but the precise definitions of which actions are and are not "essential" are highly discriminatory, and have no rational basis in serving the State's interest. "Essential activities" include all outdoor activities, as well as shopping at a grocery store — and ordering food from virtually any restaurant, but only if it's delivery or carryout. Essential activities also include caring for sick and elderly relatives — or for a friend's pet — but grandchildren are forbidden from visiting their grandparents for merely social reasons.

Seeking medical attention is always an essential activity, but many health services are not deemed "essential business", forcing them to close their doors to patients with chronic health problems and defeating the purpose of allowing those patients to seek medical attention in the first place. "Essential business services" include both a minimal staff to maintain the premises or equipment of businesses that are otherwise deemed non-essential, as well as a broad swath of

---

[2] https://www.governor.wa.gov/sites/default/files/proclamations/20-55%20COVID-19%20Collective%20Bargaining%20%28tmp%29.pdf

[3] https://www.governor.wa.gov/sites/default/files/proclamations/20-25%20Coronavirus%20Stay%20Safe-Stay%20Healthy%20%28tmp%29%20%28002%29.pdf

exceptions enumerated in the "Essential Critical Infrastructure Workers" list appended to Proclamation 20-25, but these too are capricious. Sellers of equipment used by medical and emergency personnel do not qualify as essential businesses, but fast food workers, coffee shop baristas, and clerks at liquor stores and marijuana dispensaries do. Most notably, elected representatives are forbidden from attending their party's state convention, while the text of Proclamation 20-25 explicitly singles out attending religious services of any kind in person as categorically prohibited. No option is given for religious services or other prohibited activities to continue so long as they comply with the same requirements as permitted activities.

At the time Proclamation 20-25 issued, epidemiological data indicated that most of humanity would become infected with COVID-19 at some point, and Proclamation 20-25 does *not* purport to reduce the total number of eventual COVID-19 deaths. Rather, it places particular emphasis on the threat of overloading the hospital system if the virus spreads too rapidly, which would cause people to die from lack of medical care who might have recovered from the virus (or some other ailment) if only the spread of the infection had been slowed and fewer people were hospitalized at any given time. Proclamation 20-25 cites this threat to the hospital system as the very thing that constitutes the current state of emergency at the time of its issuance, and as both the Governor's motivation and his justification for implementing the stay-at-home order.

All of these restrictions took effect at midnight on March 25, 2020 — less than 48 hours after the Proclamation issued. Proclamation 20-25 when issued was set to expire on April 8, 2020, but its various provisions have been extended — with minor amendments, but otherwise without interruption — by Proclamations 20-25.1,[4] 20-25.2,[5] and most recently 20-25.3,[6] which has extended the stay-at-home order to May 31, 2020. Proclamations 20-25.1 and 20-25.2 again

---

[4] https://www.governor.wa.gov/sites/default/files/proclamations/20-25%20Addendum%20Implementation%20of%20Phase%201%20Construction%20Restart%204.29_0.pdf

[5] https://www.governor.wa.gov/sites/default/files/proclamations/20-25.2%20Coronovirus%20Stay%20Home%20Amend%20%28tmp%29%20%28with%20links%29.pdf

[6] https://www.governor.wa.gov/sites/default/files/proclamations/20-25.3%20-%20COVID-19%20Stay%20Home%20Stay%20Healthy%20-%20Reopening%20%28tmp%29.pdf

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

explicitly single out attendance at religious services as a prohibited activity, but Proclamation 20-25.2 — issued on April 7, 2020 — initiated a process of reopening public parks and lifting prohibitions on outdoor recreation such as golf.

Proclamation 20-25.3 issued on May 4, 2020, and was accompanied by the Governor's "Safe Start Washington" reopening plan, which lays out a tentative schedule according to which the State will gradually lift restrictions as the pandemic is brought under control. Individual counties which curb the pandemic more quickly than the rest of the state may apply to enter subsequent phases of reopening ahead of Washington generally. Notably, at the issuance of Proclamation 20-25.3, the State and all counties began in Phase I, which is primarily distinguished by loosening Proclamation 20-25's restrictions on a handful of outdoor-centered businesses (such as construction and motor vehicle sales) and granting permission to perform "drive-in" religious services.

These drive-in religious services are further detailed in a document issued on May 6, 2020, titled "Religious and Faith-based Organization Guidance – Stay Home Stay Healthy Safe Start Washington – Phase 1: Drive-in Services."[7] These guidelines require congregants to remain in their vehicles at all times — rendering these services practicably inaccessible to members of religions who are forbidden to drive on holy days, such as many observant Jews — limit the passengers of each vehicle to persons of a single household, and forbid them to open windows or sunroofs unless at least six feet away from any other vehicle. The document explicitly forbids distribution or collection of food before, during, or after the service — thereby prohibiting the Christian rite of holy communion, the Hasidic tish, and any number of liturgical meals or acts of ritual consumption in the various religions practiced by Washington's 7.6 million residents; as well as barring the charitable feeding of the disadvantaged if done in connection with any liturgical service, even though drive-through restaurants and cart-to-cart food service on golf courses are permitted under the amended Proclamations.

---

[7] https://www.governor.wa.gov/sites/default/files/Spiritual%20Drive-in%20Services%20Guidance%20Memo.pdf?utm_medium=email&utm_source=govdelivery

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Even in Phase I, the social and commercial restrictions of Proclamation 20-25 are only slightly mitigated in most situations and most industries. The vast majority of business services previously deemed non-essential remain categorically prohibited, as do all social gatherings, of any size, with anyone outside of one's own household — with the exception of drive-in religious services. At the time of this filing, most Washingtonians are still living under the bulk of the restrictions originally imposed by Proclamation 20-25.

It must be noted that neither Proclamation 20-25 nor any of its three amending Proclamations make any reference to the fact that Washington law already has an established procedure for addressing pandemic influenza at RCW 70.26, which requires every local health jurisdiction to establish its own response plan and implement it in case of pandemic influenza. Nor do the Proclamations address the fact that the stay-at-home order in all its iterations is significantly more restrictive and burdensome than the preexisting pandemic response plans, which local health districts are already legally obliged to follow — which the Proclamations themselves make it impossible to do. In fact, the Proclamations do not contemplate currently established, less invasive means of addressing the pandemic at all.

### B.    Harm to Plaintiffs

#### 1.    Harm to Freedom of Religion

As a direct result of the Proclamations, the Plaintiffs and many other Washingtonians have suffered and are still suffering harm to their First Amendment right to freedom of religion. Proclamation 20-25 explicitly singles out "spiritual" gatherings "of any kind" as prohibited under the stay-at-home order. Although there were numerous exemptions for other types of social gatherings, in-person religious services were categorically prohibited. Proclamations 20-25.1 and 20-25.2 reiterated this precise language, singling out "spiritual" gatherings a second and third time when renewing the ban.

At least Plaintiffs Corry, McKee, McMullan, Russell, and Vick are Christians, for whom regular attendance at church is a central element of their religious life. See, for example, Corry Dec., ¶ 36; McKee Dec., ¶ 21; Several Plaintiffs hold that the injunction in Hebrews 10:25 against

Motion for Preliminary Injunction - 7
No. 3:20-cv-05423-BHS

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

"forsaking the assembling of ourselves together" is a moral imperative, that Christians *must* attend communal worship services on Sundays and other major holidays of the liturgical years — several of which have occurred during the time the Proclamations have been in effect, such as the entirety of Holy Week and Easter.  Corry Dec., ¶ 38; McMullen Dec. ¶ 4.

Although many churches have offered livestreamed digital services as a consolation to their congregants, these are a very poor substitute for the real thing. While online streaming is a dismal substitute for any in-person activity, it is uniquely sterile, alienating, and uncomfortable in the context of a religious service. In addition to being utterly unconducive to spirituality generally, streamed services also render impossible the communal aspect required by Hebrews 10:25 because participants cannot see or hear each other. The general notion of "praying together" through a livestream is *at best* an abstraction in the extreme, and specific acts central to much Christian worship — engaging in liturgical dialogue, listening to a choir sing hymns, congregational singing that his harmonized or antiphonal — are made literally impossible. Corry Dec., ¶¶ 36-40.  Online worship may enable a multiplicity of individual acts of worship, but the *corporate* worship mandated by the Bible remains impossible, and so therefore does fulfilling the moral obligation for Christians to participate in that corporate worship. As such, the Proclamations have placed the Plaintiffs in the impossible position of having to choose between obeying the law and obeying their consciences.

Proclamation 20-25.3 singles out spiritual services a fourth time in renewing the ban, although it introduces the caveat that "drive-in" services can be attended, from within a motor vehicle — provided that no food is distributed, passengers do not travel with members of other households, and doors and windows remain closed at all times unless six feet away from all other vehicles. Exactly what sort of service this leaves room for attending — in which no altar, tabernacle, or church interior can be seen; in which no communion, charitable meal, or ritual sacrifice can be consumed; in which windows cannot be rolled down to sing hymns together; and which no one who doesn't own a car, or who observes a religion that forbids driving on holy days, can attend at all — and how it meaningfully differs from a livestreamed service is unclear. Many of these

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

restrictions are discriminatory in nature, uniquely afflicting religious people while, for instance, McDonald's remains perfectly free to distribute food through a car window.

Proclamation 20-25 went into effect on March 25. Drive-in services remained prohibited for a period of 40 days, until the issuance of Proclamation 20-25.3 on May 4. The ban on all other religious services persists to the date of this filing on May 26, 62 days later — as does the tremendous harm still being done to the Plaintiffs.

### 2.    Harm to Freedom of Assembly

As a direct result of the Proclamations, the Plaintiffs and many other Washingtonians have suffered harm and are still suffering harm to their First Amendment right to peaceably assemble. Proclamation 20-25 bans all public and private gatherings of individuals not from a single household. With very limited and minor exceptions — such as the ability to golf in a party of two, or attend one of the aforementioned "drive-in" religious services — the amending Proclamations 20-25.1, 20.25-2, and 20-25.3 have maintained this near-universal prohibition on social gatherings, even with members of one's own immediate family who happen to live in a different household. Wills Dec., ¶¶ 27-29. This too is a yoke lain unequally across the backs of Washingtonians: grown adults cannot go visit their parents in the house where they grew up, but professional or volunteer dogwalkers are free to visit their friends' or clients' houses on a recurring basis in order to pick up the dog; churches, schools, and gymnasia where the chronically ill participate in life-extending exercises remain closed, but tribal casinos in the same areas have been permitted to open.

A uniquely pernicious consequence of this restriction is that elected representatives are being prevented from participating in their local (and, thus far, state-level) political conventions. Plaintiffs MacEwen, Barkis, Corry, Vick, and Chambers are members of the Washington State House of Representatives;[8] Plaintiff Fortunato is a member of the Washington State Senate.[9] All of them have been hampered in fulfilling their duties to their constituents because the Proclamations have forbidden physical attendance at political conventions, fundraisers, meet-and-

---

[8] See http://leg.wa.gov/House/Representatives/Pages/default.aspx.

[9] See http://leg.wa.gov/Senate/Senators/Pages/default.aspx.

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

greets, and other events at which politicians conduct business and interact with their electorate, their donors, and other politicians. While many functions of elected representatives have been transferred online, the remoteness of online communication tends to prohibit zealous advocacy for their constituents' interests, and the Plaintiffs are thereby unable to give the districts that elected them the representation they deserve. The effect has been to silence the smaller voices in the state and county legislatures, and to give a tacit benefit to the established political status quo.

Proclamation 20-25's ban on public and private gatherings went into effect on March 25, 2020, and aside from the aforementioned minor adjustments, remains in place 62 days later at the time of this filing on May 26, 2020 — as does the harm still being done to the plaintiffs.

### 3.    Harm to Physical and Mental Health

The aforementioned restrictions to freedom of assembly have not only impacted the Plaintiffs' Constitutional rights, but their physical and mental health as well. Human beings are psychologically dependent upon both human interaction and variety in their daily lives for their sanity and happiness, and this has been denied to every single one of the Plaintiffs, and in some way or other to virtually every single one of the State of Washington's 7,615,000 inhabitants. The Plaintiffs cannot dine out with friends, see movies, go bowling (unless they are lucky enough to live near a tribal casino that offers it), or visit their grandchildren. See, for example, Wills Dec. ¶¶ 27-29. In particular, many of the Plaintiffs in this action live in parts of the state that are significantly more rural than the 60% of Washington's population that live in the Seattle metro, where they are afforded less human contact even when engaged in the few permitted activities that take them out of the house (such as grocery shopping), and where they are less able to avail themselves of reliable Internet service, which has become the default medium for human socialization under the shutdown. This can be especially stressful and damaging for the elderly or others who live alone or otherwise experience fewer opportunities to socialize already, even without a statewide stay-at-home order.

Governor Inslee's orders, which are purportedly for the purpose of protecting the public health, actually pose a significant threat to the physical wellbeing of many Washingtonians. In his

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

attempts to ensure that hospitals throughout the state will have enough beds and enough doctors to handle a sudden deluge of COVID-19 victims, the Governor has all but paralyzed the State's healthcare system, forbidding medical professionals and hospital staff from attending to most non-emergency procedures. Most hospitals and medical practices are now operating at such a small fraction of their total patient capacity that their revenues are no longer sufficient to support all their employees, many of whom have had to be laid off, while several of the Plaintiffs have been unable to seek routine medical or dental care despite widespread availability of professionals to provide such because these are not deemed "essential business services".  See, for example, Wills Dec., ¶¶ 15-26.

It should be noted that although much of this care is routine, that does not make it unimportant: regular checkups are vital for maintaining physical health, while many younger patients who are still growing regularly require updates in their treatment regimens or medical hardware. Corry Dec. at 24. Of particular concern are patients with chronic health problems, which, while not emergencies in the immediate sense, do pose very serious risks if left untreated for several months at a time. Plaintiff Wills, who suffers from multiple sclerosis, has likely already suffered permanent, irreversible muscle atrophy due to the Proclamations shutting down one of the few facilities where she can exercise. It is entirely possible that this muscle atrophy will lead to her premature death. Wills Dec. ¶¶ 3–23.

Proclamation 20-25's bans on public and private gatherings and on many health-related fitness and medical activities went into effect on March 25, 2020, and was lifted on May 18, 2020, after doing much harm to the plaintiffs.

### 4.     Harm to Material Assets

Perhaps most widespread of all is the economic paralysis that has afflicted the Plaintiffs and almost all Washingtonians. Vast swaths of the economy have been shut down completely, with no option to continue operating provided that social distancing and other hygienic measures can be observed. Which particular businesses have fallen prey to the Proclamations seems to have no basis in a compelling State interest: catering services are banned, but walk-in orders at coffee shops are

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

permitted; sellers of knives and tools used by first responders have been forced to close their doors, while liquor stores continue doing business; marijuana dispensaries are still open, while outdoor construction is largely prohibited — except for government-sponsored projects. Fortunato Dec. ¶¶3–11. Even in industries where work has been transferred online or sales can be made via delivery or pickup the headaches and awkwardness of doing these digitally has driven many customers away. Other businesses suffer because their customers and clients are also suffering financially, and can no longer afford their usual services. Corry Dec. ¶¶5–10; MacEwen Dec. ¶¶3–8; McKee Dec. ¶¶3–8; McMullan Dec. ¶13; Russell Dec. ¶ 8.

Multiple Plaintiffs have been forced to lay off employees whom it is uncertain they will be able to hire back. Some have been coerced — while still operating at a loss — to hire back some of these employees in order to qualify for the Paycheck Protection Program. Others have been able to keep their employees only by paying out of pocket at a tremendous loss while they are unable to generate revenue. Vellekamp Dec. ¶¶ 11–15. Almost every business is hemorrhaging a staggering amount of money; some have lost a majority of their net worth; many have gone bankrupt and closed their doors forever. Even essential services which actually provide care to the demographics most vulnerable to COVID-19 are not immune.. Many of these businesses have been harmed so badly that they will be unlikely to recover for many months after the shutdown has ended, if ever. McKee Dec. ¶6; Russell Dec. ¶ 9.

The sheer scale at which this economic loss has occurred all but guarantees that any efforts the State may take to make reparations — even if they were undertaken with the utmost sincerity — can never fix the harm the Proclamations have caused and are continuing to cause. As of the time of this filing on May 26, 2020, the economic paralysis that is the direct result of the Proclamations has persisted for 62 days since Proclamation 20-25 took effect on March 25, but the repercussions for the economy of Washington and the people who do business in it — including the Plaintiffs — will reverberate for years to come.

Motion for Preliminary Injunction - 12
No. 3:20-cv-05423-BHS

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

C. **Adequacy and Superiority of Existing County Health Plans**

Neither Proclamation 20-25 nor any of subsequent amendments make any reference to the fact that Washington law already has an established procedure for addressing pandemic influenza, which the Legislature passed in the midst of the 2006 H5N1 outbreak — specifically with the threat of hospital overload in mind — and incorporated into the Revised Code of Washington as RCW 70.26, which specifically asserts that pandemic influenza response "must focus at the local level", and to that end requires every local health jurisdiction to establish its own response plan and implement it in case of pandemic influenza. RCW 70.26.010(1), (3), (5); Ard Dec. Ex. D, p. 9 at 2. The State's role in pandemic response is primarily one of enforcing compliance, setting standards for local response plans, granting or withholding approval of those plans based on their satisfaction of those standards, and allocating funding for those plans. RCW 70.26.030(1), 060, 070. This is summarized in Washington State's own "Pandemic Influenza Plan Summary", which states that "the [Department of Health] will . . . work with local public health and other partners to implement disease containment strategies (including isolation and quarantine procedures) *as necessary*" (emphasis added) and that "[l]ocal health plans focus on issues related to disease control measures, protecting their communities, and ensuring the delivery of essential services." Ard Dec. Ex. J., p. 2; *id.* at 3.

These State-mandated, State-approved pandemic response plans for numerous counties were drafted with pandemics such as the current COVID-19 outbreak in mind, and are well-suited to the task of addressing it. Ard Dec. Ex. B at 8. Indeed, the level of granularity in each local plan allows local jurisdictions to fine-tune their responses to the unique needs of their individual localities. This is markedly preferable to the heavy-handed, one-size-fits-all approach of the Proclamations, which treat every county in Washington — even counties between which the total number of COVID-19 cases differs by *almost four degrees of magnitude* — as if they face comparable infrastructural demands and risks. This remains the case even after Proclamation 20-25.3's introduction of the County Variance Requests, which simply attaches an appeals process to a paradigm that still uses the situation in King County as the baseline for determining the restrictions

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

in Garfield County, even though there have been 3.5 times as many COVID-19 cases in King as there are *people* in Garfield — which has had exactly 0 confirmed cases, and which is located over 250 miles away.

All of the local response plans that the Plaintiffs were able to acquire are exceedingly thorough and well-organized, and give detailed coverage to each specific element of pandemic response contemplated by the Proclamations. The attached plans anticipate and account for — among many, many other factors — the following:

- Issues with the plans themselves, including the need to continually reevaluate and adjust pandemic response procedures; the real potential of unforeseen contingencies; the variable scope and circumstances of every individual pandemic, based on the virility of the virus, its mode of transfer, and circumstantial factors; the potential for overwhelming the hospital and outpatient care system; the higher risk of infection posed to healthcare workers and other first responders, further straining the hospital system; the likelihood that medicine and medical equipment may not be available in sufficient quantities or in a sufficient timeframe; the possibility that worker shortage due to infection may strain other critical infrastructure, such as transportation or public safety; and the possibility of overwhelming the testing or information logistics capabilities of the hospital system. Ard Dec. Ex. F, p. 24; Ex. G, Intro; Ex. H, p. 12; Ex. I, 10.

- Preparation for a pandemic, including monitoring the locality, state, country and globe for signs of potential outbreaks and their spread; establishing incident response systems; forging agreements with other public, private, and tribal entities in regard to the role and resource allocation (below); keeping healthcare workers and relevant government employees and educators apprised of relevant developments in epidemiology and emergency response; providing support to other local agencies and private and tribal entities for planning their own pandemic contingencies; identifying potential problem areas and weak points in infrastructure and response plans;

conducting training drills and other exercises to prepare relevant staff for a potential pandemic. Ard Dec. Ex. E, pp. 8–10; G, II.

- Allocation of responsibilities to various personnel and departments, including coordinating with local non-healthcare agencies to comprehensively address all complications arising from the pandemic; coordinating with other health jurisdictions, both State and local, to ensure a response that takes population mobility into account; reaching out to public officials, educators, private employers, and tribal leaders to ensure both effective spread of information and implementation of preventative protocols; collaborating on disease tracking and surveillance; sharing recommendations and asking for suggestions in order to improve response; establishing contingencies for potential system strain, overflow, or breakdown; synchronizing mass vaccinations; efficiently allocating and distributing medication, equipment, healthcare workers, and other resources; and developing community guidelines to prevent the spread of the disease. Ard Dec. Ex. C, VI; Ex. D, VII; Ex. E, pp. 15–20; Ex. F, pp. 12–21; Ex. G, I; Ex. I, 3.1–4.

- Monitoring developments in virology and epidemiology, including remaining apprised of novel strains that are identified; collecting data regarding the location, mode of transfer, and vector of novel strains; noting whenever a novel strain enters a new geographic area; keeping partner agencies and private entities informed as the novel strain approaches or enters the country, state, or locality, and instructing them to notify other members of the network if they hear about a new case in the locality first; providing medical providers with instructions for obtaining samples from symptomatic individuals; disseminating information updates to the general public as well as partner agencies; tracking demographic information pertaining to infections, hospitalizations, and deaths in the individual locality, and incorporating this data into finetuning the response and reassessing priorities in preventative methods, medication, and logistics; monitoring news, weather, and other public health events that could effect the spread

of the virus; coordinating dynamic interagency tracking of availability of healthcare workers, medicine, medical equipment, and healthcare facilities; and tracking reports of missing persons or absences from school or work, especially within the healthcare system. Ard Dec. Ex. G, III; Ex. H, pp. 15–23.

- Identifying optimal medical countermeasures, including setting guidelines on who should seek testing based on the availability of diagnostic methods, the availability of medical staff, and the likelihood of infection and potential spread; susceptibility of the novel virus to medication; receptivity to — and negative side-effects experienced as a result of — the same in varying population groups; vaccine development and testing; relative efficacy of vaccinations, prophylactic use of antivirals, and use of antivirals in treating infected patients; coordinating response based on supply and logistic constraints on various treatment methods; and prioritizing treatment and prophylaxis based on relative risk of infection or serious complication, efficacy of treatment, chance of recovery, age, pregnancy, and necessity to healthcare system.

- Identifying optimal non-medical countermeasures, including when it is effective or recommended to employ social distancing (and the appropriate distance thereof); the wearing of masks by infected persons; the wearing of masks by uninfected persons; the wearing of gloves; sanitizing surfaces; separate determinations for the isolation of confirmed cases, symptomatic but unconfirmed cases, exposed but asymptomatic and unconfirmed cases, and uninfected persons; restricting certain types of business, travel, social interaction, or mass gatherings, with an eye to balancing pandemic response and more general measures of public good and public happiness; prioritizing unrestricted conduct for healthcare and other critical infrastructure, followed by areas which would face the greatest disruption if restricted.

- Public education and communication, including educating the public regarding the necessity of these procedures, the nature of the virus, its life cycle, and its spread; how to identify high-risk persons with whom they interact and how to respond accordingly

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

to protect their own health and that of the high-risk persons; special training for those who interact with high-risk persons on a regular basis; how to identify potential cases or signs that they or another person may have been exposed or infected, how to monitor their case going forward, and when to report to healthcare authorities; how to obtain more information and which healthcare or government entities to contact for specific questions, protective equipment, or training; which alternatives to take in case of shortage of medical resources or strain, overload, or shutdown of the hospital system; prepping community for potential short-term or even long-term loss of many or all key public utilities and services; how to train those in subordinate positions, such as students or employees, in the above.

- Triage protocols in case of shortage of medication, hospital beds, healthcare workers, protective devices, or diagnostic devices, including alternative care facilities, mobilization of volunteer healthcare workers, and patient prioritization based on risk, chance of recovery, and importance to pandemic response, and relevant ethical considerations.

This is a *small* sample of the incredibly detailed and well-ordered plans which the various local health jurisdictions have enacted. The plans in their full forms are attached as exhibits, and there can be little doubt that they are adequate to face the challenge of the COVID-19 pandemic. Elements of some county plans have even been subjected to numerous drills and test exercises, providing valuable feedback on the efficacy of the systems in place, while endowing the personnel responsible for utilizing them with both real experience in tackling the challenges posed by a pandemic and familiarity with the response protocols themselves — a startling contrast with the completely alien and unforeseen set of circumstances and response protocols imposed by the Governor's Proclamations.

It is for these reasons that Dr. Malcolm Butler, Chief Medical Officer at Chelan Valley Community Health and the Health Officer of the Chelan–Douglas Health District, stated that "[i]f permission were granted, our office would impose fewer restrictions on residents within the

boundaries of the Chelan–Douglas Health District than are currently imposed by the Governor's proclamations. . . . My office, together with local health officials, is prepared for and capable of dealing with the threat to public health currently posed by COVID-19, as well as the additional threat posed by a phased reopening of the economy." Ard Dec. Ex. B at 7, 8. Evidently sharing his confidence, the Governor has recently announced that all elective medical procedures may be resumed throughout Washington, so long as proper hygienic measures are observed—yet other provisions of the Proclamations still remain. Ard Dec. Ex A, p. 2.

Additionally, several county plans warn against overreach during a pandemic, noting that the government should impose the slightest restrictions on civil liberties possible, even in the midst of pandemic influenza. These plans—drafted at the behest of Washington State, approved by Washington State, and mandated by Washington State to be followed in the case of a pandemic—provide that "[i]f it should become necessary to restrict individual liberties for the sake of public health, the least restrictive interventions likely to be effective should be employed", and that ". . . [Chelan–Douglas Health District] will focus on gaining voluntary compliance from ill or exposed persons and implementing the least restrictive means possible to reduce the spread of infection." Ard Dec. Ex. C, Annex B, §4.5; Ex. G, V. Yakima County's plan is particularly careful to take precautions against the kind of discriminatory restrictions we see applied to churches under the Proclamations, requiring that "[i]n the exercise of powers or in the performance of duties, the county shall ensure that no person is discriminated against because of race, creed, color, sex, age, handicap or any other basis not reasonably related to the accomplishment of a legitimate governmental purpose." Ard Dec. I, 2.1.7.

Proclamations 20-25, 20-25.1, 20-25.2, and 20-25.3 and their appended documents do not even acknowledge the existence of these statutes, much less the fact that, in compliance with RCW 70.26, the local health jurisdictions were required by law to draft them and *are* required by law to implement them in case of pandemic influenza—a duty which the Governor's override of the state's hospital system not only hasn't helped, but has actually made it impossible to carry out by

Motion for Preliminary Injunction - 18
No. 3:20-cv-05423-BHS

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

imposing conditions foreign to the preexisting State-approved plans. In fact, the Proclamations do not appear to contemplate the possibility of any less onerous alternative at all.

### III.   Argument

In determining whether to issue a preliminary injunction, courts must consider four factors: (1) whether the plaintiffs are likely to succeed on the merits, (2) whether they are likely to suffer irreparable harm in the absence of preliminary relief, (3) whether the balance of equities tips in their favor, and (4) whether an injunction is in the public interest. *Aleman Gonzalez v. Barr*, 955 F.3d 762 (9th Cir. 2020), *citing Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). These factors are satisfied in this case.

#### A.      Standard of Review

While the government can restrict liberty to protect public health, that power is subject to limits, and courts engage in strict scrutiny of the exercise of such impositions. In other words, the government is not entitled to a rubber stamp simply because it intones a public health justification. Indeed, "[i]f a statute is subject to strict scrutiny, the statute always, or nearly always . . . is struck down." *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 319 (1976).

In *Jacobson vs. Massachusetts*, 197 U.S. 11 (1905), the Supreme Court upheld the constitutionality of a state law requiring compulsory vaccinations against smallpox based on "a primitive form of rational basis review." Jacobson predated the notion of "levels of judicial scrutiny." The Court has since expanded the application of strict scrutiny review to include government violations of fundamental rights, namely, those rights that are "deeply rooted in [the] Nation's history and tradition." The Supreme Court has enumerated certain fundamental rights, including the rights to travel, to vote, and to free speech. With regard to these rights, the Court applies some form of heightened scrutiny to government encroachment.

Governor Inslee's edicts, limiting free exercise of religion, association and travel, implicate fundamental rights and are overly broad. They also lack any demonstrable, tested, scientific basis, and indeed, are contrary to CDC advice. For example, quarantining identified infected individuals, or those with known exposure to pathogens can be a useful tool on a small scale. However, once a

Motion for Preliminary Injunction - 19
No. 3:20-cv-05423-BHS

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

novel disease spreads widely in the population, compelling the quarantine of an entire population is hardly the least restrictive means for stopping spread. Indeed, it is not even demonstrably effective at stopping the spread of an infectious disease.

**B.      State Law Provides A Less Restrictive Means To Address Any Asserted Government Interest**

Governor Inslee has posed a false dichotomy between two extremes: on the one hand, he claims virtually unlimited power to ignore constitutional for an unlimited period of time; unless he is granted this power, he claims, a deadly disease will proceed unchecked to ravage the state, attacking and killing the most vulnerable Washington citizens. If Governor Inslee's assumption of unchecked power were the only alternative to deal with a deadly pandemic, it might be constitutionally defensible. However, there is a much better alternative.

In fact, Washington law anticipated a pandemic even more deadly than COVID-19, and prescribed the means of dealing with it: Chapter 70.26 RCW, which is entitled "Pandemic Influenza Preparedness." This legislation was adopted in 2006, after the so-called bird flu pandemic. Anticipating a future pandemic, the Legislature described how it wanted to address it. First, it described COVID-19: "Pandemic influenza is a global outbreak of disease that occurs when a new virus appears in the human population, causes serious illness, and then spreads easily from person to person." RCW 70.26.010(1). It warns that a future pandemic "could emerge with little warning" and that it could kill "as many as five thousand in Washington." RCW 70.26.010(3).

Chapter 70.26 requires each local health jurisdiction to prepare a plan that will include

"(b) Describing the response, coordination, and decision-making structure that will incorporate the local health jurisdiction, the local health care system, other local response agencies, and state and federal agencies during the pandemic; [and]
(c) Defining the roles and responsibilities for the local health jurisdiction, local health care partners, and local response agencies during all phases of a pandemic;

RCW 70.26.030(2).

In other words, Washington law provides a less restrictive means for dealing with COVID-19 that does not require the restriction of the plaintiffs' constitutional rights.

C.      **Plaintiffs Are Likely To Succeed On The Merits.**

Governor Inslee's series of Proclamations addressing COVID-19, beginning on February 29, 2020, proclaimed a State of Emergency under the authority of RCW 43.06.220. Pursuant to those Proclamations, Governor Inslee restricted Washington citizens' rights to assemble, to worship, to move about freely, and to engage in gainful employment. There can be no question that his orders infringe on the civil rights of Washington citizens. While an emergency such as a volcanic eruption, forest fire, or impending tsunami gives the Governor the authority to infringe on civil liberties for a brief period of time in order to protect the public health and safety, his actions are still subject to strict judicial scrutiny. The same applies to COVID-19. Governor Inslee's successive Proclamations do not survive such scrutiny. Nor is there any basis for him to continue infringing the civil rights of Washington citizens by unilateral, successive declarations of "emergency."

1.      **Governor Inslee's Proclamations Subject Religious Exercise to Less Favorable Treatment Than Commercial Activity**

Freedom of religion is enshrined in the First Amendment to the Constitution. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012, 2019 (2017) (the Constitution "protect[s] religious observers against unequal treatment" and subjects to the strictest scrutiny laws that target the religious for "special disabilities" based on their "religious status."). A law or executive action that burdens religious practice may survive constitutional challenge only if it is a neutral law of general application. *Church of the Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520, 546 (1993); *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). However, even a law of general applicability may be unconstitutional as applied to religious activity if it is "riddled with exemptions" for secular activities. *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012). "As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law." *Maryville Baptist Church, Inc. v. Beshear*, ____ F.3d ____, 2020 WL 2111316 at *3 (6th Cir., May 2, 2020).

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1    Moreover, even if the law is facially neutral, it will be found unconstitutional if applied in a

2    discriminatory way. For example, the Supreme Court invalidated a facially neutral regulation on

3    the keeping and killing of animals because in reality it targeted one religious minority group. *Church

4    of Lukumi Babalu Aye*, 508 U.S. at 524–25, 533–35. Likewise, in *Tenafly Eruv Association, Inc. v.*

5    *Borough of Tenafly*, 309 F.3d 144 (3d Cir. 2002), the Third Circuit found that a city ordinance could

6    not be enforced against the Orthodox Jewish community, even though it was facially neutral,

7    because it had been selectively enforced only against that group.

8    More recently, on May 6, 2020, Governor Inslee issued a Memo entitled "Religious and

9    Faith-based Organization Guidance—Stay Home Stay Healthy Safe Start Washington—Phase 1:

10   Drive-in Services."[10] It permits "drive-in" gatherings, but forbids distribution of food, beverages

11   or other materials before, after, or as part of the service, and requires vehicle windows to be closed

12   during the entire service unless the vehicle is parked more than six feet from any other vehicle. By

13   comparison, commercial food vendors such as Starbucks and McDonalds may receive cash or other

14   payment from customers through an open window, and may then distribute food to occupants of

15   the same vehicle with an open window. In other words, customers may enter a grocery store or

16   home improvement store and interact with store personnel, but no contact of any kind, regardless

17   of social distancing or other precautions, is permitted for gatherings for religious purposes.

18   If a government action burdens religious practice, and it is neither neutral nor generally

19   applicable, it is unconstitutional unless it can survive strict scrutiny: that is, finding a compelling

20   governmental interest that is narrowly tailored to achieve that end. *Lukumi*, supra, 508 U.S. at 546.

21   Impairment of a fundamental right such as religious freedom rarely survives strict scrutiny and the

22   Proclamations do not come close to doing so here, because there is no pretense of narrow tailoring

23   in this case. The restrictions under the Proclamations are subject to much more extensive

24   exemptions for commercial activities which are not entitled to First Amendment protection, while

25   gatherings for religious purposes are subject to restrictions that effectively prohibit Washington

26

27   [10] https://www.governor.wa.gov/sites/default/files/Spiritual%20Drive-in%20Services%20Guidance%20Memo.pdf?utm_medium=email&utm_source=govdelivery

Motion for Preliminary Injunction - 22
No. 3:20-cv-05423-BHS

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

citizens from gathering for religious worship. It would be one thing if the government's interest in preventing the spread of COVID-19 could only be achieved by subjecting all Washington citizens to a "stay-at-home" order that admitted of no restrictions. But attendees at a religious service are capable of following the same social distancing and hygiene requirements that are imposed on patrons of bars, restaurants, grocery stores, home improvement centers, golf courses and other activities; to permit one group an exemption while denying it to another—because of the nature of the activity in which they are engaged—is not justifiable under strict scrutiny. The Governor does not even purport to explain in his Proclamations why constitutionally protected rights must be infringed in this egregious way.

> **2.      Governor Inslee Cannot Defend Restrictions On Peaceable Assembly And Political Gatherings as the Least Restrictive Means of Promoting Public Health.**

Governor Inslee's Proclamations concerning COVID-19 burden other fundamental constitutional rights, such as rights of assembly and liberty interests. Just as the prohibition on gatherings (except for commercial purposes) burdens religious practice, Washington citizens have been forbidden from exercising their right peaceably to assemble. The right to assemble is fundamental to the exercise of all civil and political institutions and is the lifeblood of American political discourse. *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937).

Modern treatment of the right peaceably to assemble has merged with the right to expressive association. *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984). Restrictions on expressive association can only pass constitutional muster if they are justified by a compelling state interest and are narrowly tailored. *Id.* at 623. For the same reasons as stated in Section 3 above, the Governor fails this requirement.

> **3.      Governor Inslee Has Placed Unconstitutional Restrictions On The Right To Gainful Employment.**

Plaintiffs have a protected liberty interest in practicing their chosen occupations. *See, e.g.*, *Dittman v. California*, 191 F.3d 1020, 1029 (9th Cir. 1999); *Meyer v. Nebraska*, 262 U.S. 390, 399

Motion for Preliminary Injunction - 23
No. 3:20-cv-05423-BHS

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

(1923) (the Fourteenth Amendment protects "the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men"). The Proclamations bar them from working, and are therefore subject to review by this Court.

First, as detailed in the Facts section above, the various impositions of the Proclamations, even as they change day-to-day, have no scientifically demonstrated relationship to public health. By treating groups differently despite being similarly situated (from a public health perspective), the restrictions in the Proclamations cannot withstand any level of scrutiny. The Governor cannot demonstrate, as he must, that his elections of who should work and who must be stay at home—often with the result of forfeiting one's livelihood altogether—have a direct relationship to public health. It is certainly not enough to assert that they might have a positive benefit, or that other governors have done so.

The Governor's separation of the sheep from the goats—the designation of "essential" and "non-essential" services—is not based on any evaluation of public health consequences, but rather emanates from a belief that some activities are valuable ("essential") while others ("non-essential") are ones that society can live without.  Divorced from any public health rationale for why some are allowed to work, while others must stay at home, the Governor cannot justify this infringement upon the liberty of Washington citizens. "The established doctrine is that this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect. Determination by the Legislature of what constitutes proper exercise of police power is not final or conclusive but is subject to supervision by the courts." *Meyer v. Nebraska*, 262 U.S. 390, 399–400 (1923). Here, the Governor cannot demonstrate that reasonable relationship.

Further, the bar on productive labor caused by the Proclamations has now extended for months, with no signs of lifting and is accompanied by routine threats by the Governor that if he

becomes displeased, the restrictions will be re-imposed. This goes far beyond the kinds of restrictions subject to mere "rational basis review," such as requiring disclosure of a social security number to receive an acupuncture license discussed in *Dittman v. California*, 191 F.3d 1020, 1030 (9th Cir. 1999).

Finally, simply because the contemporary approach to review of state limitations on economic action, is different from the more stringent review of impositions on religious activity, speech rights, Fourth amendment rights, and even other unenumerated rights protected by due process, does not mean that any infringement on the right to earn a livelihood is permissible. A massive, statewide, long-running ban on productive economic activity, mistakenly presumed to have some discernable public health benefit, presents the best opportunity to recognize that a crabbed view of the 14th Amendment, starting with the *Slaughter-House Cases*, 83 U.S. 36 (1872). *Slaughterhouse* is a blemish on American jurisprudence that should be consigned to the dust bin of history. In some ways, it is not surprising that *Slaughterhouse* came to the conclusion about the 14th Amendment that it did:

> The vital thing to note here is that this case was decided in 1878 in Louisiana. During this time in Louisiana there were strong efforts being made to ***reverse*** Reconstruction in every possible way, and the ***Slaughter-house Cases*** had wrongly limited the Privileges or Immunities Clause to apply only to rights of national citizenship. Thus, it is actually not at all surprising that a Louisiana court would find no Fourteenth Amendment violation in 1878, and therefore this opinion should have no impact on our analysis here.[11]

The legacy of *Slaughterhouse* should not be invoked today. *Plessy v. Ferguson*[12] cited *Slaughterhouse* twice, most notably relying upon its interpretation of the Privileges and Immunities Clause to uphold "separate, but equal":

> The proper construction of [the 14th Amendment] was first called to the attention of this court in the *Slaughterhouse Cases*, which involved, however, not a question of race, but one of exclusive privileges. The case did not call for any expression of opinion as to the exact rights it was intended to secure to the colored race, but it was said generally that its main purpose was to establish the citizenship of the negro, to give definitions of citizenship of the United States and of the States, and to protect from the hostile legislation of the

---

[11] Steven G. Calabresi *Originalism and Brown v. Board of Education* 2014 MICH. ST. L. REV. 429 (2014).

[12] *Plessy v. Ferguson*, 163 U.S. 537 (1896).

States the privileges and immunities of citizens of the United States, as distinguished from those of citizens of the States.[13]

*Plessy* relied explicitly on *Slaughterhouse*'s restrictive interpretation of the Privileges and Immunities Clause, distinguishing the rights of citizens of the United States from those of citizens of the several states, allowing the continued imposition of Jim Crow laws and decades of institutionalized racism from which many people have yet to recover. That narrow interpretation of privileges and immunities in *Slaughterhouse* is drawn on in any number of later cases that enabled Jim Crow and the segregation of schools following reconstruction.[14] These include *King v. Gallagher*[15], which decided that separate schools for black children are not a disadvantage, and *Lehew v. Brummell*[16], which assumed without argument that no inequality of school privileges was at stake in segregation. Following *Slaughterhouse*, no thought was paid to the privileges of citizenship in the several states.

Only recently, the tide has finally begun to turn. The Supreme Court remarked on *Slaughterhouse* and its narrow interpretation of the Privileges and Immunities Clause in *McDonald v. Chicago*.[17] While it took an agnostic view on that occasion, the door was left open for the Court to revisit the issue:

> The municipal respondents and some of their amici … contend that the phrase 'privileges or immunities' is not naturally read to mean the rights set out in the first eight Amendments … . A number of scholars have found support for the total incorporation of the Bill of Rights… . We take no position with respect to this academic debate.[18]

*McDonald* is only one of recent remarks by the Supreme Court that *Slaughterhouse* and its progeny should finally and ultimately be overruled. Here, to whatever extent the Governor seeks minimal and uncritical review of his gross imposition on the rights of the citizens of Washington to engage

---

[13] *Id.* at 163 U.S. 544.

[14] Christopher R. Green, *Originalism and the Sense-Reference Distinction*, 50 St. Louis L.J. 555, (2006).

[15] 93 N.Y. 438 (1883).

[16] 15 S.W. 765 (Mo. 1891).

[17] *McDonald v. City of Chi.*, 130 S. Ct. 3020 (2010).

[18] *Id.* at 3033 n.10 (plurality opinion).

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

in gainful labor, and profit from the fruits of that labor, he invokes a shameful chapter in American history, when majorities were routinely permitted to trample on any and every right of a minority, and exercised that power at will. Here, presented with a fact record of impositions on the right to productive labor that exceeds any fact pattern presented to a court since the era of *Slaughterhouse*, a searching and meaningful review by this Court will ensure that Plaintiffs' rights are vindicated.

### 4. Governor Inslee's Proclamations Violate the Takings Clause.

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. CONST. AMEND. V. "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

The Takings Clause "is designed not to limit the governmental interference with property rights per se, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536–37 (2005) (quoting *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 315 (1987) (emphasis in original)).

The Supreme Court "recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Lingle*, 544 U.S. at 537. "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415–16 (1922).

There can be no reasonable dispute that the Proclamations are not merely regulations that affect property, but amount to such an interference with the beneficial use of property as to require that they "be recognized as a taking." *See id*. Otherwise, without just compensation guaranteed by

MOTION FOR PRELIMINARY INJUNCTION - 27
No. 3:20-cv-05423-BHS

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

the Takings Clause, landlords across the state will be privately saddled with the cost of paying for government action undertaken for the alleged common good.

Here, the Governor's 20-19.1 Proclamation imposes blanket prohibitions on property owners statewide, preventing them from taking practically any remedial or protective action concerning their property and those renting from them. Barkis Decl. ¶¶ 23-28. The prohibitions operate automatically and there is *no need for a tenant to establish a nexus between his or her inability to pay and the COVID-19 epidemic. Id.* ¶¶ 10-15. The lack of nuance in the Proclamation has invited their abuse and taken all discretion from property managers who have long experience working with tenants to address ability-to-pay issues. *Id.* The effect of the blanket, untailored, and draconian Proclamations is to push property owners to the brink, hamstring the ability of owners and managers to manage and protect their rental communities—even from disruptive behavior, and create unnecessary (and non-COVID 19-related) costs across the entire renter and landlord population of the state. *Id.* ¶¶ 6-9; 16-20; 28-33.

In sum, a huge part of the bundle of property rights has been extinguished. Property owners and managers across Washington State are barred from doing anything to protect their rights if a tenant refuses to pay rent even if the decision not to pay has nothing to do with the economic dislocation resulting from the pandemic. As such, they have suffered a significant loss of the "economically beneficial uses" of their properties while the proclamation remains in effect. This loss constitutes a categorical taking. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992). (where "h[ave] been called upon to sacrifice all economically beneficial uses [for their Properties] in the name of the common good, that is, to leave [their] propert[ies] economically idle, [they] h[ave] suffered a taking.")

In the alternative, under the framework articulated by the Supreme Court in *Penn Central*, the proclamation also constitutes a taking based upon "the magnitude of [the Orders'] economic impact and the degree to which [the Orders] interfere[] with legitimate property interests." *Lingle*, 544 U.S. at 540. The Governor has seized properties across the state without compensation, inflicting significant financial and other hardships. In so doing, the Governor has put the cost of his

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Proclamations squarely upon the shoulders of private parties and has failed to compensate or even attempt to tailor these costs to the realities on the ground. Without extending constitutionally required just compensation and narrow tailoring to Plaintiffs and those similarly situated, the proclamation jeopardizes the sustainability of many Washington businesses and the livelihoods those businesses provide to individuals.

In short, there is a continuing, egregious violation of the Takings Clause of the Fifth Amendment, made applicable to States through the Fourteenth Amendment, as well as well-established notions of Substantive and Procedural Due Process.

### a) Enforcement of the Order Would Result in Irreparable Injury to the Plaintiffs and Others Similarly Situated

As will be discussed below with respect to the other constitutional rights that have been infringed, the property takings effected by the Proclamations constitute irreparable injury for purposes of evaluating a request for an injunction. *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014). By preventing landlords from using their properties in violation of the Fifth Amendment, the Governor has inflicted irreparable injury and, absent the requested relief, will continue to do so.

### b) Granting the Preliminary Injunction Would Not Result in Substantial Harm to Others or the Public Interest

Here, Plaintiffs are simply asking that the Takings Clause be respected and that any measure to address the economic harm from the pandemic be narrowly tailored. Granting this preliminary injunction would therefore serve the public interest by ensuring that the constitutional protections have real teeth even during challenging time. Granting relief will not impede any government efforts to manage the public. The governor simply needs to find a more narrowly tailored process to relieve the plight of people directly impacted by the pandemic. Therefore, no harm would accrue to the State of Washington if this injunction is granted.

Even the limited and mostly hypothetical risk posed by the permitted activity must be evaluated on a comparative basis; in ruling on a motion for a preliminary injunction, a court must consider the "balance of equities" or "balance of hardships" posed by, on the one hand granting,

Motion for Preliminary Injunction - 29
No. 3:20-cv-05423-BHS

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

and on the other hand denying, the motion. *Chamber of Commerce of United States v. City of Seattle*, 274 F.Supp.3d 1140, 1145 (W.D. Wash. 2017). Where, as here, the hardship suffered by the Plaintiffs (*i.e.*, deprivation of fundamental constitutional rights) is continuing, and the hardship suffered by the Defendant is non-existent and *at most* speculative, the balance tips decisively in Plaintiffs' favor.

### D.   Plaintiffs Are Suffering Irreparable Harm.

The law is clear that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014). Governor Inslee's May 6 Proclamation will eventually be replaced by other Proclamations that presumably will end the restrictions as the COVID-19 threat recedes. However, by preventing the exercise of the Plaintiffs' religious liberty and other fundamental constitutional rights, and by subjecting religious practice to unfavorable treatment compared with other secular activities, the Governor has inflicted irreparable injury and, absent the requested relief, will continue to do so.

Every Plaintiff who has wished to attend religious services at his or her church has been prevented from doing so. Corry Dec. at 39; McKee Dec. at 24; McMullan Dec. at 7; Russell Dec. at 12; Vick Dec. at 22. The option to livestream services is small consolation; beyond being sterile and alienating to an extent that many find too distracting to be conducive to any real spiritual experience, livestreaming does not satisfy what many Christians solemnly hold as a moral obligation to attend services in person — an obligation which the Proclamations have made impossible to fulfil. Corry Dec. at 36–40; McKee Dec. at 21–25; Vick Dec. at 19–23. This is a grave intrusion upon the rights of ostensibly free Americans.

Almost as grave has been the prevention of multiple elected representatives from attending the state Republican Party convention in person. Not only does this handicap the elected officials' abilities to serve their constituents; it also silences the voices of those constituents in a state-level political process in which they are supposed to have a say. This is incompatible with the core precepts of a democratic society.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

The prohibition against free association has also been tremendously damaging in this trying time, when people are especially dependent upon human interaction and camaraderie to bolster their emotional wellbeing against the challenging circumstances. Corry Dec. at 31–34, 41; McKee Dec. at 26–30; Vick Dec. at 24. This is most true of elderly and infirm individuals who often have difficulty socializing in the first place, and who may lack the technological competence to engage in remote socialization. Wills Dec. at 27–29. The ill and elderly are also especially harmed by the paralysis that has taken hold of our hospital system, as almost anything short of a medical emergency is deemed an inessential procedure — even if the consequences of denying people this care for chronic illnesses can be permanent, damaging, and perhaps even lethal. Wills Dec. at 3–26. The general population is being affected by the lack of medical and dental care as well, as are children who are unable to receive medical and dental attention for ailments occurring while they are still developing into adults. Corry Dec. at 11–24. Children are also prevented from attending school in person, forced at this critical juncture in their lives to rely on "distance learning" alternatives that are often inadequate to their needs and place a tremendous burden on parents who are unqualified to play the role of professional educator and already laden with other responsibilities. Corry Dec. at 25–30; Vick Dec. at 7–10.

Other Plaintiffs are prevented from exercising Second Amendment rights. McKee Dec. at 14–19. Professional caregivers who work with the most vulnerable demographics in the current crisis — the elderly and the disabled — are put in the impossible position of being required to use personal protective equipment that no private entity can satisfactorily provide them, and which the government refuses or fails to provide them. The economic paralysis that has descended upon Washington has been especially severe. Multiple Plaintiffs have been forced to lay off employees whom it is uncertain they will be able to hire back, and the nebulous timeline the Governor has given for the phased reopening of the economy has left these Plaintiffs' financial prospects too uncertain to justify rehiring at the rate necessary to maximize their benefits under the Paycheck Protection Program and other SBA initiatives. Russell Dec. at 7. Others have been able to keep their employees only by paying out of pocket at a tremendous loss while they are unable to generate

Motion for Preliminary Injunction - 31
No. 3:20-cv-05423-BHS

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

revenue. Vellekamp Dec. 11–15. Both join the ranks of innumerable Washingtonians hemorrhaging money at a rate the State will almost certainly never be able to repay en masse, due to the Proclamations either prohibiting their businesses from operating at all, imposing interaction requirements so onerous that potential clients and customers find it too aggravating to do business, or rendering the clientele themselves too poor to afford the goods and services in question. Corry Dec. at 5–10; Fortunato Dec. at 3–11; MacEwen Dec. at 3–8; McKee Dec. at 3–8; McMullan Dec. at 13; Russell Dec. at 8. This even includes businesses that sell devices used by medical professionals and other emergency workers, or which actually provide healthcare. Vellekamp Dec. at 5–8. Many of these businesses have been harmed so badly that they will be unlikely to recover for many months after the shutdown has ended, if ever. McKee Dec. at 6; Russell Dec. at 9.

All these harms are immediate, and either certain or substantially likely to be irreparable — especially when one considers how difficult it would be to repair such harms when they are multiplied across the population of an entire state. The only way to prevent them is by lifting the stay-at-home order imposed by the Proclamations.

### E.    The Balance Of Equities Tips In Plaintiffs' Favor.

The third factor to consider in a request for a preliminary injunction is whether the balance of equities (or hardships) tips in favor of the moving party. The previous section identified the concrete and specific harms that will continue to be inflicted on the Plaintiffs in the absence of equitable relief. In comparing the harm that might arise when the government is the defendant, the assessment of harm to the defendant merges with the consideration of the public interest. *East Bay Sanctuary Covenant v. Trump*, 349 F.Supp.3d 838 (N.D. Cal. 2018).

Plaintiffs are simply asking that the lockdown decisions be made at the local level, where they will actually be based on public health considerations, rather than left to the Governor in Olympia, who has assumed for himself the authority to grant dispensations to those whom he deems "essential," while withholding permission from those he deems "non-essential." The Governor similarly continues to claim the power to decide release some counties from the lockdown orders, while subjecting others to the ban. The Legislature's chosen procedure for

dealing with a pandemic, specified in Chapter 70.26 RCW, not only empowers local authorities to follow the plan they had previously formulated, but their decisions are based on public health criteria, not on the separation of Washington citizens into favored and disfavored groups.

Forcing the Governor to abide by the statutory scheme laid out in Chapter 70.26 RCW will also restore the system of checks and balances that prevents the aggregation of power into the hands of a single branch of government.   Moreover, the Governor's issuance of multiple emergency Proclamations undermines a future Governor's ability to impose harsh conditions when a true emergency demands drastic action.   Granting this preliminary injunction would therefore serve the public interest by preserving the allocation of political power as envisioned in a democratically enacted statute. Granting relief will also not impede any government efforts to contain the virus or save lives. Indeed, a county-by-county response that takes into account the specific conditions of each locality is not only consistent with state law, but is likely to be a more effective way to fight the pandemic. Therefore, no harm would accrue to the State of Washington.

Even if there is a risk of harm posed by reinstating local control of the response to COVID-19, that risk must be evaluated on a comparative basis; in ruling on a motion for a preliminary injunction, a court must consider the "balance of equities" or "balance of hardships" posed by, on the one hand granting, and on the other hand denying, the motion. *Chamber of Commerce of United States v. City of Seattle*, 274 F.Supp.3d 1140, 1145 (W.D. Wash. 2017). Where, as here, the hardship suffered by the Plaintiffs (*i.e.*, deprivation of fundamental constitutional rights) is continuing, and the risk of hardship suffered by the Defendant is either non-existent or highly speculative, the balance tips in Plaintiffs' favor.

**F.      A Preliminary Injunction Is In The Public Interest.**

The last factor to be considered is whether the public interest would be served by granting the requested injunctive relief. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Innovation Law Lab v. Nielsen*, 310 F.Supp.3d 1150, 1163 (D. Ore. 2018). It is to be acknowledged that the public interest is served by following guidelines promulgated by public health authorities to prevent the spread of COVID-19. However,

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

compliance with those guidelines will be enhanced by a public perception that they are applied evenly, not in a discriminatory fashion that imposes special restrictions on a disfavored group while permitting comparable conduct by others. Moreover, by returning the authority to deal with COVID-19 to the regional health authorities as prescribed by RCW 70.26.010, the experts most familiar with local conditions will be able to strike a better balance between the fight against COVID-19 and the satisfaction of other important governmental priorities, including demands on local health care resources, the need for a functioning economy, and the protection of fundamental civil rights. It would also serve the public interest by respecting and honoring the separation of powers principle.

## IV.   CONCLUSION

The Constitution is not suspended during crises; in fact, the need to enforce constitutional limitations on governmental power is greatest when the temptation to ignore them is strongest. Governor Inslee can no longer justify his unilateral restriction on constitutional rights by the limited authority granted to him by RCW 43.06.220. Whether the Governor has exceeded his authority, or in the alternative the legislation upon which he relies for that authority is inconsistent with the 14th amendment's protections against state action violating the Bill of Rights—whichever conclusion is drawn, the Governor's actions are unconstitutional.

The balance of hardships tips sharply in favor of requiring Governor Inslee to follow the legislatively directed means of dealing with a pandemic like COVID-19. No one will suffer from permitting local authorities to deal with the pandemic, while continuing the arbitrary limitations on constitutional rights would, if not enjoined, result in irreparable injury.

The Plaintiffs therefore respectfully request that the preliminary injunction be granted.

///

May 26, 2020.

ARD LAW GROUP PLLC

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

By:_____
Joel B. Ard, WSBA # 40104
P.O. Box 11633
Bainbridge Island, WA 98110
(206) 701-9243
Attorneys for Plaintiffs

ALBRECHT LAW PLLC

By:
David K. DeWolf, WSBA #10875
421 W. Riverside Ave., Ste. 614
Spokane, WA 99201
(509) 495-1246
Attorneys for Plaintiffs

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

## CERTIFICATE OF SERVICE

I certify under penalty of perjury under the laws of the United States of America that on May 26, 2020, I filed the foregoing Motion for Preliminary Injunction in *MacEwen et al. v. Inslee*, No. 3:20-cv-05423-BHS, with the Court's CM/ECF system, which will give notice to all parties and counsel of record.

ARD LAW GROUP PLLC

By _____

Joel B. Ard, WSBA # 40104
P.O. Box 11633
Bainbridge Island, WA 98110
(206) 701-9243
Joel@Ard.law

Attorneys for Plaintiffs

CERTIFICATE OF SERVICE
No. 3:20-cv-05423-BHS

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243