1

2

3

4

5

The Honorable Benjamin H. Settle

6

7

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA**

8  DREW MACEWEN, *et al.*,

9             Plaintiff,

10    v.

11  JAY INSLEE, in his official capacity as
the Governor of Washington

12

13             Defendant.

NO.  3:20-cv-05423-BHS

DEFENDANT GOVERNOR
JAY INSLEE'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION

14

15

16

17

18

19

20

21

22

23

24

25

26

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................. 2

    A.   COVID-19 and the Outbreak in Washington ............................................ 2

    B.   Washington State's Early Response to COVID-19 ................................... 3

    C.   The Governor's Stay Home Proclamation ................................................. 4

    E.   The Safe Start Proclamation ..................................................................... 5

    F.   Accommodations for Religious Gatherings .............................................. 7

    G.   COVID-19's Continuing Threat to Washington ....................................... 7

    H.   Plaintiffs' Lawsuit and Motion for Preliminary Injunction ..................... 8

III. ARGUMENT ...................................................................................................... 9

    A.   The Court Lacks Jurisdiction .................................................................... 9

        1.   Plaintiffs' claims are unripe or they lack standing ............................. 9

        2.   The Governor is Immune Under the Eleventh Amendment ............... 10

    B.   Preliminary Injunction Standards ........................................................... 12

    C.   Plaintiffs Are Unlikely to Succeed on the Merits of Any Claim ............ 12

        1.   RCW Chapter 70.26 does not apply to the COVID-19 pandemic response .... 12

            a.   The Pandemic Flu Act does not limit the Governor's powers ................. 13

            b.   The history of the Pandemic Flu Act confirms its plain text ................... 14

            c.   RCW Ch. 70.26 does not govern the local response to COVID-19 ......... 17

        2.   The Proclamations Do Not Violate the Free Exercise Clause ......................... 19

            a.   Plaintiffs' free exercise claim is moot ...................................................... 19

            b.   The Proclamations do not violate the Free Exercise Clause .................... 20

        3.   The Proclamations do not infringe the right to assemble ............................... 22

        4.   Plaintiffs are unlikely to prevail on their claim that the Proclamation violates their "right to gainful employment" .................................................. 26

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO.  3:20-cv-05423-BHS

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

5. The Proclamation does not violate the Takings Clause .................................... 27

    a. Even if pleaded, Plaintiffs' Takings claim would be unripe..................... 28

    b. Plaintiffs lack constitutionally protected property interests .................... 28

    c. Plaintiffs could not establish regulatory takings claim............................ 29

    d. The exclusive remedy for a Takings Clause violation is damages ........... 30

6. *Jacobson v. Massachusetts* compels denial of the Motion.............................. 30

D. Plaintiffs Have Failed to Establish the Irreparable Harm Requirement ................. 31

E. The Balance of Equities and the Public Interest Weigh Against an Injunction....... 33

IV. CONCLUSION ...................................................................................................... 34

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

ii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Abbott Labs. v. Gardner,*
   387 U.S. 136 (1967)..................................................................................................... 10

*Abiding Place Ministries v. Newsom,*
   No. 20-CV-683-BAS-AHG, 2020 WL 2991467 (S.D. Cal. June 4, 2020) ............................. 20

*Akina v. Hawaii,*
   835 F.3d 1003 (9th Cir. 2016)........................................................................................ 20

*Altman v. Cty. of Santa Clara,*
   No. 20-CV-02180-JST, 2020 WL 2850291 (N.D. Cal. June 2, 2020) .............................. 20

*Am. Civil Liberties Union of Colorado v. City & Cty. of Denver,*
   569 F. Supp. 2d 1142 (D. Colo. 2008)............................................................................ 23

*Amato v. Elicker,*
   No. 3:20-CV-464 (MPS), 2020 WL 2542788 (D. Conn. May 19, 2020)........................... 22

*Antietam Battlefield KOA v. Hogan,*
   No. CV CCB-20-1130, 2020 WL 2556496 (D. Md. May 20, 2020)....................... 22, 24, 25

*Arizona Dream Act Coalition v. Brewer,*
   757 F.3d 1053 (9th Cir. 2014) ....................................................................................... 31

*ATU Legislative Council of Wash. v. State,*
   145 Wn.2d 544 (2002).................................................................................................... 14

*Benner v. Wolf,*
   No. 20-CV-775, 2020 WL 2564920 (M.D. Pa. May 21, 2020)............................... 22, 23, 24

*California v. U.S. Dep't of Health & Human Servs.,*
   941 F.3d 410 (9th Cir. 2019) ........................................................................................ 12

*Callahan v. City of Chicago,*
   813 F.3d 658 (7th Cir. 2016).......................................................................................... 29

*Calvary Chapel of Bangor v. Mills,*
   No. 1:20-CV-00156-NT, 2020 WL 2310913 (D. Me. May 9, 2020) ................................. 22

*Caribbean Marine Servs. Co., Inc. v. Baldrige,*
   844 F.2d 668 (9th Cir. 1988) ......................................................................................... 31

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993)................................................................................................. 21, 22

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

iii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

*City of Renton v. Playtime Theatres, Inc.*,
  475 U.S. 41 (1986) ........................................................................................ 23

*Civil Liberties for Urban Believers v. City of Chicago*,
  342 F.3d 752 (7th Cir. 2003) ....................................................................... 23

*Colorado River Indian Tribes v. Town of Parker*,
  776 F.2d 846 (9th Cir. 1985) ....................................................................... 32

*Colvin Cattle Co. v. United States*,
  468 F.3d 803 (Fed. Cir. 2006) ..................................................................... 29

*Cooper v. City of Tucson*,
  649 F. App'x 624 (9th Cir. 2016) ................................................................ 20

*Dittman v. California*,
  191 F.3d 1020 (9th Cir. 1999) ..................................................................... 26

*Emp't Div., Dep't of Human Res. v. Smith*,
  494 U.S. 872 (1990) ........................................................................................ 2

*Ex Parte Young*,
  209 U.S. 123 (1908) ...................................................................................... 11

*Friends of Danny DeVito v. Wolf*,
  --- A.3d ----, No. 68 MM 2020, 2020 WL 1847100 (Pa. Apr. 13, 2020) ........................ 22, 25

*Furgeson v. City of Tacoma*,
  No. C05-5490FDB, 2006 WL 3333046 (W.D. Wash. Nov. 15, 2006) ................................ 29

*Geller v. de Blasio*,
  No. 20CV3566 (DLC), 2020 WL 2520711  (S.D.N.Y. May 18, 2020) ............. 22, 23, 24, 25

*Gish v. Newsom*,
  No. EDCV-20-755 JGB (KKX), 2020 WL 1979970 (C.D. Cal. Apr. 23, 2020) ........... 22, 30

*Givens v. Newsom*,
  No. 2:20-cv-00852-JAM-CKD, 2020 WL 2307224 (E.D. Cal. May 8, 2020) ......... 22, 24, 25

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
  546 U.S. 418 (2006) ................................................................................. 22, 23

*Halverson v. Skagit Cty.*,
  42 F.3d 1257 (9th Cir. 1994), *as amended on denial of reh'g* (Feb. 9, 1995) ...................... 27

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  938 F.3d 985 (9th Cir. 2019) ....................................................................... 32

*Hudson v. City of Wenatchee*,
  94 Wn. App. 990 (1999) ............................................................................... 29

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO.  3:20-cv-05423-BHS

iv

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

*In re Abbott*,
   954 F.3d 772 (5th Cir. 2020) ........................................................................ 30

*Jacobson v. Massachusetts*,
   197 U.S. 11 (1905).................................................................................... 2, 30

*Johnson v. Manitowoc Cty.*,
   635 F.3d 331 (7th Cir. 2011) ........................................................................ 30

*Krishna Lunch of S. Cal. v. Gordon*,
   797 F. App'x 311 (9th Cir. 2020) .................................................................. 21

*L.A. Cty. Bar Ass'n v. Eu*,
   979 F.2d 697 (9th Cir. 1992) ........................................................................ 11

*Lech v. Jackson*,
   791 F. App'x 711 (10th Cir. 2019) ................................................................ 29

*Legacy Church, Inc. v. Kunkel*,
   --- F. Supp. 3d ----, No. CIV 20-0327 JBSCY, 2020 WL 1905586 (D.N.M. Apr. 17,
   2020) ........................................................................................... 22, 24, 25

*Lighthouse Fellowship Church v. Northam*,
   No. 2:20-cv-204, 2020 WL 2110416 (E.D. Va. May 1, 2020).......................... 22

*Lucas v. S.C. Coastal Council*,
   505 U.S. 1003 (1992)................................................................................... 29

*Miller v. Thurston*,
   No. 5:20-CV-05070, 2020 WL 2617312 (W.D. Ark. May 25, 2020) ................. 24

*Mugler v. Kansas*,
   123 U.S. 623 (1887).................................................................................... 29

*Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*,
   676 F.3d 829 (9th Cir. 2012) ........................................................................ 10

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
   810 F.3d 631 (9th Cir. 2015)......................................................................... 20

*Page v. Tri-City Healthcare Dist.*,
   860 F. Supp. 2d 1154 (S.D. Cal. 2012)............................................................. 9

*Pakdel v. City & Cty. of S. F.*,
   952 F.3d 1157 (9th Cir. 2020) ...................................................................... 28

*Parents for Privacy v. Barr*,
   949 F.3d 1210 (9th Cir. 2020) ...................................................................... 21

*Planned Parenthood of Idaho, Inc. v. Wasden*,
   376 F.3d 908 (9th Cir. 2004) ........................................................................ 11

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

v

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

*Powell v. McCormack,*
  395 U.S. 486 (1969) ................................................................................................ 19

*Prince v. Massachusetts,*
  321 U.S. 158 (1944) .................................................................................................. 2

*Prof'l Beauty Fed'n of Cal. v. Newsom,*
  No. 2:20-CV-04275-RGK-AS, 2020 WL 3056126 (C.D. Cal. June 8, 2020) ................ 30, 33

*Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.,*
  180 F.3d 1072 (9th Cir. 1999) ................................................................................ 31

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984) ............................................................................................... 25

*Rosebrock v. Mathis,*
  745 F.3d 963 (9th Cir. 2014) ................................................................................. 20

*S. Bay United Pentecostal Church v Newsom,*
  No. 19A1044, 2020 WL 2813056 (U.S. May 29, 2020) ................................... passim

*Sagana v. Tenorio,*
  384 F.3d 731 (9th Cir. 2004), *as amended* (Oct. 18, 2004) ................................. 26

*Samson v. City of Bainbridge Island,*
  683 F.3d 1051 (9th Cir. 2012) ............................................................................... 26

*San Diego Cty. Gun Rights Comm. v. Reno,*
  98 F.3d 1121 (9th Cir. 1996) ................................................................................. 10

*Seminole Tribe of Florida v. Florida,*
  517 U.S. 44 (1996) ................................................................................................. 10

*Serv. Employee Int'l Union v. City of Los Angeles*, 114 F. Supp. 2d 966 (C.D. Cal. 2000) ..... 23

*Shanks v. Dressel,*
  540 F.3d 1082 (9th Cir. 2008) ............................................................................... 26

*Sierra Med. Servs. All. v. Kent,*
  883 F.3d 1216 (9th Cir. 2018) ............................................................................... 28

*Slidewaters LLC v. Wash. Dep't of Labor & Indus.,*
  No. 2:20-cv-0210-TOR, 2020 WL 3130295 (E.D. Wash. June 12, 2020) ........... 8, 14, 27, 33

*Sofamor Danek Group, Inc. v. Brown,*
  124 F.3d 1179 (9th Cir. 1997) ............................................................................... 11

*Stoianoff v. Montana,*
  695 F.2d 1214 (9th Cir. 1983) ................................................................................. 9

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

vi

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

*Thomas v. Anchorage Equal Rights Comm'n*,
220 F.3d 1134 (9th Cir. 2000) (en banc) ........................................ 1, 9, 10

*Tohono O'odham Nation v. Ducey*,
130 F. Supp. 3d 1301 (D. Ariz. 2015) ............................................ 11

*Tri-Valley Cares v. U.S. Dep't of Energy*,
No. C 08-01372 SBA, 2008 WL 2951396 (N.D. Cal. July 28, 2008) ................... 27

*United States v. Graf*,
610 F.3d 1148 (9th Cir. 2010) ..................................................... 9

*US West Commc'ns v. MFS Intelenet, Inc.*,
193 F.3d 1112 (9th Cir. 1999) ..................................................... 28

*Va. Office for Prot. & Advocacy v. Stewart*,
563 U.S. 247 (2011) .............................................................. 11

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ............................................................ 23, 24

*Wash. Legal Found. v. Legal Found. of Wash.*,
271 F.3d 835 (9th Cir. 2001) (en banc) ........................................... 28

*Whitlow v. California*,
203 F. Supp. 3d 1079 (S.D. Cal. 2016) ............................................ 24

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .............................................................. 14

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ................................................................ 12

### <u>Statutes</u>

RCW 38.52.050 ....................................................................... 3

RCW 38.52.050(1) .................................................................... 13

RCW 38.52.050(3)(a) ................................................................. 11

RCW 38.52.110(1) .................................................................... 14

RCW 43.05.220 ....................................................................... 16

RCW 43.06.010(12) ............................................................ 12, 14, 16

RCW 43.06.220(1) .................................................................... 14

RCW 43.06.220(2) .................................................................... 14

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

vii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

1    RCW 43.06.220(5) ................................................................................................. 11

2    RCW 43.70.130 .................................................................................................... 14

3    RCW 70.26 .................................................................................................... passim

4    RCW 70.26.010 .................................................................................................... 13

5    RCW 70.26.030(1) ................................................................................................ 13

6    RCW 70.26.030(2) ................................................................................................ 13

7    RCW 70.26.050 .............................................................................................. 13, 16

8    **<u>Other Authorities</u>**

9    2006 Wash. Legis. Serv. Ch. 63 ........................................................................... 16

10   CDC, 2009 H1N1 Pandemic (H1N1pdm09 virus),
11       https://www.cdc.gov/flu/pandemic-resources/2009-h1n1-pandemic.html (last visited
      June 15, 2020) ................................................................................................ 17

12   Centers for Disease Control and Prevention (CDC), Coronavirus Disease 2019 (COVID-
13       19), Cases in the U.S. (last updated June 15, 2020),
      https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html. ..................... 1

14   Christianson, Anna & Tiffany Littler,
15       *Gov. Kelly issues executive order to limit church gatherings, funerals*, KSNT, Apr. 7,
      2020,
16       https://bit.ly/3bZV0F5 ......................................................................................... 4

17   DOH, COVID-19 Data Dashboard (last updated June 13, 2020),
      https://www.doh.wa.gov/Emergencies/NovelCoronavirusOutbreak2020COVID19/Da
18       taDashboard ....................................................................................................... 3

19   Flores, Hilda,
      *One-third of COVID-19 cases in Sac County tied to church gatherings, officials say*,
20       KCRA (Apr. 1, 2020),
      https://bit.ly/2XlCpPu ......................................................................................... 4

21   Gov. Procl. 20-09.02 (June 11, 2020),
22       https://www.governor.wa.gov/sites/default/files/proclamations/20.09.2%20COVID19
      %20Phased%20Reopening%20of%20K12%20Schools.pdf?utm_medium=email&utm
23       _source=govdelivery ........................................................................................... 32

24   H.R. B. Rep., 2006 Reg. Sess. S.B. 6366 (Mar. 3, 2006) ......................................... 15

25   H.R. Conf. Rep. 109-359, 523, 2005 U.S.C.C.A.N. 1457, 1522 ................................ 16

26   https://www.governor.wa.gov/sites/default/files/20-24.1%20-%20COVID-19%20Non-
      Urgent%20Medical%20Procedures%20Ext%20.pdf .............................................. 5

DEFENDANT'S RESPONSE TO         viii         ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                            Complex Litigation Division
INJUNCTION                                                 800 5th Avenue, Suite 2000
NO. 3:20-cv-05423-BHS                                   Seattle, WA 98105-3188
                                                                  (206) 474-7744

https://www.governor.wa.gov/sites/default/files/Non-
Emergent%20Procedure%20Interpretive%20Statement%204.29.20%20%28tmp%29.
pdf?utm_medium=email&utm_source=govdelivery .............................................................. 5

Loosemore, Bailey & Mandy McLaren,
*Kentucky county 'hit really, really hard' by church revival that spread deadly
COVID-19*, Louisville Courier J., Apr. 2, 2020,
https://bit.ly/2XkKCnd ...................................................................................................... 4

Monica Gandhi, et al.,
*Asymptomatic Transmission, the Achilles' Heel of Current Strategies to Control
Covid-19*, N.E. J. of Med., Apr. 24, 2020,
https://www.nejm.org/doi/full/10.1056/NEJMe2009758 ........................................................ 2

Office of the Governor,
Phase 2 Construction COVID-19 Job Site Requirements,
https://www.governor.wa.gov/sites/default/files/COVID19Phase2ConstructionSafety
Guidance.pdf?utm_medium=email&utm_source=govdelivery (updated June 2, 2020)......... 6

Office of the Governor,
Phase 2 Restaurant/Tavern Reopening COVID-19 Requirements,
https://www.governor.wa.gov/sites/default/files/Phase%202%20Restaurant%20indust
ry%20re-open%20proposal _FINAL.pdf (updated May 15, 2020)........................................ 6

Otterman, Sharon & Sarah Maslin Nir,
*New Rochelle, Once a Coronavirus Hot Spot, May Now Offer Hope*, N.Y. Times,
Mar. 27, 2020,
https://www.nytimes.com/2020/03/27/nyregion/new-rochelle-coronavirus.html .................. 4

Pandemic and All-Hazards Preparedness Reauthorization Act of 2013,
Pub. L. 113-5, 127 Stat. 161 (Mar. 13, 2013) ....................................................................... 17

Pub. L. 109–148, Title II, ch. 6, 119 Stat. 2680, 2786, Dec. 30, 2005 ..................................... 16

Public Health – Seattle & King County,
*Safe Start King County*,
https://kingcounty.gov/depts/health/covid-19/safe-start.aspx (last visited June 8, 2020) ....... 6

Read, Richard,
*A choir decided to go ahead with rehearsal. Now dozens of members have COVID-19
and two are dead*, L.A. Times, Mar. 29, 2020,
https://www.latimes.com/world-nation/story/2020-03-29/coronavirus-choir-outbreak .......... 4

Shin, Youjin, et al.,
*How a South Korean church helped fuel the spread of the coronavirus*, Wash. Post,
Mar. 25, 2020,
https://www.washingtonpost.com/graphics/2020/world/coronavirus-south-korea-
church/ ................................................................................................................................... 4

Vancouver Pub. Schs., Calendar,
https://vansd.org/calendar/ (last visited June 14, 2020)........................................................ 32

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO.  3:20-cv-05423-BHS

ix

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

Wash. Dep't of Health, 2019 Novel Coronavirus Outlook (COVID-19), (last updated June 13, 2020), https://www.doh.wa.gov/Emergencies/NovelCoronavirusOutbreak2020COVID19/DataDashboard ............................................................................................................ 1

Wash. Gov. Jay Inslee, Proclamations, https://www.governor.wa.gov/office-governor/official-actions/proclamations .................... 3

Wash. S. Bill Rep., 2006 Reg. Sess. S.B. 6366 ......................................................... 16

Wash. State COVID-19 Risk Assessment Dashboard, https://coronavirus.wa.gov/what-you-need-know/covid-19-risk-assessment-dashboard ........ 5

Wash. State Republican Party, 2020 Red to the Roots State Convention, https://wsrp.org/2020convention/ (last visited June 14, 2020) ............................................. 32

Washington Office of the Governor, *Proclamation 20-25, Appendix* at 4 (Mar. 23, 2020), https://bit.ly/2TKFXbu ............................................................................................................ 10

Washington State Office of the Governor, *COVID-19 County Variance Application Process* (last updated June 13, 2020), https://bit.ly/2ZK8dPo ............................................................................................................ 6

Yakima Sch. Dist., Calendar, https://www.yakimaschools.org/Page/10#calendar2186/20200614/month (last visited June 14, 2020) ............................................................................................................ 32

### Rules

Fed R. Civ. P. 65(b)(1) ................................................................................................ 12

### Constitutional Provisions

U.S. Const. amend. V ................................................................................................... 9

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

x

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

# I.     INTRODUCTION

In just a few months, Coronavirus Disease 2019 (COVID-19) has infected over 2 million Americans and killed over 115,000.[1] In Washington State, the virus's original U.S. epicenter, more than 25,800 people have contracted COVID-19 and 1,217 have died.[2]

To slow COVID-19's spread, Defendant Governor Jay Inslee exercised his emergency powers to issue a proclamation ordering "[a]ll people in Washington State" to "immediately cease leaving their home" except for essential activities such as grocery shopping or medical appointments. That Stay Home – Stay Healthy Proclamation employed the single public health tool available in the absence of a vaccine, cure, or widespread testing to mitigate transmission of a highly contagious virus. The Governor's order saved thousands of lives, and as transmission and death rates declined, last month Washington began a phased "reopening."

For Plaintiffs—a group of state legislators, business owners, and other residents—that reopening process is not moving quickly enough. In their view, an obscure state statute displaces the Governor's legal authority to declare a state of emergency during a pandemic and manage the state's response, vesting that authority instead in each of Washington's 35 local health jurisdictions. Although Plaintiffs' Complaint does not actually plead a claim under that statute, RCW ch. 70.26—nor even mention it—they now seek a preliminary injunction largely on its basis to prevent the Governor from "enforcing his COVID-19 Proclamations to the extent they infringe upon the rights of the free exercise of religion, the right to peaceably assemble, and the right to earn a livelihood." Dkt. #27 at 1.

Plaintiffs' position cannot be squared with the plain text of RCW ch. 70.26 or clear Supreme Court precedent. To begin, their claims are not ripe because they have shown no "genuine threat of imminent prosecution." *Thomas v. Anchorage Equal Rights Comm'n*, 220

---

[1] Centers for Disease Control and Prevention (CDC), Coronavirus Disease 2019 (COVID-19), Cases in the U.S. (last updated June 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.
[2] Wash. Dep't of Health, 2019 Novel Coronavirus Outlook (COVID-19), (last updated June 13, 2020), https://www.doh.wa.gov/Emergencies/NovelCoronavirusOutbreak2020COVID19/DataDashboard.

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO.  3:20-cv-05423-BHS

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

F.3d 1134, 1139 (9th Cir. 2000) (en banc). But even if the Court considered Plaintiffs' hypothetical claims, they would fail. During the smallpox outbreak over a century ago, the Supreme Court held that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905). Decades later, the Court explained in the free exercise context: "We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 878–79 (1990). And just last month, the Court rejected a claim indistinguishable from Plaintiffs', with Chief Justice Roberts emphasizing that "when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter" as to which state officials must have "broad latitude." *S. Bay United Pentecostal Church v Newsom* (*South Bay*), No. 19A1044, 2020 WL 2813056, at *2 (U.S. May 29, 2020) (Roberts, C.J., concurring). The Bill of Rights "does not include liberty to expose the community . . . to communicable disease or . . . to ill health or death." *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944). Plaintiffs' Motion for Preliminary Injunction should be denied.

## II.      FACTUAL BACKGROUND

### A.      COVID-19 and the Outbreak in Washington

The SARS-CoV-2 virus, which causes COVID-19, is highly contagious and potentially fatal. Declaration of Dr. Kathy Lofy (Lofy Decl.) ¶¶ 6–7. Seniors and persons with medical conditions are most vulnerable to complications and death. *Id.* ¶ 7. COVID-19 spreads primarily through close person-to-person contact via respiratory droplets produced when an infected person coughs, sneezes, or talks. *Id.* ¶ 6. There is a lag of at least several days from when a person contracts the virus and the onset of symptoms.[3] In many cases, persons with COVID-19 never experience symptoms, so an infected person may spread it unknowingly. *Id.*

---

[3] *See, e.g.*, Monica Gandhi, et al., *Asymptomatic Transmission, the Achilles' Heel of Current Strategies to Control Covid-19*, N.E. J. of Med., Apr. 24, 2020, https://www.nejm.org/doi/full/10.1056/NEJMe2009758.

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

2

On January 21, 2020, the Washington State Department of Health (DOH) announced a case of COVID-19 in Snohomish County—believed then to be the first case in the United States. *Id.* ¶ 4. Additional cases emerged here the next month, including a cluster at a Kirkland nursing home, *id.*, and through March new cases increased dramatically, as Figure 1 illustrates.

**Figure 1: Washington State COVID-19 Epidemiologic Curve, June 13, 2020**[4]



### B.   Washington State's Early Response to COVID-19

On February 29, the Governor issued Proclamation 20-05, declaring a State of Emergency in Washington due to COVID-19 and directing implementation of the state's emergency plans. Declaration of David Postman (Postman Decl.) ¶ 4, Ex. 1; *see* RCW 38.52.050. The State's mitigation measures, adopted through amendatory proclamations,[5] grew stricter as cases and deaths accelerated. Postman Decl. ¶¶ 5, 18. They included: prohibiting gatherings of 250 people or more—and, later, 50 or more; permitting smaller gatherings only if individuals complied with CDC and DOH guidelines; closing schools, colleges, and universities; and prohibiting gatherings of any size in "public venues," including restaurants, gyms, faith-based organizations, and any "other similar venues." *Id.* ¶¶ 7–12; Lofy Decl. ¶ 10.

---

[4]   DOH, COVID-19 Data Dashboard (last updated June 13, 2020), https://www.doh.wa.gov/Emergencies/NovelCoronavirusOutbreak2020COVID19/DataDashboard. DOH notes that "[i]llnesses that began in the last 4 to 7 days may not yet be reported." *Id.*
[5]   For a complete repository of the Governor's proclamations, see Wash. Gov. Jay Inslee, Proclamations, https://www.governor.wa.gov/office-governor/official-actions/proclamations.

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

Despite Washington's early and aggressive mitigation strategies, in mid-March the state had the nation's highest absolute number of COVID-19 cases (and the highest or among the highest per capita). Lofy Decl. ¶ 13. One of the worst outbreaks came at a Mount Vernon church, when a March 10 choir practice tragically resulted in 45 infections, three hospitalizations, and two deaths in a relatively rural community—despite social distancing precautions.[6] This was one of many examples of major COVID-19 outbreaks at religious gatherings.[7]

## C. The Governor's Stay Home Proclamation

On March 23, the Governor issued Proclamation 20-25 (the Stay Home Proclamation), declaring that "the worldwide COVID-19 pandemic . . . remains a public disaster." Postman Decl., Ex. 12. The Stay Home Proclamation required people to "cease leaving their home" except for (1) "essential activities" (such as obtaining necessary household supplies) or (2) "employment in essential business services." *Id.* (emphasis omitted). The Stay Home Proclamation also ordered people to "immediately cease participating in all public and private gatherings and multi-person activities for social, spiritual and recreational purposes, regardless of the number of people involved," except those including only persons from the same household. *Id.* (emphasis omitted). Such activity "includes, but is not limited to, community, civic, public, leisure, faith-based, or sporting events; parades; concerts; festivals; conventions; fundraisers; and similar activities," as well as "wedding and funeral events." *Id.*

---

[6] *See* Richard Read, *A choir decided to go ahead with rehearsal. Now dozens of members have COVID-19 and two are dead*, L.A. Times, Mar. 29, 2020, https://www.latimes.com/world-nation/story/2020-03-29/coronavirus-choir-outbreak.

[7] *See, e.g.*, Sharon Otterman & Sarah Maslin Nir, *New Rochelle, Once a Coronavirus Hot Spot, May Now Offer Hope*, N.Y. Times, Mar. 27, 2020, https://www.nytimes.com/2020/03/27/nyregion/new-rochelle-coronavirus.html; Bailey Loosemore & Mandy McLaren, *Kentucky county 'hit really, really hard' by church revival that spread deadly COVID-19*, Louisville Courier J., Apr. 2, 2020, https://bit.ly/2XkKCnd; Hilda Flores, *One-third of COVID-19 cases in Sac County tied to church gatherings, officials say*, KCRA (Apr. 1, 2020), https://bit.ly/2XlCpPu; Anna Christianson & Tiffany Littler, *Gov. Kelly issues executive order to limit church gatherings, funerals*, KSNT, Apr. 7, 2020, https://bit.ly/3bZV0F5; *see also* Lofy Decl. ¶ 6; Youjin Shin, et al., *How a South Korean church helped fuel the spread of the coronavirus*, Wash. Post, Mar. 25, 2020, https://www.washingtonpost.com/graphics/2020/world/coronavirus-south-korea-church/.

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

**D.      Relaxation of Some Stay Home Proclamation's Restrictions**

After a month, the Stay Home Proclamation's unprecedented mitigation measures had begun to yield positive results. By April 29, state health officials had observed a "falling disease burden" as measured by the lower rates of COVID-19 cases, hospitalizations, and deaths, improved projections, and adherence to physical distancing requirements. At the same time, the situation remains precarious due to limited "testing capacity and availability," a continuing "risk to vulnerable populations," and limited isolation and quarantine ability.[8] In addition, for every confirmed COVID-19 case there may be as many as 19 undetected cases. Lofy Decl. ¶ 17.

In late April, the Governor issued guidance amending Proclamation 20-24, clarifying that it "allows performance of all [medical] services" for which "delay would result in worsening a life-threatening or debilitating prognosis." Postman Decl., Ex. 10 at 47.[9] On May 18, the Governor announced the resumption of all other medical services. *Id.*, Ex. 11.[10] The Governor also amended the Stay Home Proclamation to allow certain outdoor recreational activities, including hunting, fishing, and activities at public parks and lands. Postman Decl., Ex. 12 at 72.

**E.      The Safe Start Proclamation**

On May 4, the Governor announced a four-phase *Safe Start, Washington* reopening plan (the Safe Start Proclamation). Postman Decl., Ex. 17. In Phase 1, no gatherings are permitted outside the home, except for essential activities. *Id.*, Ex. 18. The Safe Start Proclamation continued to allow restaurants to be open for takeout and delivery and permitted other businesses to reopen, including auto dealerships, curbside retail, car washes, and certain construction projects. *Id.*, Ex. 17 at 83. In Phase 2, gatherings of up to five people outside one's household

---

[8] Wash. State COVID-19 Risk Assessment Dashboard, https://coronavirus.wa.gov/what-you-need-know/covid-19-risk-assessment-dashboard.

[9] https://www.governor.wa.gov/sites/default/files/Non-Emergent%20Procedure%20Interpretive%20Statement%204.29.20%20%28tmp%29.pdf?utm_medium=email&utm_source=govdelivery.

[10] https://www.governor.wa.gov/sites/default/files/20-24.1%20-%20COVID-19%20Non-Urgent%20Medical%20Procedures%20Ext%20.pdf.

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

are permitted, as is restaurant dining (with detailed safety protocols[11]). *Id.*, Ex. 18. A wide section of other businesses may reopen in Phase 2, including real estate, all construction projects,[12] professional services, and personal services (such as beauty salons). *Id.* In Phase 3, gatherings of up to 50 non-household members are permitted, restaurants may operate at 75% capacity, and all other businesses may reopen except nightclubs, concert venues, and those that involve events of more than 50 people. *Id.* Phase 4 represents the resumption of normal public interactions (with distancing), all recreational activity, and gatherings larger than 50 people. *Id.*

When the Governor first announced the Safe Start Proclamation, all counties were in Phase 1. In May, counties with populations of 75,000 people or fewer and without COVID-19 cases for three weeks may request a variance from DOH to move to Phase 2. In June, all counties became eligible to apply. Today, 25 counties are in Phase 2 (including Pierce) and eight are in Phase 3. Postman Decl. ¶ 25. Phase 2 counties include Clark (where Plaintiff Vick resides), Mason (Plaintiff MacEwen), Pierce (Plaintiff Chambers), and Thurston (Plaintiff Barkis). Amend. Compl. ¶¶ 61, 58, 62, 59.[13] Plaintiff Fortunato lives in King County, *id.* ¶ 63, the outbreak's original U.S. epicenter, which DOH approved for "Phase 1.5," a hybrid phase tailored to local conditions that combines most aspects of Phase 2 while retaining some of the limitations of Phase 1. Lofy Decl. ¶¶ 4, 13, 21.[14]

---

[11] Office of the Governor, Phase 2 Restaurant/Tavern Reopening COVID-19 Requirements, https://www.governor.wa.gov/sites/default/files/Phase%202%20Restaurant%20industry%20re-open%20proposal_FINAL.pdf (updated May 15, 2020).

[12] *See* Office of the Governor, Phase 2 Construction COVID-19 Job Site Requirements, https://www.governor.wa.gov/sites/default/files/COVID19Phase2ConstructionSafetyGuidance.pdf?utm_medium=email&utm_source=govdelivery (updated June 2, 2020).

[13] Washington State Office of the Governor, *COVID-19 County Variance Application Process* (last updated June 13, 2020), https://bit.ly/2ZK8dPo.

[14] *See* Public Health – Seattle & King County, *Safe Start King County*, https://kingcounty.gov/depts/health/covid-19/safe-start.aspx (last visited June 8, 2020). The five remaining Plaintiffs do not identify their counties of residence. *See* Amend. Compl. ¶¶ 64–68. Assuming each resides in the county in which the declaration was signed, those Plaintiffs all live in Phase 2 counties. *See* Declaration of Michael McKee (McKee Decl.) at 3 (Quincy, Grant County); Declaration of Dave McMullan (McMullan Decl.) at 2 (Puyallup, Pierce County); Declaration of Bruce Russell (Russell Decl.) at 3 of 3 (Moses Lake, Grant County); and Declaration of Isaac Vellekamp (Vellekamp Decl.) at 2 (Puyallup, Pierce County); Declaration of Fran Wills (Wills Decl.) at 4 of 4 (Spokane, Spokane County).

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

**F.      Accommodations for Religious Gatherings**

Throughout this crisis, the Governor has repeatedly interpreted or modified his orders to accommodate or exempt religious worship. For example, the Governor interpreted the Stay Home Proclamation to permit religious counseling as essential. Postman Decl. ¶ 18, Ex. 17. In early May, he permitted "drive-in" religious services. *Id*. And last month the Governor granted an even broader accommodation by permitting in-person services. Postman Decl., Ex. 22. During Phase 1, despite no other gatherings of any kind outside the home being permitted, houses of worship and other faith-based organizations may hold outdoor religious services for up to 100 people (excluding staff). *Id.* In Phase 1, then, one may attend outdoor religious worship services with up to 99 other guests, but not a secular gathering of any size, even if outdoors. *Id.*

During Phase 2, the religious services exemption also permits indoor worship services, with attendance capped at 25% of capacity or 50 guests, whichever is fewer (again, excluding staff). *Id.* To promote safety and health, in-person religious services must follow social distancing (*e.g.*, a six-foot separation between persons of different households), sanitation (*e.g.*, hand-washing), and PPE guidelines (*e.g.*, providing gloves and face coverings "as appropriate"). *Id.* The exemption for in-person religious gatherings applies not only to worship services but also to religious holiday celebrations, study classes, weddings, and funerals. *Id.* The Governor continues to collaborate with representatives of more than 30 religious groups in evaluating potential modifications to the religious services exemption. *Id.* ¶ 24.

**G.      COVID-19's Continuing Threat to Washington**

Although Washington has made progress in combatting COVID-19, an emergency continues to exist for the entire state. Lofy Decl. ¶ 22. As Dr. Lofy testifies, "COVID-19 can be (1) difficult to detect, (2) easily transmitted, and (3) lethal," and in parts of the state COVID-19 activity is increasing. *Id.* As more and more counties reopen, "social distancing will decline," "mobility across the state will increase," and the state will face a greater risk of a second wave of COVID-19, which knows "neither geographic nor political boundaries." *Id.* However,

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

1    favorable trends and compliance with social distancing directives led the Governor to gradually

2    relax some of the Proclamation's restrictions on movement and gatherings outside the home.

3    **H.     Plaintiffs' Lawsuit and Motion for Preliminary Injunction**

4            Plaintiffs include state representatives and business owners who have seen lost profits in

5    the past three months. *See, e.g.*, Dkt. #13 ¶¶ 58–62, 165, 179, 282. They believe that the COVID-

6    19 "emergency has been averted" and that "[w]e can declare victory." *Id.* ¶¶ 37, 38. Both the

7    original complaint and the Amended Complaint centered around their allegation that in

8    Washington, the threat of COVID-19 is "almost exclusively confined to long term care

9    facilities," and "elderly, sick residents of the state." Dkt. #1, ¶ 68; Dkt. #13, ¶ 103.

10           Plaintiffs' Motion for Preliminary Injunction (the Motion) takes a different approach.

11   Rather than pick up the Complaint's refrain that "there is no longer an emergency," Dkt. #13,

12   ¶ 37, the Motion's mantra is that a state statute called "Pandemic Influenza Preparedness,"

13   RCW ch. 70.26 (the Pandemic Flu Act), displaces the Governor's general emergency powers

14   and "empowers local authorities" to take "control of the response to COVID-19." Dkt. #28-1 at

15   33. Although that novel claim appears nowhere in Plaintiffs' Amended Complaint, their counsel

16   have raised it in three other cases they filed in state court challenging the Proclamation under

17   Washington law. *See* Jones Decl. ¶ 2, Exs. A–C. Even if Plaintiffs could somehow recycle that

18   Pandemic Flu Act theory here without even pleading it, the evidence developed in the state court

19   proceedings undercuts it. Just last week, the sole official Plaintiffs identify to support their

20   contention that local pandemic flu plans are "well-suited to the task of addressing" COVID-19

21   dismissed that notion as "ridiculous." Jones Decl., Ex. E (Butler Dep. 82:15–18). The U.S.

22   District Court for the Eastern District of Washington rejected an identical argument in denying

23   a TRO motion directed against the Governor's Proclamations. *See Slidewaters LLC v. Wash.*

24   *Dep't of Labor & Indus.*, No. 2:20-cv-0210-TOR, 2020 WL 3130295, at *1 (E.D. Wash. June

25   12, 2020). The Motion seeks preliminary injunctive relief on the basis of (1) the Free Exercise

26   Clause, U.S. Const. amend. I; (2) the Assembly Clause, *id.*; (3) the "right to gainful

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

employment," without an anchor in the Constitution's text; and (4) the Takings Clause, U.S. Const. amend. V, though the Amended Complaint includes no such claim.[15]

### III.    ARGUMENT

### A.    The Court Lacks Jurisdiction

Before reaching the merits of Plaintiffs' TRO Motion, the Court must first consider the threshold question of jurisdiction. *See Page v. Tri-City Healthcare Dist.*, 860 F. Supp. 2d 1154, 1159 (S.D. Cal. 2012). Here, the Court lacks jurisdiction because (1) Plaintiffs' claims are not justiciable; and (2) the Governor has sovereign immunity under the Eleventh Amendment.

### 1.    Plaintiffs' claims are unripe or they lack standing

Whether viewed through the lens of standing or ripeness, Plaintiffs' claims are not justiciable because they cannot demonstrate a genuine threat of imminent prosecution for violating the Proclamations. *Thomas*, 220 F.3d at 1139. The challenged restrictions have not been applied to Plaintiffs. They do not plead facts to show their actual or planned conduct would violate the order. On the contrary, at least six of the Plaintiffs own or work for businesses that are currently allowed to operate under the Safe Start Proclamation.[16]

A person wishing to challenge a law before it is enforced "must demonstrate a genuine threat that the allegedly unconstitutional law is about to be enforced against him." *Stoianoff v. Montana*, 695 F.2d 1214, 1223 (9th Cir. 1983). To avoid resolving hypothetical disputes, a plaintiff must show a "genuine threat of imminent prosecution," which requires consideration of: (1) "whether the plaintiff [has] articulated a 'concrete plan' to violate the law in question";

---

[15] The Motion also contains passing references to the Second Amendment, Dkt. #28-1 at 31, and "Substantive and Procedural Due Process," *id.* at 29. Plaintiffs make no argument in reference to such constitutional theories, which are therefore waived. *See, e.g.*, *United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) ("Arguments made in passing and not supported by citations to the record or to case authority are generally deemed waived.").

[16] *See, e.g.*, Dkt. #13, ¶¶ 162–64 (Plaintiff MacEwen's restaurants in Mason and Kitsap Counties, both of which are in Phase 2); *id.* ¶¶ 170–71 (Plaintiff Barkis's property management company in Thurston County, which is in Phase 2); *id.* ¶¶ 286–87 (Plaintiff Fortunato's environmental compliance company in King County, which is in Phase 2 with respect to professional services and construction projects); *id.* ¶¶ 356–58 (Plaintiff Russell's restaurant and tap house in Grant County, which is in Phase 2); *id.* ¶ 257 (noting that Plaintiff Chambers's business "is deemed an essential service"); *id.* ¶ 376–77 (same for Plaintiff McMullan's business).

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

9

(2) "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings"; and (3) "the history of past prosecution or enforcement under the challenged [law]." *Thomas*, 220 F.3d at 1139.

Plaintiffs satisfy none of the three factors. First, the Amended Complaint contains no allegations demonstrating that Plaintiffs have any plan, concrete or otherwise, to violate the Proclamations—either by in-person operation of nonessential businesses over the "minimum basic" operations permitted, or by engaging in public gatherings. Again, most of the Plaintiffs work in sectors that are currently permitted to operate. Dkt. No. 13 at 3–5.[17] None has articulated a plan to violate the Proclamations. Second, Plaintiffs do not allege that any official has made "even a general threat" to commence proceedings against them. *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1127 (9th Cir. 1996). Third, Plaintiffs have not identified a history of enforcement of the Proclamations. In short, every factor this Court considers in deciding whether Plaintiffs have shown a "genuine threat of imminent prosecution," *Thomas*, 220 F.3d at 1139, demonstrates that they have not. Their generalized claims against the Proclamations are entirely hypothetical. They lack Article III standing and their claims are unripe.[18]

**2.     The Governor is Immune Under the Eleventh Amendment**

The second threshold barrier is the "jurisdictional bar of the Eleventh Amendment," *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 73 (1996), which prohibits "federal courts

---

[17] Postman Decl., Ex. 17 at 85 (permitting reopening of "[v]ehicle and vessel sales"); Washington Office of the Governor, *Proclamation 20-25, Appendix* at 4 (Mar. 23, 2020), https://bit.ly/2TKFXbu (classifying as essential "[r]estaurant carry-out and quick serve food operations").

[18] Plaintiffs also cannot establish prudential ripeness, which requires consideration of two factors: the fitness of the issues for judicial decision and the hardship to the parties of withholding adjudication. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977). Both factors here counsel against attempting to resolve the generalized and hypothetical claims that Plaintiffs raise. First, Plaintiffs' claims are not fit for judicial decision because they challenge the Proclamations before they have ever been enforced against them and without alleging facts sufficient to demonstrate that they will be enforced against them. *See Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 837 (9th Cir. 2012). Second, there is no hardship to Plaintiffs in delaying judicial review until the Court has a factual context to analyze application of the challenged restrictions. Plaintiffs have not been charged with violating the Proclamation and do not "face a credible threat of prosecution"; thus, "any hardship caused by [a] decision to delay resolution of plaintiffs' claims does not justify the exercise of jurisdiction." *San Diego County Gun Rights Committee*, 98 F.3d at 1132.

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

10

1  from hearing suits brought by private citizens against state governments without the state's

2  consent," *Sofamor Danek Group, Inc. v. Brown*, 124 F.3d 1179, 1183 (9th Cir. 1997). The

3  narrow exception articulated in *Ex Parte Young*, 209 U.S. 123, 157 (1908), permits suits for

4  prospective injunctive relief against state officials only if they have a proven connection to

5  enforcing the challenged law. *See Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253

6  (2011). The connection "must be fairly direct," and "a generalized duty to enforce state law or

7  general supervisory power over the persons responsible for enforcing the challenged provision"

8  does not suffice. *L.A. Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).

9  Here, the *Ex parte Young* exception does not apply because the Governor does not have

10  a "fairly direct" connection to enforcement of the Proclamations. Under state law, the Governor

11  has authority to issue (and amend or rescind) an emergency order, *see* RCW 38.52.050(3)(a),

12  but enforcement power lies with others, *see generally* RCW 43.06.220(5) (making willful

13  violation of any emergency order issued by the Governor a gross misdemeanor). If an official

14  "cannot direct, in a binding fashion, the prosecutorial activities of the officers who actually

15  enforce the law or bring his own prosecution, he may not be a proper defendant." *Planned*

16  *Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004). "Were the law

17  otherwise, the exception would always apply" and "[g]overnors who influence state executive

18  branch policies (which virtually all governors do) would always be subject to suit under *Ex parte*

19  *Young*." *Tohono O'odham Nation v. Ducey*, 130 F. Supp. 3d 1301, 1311 (D. Ariz. 2015).[19] The

20  preliminary injunction Plaintiffs seek is barred by the Eleventh Amendment.

21

22

---

23      [19] Consistent with this principle, the only appellate court to thus far consider this issue in the context of a governor's COVID-19 emergency order has concluded that the *Ex parte Young* exception did not apply because "[t]he power to promulgate law is not the power to enforce it" and the governor "lack[ed] the required enforcement connection to" his emergency order. *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020); *see also Lighthouse Fellowship Church v. Northam*, No. 2:20-cv-204, 2020 WL 2614626, at *4 (E.D. Va. May 21, 2020) (denying injunction pending appeal where governor lacked authority to enforce stay home order). *But cf. First Baptist Church v. Kelly*, No. 20-1102-JWB, 2020 WL 1984259, at *7 (D. Kan. Apr. 27, 2020) (*Ex parte Young* exception applied to governor where Kansas state constitution, unlike Washington's, explicitly charged her with enforcing state law).

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

**B.     Preliminary Injunction Standards**

To obtain a preliminary injunction, Plaintiffs must make a "clear showing" that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in their favor; and (4) an injunction is in the public interest. *See* Fed R. Civ. P. 65(b)(1); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *California v. U.S. Dep't of Health & Human Servs.*, 941 F.3d 410, 423–24 (9th Cir. 2019).

**C.     Plaintiffs Are Unlikely to Succeed on the Merits of Any Claim**

**1.     RCW Chapter 70.26 does not apply to the COVID-19 pandemic response**

Throughout their Motion, Plaintiffs argue that the Pandemic Flu Act displaces the Governor's emergency powers and vests "the authority to deal with COVID-19 [in] the regional health authorities," Dkt. #28-1 at 34, and that the Court should "[f]orc[e] the Governor to abide by the statutory scheme," *id.* at 33; *see also id.* at 3, 7, 13–19. Unlike similar lawsuits Plaintiffs' counsel have filed in other courts, Plaintiffs here do not plead a claim that the Governor has acted contrary to RCW ch. 70.26. *See* Jones Decl., Exs. A–C. But while it does not represent a legal claim on the basis of which Plaintiffs seek a preliminary injunction, their quixotic theory pervades their entire Motion and distorts their discussion of both the merits and the equities. It therefore must be addressed squarely at the outset and exposed as the fiction that it is.

Plaintiffs' argument that RCW ch. 70.26 somehow limits the Governor's emergency powers and devolves state authority during a public health crisis to local officials is flawed on every level. First, it disregards the plain text of the statute, which simply requires that local health jurisdictions prepare and submit plans to prepare for and respond to a pandemic of influenza (a different virus from COVID-19) to the Washington Secretary of Health for approval to qualify for state and federal funds. The statute does nothing to limit the Governor's broad statutory powers to proclaim and manage an emergency involving a "public disorder . . . affect[ing] life, health, property, or the public peace." RCW 43.06.010(12). Second, consistent with the statutory text, the context in which the Legislature enacted the Pandemic Flu Act confirms that it was a

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO.  3:20-cv-05423-BHS

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

narrow piece of legislation designed to secure federal funds for influenza preparedness to be distributed to local health jurisdictions. Third, the transcendent importance Plaintiffs ascribe to RCW ch. 70.26 is belied by state and local public health officials' unawareness of the statute's very existence, and their opposition to the decentralized approach to pandemic management Plaintiffs misinterpret the statute to require.

### a.    The Pandemic Flu Act does not limit the Governor's powers

The Pandemic Flu Act is a simple statute. Its purpose was to ensure that "adequate pandemic flu preparedness and response plans be developed and implemented by local public health jurisdictions statewide." RCW 70.26.010. It accomplishes that purpose in three steps. First, it required the Secretary to "establish requirements and performance standards, consistent with any requirements or standards established by the [U.S. Department of Health and Human Services (HHS)], regarding the development and implementation of local pandemic flu preparedness and response plans." RCW 70.26.030(1). Second, it required "each local health jurisdiction" to "develop a pandemic flu preparedness response plan, consistent with [the state] requirements and performance standards," RCW 70.26.030(2), and to "submit" them to the Secretary for "approv[al] or reject[ion]" by November 1, 2006, RCW 70.26.030(1), .050. Third, the Secretary was to grant "additional state or federal funding appropriated" to local jurisdictions whose plans he "determined . . . to comply with [DOH] requirements." RCW 70.26.050.

In other words, the entire statute is directed towards *planning* for an influenza pandemic, and says nothing at all about how to actually manage the state's emergency response when a pandemic occurs. That subject is addressed in various emergency management statutes that allocate powers and duties to state officials, notably the Governor and the Secretary. *See, e.g.*, RCW § 38.52.050(1) (vesting in the governor the "general supervision and control of the emergency management functions in the department" and providing that he "in the event of disaster beyond local control, may assume direct operational control over all or any part of the

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

emergency management functions within this state").[20] The Pandemic Flu Act does not mention those broad emergency management statutes nor suggest that the Legislature intended to significantly curb them during a flu pandemic (let alone a non-flu pandemic) by requiring a "county-by-county" emergency response. Dkt. 28-1 at 33. To read the Act in this way would ignore not only the established presumption against "repeal by implication," *ATU Legislative Council of Wash. State v. State*, 145 Wn.2d 544, 552 (2002), but also the maxim that the Legislature does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The text supports the conclusion of another federal court in this state that, "[b]ecause the governor may lawfully proclaim a public emergency related to disease outbreak, authority to enforce public health rules related to a pandemic is not vested "exclusively" in local health officers." *Slidewaters LLC*, 2020 WL 3130295, at *3 (rejecting argument that Pandemic Flu Act permits only local health officers to issue COVID-19 directives).

### b.  The history of the Pandemic Flu Act confirms its plain text

The history of the statute further confirms that it does not have the expansive effect Plaintiffs' attribute to it. The legislature adopted ch. 70.26 RCW in direct response to a major federal initiative designed to improve and coordinate federal, state, and local public health

---

[20] *See also* RCW 43.06.010(12) ("The governor may, after finding that a public disorder, disaster, energy emergency, or riot exists within this state or any part thereof which affects life, health, property, or the public peace, proclaim a state of emergency . . . ."); RCW 43.70.130 (authorizing the Secretary to "[i]nvestigate outbreaks and epidemics of disease that may occur and advise local health officers as to measures to be taken to prevent and control the same," "exercise general supervision over the work of all local health departments," and exercise "the same authority as local health officers . . . when in an emergency the safety of the public health demands it"); RCW 38.52.110(1) (authorizing the governor to "utilize the services, equipment, supplies, and facilities of existing departments, offices, and agencies of the state, political subdivisions, and all other municipal corporations thereof . . . to the maximum extent practicable, and the officers and personnel of all such departments, offices, and agencies are directed to cooperate with and extend such services and facilities to the governor . . . upon request notwithstanding any other provision of law"); RCW 43.06.220(1) (authorizing the governor after proclaiming a state of emergency to "issue an order prohibiting: . . . (b) Any number of persons, as designated by the governor, from assembling or gathering on the public streets, parks, or other open areas of this state, either public or private; . . . and (h) Such other activities as he or she reasonably believes should be prohibited to help preserve and maintain life, health, property or the public peace"); RCW 43.06.220(2) (authorizing the governor after proclaiming state of emergency "waive[]" or "suspen[d]" any "statutory and regulatory obligations or limitations prescribing the procedures for conduct of state business, or the orders, rules, or regulations of any state agency if strict compliance with the provision of any statute, order, rule, or regulation would in any way prevent, hinder, or delay necessary action in coping with the emergency").

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

infrastructure in anticipation of the next major flu pandemic. *See* H.R. B. Rep., 2006 Reg. Sess. S.B. 6366 (Mar. 3, 2006) (describing federal findings and policy on preparedness for pandemic influenza). In 2005, as the avian influenza virus A (H5N1) spread throughout East and Southeast Asia, U.S. public health experts and policymakers grew concerned that the world was on the verge of an influenza pandemic. Jones Decl., Ex. I at 882. In November 2005, the White House Homeland Security Council released the National Strategy for Pandemic Influenza (Strategy), which six months later the Security Council supplemented with detailed Implementation Plan containing 300 required actions for federal agencies, state and local governments, and private sector. The Strategy "recognize[d] that preparing for and responding to a pandemic cannot be viewed as a purely federal responsibility, and that the nation must have a system of plans at all levels of government . . . that can be integrated to address the pandemic threat." *Id.*, Ex. J at 2. The Implementation Plan provided that "State, local and tribal entities should develop and exercise pandemic influenza plans that address key response issues and outline strategies to mitigate the human, social, and economic consequences of a pandemic," including "social distancing measures and strategies to mitigate consequences." *Id.*, Ex. K at 115, 84.

In November 2005, the U.S. Department of Health and Human Services (HHS), issued its own Pandemic Influenza Plan (HHS Plan). The HHS Plan provides public health guidance for state and local governments, including recommending review of "[l]aws and procedures for closing businesses or schools or suspending public meetings during a declared state of emergency." *Id.*, Ex. L at I-5. HHS noted that "[s]tate governors generally may restrict travel within their states and access to their states," and "[s]tates may also impose quarantine," *id.* at E-32, but urged states to "[e]nsure the existence of a statute, regulation, or other administrative mechanism authorizing isolation/quarantine for pandemic influenza." *Id.* at E-32, I-13.

The administration requested $7.1 billion in emergency supplemental funds for avian and pandemic flu preparedness. Jones Decl., Ex. M at 4. In December 2005, Congress provided $3.8 billion in emergency supplemental appropriations, including $350 million for state and local

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO.  3:20-cv-05423-BHS

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

public health capacity. Pub. L. 109–148, Title II, ch. 6, 119 Stat. 2680, 2786, Dec. 30, 2005. Specifically, Congress intended that the appropriation be used to support the development of "pandemic response plans by State and local officials." H.R. Conf. Rep. 109-359, 523, 2005 U.S.C.C.A.N. 1457, 1522. As a condition of eligibility for those federal funds, HHS required states to submit a "state pandemic influenza response plan" by February 1, 2007. Jones Decl., Ex. N at 12. In March and July 2006, HHS awarded $325 million of the total $350 million Congress had appropriated to 62 jurisdictions, including Washington. all 50 states and the District of Columbia. Jones Decl., Ex. O at 2. Washington was among those states, having enacted the Pandemic Flu Act in March 2006. Wash. S. Bill Rep., 2006 Reg. Sess. S.B. 6366; 2006 Wash. Legis. Serv. Ch. 63, codified at ch. 70.26 RCW.

As Plaintiffs have noted, various local health jurisdictions in Washington adopted pandemic flu plans. *See, e.g.*, Dkt. ##16-3 to -5, -7 to -9. Plaintiffs provide no evidence that any of those plans were approved by the Secretary by November 1, 2006, as required by RCW 70.26.050. And the plans themselves do not purport to displace the statutory authority of state officials to direct the state's response during a public health emergency. To the contrary, the draft pandemic flu plan of the Chelan-Douglas County Health District (Chelan-Douglas)—on which Plaintiffs rely more than any other local health jurisdiction in support of their theory— explicitly states that it will coordinate the "local health care response to an influenza pandemic . . . within the framework of the county-state-federal Emergency Management system." Dkt. 16-3 at 3. The draft also expressly acknowledges that the "Governor has authority to proclaim a state of emergency after finding that a disaster affects life, health, property, or the public peace," *id.* at 34 (citing RCW 43.06.010(12)), and that, after doing so, "the Governor has the authority to restrict public assembly, order periods of curfew, and prohibit activities that he or she believes should be prohibited in order to maintain life and health," *id.* (citing RCW 43.05.220).

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

In other words, these local pandemic flu plans, rather than all-encompassing blueprints for an exclusive local response to any pandemic, read as limited and conventional local guidance documents created in large part to secure federal funds. In the intervening 14 years, and partly in response to later federal legislation,[21] "statewide pandemic preparedness efforts . . . broadened their focus beyond influenza," local health jurisdictions in Washington have "worked to update and strengthen their pandemic preparedness plans . . . based on more recent communicable disease incidents and advancements in public health science and technology," and pandemic influenza plans developed pursuant to RCW Chapter 70.26 "have receded in importance." Declaration of Kevin Wickersham (Wickersham Decl.) ¶ 12. Of the four local pandemic flu plans Plaintiffs cite, just one was written after 2008, and even it is nearly seven years old. Dkt. #16-5. If the Legislature really intended for those plans to provide a definitive roadmap for locality-driven pandemic management, as Plaintiffs claim, one would expect them to have unearthed more than four—and certainly at least one written in the past six years.[22]

### c.   RCW Ch. 70.26 does not govern the local response to COVID-19

In addition to its inconsistency with the plain text and historical context, Plaintiffs' reading of the Pandemic Flu Act also defies the actual practices of state and local public health agencies charged with managing pandemic response and the views of public health experts— including the one local official Plaintiffs identify to try to bolster their position, Dr. Malcolm Butler, the Chelan-Douglas Health Officer. Plaintiffs invoke Dr. Butler to support their claim that local pandemic influenza plans "are adequate to face the challenge of the COVID-19 pandemic." Dkt. 28-1 at 17.[23] Dr. Butler himself takes a dim view of that assertion.

---

[21] *See, e.g.*, Pandemic and All-Hazards Preparedness Reauthorization Act of 2013, Pub. L. 113-5, 127 Stat. 161 (Mar. 13, 2013).

[22] CDC, 2009 H1N1 Pandemic (H1N1pdm09 virus), https://www.cdc.gov/flu/pandemic-resources/2009-h1n1-pandemic.html (last visited June 15, 2020).

[23] The eight-point document that Plaintiffs cite, *see* Dkt. #16-2, was originally drafted by a state court plaintiff, who used his position on the Chelan-Douglas Board of Health to pressure Dr. Butler (who reports to the Board) to sign the document, without ever revealing it would be used in litigation. Dr. Butler testified that he

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

In fact, Dr. Butler had not even known the Chelan-Douglas plan existed before it was called to his attention last month by a plaintiff in a state court lawsuit challenging the Governor's Proclamations. Jones Decl., Ex. E (Butler Dep. 51:21–25), Ex. G. And as of June 8, 2020, Dr. Butler had not even read the plan. *Id.* (Butler Dep. 52:1–4). The reason, Dr. Butler testified at his deposition, is that relying on a plan for an influenza pandemic "made absolutely no sense, since [COVID-19] is not an influenza." *Id.*, Ex. E (44:15–16); *see also* Lofy Decl. ¶ 24 (describing differences between COVID-19 and pandemic influenza); Declaration of Kevin Wickersham (Wickersham Decl.) ¶ 10 (same). And more importantly, Dr. Butler unequivocally rejected the idea of "local control of the response to COVID-19." Dkt. #28-1 at 33. He testified that "[t]here is just no conceivable way that our local health jurisdiction could have the resources required to understand or manage a pandemic like this." Jones Decl., Ex. E (Butler Dep. 92:4–6). In contrast, DOH "does have access to those resources," as well as "full-time prepared epidemiologists and public health officers working closely with academic institutions on modeling and guidance." *Id.* (Butler Dep. 92:7–11). Thus, Dr. Butler—the one official that Plaintiffs identify in support of their pandemic flu statute theory—flatly rejected their "county-by-county" approach to managing COVID-19. *Id.* (Butler Dep. 92:14).

State Health Officer Dr. Kathy Lofy agrees with Dr. Butler on the importance of a state-led pandemic response. She explains that "widespread public health emergencies are best managed through the current process of centralized decision-making guided by close cooperation and consultation with local public health authorities." Lofy Decl. ¶ 23. A "coordinated, statewide public health emergency response directed by the Governor and the Secretary" allows for a (1) "bird's eye view of statewide data," (2) "consistent and science-based mitigation measures and public messaging," (3) "coordinated and efficient distribution of health care resources," and (4) a "clear hierarchy to resolve competing interests." *Id.* Virtually all of Washington's 35 local

---

"deceived me into believing that he needed this statement to support work that was being conducted by the Douglas County Board of Commissioners." Jones Decl., Ex. E (Butler Dep. 87:13–15); *see also id.*, Ex. 6.

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

1   health jurisdictions "have fully supported a centralized response effort." *Id.* And Dr. Lofy herself

2   would oppose any proposal for "devolving policy authority to local jurisdictions during any

3   widespread public health crisis, let alone during the worst pandemic in a century." *Id.*

4       Plaintiffs' theory that the Pandemic Flu Act restricts the Governor's emergency powers

5   and authorizes local health jurisdictions instead to manage the COVID-19 pandemic cannot be

6   reconciled with the statutory text, its historical and legislative context, or the practices and views

7   of the health officials actually charged with implementing the state's response to this pandemic.

8       **2.    The Proclamations Do Not Violate the Free Exercise Clause**

9       The first cause of action on the basis of which Plaintiffs formally seek a preliminary

10  injunction is their free exercise claim. Specifically, Plaintiffs allege that the Governor's

11  Proclamations "effectively prohibit Washington citizens from gathering for religious worship."

12  Dkt. #28-1 at 22–23. But the Governor's May 27, 2020 religious services exemption, which

13  permits in-person services outdoors in Phase 1 and indoor services in Phase 2, plainly moots

14  Plaintiffs' claim. Even if Plaintiffs were to amend their Complaint yet again or file a new motion

15  challenging the current religious services exemption, such efforts would be futile because the

16  exemption comports with the Free Exercise Clause.

17      **a.    Plaintiffs' free exercise claim is moot**

18      Plaintiffs' Motion challenges under the Free Exercise the Governor's May 6, 2020

19  memorandum allowing drive-in religious services. *See* Dkt. #28-1 at 22. Plaintiffs cannot succeed

20  on that claim because Washington now permits in-person religious service. Under the religious

21  services exemption, Plaintiffs subject to Phase 1 restrictions may participate in outdoor services

22  with up to 100 individuals. Postman Decl., Ex. 20 at 101, Ex. 22 at 118. Plaintiffs subject to Phase

23  2 restrictions may also participate in indoors services at the lower of 25 percent capacity or 50

24  people, as well as in-home or residential counseling with up to five people. *Id.*, Ex. 22 at 118.

25      "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally

26  cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). A

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

1    preliminary injunction request is moot "when a court can no longer grant any effective relief

2    sought." *See Akina v. Hawaii*, 835 F.3d 1003, 1010 (9th Cir. 2016). "A statutory change . . . is

3    usually enough to render a case moot, even if the legislature possesses the power to reenact the

4    statute." *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014); *see, e.g.*, *Abiding Place Ministries*

5    *v. Newsom*, No. 20-CV-683-BAS-AHG, 2020 WL 2991467, at *3 (S.D. Cal. June 4, 2020) (denying

6    PI motion challenging prior guidelines that were superseded by new guidelines allowing religious

7    services); *Altman v. Cty. of Santa Clara*, No. 20-CV-02180-JST, 2020 WL 2850291, at *5 (N.D.

8    Cal. June 2, 2020) (dismissing Second Amendment claims arising from COVID-19 restrictions as

9    to plaintiffs no longer subject to challenged restrictions).

10        Plaintiffs' Motion on this issue is based on an alleged inability by particular plaintiffs to

11    engage in in-person worship. Dkt. 28-1 at 32 (citing Plaintiffs' declarations). In-person worship at

12    church, while still limited in some ways, is no longer prohibited. Plaintiffs' Motion was filed the

13    day before the new guidance on religious services was released. They have had ample opportunity

14    to amend their Motion to demonstrate that they would continue to suffer harm under the new

15    guidance. They have not done so. *See Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810

16    F.3d 631, 636 (9th Cir. 2015) (there must be a 'sufficient nexus between the claims raised in a

17    motion for injunctive relief and the claims set forth in the underlying complaint itself.'"). Plaintiffs

18    are not churches challenging limitations on the size or location or services. They are individuals

19    whose claimed injury lay in being unable to do something they now may do. Their eree exercise

20    claim is moot. *See Cooper v. City of Tucson*, 649 F. App'x 624, 626 (9th Cir. 2016) (vacating

21    preliminary injunction that was "no longer responsive" to current state or enforcement of the law).

22                    **b.    The Proclamations do not violate the Free Exercise Clause**

23        Even if Plaintiffs were to challenge the current regulatory regime with respect to religious

24    exercise, they would be unlikely to succeed because the Governor's orders are perfectly

25    consistent with the Free Exercise Clause. Under the Supreme Court's governing standard, "a law

26    that is neutral and of general applicability need not be justified by a compelling governmental

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

1   interest even if the law has the incidental effect of burdening a particular religious

2   practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah* (*Lukumi*), 508 U.S. 520, 531

3   (1993). Rather, if "a law is neutral and applies generally, [courts] uphold it if it is rationally

4   related to a legitimate state purpose." *Krishna Lunch of S. Cal. v. Gordon*, 797 F. App'x 311,

5   314, 375 (9th Cir. 2020) (unpublished). Courts evaluate "both the text of the challenged law as

6   well as the effect . . . in its real operation." *Parents for Privacy v. Barr*, 949 F.3d 1210, 1234

7   (9th Cir. 2020) (quotation marks and citation omitted). Both tests "focus on whether a law

8   specifically targets or singles out religion." *Id.* at 1234–35.

9       The Proclamations pass both tests because they impose temporary, broad-based public

10  health measures that do not target religious conduct or belief and apply to religious and secular

11  gatherings alike. In fact, the Proclamations now allow large gatherings for religious worship

12  during Phase 1 and Phase 2, while permitting no comparable secular gatherings. As Chief Justice

13  Roberts explained in denying a challenge to California's substantially similar regime, its

14  "restrictions on places of worship . . . appear consistent with the Free Exercise Clause" because

15  "[s]imilar or more severe restrictions apply to comparable secular gatherings" (such as "lectures,"

16  "concerts," and "spectator sports, . . . where large groups of people gather in close proximity for

17  extended periods of time"), and California "exempts or treats more leniently only dissimilar

18  activities, such as operating grocery stores, banks, and laundromats"). *South Bay*, 2020 WL

19  2813056 (Roberts, C.J., concurring). The same is true of Washington's Proclamations.

20      Because the Proclamations are neutral and generally applicable, "rational basis review"

21  applies. *Parents for Privacy*, 949 F.3d at 1238. Under this liberal standard, the Court "must

22  uphold the rules if they are rationally related to a legitimate governmental purpose." *Id.* Plaintiffs

23  do not contend either that slowing the spread of COVID-19 is illegitimate or that the

24  Proclamations are unrelated to that public health objective. Nor could they, for each proposition

25  is almost self-evident. Protecting public health from a highly contagious pandemic that has

26  already infected 25,000 Washingtonians is a compelling state interest. *See, e.g., Gonzales v.*

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

1   *O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 438 (2006) (recognizing state's

2   interest in "promoting public health and safety"). The Proclamations are not just "rationally

3   related" to public health, they are a critical tool to prevent the spread of a deadly and highly

4   contagious virus. Lofy Decl. ¶¶ 15, 18. The Proclamations easily survive rational basis review.[24]

5       **3.    The Proclamations do not infringe the right to assemble**

6       Next, in just two short paragraphs of analysis, Plaintiffs assert that the Proclamations

7   violate their First Amendment freedom of assembly. Dkt. #28-1 at 23. This claim, too, is unlikely

8   to succeed, as evidenced by the growing consensus of courts that have rejected assembly-based

9   challenges to state and local stay-at-home orders adopted in response to COVID-19.[25]

10      Plaintiffs do not cite, let alone apply, the correct legal framework governing assembly

11  claims, which track the well-established "time, place, and manner" standards of regulations of

12  protected speech. *See Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 765

13

14          [24] Although rational basis review is the correct standard, the Governor's orders would also meet strict
    scrutiny, given their temporary nature and the dire emergency to which this pandemic has given rise. First, it is
15  undeniable that slowing the spread of COVID-19 is a compelling state interest. As the *Legacy Church* court
    recognized in denying a TRO against New Mexico's stay-home order, mitigating "a global pandemic and its local
16  outbreak amount to a compelling state interest." *Legacy Church, Inc. v. Kunkel*, --- F. Supp. 3d ----, No. CIV 20-
    0327 JB\SCY, 2020 WL 1905586 (D.N.M. Apr. 17, 2020). Washington's early action to slow the spread and avoid
17  hospitals reaching capacity has worked. Yet Washington faces a "second wave" of COVID-19 transmission if its
    measures are relaxed too early. Lofy Decl. ¶ 22. The State has a compelling interest in continuing its measured
18  approach to reopening. Second, the religious service exemption is narrowly tailored to slow COVID-19's spread.
    The narrow tailoring inquiry asks whether a law is significantly (1) "underinclusive," such that the state's
19  "objectives are not pursued with respect to analogous . . . conduct," or (2) "overbroad," such that the state's "interests
    could be achieved by narrower [measures] that burden[] religion to a far lesser degree." *Lukumi*, 508 U.S. at 546.
20  The exemption is not "underinclusive" because it does not treat substantial, *comparable* secular conduct differently,
    as discussed above in the section on general applicability. Further, by permitting indoor worship services, with
21  attendance capped at 25% of capacity or 50 guests, Washington has crafted the exemption to be no broader than it
    needs to be to address the public health concern about a "second wave" of infections.

22          [25] *See, e.g.*, *Benner v. Wolf*, No. 20-CV-775, 2020 WL 2564920, at *4 (M.D. Pa. May 21, 2020); *Antietam
    Battlefield KOA v. Hogan*, No. CV CCB-20-1130, 2020 WL 2556496, at *10 (D. Md. May 20, 2020); *Amato v.
23  Elicker*, No. 3:20-CV-464 (MPS), 2020 WL 2542788, at *13 (D. Conn. May 19, 2020); *Geller v. de Blasio*, No.
    20CV3566 (DLC), 2020 WL 2520711, at *2 (S.D.N.Y. May 18, 2020) n.1; *Calvary Chapel of Bangor v. Mills*, No.
24  1:20-CV-00156-NT, 2020 WL 2310913, at *9 (D. Me. May 9, 2020); *Givens v. Newsom*, No. 2:20-cv-00852-JAM-
    CKD, 2020 WL 2307224 at *6 (E.D. Cal. May 8, 2020); *Lighthouse Fellowship Church v. Northam*, No. 2:20-cv-
25  204, 2020 WL 2110416 (E.D. Va. May 1, 2020); *Gish v. Newsom*, No. EDCV-20-755 JGB (KKX), 2020 WL
    1979970 (C.D. Cal. Apr. 23, 2020), *injunction pending appeal denied by* No. 2—55445, --- F.3d ----, --- WL ---
26  (9th Cir. May 7, 2020); *Legacy Church, Inc.*, 2020 WL 1905586; *Friends of Danny DeVito v. Wolf*, --- A.3d ----,
    No. 68 MM 2020, 2020 WL 1847100 (Pa. Apr. 13, 2020).

DEFENDANT'S RESPONSE TO                          22              ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                              Complex Litigation Division
INJUNCTION                                                         800 5th Avenue, Suite 2000
NO. 3:20-cv-05423-BHS                                               Seattle, WA 98105-3188
                                                                      (206) 474-7744

1    (7th Cir. 2003); *Am. Civil Liberties Union of Colorado v. City & Cty. of Denver*, 569 F. Supp.

2    2d 1142, 1161 (D. Colo. 2008); *Serv. Employee Int'l Union v. City of Los Angeles*, 114 F. Supp.

3    2d 966 (C.D. Cal. 2000). The Proclamations are a valid "time, place, and manner" regulation

4    because they are (1) "content-neutral"; (2) "designed to serve a substantial governmental

5    interest"; and (3) "do not unreasonably limit alternative avenues of communication." *City of*

6    *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986) (quotation marks omitted).

7         First, the Proclamations are content neutral because they "serve[] purposes unrelated to

8    the content of expression," namely to combat a pandemic. *Ward v. Rock Against Racism*, 491

9    U.S. 781, 791 (1989). The Governor did not adopt them because of any "disagreement with the

10   message" conveyed at any of the gatherings the Proclamations temporarily prohibit. *See Ward*,

11   491 U.S. at 791. Indeed, the sheer diversity of messages at these events, gatherings, or activities

12   illustrates that their content cannot be the Proclamations' target.

13        The Proclamations instead "serve[] purposes unrelated to the content of expression."

14   *Ward*, 491 U.S. at 791. The purpose they serve are to prevent people from transmitting the virus

15   to others. *See, e.g.*, *Benner*, 2020 WL 2564920, at *8 (stay-home order was content neutral

16   because "[it] appl[ied] equally to all citizens . . . and to a great number of non-life sustaining

17   businesses 'regardless of message.'"). The Proclamations do not target speech but, rather, the

18   "harmful secondary effects of public gathering—the spread of a novel virus for which there is

19   no cure or effective treatment." *Geller*, 2020 WL 2520711, at *4. They are content neutral.

20        The Proclamations also unquestionably serve a "substantial government interest that

21   would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799 (internal

22   quotation marks and citation omitted). Protecting public health and slowing the spread of a

23   highly contagious pandemic that has already infected nearly 24,000 Washingtonians and killed

24   over 1,100 is not only a "substantial" governmental interest, but a compelling one. *See O Centro*,

25   546 U.S. at 438. As the *Legacy Church* court recognized in denying a TRO against New

26   Mexico's stay-home order, mitigating "a global pandemic and its local outbreak amount to a

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

compelling state interest." *Legacy Church, Inc.*, 2020 WL 1905586, at \*40; *see also Givens*, 2020 WL 2307224, at \*7 (mitigating local outbreak of pandemic is compelling state interest in limiting gatherings, including protests at state capitol); *Whitlow v. California*, 203 F. Supp. 3d 1079, 1089-90 (S.D. Cal. 2016) (government's interest in fighting spread of contagious disease is compelling; collecting cases). The social distancing strategy that the Proclamations implement serves that interest. *See, e.g. Benner*, 2020 WL 2564920, at \*4 ("public health experts the world over proclaimed that social distancing was the only effective way to combat its deadly effects"); *Miller v. Thurston*, No. 5:20-CV-05070, 2020 WL 2617312, at \*1 (W.D. Ark. May 25, 2020) (social distancing is "the current best tool to prevent uncontrolled spread of that virus").

Because slowing the spread of the virus would be achieved less effectively without the Proclamations' social distancing strategy, the Proclamation is narrowly tailored. To be narrowly tailored to achieve a legitimate state interest, a regulation "need not be the least restrictive or least intrusive means of doing so." *Ward*, 491 U.S. at 798. Rather, a law is narrowly tailored "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest." *Id.* at 800. Limiting gatherings is currently the best way to prevent contagion. *See, e.g., Geller*, 2020 WL 2520711, at \*4 ("The City has demonstrated that the scientific and medical communities believe that preventing in-person gatherings is crucial to any strategy of containment."). Because COVID-19 spreads easily and because asymptomatic individuals may spread the virus, gatherings pose the risk more people will contract the virus if someone has it. *See Antietam Battlefield KOA*, 2020 WL 2556496, at \*11.

The history of the Governor's orders also indicates narrow tailoring. *See id.*, at \*11. The Governor first tried other mitigation measures before the Stay Home Proclamation, including prohibiting gatherings of 250 people or more, then 50 or more; permitting smaller gatherings only if individuals complied with social distancing and sanitation guidelines; closing schools, colleges, and universities; prohibiting gatherings of any size in "public venues," including restaurants, gyms, private clubs, faith-based organizations, and any "other similar venues."

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

Proclamations 20-07 to 20-09, 20-12 to 20-14. Only after these did not sufficiently address the crisis did the Governor adopt the Stay Home – Stay Healthy Order. This demonstrates "a gradual tailoring of the prohibition based on the COVID-19 figures and how well the previous prohibitions were working." *Antietam Battlefield KOA*, 2020 WL 2556496, at *11.

Third, the Proclamation does not unreasonably limit Washingtonians from connecting over the phone and online, which offer alternative avenues of communication for assembling and associating. *See Geller*, 2020 WL 2520711, at *4 (ability to express discontent online, through media, and protesting on her own were acceptable alternatives to group protests); *Givens*, 2020 WL 2307224, at *6 (same); *Friends of Danny DeVito*, 2020 WL 1847100, at *24 (similar). This is a reasonable limitation to prevent the spread of the virus.

To the extent Plaintiffs' assembly claim raises the "right to expressive association," Dkt. #28-1 at 23 (citing *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984)), it is also unavailing. Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms. *Roberts*, 468 U.S. at 623; *see, e.g.*, *Legacy Church*, WL 1905586, at *39 ("The right to expressive association is not an absolute right and can be infringed upon if that infringement is (i) unrelated to the suppression of expressive association; (ii) due to a compelling government interest; and (iii) narrowly tailored.").

For the same reasons discussed above, the Proclamations do not violate Plaintiffs' right expressive association. Stopping the spread of a deadly virus is a compelling state interest. The restrictions on gatherings are not related to suppressing ideas but instead serve the purpose of limiting the interactions that causes the virus to spread. And in the absence of a vaccine, cure, or treatment, reducing person-to-person transmission through community mitigation measures is the only way to achieve the goal of stopping the spread of the virus. *See Givens*, 2020 WL 2307224, at *7 (denying TRO and rejecting argument that freedom of association allowed in-person protests and rallies at state capitol during COVID-19 pandemic).

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

1

2

**4.     Plaintiffs are unlikely to prevail on their claim that the Proclamation violates their "right to gainful employment"**

3       Plaintiffs have not shown a likelihood of success on their contention that the

4   Proclamations impermissibly burden their "liberty interest in practicing their chosen

5   occupations," *see* Dkt. No. 28-1 at 25–28—a type of claim that a growing consensus of courts

6   have rejected in the context of challenges to COVID-19 orders.[26] Neither the Supreme Court nor

7   the Ninth Circuit "has []ever held that the right to pursue work is a fundamental right" that would

8   be entitled to heightened constitutional scrutiny. *Sagana v. Tenorio*, 384 F.3d 731, 743 (9th Cir.

9   2004), *as amended* (Oct. 18, 2004); *Dittman v. California*, 191 F.3d 1020, 1031 n.6 (9th Cir.

10  1999). Judicial review of laws affecting non-fundamental rights is "very narrow," asking only

11  "whether the government *could* have had a legitimate reason for acting as it did." *Id.*

12       To challenge the Proclamations on this basis, the viability of Plaintiffs' claim depends

13  on whether they can show that it is not even "fairly debatable" whether the restrictions have "*any*

14  reasonable justification in the service of a legitimate governmental objective." *Shanks v. Dressel*,

15  540 F.3d 1082, 1088–89 (9th Cir. 2008) (emphasis added); *see also Samson v. City of Bainbridge*

16  *Island*, 683 F.3d 1051, 1058 (9th Cir. 2012) (challenge must show that state action bears "no

17  substantial relation to the public health, safety, morals or general welfare").

18       Plaintiffs cannot make this showing. Although they contend that drawing any distinctions

19  between different sectors of the economy is itself unreasonable, *see* Dkt. No. 28-1 at 26, they

20

21       [26] *See, e.g.*, *Best Supplement Guide, LLC v. Newsom*, No. 220CV00965JAMCKD, 2020 WL 2615022, at

22  *6 (E.D. Cal. May 22, 2020) (denying TRO on business owners' substantive due process claim where stay home
orders enacted for legitimate reason because "limiting physical contact between people is the most effective way to

23  stop COVID-19's spread"); *SH3 Health Consulting, LLC v. Page*, No. 4:20-CV-00605 SRC, 2020 WL 2308444, at
*10 (E.D. Mo. May 8, 2020) (denying claim based on "some right to conduct their business and to earn a living"

24  where "[d]uring these uniquely rare times, the executive branch has extraordinary powers over businesses"); *Henry
v. DeSantis*, No. 20-CV-80729, 2020 WL 2479447, at *7 (S.D. Fla. May 14, 2020) (dismissing business owners'

25  substantive due process challenge where COVID-19 orders "most certainly [had] a 'legitimate' government
interest"); *see also McGhee v. City of Flagstaff*, No. CV-20-08081-PCT-GMS, 2020 WL 2308479, at *5 (D. Ariz.

26  May 8, 2020) (denying TRO on substantive due process claim where plaintiff could not show stay-home measure
"shocks the conscience" "in light of the circumstances presented by COVID-19 and the fundamental principle that
our individual rights must at times yield to the needs of society").

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO.  3:20-cv-05423-BHS                                      26                          ATTORNEY GENERAL OF WASHINGTON
                                                                                                Complex Litigation Division
                                                                                                800 5th Avenue, Suite 2000
                                                                                                  Seattle, WA 98105-3188
                                                                                                     (206) 474-7744

have not shown the lack of any legitimate reason for the challenged restrictions. Rather than shut down all businesses, the Governor's approach appropriately allowed for operation and reopening of successively broader sections of the economy, to the extent data indicated that reopening could be done safely with adherence to social distancing. Lofy Decl. ¶¶ 19–20. Plaintiffs may disagree with the manner in which the Governor has combatted COVID-19, but they have failed to provide any basis to conclude that the challenged restrictions bear no substantial relation to public health. See *Halverson v. Skagit Cty.*, 42 F.3d 1257, 1262 (9th Cir. 1994), *as amended on denial of reh'g* (Feb. 9, 1995). The *Slidewaters* court recently rejected a similar claim under the purported due process "right to pursue a common calling," concluding that the Proclamations had a reasonable relation to the ongoing public health crisis. *See* 2020 WL 3130295, at *4.

Perhaps recognizing their inability to succeed under existing law, Plaintiffs instead ask the Court to overturn longstanding Fourteenth Amendment jurisprudence and impose a heightened standard of review that finds no support in the case law. Dkt. No. 28-1 at 25–29. Put simply, the fact that Plaintiffs acknowledge that their economic liberty interest claim would require a major change in the law speaks for itself with regard to the claim's merits.

### 5.   The Proclamation does not violate the Takings Clause

For numerous reasons, Plaintiffs are unlikely to prevail on any takings claim against the Proclamation. But the simplest reason is this: the Amended Complaint does not plead a Takings Claim. *See* Dkt. #13 ¶¶ 398–410. Preliminary injunctive relief may not issue based on a claim Plaintiffs "did not raise [in] their Complaint, because logically speaking, they could not prevail on its merits at trial." *Tri-Valley Cares v. U.S. Dep't of Energy*, No. C 08-01372 SBA, 2008 WL 2951396, at *5 (N.D. Cal. July 28, 2008). Even if Plaintiffs' had pleaded a Takings claim, it is unripe and meets neither of the prerequisites of a takings claim—a protected property interest and a compensable injury. Finally, a preliminary injunction is not an appropriate remedy for a takings.

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO.  3:20-cv-05423-BHS

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

**a.      Even if pleaded, Plaintiffs' Takings claim would be unripe**

Plaintiffs cannot meet the ripeness requirement that applies to takings claims. Although the ripeness standard has changed in recent years, the law remains that "'the government entity . . . [must have] reached a final decision regarding the application of the regulations to the property at issue.'" *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 850–51 (9th Cir. 2001) *aff'd sub nom. Brown v. Legal Found. of Washington*, 538 U.S. 216 (2003) (en banc) (quoting *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), *overruled on other grounds by Knick v. Township of Scott*, 139 S. Ct. 2162 (2019); *see also Pakdel v. City & Cty. of S. F.*, 952 F.3d 1157, 1160 (9th Cir. 2020) (confirming *Williamson*'s "separate finality requirement, which survived *Knick* and thus continues to be a requirement for bringing regulatory takings claims such as Plaintiffs' in federal court").

Plaintiffs cannot establish that any of the property deprivations they allege reflects a "final decision" by the Governor. *Williamson*, 473 U.S. at 186. To the contrary, the Proclamations are by their very nature temporary, with the most recent Safe Start Washington Proclamation set to expire on July 1, 2020. Postman Decl., Ex. 20 at 104. *See, e.g.*, *US West Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1126 (9th Cir. 1999) (takings claim unripe where allegedly confiscatory policy is "interim" policy and government has "not taken final action"). This ripeness requirement presents an insurmountable hurdle to any takings claim Plaintiffs might attempt to plead.

**b.      Plaintiffs lack constitutionally protected property interests**

Even if Plaintiffs could plead a ripe takings claim, none has plausibly alleged that the Proclamations impinge on any protected property interests—a threshold requirement of any takings claim. As the Ninth Circuit has explained, a "Takings Clause claim requires proof that the plaintiff possesses a property interest that is constitutionally protected." *Sierra Med. Servs. All. v. Kent*, 883 F.3d 1216, 1223 (9th Cir. 2018) (quotation marks and citations omitted). The Fifth Amendment does not create property interests, so the Court must look to state, federal, or

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

common law principles to ascertain whether Plaintiffs have asserted a cognizable property interest. *See Colvin Cattle Co. v. United States*, 468 F.3d 803, 806–07 (Fed. Cir. 2006).

Plaintiffs do not allege that they own any protected property interest burdened by the Proclamations. While Plaintiffs allege that they own businesses that have suffered, they fail to identify any "legitimate claim of entitlement, arising from" any law, "implied contract, customs, practices, [or] de facto policies, to operate their . . . business[es]." *See Hudson v. City of Wenatchee*, 94 Wn. App. 990, 997 (1999). Because no Plaintiff plausibly alleges a property right "encumbered by regulatory duties" attendant in the Proclamations, none has an interest cognizable under the Takings Clause. *Callahan v. City of Chicago*, 813 F.3d 658, 661 (7th Cir. 2016). This claim must be rejected.

### c.    Plaintiffs could not establish regulatory takings claim

Even if Plaintiffs had pleaded a Takings Clause claim (they did not), and even if that claim were ripe (it is not), and even if any had a cognizable property right at stake (none does), they could not prevail on this claim because they allege a (1) regulatory (as opposed to physical) takings (2) pursuant to the state's police power (as opposed to eminent domain) that (3) is non-categorical (as opposed to a "complete elimination of value."). *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 n.8 (1992). That subset of state action does "not constitute a taking requiring compensation as contemplated by the Fifth Amendment." *Furgeson v. City of Tacoma*, No. C05-5490FDB, 2006 WL 3333046, at *4–5 (W.D. Wash. Nov. 15, 2006); *see, e.g.*, *Lucas*, 505 U.S. at 1022–23 ("government may, consistent with the Takings Clause, affect property values by regulation without incurring an obligation to compensate—a reality we nowadays acknowledge explicitly with respect to the full scope of the State's police power"); *Mugler v. Kansas*, 123 U.S. 623, 668–69 (1887) (police powers are not "burdened with the condition that the state must compensate [affected] individual owners for pecuniary losses"); *see also Lech v. Jackson*, 791 F. App'x 711, 717 (10th Cir. 2019) (unpublished); *Johnson v. Manitowoc Cty.*, 635 F.3d 331,

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

1  336 (7th Cir. 2011). Because the Governor issued the Proclamation pursuant to his police

2  powers, any harm to Plaintiffs' property interests is not compensable under the Takings Clause.

3  　　　　　**d.** 　　**The exclusive remedy for a Takings Clause violation is damages**

4  　　　　　Finally, even if Plaintiffs could establish a violation of the Takings Clause, they would

5  not be entitled to a preliminary injunction because "damages—not injunctive relief—are the

6  proper remedy for a taking." *Prof'l Beauty Fed'n of Cal. v. Newsom*, No. 2:20-CV-04275-RGK-

7  AS, 2020 WL 3056126, at *8 (C.D. Cal. June 8, 2020).

8  　　　　　**6.** 　　***Jacobson v. Massachusetts* compels denial of the Motion**

9  　　　　　Plaintiffs are unlikely to prevail on any of their claims under traditional constitutional

10  standards. In a state of emergency such as this, however, the state's interests in protecting its

11  residents' health and safety are at their apex, tipping the constitutional scale in its favor. Thus,

12  during the COVID-19 pandemic, federal courts—as well as Chief Justice Roberts—have applied

13  a more deferential constitutional framework in adjudicating constitutional claims arising out of

14  state and local governments' public health orders. Derived from *Jacobson*, 197 U.S. 11, the

15  standard allows the state to "implement emergency measures that curtail constitutional rights so

16  long as the measures have at least some 'real or substantial relation' to the public health crisis

17  and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental

18  law.'" *In re Abbott*, 954 F.3d 772, 784–85 (5th Cir. 2020) (quoting *Jacobson*, 197 U.S. at 31);

19  *accord Gish*, 2020 WL 1979970, at *4–5. The framework is "especially" important where "a

20  party seeks emergency relief in an interlocutory posture, while local officials are actively shaping

21  their response to changing facts on the ground." *South Bay*, 2020 WL 2813056, at *2.

22  　　　　　The Governor's orders easily pass the *Jacobson* standard. On their face, the challenged

23  rules relate to an ongoing public health crisis. *See Abbott*, 954 F.3d at 787 ("Faced with

24  exponential growth of COVID-19 cases, states have . . . banned social gatherings, . . . *prohibited*

25  *churches from holding public worship services*, and locked down entire cities. These measures

26  would be constitutionally intolerable in ordinary times, but are recognized as appropriate and

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO.  3:20-cv-05423-BHS

30

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

even necessary responses to the present crisis.") (emphasis added). As the Chief Justice recognized in *South Bay*, federal courts should defer to the "background, competence, and expertise" of "the politically accountable officials of the States." 2020 WL 2813056, at \*1. To the extent Plaintiffs suggest that *Jacobson* does not apply in cases involving "fundamental rights," Dkt. #28-1 at 23, *South Bay*—a case involving, like this one, a challenge under the First Amendment's Free Exercise Clause—plainly forecloses their argument.

Whether viewed under the traditional standards or *Jacobson*'s lens, Plaintiffs have failed to carry their heavy burden to show that they are likely to prevail on any claim. On this basis alone, their Motion should be denied. *See, e.g.*, *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1081 (9th Cir. 1999) (where plaintiff unlikely to prevail, court "need not consider . . . balance of hardships or . . . irreparable harm" requirements).

## D.    Plaintiffs Have Failed to Establish the Irreparable Harm Requirement

Plaintiffs' motion should also be denied because they fail to show how any of them would suffer irreparable harm without a preliminary injunction. "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Of the five types of harm Plaintiffs claim to have suffered, none amounts to a "demonstrate[d]" and "immediate threatened injury" that is "a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

First, Plaintiffs' assertion that each may not "attend religious services at his or her church," Dkt. 28-1 at 30, is untrue now that the Proclamations permit in-person religious services of up to 100 people. Postman Decl., Ex. 22. Second, and similarly, Plaintiffs' contention that "anything short of a medical emergency is deemed an inessential procedure" is false, Dkt. #28-1, at 31, as the Governor lifted the restrictions on elective medical services and procedures on May 18, 2020—more than a week before Plaintiffs' filed their motion, Postman Decl., Ex. 11.

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

31

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

Third, Plaintiffs fail to demonstrate irreparable harm with their unsupported assertion that the "elected representatives" among them are "prevent[ed] . . . from attending the state Republican Party convention in person." Dkt. #28-1 at 30; *see also id.* at 5, 9. They cite no evidence, and none of Plaintiffs' declarations mentions anything about a political convention.[27]

Fourth, Plaintiffs Corry and Vick fail to demonstrate any irreparable harm from their children's inability to "attend[] school in person" for much of the past spring semester. Dkt. #28-1 at 31. Not only do Plaintiffs provide no evidence that remote learning alternatives are so "inadequate" in Yakima and Vancouver as to irreparably harm these parents, *id.*, but their children's academic school years end no later than June 19, 2020, and the Governor has announced a plan for resuming in-person instruction for the 2020–21 academic year.[28] Any injury based on alleged harms that may occur next school year would be speculative.

Finally, Plaintiffs' argument for irreparable harm boils down to their claims of economic injuries to their businesses and personal finances. While "being driven out of business" entirely may satisfy the irreparable harm requirement, economic strain alone does not. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019); *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 851 (9th Cir. 1985) ("[E]conomic injury alone is not considered irreparable."). None of the Plaintiffs allege—much less provide any evidence—that the Governor's orders are likely to result in the permanent closure of their companies. *See, e.g.*, Dkt. 28-1 at 32 ("Many of these businesses have been harmed so badly that they will be unlikely to recover for many months after the shutdown has ended, if ever."). To the contrary, most of Plaintiffs' firms are permitted to operate under the Safe Start Proclamation, and some have even

---

[27] The Washington State Republican Party is holding its 2020 State Convention online on June 26 and 27, 2020, so there is no reason why Plaintiffs should be unable to participate, if they wish. *See* Wash. State Republican Party, 2020 Red to the Roots State Convention, https://wsrp.org/2020convention/ (last visited June 14, 2020).

[28] *See* Yakima Sch. Dist., Calendar, https://www.yakimaschools.org/Page/10#calendar2186/20200614/month (last visited June 14, 2020); Vancouver Pub. Schs., Calendar, https://vansd.org/calendar/ (last visited June 14, 2020); Gov. Procl. 20-09.02 (June 11, 2020), https://www.governor.wa.gov/sites/default/files/proclamations/20.09.2%20COVID19%20Phased%20Reopening%20of%20K12%20Schools.pdf?utm_medium=email&utm_source=govdelivery.

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

32

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

1    operated uninterrupted as essential businesses throughout the COVID-19 crisis. Although their

2    revenues may be lower than they would be had COVID-19 not necessitated urgent mitigation

3    measures to slow the virus's spread, that generalized grievance does not constitute an irreparable

4    injury warranting preliminary injunctive relief.

5    **E.**      **The Balance of Equities and the Public Interest Weigh Against an Injunction**

6         The final *Winter* factors merge when the federal government or a state (or an official

7    thereof) is a defendant. *See Slidewaters LLC*, 2020 WL 3130295, at *5 (citing *Drakes Bay Oyster

8    Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)); Dkt. #28-1 at 32. Both the balance of equities

9    and the public interest weigh against "employing the extraordinary remedy of injunction."

10    *Winter*, 555 U.S. at 24. As the *Slidewaters* court explained in denying a TRO based on a similar

11    record as the one before this Court, "in the absence of other effective prevention or treatment

12    measures" there is a demonstrated and continuing "need to restrict in-person gatherings to slow

13    transmission of the disease," and "the public interest in mitigating and combatting the significant

14    danger posed by the spread of COVID-19 outweighs individual business interests in continued

15    operations." *Slidewaters LLC*, 2020 WL 3130295, at *14–15; *see also Prof'l Beauty Fed'n of

16    Cal.*, 2020 WL 3056126, at *9 (concluding that an injunction "at this stage in the crisis would

17    be premature and might undermine the State's efforts and disrupt the balance of powers

18    established by our federal system" and that plaintiffs had failed to "show that the hardships they

19    suffer *definitely* outweigh the risk of interfering in the State's process for reopening")

20    (citing *South Bay*, 2020 WL 2813056 (Roberts, C.J., concurring)).

21         Plaintiffs' only argument on the equities is that enjoining the Governor's orders will

22    allow "lockdown decisions to be made at the local level" and supposedly follow the

23    "Legislature's chosen procedure for dealing with a pandemic, specified in Chapter 70.26 RCW."

24    Dkt. 28-1 at 32–33. But as explained above, the Pandemic Flu Act statute does not remotely

25    provide for devolution of pandemic management to local authorities. And the record indicates

26    that such decentralization would hinder the state's ability to mitigate COVID-19's spread. As

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:20-cv-05423-BHS

33

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

1    Dr. Lofy testifies, "the efficacy of Washington's mitigation efforts thus far has been achieved

2    through the coordinated, statewide public health emergency response directed by the Governor

3    and the Secretary." Lofy Decl. ¶ 23. Because local health jurisdictions lack the resources,

4    expertise, and global view that state-level actors bring to the crisis, "[d]ecentralizing

5    management of the public health emergency would sacrifice the advantages" of the state-led

6    response. *Id.* Granting Plaintiffs' requested injunction to put 35 different local health

7    jurisdictions in charge of the pandemic response would risk significant backsliding in the state's

8    battle against COVID-19 and gravely endanger public health, as well as the economic reopening

9    Plaintiffs desire.

## IV.    CONCLUSION

11    For all the reasons stated above, the Governor respectfully requests that the Court deny

12    Plaintiffs' Motion for Preliminary Injunction.

13    DATED this 15th day of June, 2020.

14                           ROBERT W. FERGUSON
                             Attorney General
15
                             *s/ Zachary Pekelis Jones*
16                           ZACHARY PEKELIS JONES, WSBA No. 44557
                             BRENDAN SELBY, WSBA No. 55325
17                             Assistant Attorneys General
                               Complex Litigation Division
18                           JEFFREY T. EVEN, WSBA No. 20367
19                           EMMA S. GRUNBERG, WSBA No. 54659
                             PAUL M. WEIDEMAN, WSBA No. 42254
20                             Deputy Solicitors General
                             800 Fifth Avenue, Suite 2000
21                           Seattle, WA  98104
22                           (206) 254-4270
                             (206) 332-7089
23                           (206) 521-3222
                             (360) 586-0728
24                           (360) 753-7085
25                           zach.jones@atg.wa.gov
                             brendan.selby@atg.wa.gov
26                           emma.grunberg@atg.wa.gov

DEFENDANT'S RESPONSE TO
MOTION FOR PRELIMINARY
INJUNCTION
NO.  3:20-cv-05423-BHS

34

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98105-3188
(206) 474-7744

1     jeffrey.even@atg.wa.gov
      paul.weideman@atg.wa.gov
2
      *Attorneys for Defendant Jay Inslee,*
3     *Governor of Washington*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT'S RESPONSE TO                35          ATTORNEY GENERAL OF WASHINGTON
MOTION FOR PRELIMINARY                                    Complex Litigation Division
INJUNCTION                                                800 5th Avenue, Suite 2000
NO.  3:20-cv-05423-BHS                                       Seattle, WA 98105-3188
                                                                 (206) 474-7744