The Honorable Benjamin H. Settle

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| DREW MACEWEN, *et al.*, | NO.  3:20-cv-05423-BHS |
| Plaintiff, | DECLARATION OF KATHY LOFY, MD |
| v. | |
| GOVERNOR JAY INSLEE, in his official capacity as the Governor of Washington, | |
| Defendant. | |

I, Kathy Lofy, MD, declare as follows:

1.      I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge. I am currently employed as State Health Officer and Chief Science Officer at the Washington State Department of Health (DOH), a position I have held for six years.

2.      I am responsible for advising the Secretary of Health and the Governor on public health issues, including health promotion, disease prevention, and emergency response, including the response to the COVID-19 pandemic. I earned a BA in human biology from Stanford University and an MD from the UCLA School of Medicine and completed a pediatric residency at Children's Hospital Oakland. I started my public health career in 2002 as a U.S. Centers for Disease Control and Prevention (CDC) Epidemic Intelligence Service Officer

assigned to DOH. I then joined DOH. Prior to attaining my current position, I served as the state foodborne disease epidemiologist, influenza surveillance coordinator, and medical consultant to the Offices of Communicable Disease Epidemiology and Infectious Disease.

3.      On January 8, 2020, I received an advisory from the CDC regarding an outbreak of pneumonia of unknown etiology in Wuhan, China. This cluster of pneumonia was subsequently determined to be the start of the COVID-19 pandemic. Since early January, in collaboration with state and local public health experts, I have helped lead Washington State's response to the COVID-19 pandemic by developing, implementing, and advising the Secretary of Health and Governor on public health interventions to limit the spread of COVID-19 in Washington and maintain capacity and supplies in our healthcare system to adequately provide care to people with COVID-19.

4.      On January 21, 2020, the CDC and DOH announced what was then believed to be the first confirmed case of COVID-19 in the United States in Snohomish County, Washington. By late February/early March, public health officials recognized the spread of COVID-19 in Washington, including an individual with COVID-19 from Snohomish County who had not traveled and an outbreak in the Life Care Center, a skilled nursing facility in Kirkland, associated with at least 167 cases and 35 deaths. On February 29, 2020, DOH announced that a patient had died in the EvergreenHealth Medical Center in Kirkland, which was then believed to be the first COVID-19 death in the United States. (In April, it was determined that the first known COVID-19 death had occurred in early February in California.) Since then, public health officials have worked to determine the extent of COVID-19 in Washington and worked with the Office of the Governor and others to coordinate a response.

5.      On January 30, 2020, the World Health Organization declared the COVID-19 outbreak a "public health emergency of international concern." On January 31, 2020, the United States Health and Human Services Secretary, Alex M. Azar II, declared a public health emergency.

DECLARATION OF KATHY LOFY, MD
NO.  3:20-CV-05423-BHS

2

1      6.      COVID-19, a disease that can result in serious illness or death, is caused by the

SARS-CoV-2 virus, which is a coronavirus not identified in humans prior to December 2019 that spreads easily from person to person. It spreads mainly from person to person through respiratory droplets produced when an infected person coughs, sneezes, or talks. A person may also get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes. People can spread the virus before their symptoms begin (pre-symptomatic transmission) and during an asymptomatic infection which results in people unknowingly spreading the virus to others. The CDC has reported two situations in Singapore where pre-symptomatic transmission likely occurred in a religious setting (CDC. *Morbidity and Mortality Weekly Report* 2020; 69[14]:411–415). Various studies have found that the risk of transmission of SARS-CoV-2 is significantly greater in indoor settings compared to outdoor settings.

7.      Although many patients experience mild to moderate, or no symptoms, some patients experience severe or critical illness requiring hospitalization and intensive care treatment, such as the use of ventilators (intubation). A subset of those with severe disease will die. People who are 65 years or older and people of all ages with underlying medical conditions, particularly if not well controlled, are at higher risk for severe COVID-19 illness. *See* CDC, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

8.      Because of the speed with which COVID-19 spreads in a community, and the significant portion of COVID-19 patients who require hospitalization, intensive care, and mechanical ventilation, outbreaks threaten to overwhelm the healthcare system.

9.      There are currently no drugs or therapeutics presently approved by the U.S. Food and Drug Administration (FDA) or vaccines to treat or prevent COVID-19. On May 1, 2020, the FDA issued an Emergency Use Authorization for emergency use of remdesivir for the treatment

DECLARATION OF KATHY LOFY, MD     3     ATTORNEY GENERAL OF WASHINGTON
NO.  3:20-CV-05423-BHS     Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   of hospitalized COVID-19 patients with severe disease. An Emergency Use Authorization does

2   not constitute formal FDA approval.

3         10.     On February 29, 2020, Governor Inslee proclaimed that "a State of Emergency

4   exists in all counties in the state of Washington," and directed that emergency plans be

5   implemented. At the same time, the Governor ordered into active state service the National

6   Guard and the State Guard. In a series of proclamations issued over the following month, the

7   Governor took multiple actions to slow the spread of COVID-19, including: prohibiting

8   gatherings of 250 people or more (and, later, 50 or more); permitting gatherings of fewer than

9   50 people only if individuals complied with CDC and DOH social distancing and sanitation

10  guidelines; closing schools, colleges, and universities; prohibiting gatherings of any size in

11  "public venues," including restaurants, gyms, private clubs, faith-based organizations, and any

12  "other similar venues."

13        11.     These actions were essential to mitigating the spread of COVID-19 and easing

14  the strain on our healthcare system. Because COVID-19 spreads from person to person through

15  close contact, maintaining distance between people and avoiding large gatherings, particularly

16  indoors, is critical. If people consistently retain a distance of at least six feet from each other, the

17  risk of the virus spreading from an infected person to an uninfected person is very low. That

18  reduces the overall spread and number of persons infected within a geographic area and persons

19  requiring hospitalization, which in turn reduces the number of intensive-care beds and ventilators

20  needed to treat patients.

21        12.     Without efforts to stop person-to-person transmission, modeling studies have

22  shown that unmitigated spread of COVID-19 would lead to an explosion of cases, many more

23  hospitalizations and fatalities, and an untenable burden on the healthcare system. This potentially

24  includes deaths of patients who could potentially recover but for the unavailability of ventilators

25  and other medical care due to the strain on the healthcare system.

26

DECLARATION OF KATHY LOFY, MD      4       ATTORNEY GENERAL OF WASHINGTON
NO.  3:20-CV-05423-BHS                       Complex Litigation Division
                                              800 5th Avenue, Suite 2000
                                              Seattle, WA 98104-3188
                                                 (206) 474-7744

13.     For that reason, significant preventative steps were medically and scientifically necessary in order to stem the outbreak in Washington. The Governor has issued numerous proclamations since his initial emergency proclamation on February 29, 2020. Throughout this process, I have worked in tandem with the Governor's Office, other DOH officials, and public health experts to ensure the state's mitigation strategies are based on the latest and most accurate data and accepted scientific practice. Despite the state's early and aggressive mitigation efforts, the virus continued to spread rapidly in the first month of the outbreak: In mid-March, Washington had the highest absolute number and had among the highest number per capita of COVID-19 cases of any state in the country. The effective reproductive rate ($R_e$) during the first half of March—that is, the number of new infections estimated to stem from a single case—was estimated in the 2 to 3.5 range. By late March, 400 to 500 new COVID-19 cases were being reported each day. From a public health standpoint, that transmission rate was unsustainable.

14.     Thus, DOH and the Governor's Office determined that it was necessary to escalate Washington's mitigation strategies. Most prominently, these include Proclamation 20-25, the Governor's "Stay Home, Stay Safe" proclamation on March 23, 2020, as well as subsequent modifications to that Proclamation, which generally required Washingtonians not to leave their homes except for certain essential activities and essential employment, and generally prohibited social, spiritual, and recreational gatherings other than those attended by household members in the home. My office continues to work with the Governor, Secretary of Health, and others to modify proclamations.

15.     Without a vaccine or treatment for COVID-19, reducing person-to-person transmission through community mitigation measures is the most effective way of mitigating the outbreak and ensuring that the healthcare system is not overwhelmed. The "Stay Home, Stay Healthy" order served this mitigation objective by imposing a clear, categorical prohibition on all gatherings, private or public, for any purpose. If exceptions were made to this prohibition

1   based on the subjective purpose of the gathering, mitigation efforts would be less successful and

2   it would be difficult, if not impossible, for officials to enforce the proclamation.

3       16.     The state's Essential Critical Infrastructure Workers list (Essential Workers list)

4   referenced in Proclamation 20-25 established exceptions to the stay-home order based on

5   objective criteria, including the epidemiological risk inherent in and the necessity of continued

6   operations in light of public health, economic, national security, and other governmental

7   objectives.  The  essential  activities  and  essential  business  services  allowed  under  the

8   Proclamation did not present comparable health risks to the "public and private gatherings and

9   multi-person activities for social, spiritual, and recreational purposes, regardless of the number

10  of people involved" that the Proclamation prohibits. They did not present a comparable health

11  risk because face-to-face interactions—those most likely to result in transmission—with workers

12  at  a  grocery  store  or  pharmacy  are  generally  much  shorter  in  duration  than  face-to-face

13  interactions during social, spiritual or recreational events.

14      17.     Throughout the outbreak, DOH has collected, and updated daily, statistical

15  information concerning the outbreak. Data are available online at: https://www.doh.wa.gov/

16  Emergencies/Coronavirus. Six weeks after the Stay Home, Stay Healthy order was announced,

17  the data indicated that Washington had made progress in slowing the spread of COVID-19.

18  COVID-19 activity, as measures by the number of new COVID-19 hospitalizations, peaked in

19  late March then declined steadily throughout April. Although the daily number of COVID-19

20  confirmed hospitalizations declined while the Stay Home – Stay Healthy Order was in effect, as

21  of May 3, 2020, data demonstrated that about 200 new confirmed cases continue to arise daily.

22  In addition, for every confirmed case detected, there are an estimated 3 to 19 infected people that

23  are not detected. For those reasons, the Governor extended the stay-home order on May 4, 2020

24  until May 31, 2020.

25      18.     In my professional opinion, the steps taken to date to control COVID-19 have

26  successfully mitigated morbidity and mortality from COVID-19 in Washington State and

prevented our healthcare system from becoming overwhelmed. Although the stay-home order is unprecedented, based on the epidemiological and public health data I have reviewed, I do not believe less stringent measures would have slowed the rate of transmission as effectively as the stay-home order. Restricting gatherings, including small gatherings with people outside one's household, was an important part of the stay-home order because people tend to talk face-to-face for prolonged periods of time when they gather.

19.    In early May, Governor Inslee announced the *Safe Start Washington* phased reopening plan—a process for careful, gradual, and science-based relaxation of mitigation measures across the state. The plan sets forth four phases across which mitigation measures are successively eased and is guided by a range of important public health metrics, including COVID-19 cases and hospitalizations; disease modeling; testing capacity and availability; case and contact investigation capacity; and health care system readiness. This approach reduces the risk of COVID-19 to Washington's most vulnerable populations and preserves capacity in our health care system, while safely opening up businesses and resuming gatherings, travel, shopping and recreation. The plan allows counties and DOH to holistically review COVID-19 activity and the ability for the county to respond when determining if a county is ready to move into a new phase. During the month of May, only counties with populations below 75,000 people and without a new reported COVID-19 case in the prior three consecutive weeks were eligible to apply to DOH for a variance to move to Phase 2. Starting May 19, 2020, counties with a rate of <10 newly diagnosed cases per 100,000 population during the prior two weeks were eligible to apply for a variance. Between May 4 and June 1, DOH approved 27 counties' applications to move to Phase 2: Adams, Asotin, Clallam, Columbia, Cowlitz, Ferry, Garfield, Grant, Grays Harbor, Island, Jefferson, Kitsap, Kittitas, Klickitat, Lewis, Lincoln, Mason, Pacific, Pend Orielle, San Juan, Skamania, Spokane, Stevens, Thurston, Wahkiakum, Walla Walla, and Whitman.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

20.    Effective June 1, 2020, any county became eligible to apply for Phase 2, regardless of size, provided its local health officer, board of health, and county executive or county commission supports the application. Each application is assessed in a holistic fashion by the Secretary of Health, based on a variety of key metrics reflecting the epidemiologic risk of the county's advancement to the next phase. Those metrics include the following:

    a.    COVID-19 activity: The ideal target for new cases will be 25 or fewer per 100,000 residents over a 14-day period. Hospitalizations for COVID must be flat or decreasing.

    b.    Healthcare system readiness: The percentage of licensed beds with patients in a given jurisdiction would preferably be less than 80% and the percentage of licensed beds with confirmed or suspected COVID-19 patients would preferably be less than 10%.

    c.    Testing: Counties need to show they have adequate testing capacity, 50 times as many people tested per day as they have confirmed new cases per day – which equates to positive test results under 2%. They also need to show rapid testing of patients, ensuring that we can work effectively to contain the virus.

    d.    Case and contact investigations: The goal is to contact 90% of cases by phone or in person within 24 hours of receipt of a positive lab test result. There is also a goal of reaching all that person's contacts within 48 hours of a positive test result.

    e.    Protecting high-risk populations: The ideal number of outbreaks reported by week (defined as two or more non-household cases where transmission occurred at work, in congregate living, or in an institutional setting) is zero for counties under 75,000, and no higher than three for our largest counties.

21.    Between June 2 and June 11, 2020, 6 additional counties were approved for Phase 2: Clark, Okanogan, Pierce, Skagit, Snohomish, and Whatcom. Between June 2 and June 11,

2020, 9 counties were approved for Phase 3: Columbia, Ferry, Garfield, Lincoln, Pend Oreille, Stevens, Wahkiakum, Whitman, and Asotin. Between June 1 and June 11, 2020, three counties were approved for a modified version of Phase 1 (sometimes referred to as "Phase 1.5" or "Phase 1.75"): King, Chelan, and Douglas counties.

22.     Notwithstanding the progress we have made in mitigating the spread of COVID-19 in Washington, an emergency continues to exist for the entire state. As described above, COVID-19 can be (1) difficult to detect, (2) easily transmitted, and (3) lethal. More than 24,000 Washington residents have contracted COVID-19 and over 1,100 Washington residents have died since the pandemic began a few short months ago. In some parts of Eastern Washington, COVID-19 activity is increasing rather than decreasing, including in the counties of Benton, Franklin, Spokane and Yakima. While Washington has passed an initial peak of COVID-19 cases, our progress is mostly attributable to the extensive, statewide mitigation measures—above all, the Governor's Stay Home – Stay Health order—the state implemented. As more and more counties progress to Phase 2 and Phase 3, however, social distancing will decline and mobility across the state will increase, and neither geographic nor political boundaries prevent the spread of COVID-19. Recall that at the beginning of the COVID-19 outbreak in February, transmission was concentrated primarily in King and Snohomish Counties. Within just a matter of weeks, the virus had moved across the whole state and, by April, all but one county in the state had confirmed at least one case. While mitigation efforts in Washington State have helped reduce the spread of COVID-19, cases will rebound and hospitals could become overwhelmed with COVID-19 patients if we do not continue to practice social distancing, so a statewide public health emergency still exists.

23.     I believe that the efficacy of Washington's mitigation efforts thus far has been achieved through the coordinated, statewide public health emergency response directed by the Governor and the Secretary of Health. This illustrates that widespread public health emergencies are best managed through the current process of centralized decision-making guided by close

cooperation and consultation with local public health authorities. This current process allows a bird's eye view of statewide data to drive decisions; consistent and science-based mitigation measures and public messaging; coordinated and efficient distribution of health care resources (including personal protective equipment (PPE) that is centrally purchased by the state from private vendors and resources received by the federal government); and a clear hierarchy to resolve competing interests. Importantly, the current process also takes into account county-specific concerns and provides for re-opening plans and processes tailored to local conditions and constraints. Decentralizing management of the public health emergency would sacrifice the advantages just described. Washington has 35 local health jurisdictions. Throughout the pandemic, nearly all local health jurisdiction administrators have fully supported a centralized response effort. Each of the counties and their local elected leaders could have their own unique concerns, interests, and approach. Yet because these local jurisdictions are not hermetically sealed from one another—for example, COVID-19 patients can expose people or get hospitalized in counties outside their counties of residence—each county's response will likely have an impact beyond its borders. And, to the extent one county's interests conflict with another's interests, decentralized decision-making leaves no efficient or clear mechanism for resolving those conflicts. For those reasons (and others), I would not advocate for devolving policy authority to local jurisdictions during any widespread public health crisis, let alone during the worst pandemic in a century.

24.     Finally, I will address the statements made in certain media and by various public officials to the effect that COVID-19 is equivalent to influenza. While they both cause respiratory illness and an influenza pandemic could be similar to the COVID-19 pandemic, SARS-CoV-2 is a coronavirus and biologically distinct from an influenza virus. The viruses bind to different receptors in the human body and result in different pathophysiologic processes. The human population appears to have little to no preexisting immunity to SARS-CoV-2—unlike some past influenza pandemics such as the 2009 H1N1 flu pandemic when prior immunity likely

1   protected a segment of the population. The incubation period for SARS-CoV-2 is longer

2   (average of 5 days, with a range of 2 to 14 days) than for most influenza viruses (average of 2

3   days, with a range of 1 to 5 days). The infectious period for COVID-19 starts at least 2 days prior

4   to symptom onset (compared to one day for influenza) resulting in at least 1 additional day of

5   infectiousness before a person knows they are sick. One study found that, for SARS-CoV-2,

6   viral load was highest at the time of symptom onset, suggesting that viral shedding may peak on

7   or before symptom onset—and thus making presymptomatic transmission more likely. By

8   comparison, for the H1N1 pandemic influenza A virus, viral shedding peaks the first 1 to 2 days

9   after symptom onset. Lastly, we know much less about novel coronavirus viruses than novel

10   influenza viruses, which have infected humans several times over the past couple decades.

11         25.     Disease transmissibility of a virus can be quantified by its basic reproductive

12   number, or $R_0$ (pronounced R naught). The $R_0$ is the average number of new infections that result

13   from a single infected person in a wholly susceptible population. The $R_0$ can vary not only based

14   on characteristics of a virus but also with the contact rate between people, including physical

15   distancing strategies and other mitigation measures. Unmitigated, the $R_0$ of COVID-19 initially

16   experienced in Washington was around 2 to 3.5. This means every infected person likely spread

17   the disease on average to 2 to 3.5 other individuals. Through mitigation efforts, the $R_0$ of

18   COVID-19 in Western Washington dipped below 1 in mid-May. $R_0$ has recently risen above 1

19   in parts of Eastern Washington.

20         I declare under penalty of perjury under the laws of the State of Washington and the

21   United States that the foregoing is true and correct.

22         SIGNED this 11th day of June 2020, at 12:15pm in Shoreline, Washington.

23

24                                                                
KATHY LOFY, MD

25   State Health Officer and Chief Science Officer
Washington State Department of Health

26

DECLARATION OF KATHY LOFY, MD           11              ATTORNEY GENERAL OF WASHINGTON
NO.  3:20-CV-05423-BHS                                 Complex Litigation Division
                                                          800 5th Avenue, Suite 2000
                                                             Seattle, WA 98104-3188
                                                               (206) 474-7744