1

The Honorable Benjamin H. Settle

2

3

4

5

6

7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

8

9   DREW MACEWEN, *et al.*,                    NO.  3:20-cv-05423-BHS

10                            Plaintiffs,      NOTICE OF SUPPLEMENTAL
                                              AUTHORITY
11        vs.

12   GOVERNOR JAY INSLEE, in his
     official capacity as the Governor of
13   Washington,

14                            Defendant.

15

16        Pursuant to LCR 7(n), Defendant Governor Jay Inslee hereby notifies the Court of the

17   following three supplemental authorities, attached hereto as Exhibits 1–3, in support of his

18   Response to Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 31: (1) Opinion of the U.S.

19   Court of Appeals for the Seventh Circuit affirming district court's denial of a motion for a temporary

20   restraining order (TRO) in *Elim Romanian Pentecostal Church v. Pritzker*, --- F.3d ----, No. 20-

21   1811, 2020 WL 3249062 (7th Cir. June 16, 2020); (2) Order of the U.S. District Court for the

22   Eastern District of Washington denying a motion for a TRO in *Slidewaters LLC v. Washington*

23   *Department of Labor and Industries*, No. 2:20-CV-0210-TOR, 2020 WL 3130295 (E.D. Wash.

24   June 12, 2020); and (3) revised Phase 1, Phase 2, and Phase 3 Religious and Faith-Based

25   Organization COVID-19 Requirements issued by the Governor on June 18, 2020, and available on

26   the Governor's Office website at https://www.governor.wa.gov/sites/default/files/Phase%201-

1  3%20-%20Religious%20and%20faith-

2  based%20orgs%20FINAL_6%2018%202020.pdf?utm_medium=email&utm_source=govdeliver

3  y.

4        Dated this 19th of June 2020.

5                         ROBERT W. FERGUSON
                       Attorney General

6

7                         *s/ Zachary Pekelis Jones*

8                         BRENDAN SELBY, WSBA No. 55325
                       ZACHARY PEKELIS JONES, WSBA No. 44557

9                           Assistant Attorney General
                         Complex Litigation Division

10                         EMMA S. GRUNBERG, WSBA No. 54659
                       JEFFREY T. EVEN, WSBA No. 20367

11                         PAUL M. WEIDEMAN, WSBA No. 42254
                         Deputy Solicitors General

12                         800 Fifth Avenue, Suite 2000
                       Seattle, WA  98104

13                         (206) 254-4270
                       (206) 332-7089

14                         (206) 521-3222
                       (360) 586-0728

15                         (360) 753-7085
                       brendan.selby@atg.wa.gov

16                         zach.jones@atg.wa.gov
                       emma.grunberg@atg.wa.gov

17                         jeffrey.even@atg.wa.gov
                       paul.weideman@atg.wa.gov

18

19                         *Attorneys for Defendant Jay Inslee,*
                       *Governor of Washington*

20

21

22

23

24

25

26

NOTICE OF SUPPLEMENTAL
AUTHORITY
NO.  3:20-CV-05423-BHS

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

# Exhibit 1

2020 WL 3249062
Only the Westlaw citation is currently available.
United States Court of Appeals, Seventh Circuit.

ELIM ROMANIAN PENTECOSTAL CHURCH and
Logos Baptist Ministries, Plaintiffs-Appellants,

v.

Jay Robert PRITZKER, Governor
of Illinois, Defendant-Appellee.

No. 20-1811
|
Argued June 12, 2020
|
Decided June 16, 2020

Appeal from the United States District Court for the Northern
District of Illinois, Eastern Division. No. 20 C 2782 —
Robert W. Gettleman, *Judge*.

### Attorneys and Law Firms

Roger Karam Gannam, Daniel Joseph Schmid, Mathew D.
Staver, Horatio Gabriel Mihet, Attorneys, Liberty Counsel
Inc., Orlando, FL, Sorin Adrian Leahu, Attorney, Mauck &
Baker, Chicago, IL, for Plaintiffs-Appellants.

Priyanka Gupta, Attorney, Office of the Attorney General,
Chicago, IL, for Defendant-Appellee.

Richard Brian Katskee, Alexander Joseph Luchenitser,
Attorneys, Americans United for Separation of Church and
State, Washington, DC, for Amicus Curiae Americans United
for Separation of Church and State

Benna Ruth Solomon, Attorney, City of Chicago Law
Department, Chicago, IL, for Amicus Curiae City of Chicago.

Nimra Azmi, Attorney, Muslim Advocates, Washington, DC,
for Amicus Curiae Muslim Advocates.

Hal R. Morris, Attorney, Saul Ewing Arnstein & Lehr LLP,
Chicago, IL, for Amici Curiae Illinois Health and Hospital
Association, Illinois State Medical Society, American Nurses
Association-Illinois, Illinois Society for Advanced Practice
Nursing.

Before Easterbrook, Kanne, and Hamilton, Circuit Judges.

### Opinion

Easterbrook, Circuit Judge.

**\*1** Two churches contend, in this suit under 42 U.S.C.
§ 1983, that an executive order limiting the size of public
assemblies (including religious services) to ten persons
violates their rights under the Free Exercise Clause of the
First Amendment, applied to the states by the Fourteenth
Amendment. The Governor of Illinois issued this order
to reduce transmission of the coronavirus SARS-CoV-2,
which causes the disease COVID-19. The disease is readily
transmissible and has caused a global pandemic. As of June
16, 2020, 133,639 persons in Illinois have tested positive for
COVID-19, and 6,398 of these have died. Epidemiologists
believe that those numbers are undercounts—persons with
no or mild symptoms may not be tested, some people die of
the disease without being tested, and some deaths attributed
to other causes may have been hastened or facilitated by
the effect of COVID-19 weakening the immune system or
particular organs.

Experts think that, without controls, each infected person will
infect two to three others, causing an exponential growth in
the number of cases. Because many of those cases require
intensive medical care, infections could overwhelm the
medical system. The World Health Organization, the Centers
for Disease Control, and many epidemiologists recommend
limiting the maximum size of gatherings (the Governor's cap
of ten comes from a CDC recommendation), adopting a policy
of social distancing (everyone staying at least six feet away
from anyone not living in the same household—ten feet if
the other person is singing or talking loudly), isolating people
who have the disease, wearing face coverings so that people
who have the disease but don't know it are less likely to infect
others, and tracing the contacts of those who test positive.
Reducing the number of people at gatherings protects those
persons, and perhaps more important it protects others not
at the gathering from disease transmitted by persons who
contract COVID-19 by attending a gathering that includes
infected persons.

Plaintiffs contend, however, that a limit of ten persons
effectively forecloses their in-person religious services, even
though they are free to hold multiple ten-person services
every week, and that the Governor's proposed alternatives—
services over the Internet or in parking lots while worshipers
remain in cars—are inadequate for them.

Here is the relevant text of the order in question:

All public and private gatherings of any number of people occurring outside a single household or living unit are prohibited, except for the limited purposes permitted by this Executive Order. Pursuant to current guidance from the CDC, any gathering of more than **ten** people is prohibited unless exempted by this Executive Order. Nothing in this Executive Order prohibits the gathering of members of a household or residence.

All places of public amusement, whether indoors or outdoors, including but not limited to, locations with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, museums, arcades, fairs, children's play centers, playgrounds, funplexes, theme parks, bowling alleys, movie and other theaters, concert and music halls, and country clubs or social clubs shall be closed to the public.

**\*2**  Executive Order 2020-32 § 2(3) (Apr. 30, 2020) (boldface in original). Section 2(5)(vi) adds that people are free to leave their homes

[t]o engage in the free exercise of religion, provided that such exercise must comply with Social Distancing Requirements and the limit on gatherings of more than ten people in keeping with CDC guidelines for the protection of public health. Religious organizations and houses of worship are encouraged to use online or drive-in services to protect the health and safety of their congregants.

One other section of this order bears on religious activities. Section 2(12)(c) includes in the list of "essential" functions exempt from the ten-person cap:

Businesses and religious and secular nonprofit organizations, including food banks, when providing food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, individuals who need

assistance as a result of this emergency, and people with disabilities[.]

Religious services, too, are deemed "essential," see § 2(5)(vi), which is why they can proceed while concerts are forbidden, but they have not been exempted from the size limit.

The churches contend that these rules burden the free exercise of their faith, which requires adherents to assemble in person, and discriminates against religious services compared with the many economic and charitable activities that the Governor has exempted from the ten-person limit. The churches are particularly put out that their members may assemble to feed the poor but not to celebrate their faith. A district court, however, concluded that Executive Order 2020-32 is neutral with respect to religion and supported by the compelling need to safeguard the public health during a pandemic. The court denied the motion for a preliminary injunction. —— F.Supp.3d ——, 2020 WL 2468194, 2020 U.S. Dist. LEXIS 84348 (N.D. Ill. May 13, 2020). Plaintiffs appealed under 28 U.S.C. § 1292(a)(1).

We denied the churches' motion for an injunction pending appeal, with this explanation:

Based on this court's preliminary review of this appeal for purposes of this motion, we find that plaintiffs have not shown a sufficient likelihood of success on the merits to warrant the extraordinary relief of an injunction pending appeal. The Governor's Executive Order 2020-32 responds to an extraordinary public health emergency. See generally *Jacobson v. Massachusetts,* 197 U.S. 11 [25 S.Ct. 358, 49 L.Ed. 643] (1905). The Executive Order does not discriminate against religious activities, nor does it show hostility toward religion. It appears instead to impose neutral and generally applicable rules, as in *Employment Division v. Smith,* 494 U.S. 872 [110 S.Ct. 1595, 108 L.Ed.2d 876] (1990). The Executive Order's temporary numerical restrictions on

public gatherings apply not only to worship services but also to the most comparable types of secular gatherings, such as concerts, lectures, theatrical performances, or choir practices, in which groups of people gather together for extended periods, especially where speech and singing feature prominently and raise risks of transmitting the COVID-19 virus. Worship services do not seem comparable to secular activities permitted under the Executive Order, such as shopping, in which people do not congregate or remain for extended periods. Further, plaintiffs-appellants may not obtain injunctive relief against the Governor in federal court on the basis of the Illinois Religious Freedom Restoration Act. See *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 [104 S.Ct. 900, 79 L.Ed.2d 67] (1984).

**\*3** No. 20-1811, 2020 WL 2517093 (7th Cir. May 16, 2020). We expedited briefing and oral argument.

Before the case could be argued, the Governor replaced Executive Order 2020-32 with Executive Order 2020-38 (May 29, 2020), which permits the resumption of all religious services. Section 4(a) of Order 2020-38 contains this exemption:

> This Executive Order does not limit the free exercise of religion. To protect the health and safety of faith leaders, staff, congregants and visitors, religious organizations and houses of worship are encouraged to consult and follow the recommended practices and guidelines from the Illinois Department of Public Health. As set forth in the IDPH guidelines, the safest practices for religious organizations at this time are to provide services online, in a drive-in format, or outdoors (and consistent

> with social distancing requirements and guidance regarding wearing face coverings), and to limit indoor services to 10 people. Religious organizations are encouraged to take steps to ensure social distancing, the use of face coverings, and implementation of other public health measures.

What used to be a cap of ten persons became a recommendation. Because this section is an "exemption," none of Executive Order 2020-38's rules applies to religious exercise. The guidelines, issued on May 28 and available at haps://www.dph.illinois.gov/covid19/community-guidance/places-worship-guidance, contain eight single-spaced pages of recommendations but do not impose any legal obligation.

Illinois contends that Executive Order 2020-38 makes this suit moot, because it gives the churches all of the relief they wanted from a judge. Plaintiffs observe, however, that the Governor could restore the approach of Executive Order 2020-32 as easily as he replaced it—and that the "Restore Illinois Plan" (May 5, 2020) reserves the option of doing just this if conditions deteriorate. Executive Order 2020-38 moved Illinois to Phase 3 of this Plan, which cautions that some things "could cause us to move back":

> IDPH will closely monitor data and receive on-the-ground feedback from local health departments and regional healthcare councils and will recommend moving back to the previous phase based on the following factors:
>
> • Sustained rise in positivity rate [of COVID-19 test results]
>
> • Sustained increase in hospital admissions for COVID-19 like illness
>
> • Reduction in hospital capacity threatening surge capabilities
>
> • Significant outbreak in the region that threatens the health of the region

Voluntary cessation of the contested conduct makes litigation moot only if it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Otherwise the defendant could resume the challenged

conduct as soon as the suit was dismissed. The list of criteria for moving back to Phase 2 (that is, replacing the current rules with older ones) shows that it is not "absolutely clear" that the terms of Executive Order 2020-32 will never be restored. It follows that the dispute is not moot and that we must address the merits of plaintiffs' challenge to Executive Order 2020-32 even though it is no longer in effect.

**\*4** The churches contend that any limit on religious gatherings is permissible only if supported by a compelling interest, which they say is lacking. Yet *Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), holds that the Free Exercise Clause does not require a state to accommodate religious functions or exempt them from generally applicable laws. The Justices recently granted certiorari in a case presenting the question whether *Smith* should be overruled, *Fulton v. Philadelphia*, ––– U.S. ––––, 140 S. Ct. 1104, 206 L.Ed.2d 177 (2020), but *Fulton* will not be argued until next fall. Unless the Justices overrule or modify *Smith*, we must implement its approach.

Congress established rules more favorable to religion through the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb–4, but *Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), holds that those rules cannot be applied to the states. Illinois has itself created rules more favorable to religion through the Illinois Religious Freedom Restoration Act, 775 ILCS 35/1 to 35/30, and plaintiffs want to take advantage of that statute. Given the Eleventh Amendment and principles of sovereign immunity, however, a federal court cannot issue relief against a state under state law. See, e.g., *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Plaintiffs maintain that *Pennhurst* is irrelevant because Illinois has consented to the enforcement of the Illinois Religious Freedom Restoration Act, thus waiving its sovereign immunity. Consent to be sued in state court does not imply consent to be sued in federal court, however; that takes a "clear declaration". See, e.g., *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666, 676, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) (citing other cases). Section 35/20 provides:

> If a person's exercise of religion has been burdened in violation of this Act, that person may assert that violation as a claim or defense in a judicial proceeding and may

> obtain appropriate relief against a government. A party who prevails in an action to enforce this Act against a government is entitled to recover attorney's fees and costs incurred in maintaining the claim or defense.

See also § 35/10(b)(2). This language authorizes judicial relief but does not clearly authorize suit against the state in federal court. As a result, neither the federal nor the state Religious Freedom Restoration Act can be applied in this case.

The vital question therefore is whether Executive Order 2020-32 discriminates against religion. Funerals, weddings, and similar activities are subject to the same size limit that applies to worship services. Illinois did not set out to disadvantage religious services compared with secular events. Nor does the order discriminate among faiths. Cf. *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).

Plaintiffs maintain, however, that the ten-person cap disfavors religious services compared with, say, grocery shopping (more than ten people at a time may be in a store) or warehouses (where a substantial staff may congregate to prepare and deliver the goods that retail shops sell). If those businesses, and other essential functions such as feeding and housing the poor under § 2(12)(c), may place ten unrelated persons in close contact, it amounts to disparate treatment that a religious service cannot do so as well.

For its part, Illinois reminds us how Executive Order 2020-32 § 2(3) itself classifies religious worship: with other indoor public gatherings of unrelated persons. At least worship services can proceed (with a size limit), while concerts, movies, and similar events are forbidden.

**\*5** So what is the right comparison group: grocery shopping, warehouses, and soup kitchens, as plaintiffs contend, or concerts and lectures, as Illinois maintains? Judges of other appellate courts have supported both comparisons. Plaintiffs point us to two opinions of the Sixth Circuit plus two opinions dissenting from orders denying injunctions pending appeal. See *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020); *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020); *South Bay United Pentecostal Church v. Newsom*, 959 F.3d 938 (9th Cir. 2020) (Collins, J., dissenting); *South*

*Bay United Pentecostal Church v. Newsom*, No. 19A1044, ---- U.S. ----, ---- S.Ct. ----, ---- L.Ed.2d ----, 2020 WL 2813056 (U.S. May 29, 2020) (Kavanaugh, J., joined by Thomas & Gorsuch, JJ., dissenting). Illinois relies on the majorities in *South Bay United Pentecostal Church*: the Ninth Circuit's panel did not provide much analysis when denying the motion for an injunction, nor did a majority of the Supreme Court, but Chief Justice Roberts filed a concurring opinion with these observations:

> Although California's guidelines place restrictions on places of worship, ... [s]imilar or more severe restrictions apply to comparable secular gatherings, including lectures, concerts, movie showings, spectator sports, and theatrical performances, where large groups of people gather in close proximity for extended periods of time. And the Order exempts or treats more leniently only dissimilar activities, such as operating grocery stores, banks, and laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods.

We line up with Chief Justice Roberts.

It would be foolish to pretend that worship services are exactly like any of the possible comparisons, but they seem most like other congregate functions that occur in auditoriums, such as concerts and movies. Any of these indoor activities puts members of multiple families close to one another for extended periods, while invisible droplets containing the virus may linger in the air. Functions that include speaking and singing by the audience increase the chance that persons with COVID-19 may transmit the virus through the droplets that speech or song inevitably produce. As Chief Justice Roberts observed, concerts and church services differ from grocery stores and pharmacies, "in which people neither congregate in large groups nor remain in close proximity for extended periods."

The churches reply that people *do* remain together for extended periods in warehouses, and potentially in office settings (though most offices contain spaces that provide social distancing). It is not clear to us that warehouse workers engage in the sort of speech or singing that elevates the risk of transmitting the virus, or that they remain close to one another for extended periods, but some workplaces present both risks. Meatpacking plants and nursing homes come to mind, and both can be centers of COVID-19 outbreaks. But it is hard to see how food production, care for the elderly, or the distribution of vital goods through warehouses could be halted.

Reducing the rate of transmission would not be much use if people starved or could not get medicine. That's also why soup kitchens and housing for the homeless have been treated as essential. Those activities *must* be carried on in person, while concerts can be replaced by recorded music, movie-going by streaming video, and large in-person worship services by smaller gatherings, radio and TV worship services, drive-in worship services, and the Internet. Feeding the body requires teams of people to work together in physical spaces, but churches can feed the spirit in other ways.

Perhaps a state could differentiate between the maximum gathering permitted in a small church and a cathedral with seats for 3,000, but we do not evaluate orders issued in response to public-health emergencies by the standard that might be appropriate for years-long notice-and-comment rulemaking. See *Jacobson v. Massachusetts*, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905), which sustains a public-health order against a constitutional challenge. Perhaps with more time—and more data from contact tracing—Illinois could figure out just how dangerous religious services are compared with warehouses and similar activities, but no one contends that such data were available when Executive Order 2020-32 was promulgated (or, for that matter, now).

**\*6** So we do not deny that warehouse workers and people who assist the poor or elderly may be at much the same risk as people who gather for large, in-person religious worship. Still, movies and concerts seem a better comparison group, and by that standard the discrimination has been in favor of religion. While all theaters and concert halls in Illinois have been closed since mid-March, sanctuaries and other houses of worship were open, though to smaller gatherings. And under Executive Order 2020-38 all arrangements for worship are permitted while schools, theaters, and auditoriums remain closed. Illinois has not discriminated against religion and so has not violated the First Amendment, as *Smith* understands the constitutional requirements.

Plaintiffs present some additional arguments, which have been considered but need not be discussed separately.

AFFIRMED

**All Citations**

--- F.3d ----, 2020 WL 3249062

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 2

2020 WL 3130295
Only the Westlaw citation is currently available.
United States District Court, E.D. Washington.

SLIDEWATERS LLC, Plaintiff,

v.

WASHINGTON DEPARTMENT OF LABOR
AND INDUSTRIES and Governor Jay
Inslee, in his official capacity, Defendant.

NO. 2:20-CV-0210-TOR
|
Signed 06/12/2020

ORDER DENYING PLAINTIFF'S MOTION
FOR TEMPORARY RESTRAINING ORDER

THOMAS O. RICE, Chief United States District Judge

**\*1** BEFORE THE COURT is Plaintiff's Motion for Temporary Restraining Order (ECF No. 3). This matter was submitted for consideration without oral argument. The Court has reviewed the record and files herein, and is fully informed. For the reasons discussed below, Plaintiff's Motion for Temporary Restraining Order (ECF No. 3) is DENIED.

## BACKGROUND

This case concerns Plaintiff's ability to operate its business while subject to state emergency restrictions put into place due to the COVID-19 pandemic. Plaintiff seeks a temporary restraining order ("TRO") enjoining Defendants from enforcing Proclamations 20-05 and 20-25.4 and WAC 296-800-14035. The following facts are drawn from Plaintiff's Complaint and are essentially undisputed for the purposes of resolving the instant motion.

Plaintiff Slidewaters LLC is a family-owned waterpark in Lake Chelan, owned by cousins Burke and Robert Bordner. ECF No. 1-4 at 2, ¶ 4.1. Plaintiff employs approximately 150 seasonal employees and four year-round employees. ECF No. 1-4 at 2, ¶¶ 4.5, 4.7. Plaintiff operates seasonally for an approximately 100-day window that starts the Saturday prior to Memorial Day weekend and ends at Labor Day. ECF No. 1-4 at 3, ¶¶ 4.8-4.9. Plaintiff makes nearly all of its income that sustains its business throughout the year during this 100-

day period. ECF No. 1-4 at 3, ¶ 4.10. Plaintiff depends on being open during this 100-day period to ensure that it can survive during the "off-season." ECF No. 1-4 at 3, ¶ 4.13. Plaintiff previously made a business decision to expand the park, with the goal of having the 2020 season recoup the money expended during the three-year expansion project. ECF No. 1-4 at 3, ¶ 4.14. Plaintiff has taken on substantial business debt for the expansion project in reliance upon being able to operate during the 2020 season. Id.

On February 29, 2020, in response to the COVID-19 pandemic, Defendant Governor Jay Inslee proclaimed a State of Emergency for all counties in Washington, referred to as the "Stay Home, Stay Healthy" order, or "Proclamation 20.05." ECF No. 1-4 at 3, ¶ 4.16. Governor Inslee issued Proclamation 20.05 pursuant to RCW chapters 38.08, 38.52, and 43.06. ECF No. 1-4 at 3, ¶ 4.17. Governor Inslee proclaimed that COVID-19 is a "public disaster." ECF No. 1-4 at 4, ¶ 4.19. Governor Inslee also proclaimed that the Washington State Comprehensive Emergency Management Plan be directed, and that state agencies and departments were directed to utilize state resources and do everything reasonably possible to assist affected counties to respond to and recover from COVID-19. ECF No. 1-4 at 4, ¶¶ 4.22-4.23.

On May 4, 2020, Governor Inslee sent a letter to the Washington State legislature requesting an extension of statutory waivers and suspensions ordered by Proclamation 20.05. ECF No. 1-4 at 4, ¶ 4.24. On May 9, 2020, the four legislative caucus leaders sent a letter in response to Governor Inslee, in which they granted an extension of the requested proclamations until May 31, 2020, pursuant to RCW 43.06.220(4). ECF No. 1-4 at 4, ¶ 4.25.

**\*2** On May 26, 2020, Defendant Department of Labor and Industries ("LNI") filed an emergency rule, WAC 296-800-14035, with the Washington Office of Code Reviser. ECF No. 1-4 at 4, ¶ 4.26. The emergency rule states, "Employers must not allow employees to perform work where a business activity is prohibited by an emergency proclamation." ECF No. 1-4 at 26. The emergency rule cites, in part, Proclamation 20.05 as the basis for its rulemaking authority. ECF No. 1-4 at 5, ¶ 4.28. LNI posted a notice on its website which stated, "If employers are found to be defying the Governor's order, they'll be informed and directed to close or adjust operations immediately. If they do not, they'll face a workplace safety citation that could carry a fine of nearly $10,000 or more." ECF No. 1-4 at 5, ¶ 4.29.

On May 31, 2020, Governor Inslee announced Proclamation 20-25.4, "Transition from 'Stay Home – Stay Healthy' to 'Safe Start – Stay Healthy' County-By-County Phased Reopening." ECF No. 1-4 at 31-35. Proclamation 20-25.4 utilizes a four-phase plan for opening the State of Washington. ECF No. 1-4 at 6, ¶ 4.36. Each county must, in accordance with the plan, independently demonstrate that they meet a number of specific criteria to move into a new phase. ECF No. 1-4 at 6, ¶ 4.41.

Chelan County is, as of the filing of the Complaint, in phase one of the four-phase plan. ECF No. 1-4 at 6, ¶ 4.40. At the earliest, Plaintiff would be eligible to begin moderate operations in phase three of Proclamation 20-25.4. ECF No. 1-4 at 6, ¶ 4.39. Plaintiff has not yet been able to open for its 2020 season and expects it will unlikely be able to open for the entire 2020 season. ECF No. 1-4 at 6, ¶¶ 4.42-4.43. Plaintiff now faces increased competition from out-of-state water parks such as Silverwood's water park in Idaho, which opened on May 30, 2020. ECF No. 1-4 at 7, ¶ 4.48. Plaintiff has created a "Clean & Safe" plan for its water park to assist patrons, guests, and staff in being able to maintain cleanliness, health, and necessary social distancing measures. ECF No. 1-4 at 7, ¶¶ 4.49-4.50. But for the Proclamations and the emergency rule, Plaintiff would be open for its normal season. ECF No. 1-4 at 8, ¶ 4.53.

**DISCUSSION**

**A. TRO Standard**

Pursuant to Federal Rule of Civil Procedure 65, a district court may grant a TRO in order to prevent "immediate and irreparable injury." Fed. R. Civ. P. 65(b)(1)(A). The analysis for granting a temporary restraining order is "substantially identical" to that for a preliminary injunction. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). It "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

To obtain this relief, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury in the absence of preliminary relief; (3) that a balancing of the hardships weighs in plaintiff's favor; and (4) that a preliminary injunction will advance the public interest. *Winter*, 555 U.S. at 20; *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012). Under the *Winter* test, a plaintiff must satisfy each element for injunctive relief.

Alternatively, the Ninth Circuit also permits a "sliding scale" approach under which an injunction may be issued if there are "serious questions going to the merits" and "the balance of hardships tips sharply in the plaintiff's favor," assuming the plaintiff also satisfies the two other *Winter* factors. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) ("[A] stronger showing of one element may offset a weaker showing of another."); *see also Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) ("We have also articulated an alternate formulation of the *Winter* test, under which serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." (internal quotation marks and citation omitted)).

**B. Likelihood of Success on the Merits**

**\*3** Plaintiff's Complaint raises claims that may be categorized by three main arguments: (1) Governor Inslee does not have the authority to issue the emergency proclamations; (2) LNI does not have authority to issue an emergency rule based on the Governor's unlawful emergency proclamations; and (3) Defendants' actions have violated Plaintiff's substantive due process rights under the U.S. Constitution and the Washington Constitution. ECF No. 1-4 at 8-13, ¶¶ 5.1-5.42. Plaintiff contends, while developing minimal supporting legal argument, that it is likely to succeed on the merits of its claims. ECF No. 3 at 8-9. To obtain injunctive relief, Plaintiff must show that there are "serious questions going to the merits" of its claim, and that it is likely to succeed on those questions of merit. *Cottrell*, 632 F.3d at 1131; *Farris*, 677 F.3d at 865.

*1. Governor's Authority*

First, Plaintiff contends it is likely to succeed on the merits of its argument that the Governor's Proclamations exceed the statutory authority authorizing the governor to declare a state of emergency. ECF No. 3 at 8-9. Plaintiff's argument raises questions of statutory interpretation. A federal court charged with interpreting a state statute should do so according to that state's principles of statutory interpretation. *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1209 (9th Cir. 2010).

Plaintiff argues that the Proclamations exceed Governor Inslee's statutory authority because the COVID-19 pandemic does not constitute one of the statutorily authorized purposes for which a governor may declare a state of emergency. ECF No. 3 at 8. Washington law allows a governor to proclaim a state of emergency "after finding that a public disorder, disaster, energy emergency, or riot exists within this state or any part thereof which affects life, health, property, or the public peace." RCW 43.06.010(12). "Public disorder, disaster, energy emergency, or riot" are all terms that are not otherwise defined in the statute.

"Whenever [the court] faced with a question of statutory interpretation [it looks] to the plain meaning of the words used in the statute." *State v. Fjermestad*, 114 Wash. 2d 828, 835 (1990). "A nontechnical statutory term may be given its dictionary meaning; statutes should be construed to effect their purpose, and unlikely, absurd, or strained consequences should be avoided." *State v. Smith*, 189 Wash. 2d 655, 662 (2017). The dictionary meaning of "disorder" within the state of emergency statute is relevant here. The Oxford English Dictionary defines "disorder" as a "disturbance of the bodily (or mental) functions; an ailment, disease." Oxford University Press, *disorder, n.*, OED Online (June 2020), https://oed.com/view/Entry/54859?result=1&rskey=LLoCgB&. Merriam-Webster similarly defines "disorder" as "an abnormal physical or mental condition." Merriam-Webster, *Disorder*, Merriam-Webster.com (May 16, 2020), https://www.merriam-webster.com/dictionary/disorder. The plain meaning of the governor's statutory authority to proclaim a state of emergency in the event of a "public disorder" clearly encompasses an outbreak of pandemic disease. RCW 43.06.010(12). Plaintiff fails to raise a serious question going to the merits of this claim.

Plaintiff's related argument, that only local health officers may issue health directives in light of a pandemic, is similarly unpersuasive. ECF No. 3 at 9. Plaintiff's own cited authority states that the state secretary of health may exercise the authority of local health officers "when in an emergency the safety of public health demands it." RCW 43.70.130(7). Because the governor may lawfully proclaim a public emergency related to disease outbreak, authority to enforce public health rules related to a pandemic is not vested "exclusively" in local health officers. Plaintiff fails to raise a serious question going to the merits of this claim.

*2. LNI Rulemaking Authority*

**\*4** Second, Plaintiff contends LNI exceeded its rulemaking authority when it promulgated a rule in reliance on the Governor's Proclamations. ECF No. 3 at 8-9. Plaintiff's argument not based in the text of the emergency rule, which states that LNI promulgated the rule pursuant to its statutory authority under RCW 49.17.040 and 49.17.050, among other provisions. ECF No. 1-4 at 26. Contrary to Plaintiff's characterization, LNI did not promulgate a rule "pursuant to a proclamation by the governor." ECF No. 3 at 9; *see also* ECF No. 1-4 at 10, ¶ 5.15. Indeed, the emergency rule only references the Proclamation as an explanation for why the emergency rule was promulgated pursuant to other authority. ECF No. 1-4 at 26-27. Plaintiff fails to raise a serious question going to the merits of this claim.

*3. Substantive Due Process*

Finally, Plaintiff contends the Proclamations and emergency rule infringe on Plaintiff's substantive due process right to pursue and common calling and to use and dispose of private property. ECF No. 3 at 8. "The substantive component of the Due Process Clause forbids the government from depriving a person of life, liberty, or property in such a way that ... interferes with rights implicit in the concept of ordered liberty." *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 996 (9th Cir. 2007) (quotation and citation omitted); *see also Yim v. City of Seattle*, 194 Wash. 2d 682, 686 (2019) (unless Washington courts adopt "heightened protections as a matter of independent state law, state substantive due process claims are subject to the same standards as federal substantive due process claims."). Defendants oppose Plaintiff's motion on the grounds that Plaintiff does not identify a fundamental right that is protected by the Due Process Clause. ECF No. 5 at 5-7. Even if Plaintiff does identify a protected right, Plaintiff's claim fails to raise a serious question going to the merits of its claim.

It is well settled that state governments have the authority to enact "quarantine laws and 'health laws of every description'" pursuant to their police powers. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 24-25 (1905). "[T]he liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Id.* at 26. So long as a public

health law is reasonable and not overly broad or unequally applied, it is permissible even where it infringes on other protected interests. *Id.* at 28. Here, it could not be disputed that the Proclamations and emergency rule are reasonably related to the ongoing COVID-19 pandemic. Plaintiff does not argue that the Proclamations and emergency rules are overly broad or unequally applied; instead, Plaintiff's challenge is to the mere existence of the rules. ECF No. 3 at 8; *see* ECF No. 1-4 at 12-13, ¶¶ 5.38-5.42. This Court joins the growing consensus of district courts that constitutional challenges to similar COVID-19 related measures are precluded by *Jacobson. See Open Our Oregon v. Brown,* No. 6:20-cv-773-MC, 2020 WL 2542861, at *2 (D. Or. May 19, 2020) (gathering cases). Plaintiff fails to raise a serious question going to the merits of this claim.

Because Plaintiff fails to raise a serious question going to the merits of any of its claims, the Court finds it unnecessary to address Defendants' standing argument. ECF No. 5 at 4.

### C. Irreparable Injury

Plaintiff contends its lost income and threatened closure constitute an irreparable injury. ECF No. 3 at 9-10. A plaintiff seeking injunctive relief must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter,* 555 U.S. at 22 (emphasis in original). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coalition v. Brewer,* 757 F.3d 1053, 1068 (9th Cir. 2014).

 **\*5** Defendants respond that monetary injury alone is insufficient to stablish irreparable harm. ECF No. 5 at 10. "Nonetheless, '[t]he threat of being driven out of business is sufficient to establish irreparable harm.' " *hiQ Labs, Inc. v. LinkedIn Corp.,* 938 F.3d 985, 993 (9th Cir. 2019) (quoting *Am. Passage Media Corp. v. Cass Commc'ns, Inc.,* 750 F.2d 1470, 1474 (9th Cir. 1985)). Plaintiff has offered declarations in support of its alleged business losses and risk of closure. *See* ECF No. 1-4 at 15-18. This is sufficient to indicate that Plaintiff is likely to suffer an irreparable injury absent injunctive relief.

### D. Balancing of Equities and Public Interest

Plaintiff contends that the balance of equities tip sharply in its favor and that a TRO would advance the public interest. ECF No. 3 at 6-7, 10-11. "When the government is a party, these last two factors merge." *Drakes Bay v. Oyster Co. v. Jewell,* 747 F.3d 1073, 1092 (9th Cir. 2014). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter,* 555 U.S. at 24 (quotation marks and citation omitted). The Court must balance the hardships to the parties should the *status quo* be preserved against the hardships to the parties should Plaintiff's requested relief be granted. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (quotation omitted). "The public interest inquiry primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs./ Blue Mountains Biodiversity Project v. Connaughton,* 752 F.3d 755, 766 (9th Cir. 2014) (citation omitted). Regardless, the Court will not grant a preliminary injunction unless the public interests in favor of granting an injunction "outweigh other public interests that cut in favor of *not* issuing the injunction." *Cottrell,* 632 F.3d at 1138 (emphasis in original).

Plaintiff contends that the equities tip sharply in its favor because Plaintiff has a "Clean & Safe" plan which Plaintiff asserts would allow it to operate its business at a low risk to public health, because LNI would otherwise remain able to enforce its other workplace safety rules, and because it is inequitable to allow some business to operate while Plaintiff is prohibited from operating and unable to recoup its economic losses. ECF No. 3 at 6-7. Plaintiff reiterates some of these arguments in favor of its public interest argument. *Id.* at 10-11. Defendants respond that the significant public health risks outweigh other considerations here. ECF No. 5 at 10-11.

Defendants' argument is more persuasive. Defendants have put forth substantial evidence of the public health risks posed by COVID-19, especially concerning its serious symptoms and risk of death, its ability to spread by individuals who do not know they are infected, the limited knowledge medical professionals have of this novel disease, and the need to restrict in-person gatherings to slow transmission of the disease in the absence of other effective prevention or treatment measures. ECF No. 6-1 at 21-25; ECF No. 7 at 3-8, ¶¶ 6-15. Defendants have also proffered opinions from public health professionals who believe that the risks posed by COVID-19 would not be adequately managed if only

addressed by local officials. ECF No. 6-1 at 26-27; ECF No. 7 at 13-14, ¶ 23.

**\*6** The Court sympathizes with Plaintiff that the economic impact of the COVID-19 pandemic has been extremely challenging, particularly for small and family-owned businesses. However, the public interest in mitigating and combatting the significant danger posed by the spread of COVID-19 outweighs individual business interests in continued operations. It is not the Court's role to second-guess the reasoned public health decisions of other branches of government. *Jacobson*, 197 U.S. at 28. Plaintiff's requested TRO would not be in the public interest.

**CONCLUSION**

The Court finds that Plaintiff has failed to satisfy either the *Winter* test or the *Cottrell* sliding scale test. Therefore, Plaintiff is not entitled to its requested relief.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Plaintiff's Motion for Temporary Restraining Order (ECF No. 3) is DENIED.

2. The District Court Executive is directed to enter this Order and furnish copies to counsel.

**All Citations**

Slip Copy, 2020 WL 3130295

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 3

# Phase 1, Modified Phase 1, Phase 2, and Phase 3 Religious and Faith-based Organization COVID-19 Requirements

With frequent reports of spiritual gatherings becoming COVID-19 "superspreader" events in which a single service results in dozens of new COVID-19 infections, if possible, spiritual worship should continue to be done remotely or at a drive-in service. But if spiritual worship must be done in-person, the following requirements must be employed.

Religious and faith-based organizations are permitted to, provided all requirements in this document are met:

**Phase 1**            Hold outdoor services on the organization's property (or immediately adjacent property if explicitly permitted by the local jurisdiction) with up to 100 individuals, excluding organization staff.

**Modified Phase 1**   A) Hold indoor services at a place of worship with up to 25% capacity
**and Phase 2**        or up to 200 people, whichever is less, so long as six feet of physical distancing can be achieved between households.

                       If there is a room in the organization's building with a door that leads outside **and** has restrooms, then the organization may use that room for services to hold up to 25% of the room's capacity or up to 200 people, whichever is less, so long as six feet of physical distancing can be achieved between households.

                       If there are multiple rooms with an outside door and restrooms, then the organization may use each room in the building that meets this requirement to hold services for up to 25% capacity or up to 200 people, whichever is less, so long as six feet of physical distancing can be achieved between households. Individuals in these rooms, must use the door that leads outside as the entrance and exit and shall not enter other parts of the building if the other parts of the building are being used for services.

                       If the organization has more than one building, each building is permitted to have 25% capacity or up to 200 people, whichever is less, so long as six feet of physical distancing can be achieved between households.

B) Hold or provide in-home services or counseling inside a person's residence with up to five total individuals (excluding organization staff).

**Phase 3**          Hold indoor services at a place of worship with up to 50% capacity or up to 400 people, whichever is less, so long as six feet of physical distancing can be achieved between households.

Any organization volunteers are included in the maximum number of permissible individuals. The services covered in these operational guidelines include all worship services, religious study classes, religious ceremonies, religious holiday celebrations, weddings, and funerals.

Organizations are strongly encouraged to keep a log of attendees at each service or counseling session, and to retain that log for at least two weeks. If an outbreak occurs, this information may be critical to help save lives.

**Safety and Health Requirements**

All organizations (including religious and faith-based  organizations) have a general obligation to keep a safe and healthy facility in accordance with state and federal law, and comply with the following COVID-19 organization-specific safety practices, as outlined in Governor Jay Inslee's "Stay Home, Stay Healthy" Proclamation 20-25, and in accordance with the Washington State Department of Labor & Industries General Requirements and Prevention Ideas for Workplaces and the Washington State Department of Health Workplace and Employer Resources & Recommendations at https://www.doh.wa.gov/Coronavirus/workplace.

Religious and faith-based organizations must specifically ensure operations follow the main L&I COVID-19 requirements to protect employees, members, and visitors:

- Educate all employees in the language in which they are most proficient about coronavirus, how to prevent transmission, and the owner's COVID-19 policies.
- Screen employees for signs/symptoms of COVID-19 at the start of every shift. Make sure sick employees stay home or immediately go home if they feel or appear sick. Cordon off any areas where an employee with probable or confirmed COVID-19 illness worked, touched surfaces, etc., until the area and equipment is cleaned and disinfected. Follow the cleaning guidelines set by the CDC to deep clean and disinfect.
- Maintain minimum six-foot separation between all employees, members, and visitors in all interactions and at all times. When strict physical distancing is not feasible for a specific task, other prevention measures are required, such as use of barriers, minimization of individuals in narrow, enclosed areas and waiting rooms, staggered breaks, and work shift starts.
- Provide personal protective equipment (PPE) such as gloves and face coverings as appropriate or required to employees for the activity being performed. Require employees to use PPE as appropriate or required for the activity being performed. A facial covering must be worn by every individual not alone at the location unless

their exposure dictates a higher level of protection under Department of Labor & Industries safety and health rules and guidance. Refer to Coronavirus Facial Covering and Mask Requirements for additional details. A cloth facial covering is described in the Department of Health guidance, https://www.doh.wa.gov/Portals/1/Documents/1600/coronavirus/ClothFacemasks.pdf.

- Ensure frequent and adequate hand washing with adequate maintenance of supplies. Use single use disposable gloves, where safe and applicable, to prevent transmission on items that are touched frequently or shared and discard after a single use.
- Establish a housekeeping schedule that includes frequent cleaning and sanitizing with a particular emphasis on commonly touched services.

A location-specific COVID-19 Supervisor shall be designated by the organization at each location (indoor and outdoor) to monitor the health of employees and enforce the COVID-19 safety plan.

An employee may refuse to perform unsafe work, including hazards created by COVID-19. And, it is unlawful for the employer to take adverse action against an employee who has engaged in safety-protected activities under the law if their work refusal meets certain requirements.

Employees who choose to remove themselves from a worksite because they do not believe it is safe to work due to the risk of COVID-19 exposure may have access to certain leave or unemployment benefits. Employers must provide high-risk individuals covered by Proclamation 20-46 with their choice of access to available employer-granted accrued leave or unemployment benefits if an alternative work arrangement is not feasible. Other employees may have access to expanded family and medical leave included in the Families First Coronavirus Response Act, access to use unemployment benefits, or access to other paid time off depending on the circumstances. Additional information is available at https://www.lni.wa.gov/agency/outreach/paid-sick-leave-and-coronavirus-covid-19-common-questions.

**All religious and faith-based organizations are required to comply with the following COVID-19 organization-specific safety practices:**

1. Prior to beginning operations as described in this document, all religious and faith-based organizations are required to develop for each location (indoor and outdoor if applicable) a comprehensive COVID-19 exposure control, mitigation and recovery plan. The plan must include policies regarding the following control measures: PPE utilization; on-location physical distancing; hygiene; sanitation; symptom monitoring; incident reporting; location disinfection procedures; COVID-19 safety training; exposure response procedures and a post-exposure incident project-wide recovery plan. A copy of the plan must be available at the location for inspection by state and local authorities,

but state and local authorities are not required to preapprove the plan. Failure to meet planning requirements may result in sanctions, including the location being shut down.

2. COVID-19 safety information and requirements, such as CDC, DOH, OSHA posters shall be visibly posted at each location (indoor and outdoor).

3. Authorized access to the organization's indoor location should primarily be through the front door. Other access points should be kept closed.

4. All employees, members, and visitors in attendance shall wear face coverings before, during, and after the service (whether indoor or outdoor).

5. There may be no direct physical contact between servers and members or visitors. Anything to be consumed may not be presented to the members or visitors in a communal container or plate.

6. No choirs shall perform during the service. Singing is permitted, but individuals must not remove their face coverings to sing – it must stay on for the duration of the service.

7. All services may provide access to restrooms, provided that access is controlled and limited to no more than 2 people at a time.  Individuals waiting to use the restroom must maintain at least 6 feet of distance between each person.

8. Soap and running water shall be abundantly provided at locations for frequent handwashing. Employees should be encouraged to leave their workstations to wash their hands regularly, and required to do so before and after going to the bathroom, before and after eating and after coughing, sneezing or blowing their nose. Alcohol-based hand sanitizers with greater than 60% ethanol or 70% isopropanol should also be provided and used, but are not a replacement for the water requirement.

9. Disinfectants must be available to employees, members, and visitors throughout the location (indoor and outdoor) and ensure cleaning supplies are frequently replenished.

10. Clean and disinfect high-touch surfaces after each use—including personal work stations, mirrors, chairs, headrests and armrests, doorknobs, handrails, restrooms and breakrooms—using soapy water, followed by the appropriate disinfectants. If these areas cannot be cleaned and disinfected frequently, the organization shall be shut down until such measures can be achieved and maintained.

11. All organizations must adhere to physical distancing requirements and have six feet of space between workstations or have physical barriers between them.

12. All organizations must adhere to physical distancing requirements and have six feet of space between the congregation's seats, pews, and benches or have physical barriers between them. Members of the same household may be seated together as a single unit. This may require the organization to reconfigure the congregation's seats, pews, and benches or have physical barriers between them. The organization must place markings on the floors and seats indicating a six feet radius to help guide members and visitors.

13. Increase ventilation rates where feasible. Evaluate ventilation and utilize U.V. filters with a higher MERV rating.

14. Ensure that tissues and trashcans are placed throughout the location (indoor and outdoor).

15. Inform all employees, members, and guests that they must self-screen for signs and symptoms of COVID-19 before arriving at the location.

    • Request employees, members, and visitors to take their temperature before attending a service. Any individual with a temperature of 100.4°F will not be permitted to attend the service or attend work at the organization.
    • Any individual with a household member who has been diagnosed with COVID-19 or with symptoms of COVID-19 (including a fever above 100.4°F) may not attend the service or attend work at the organization.

16. For in-home services, religious and faith-based organizations are permitted to convene up to 5 individuals, excluding organization staff. These individuals do not need to be from the same household. However, individuals must wear face coverings when individuals from outside of the household participate.

• General questions about how to comply with the agreement practices can be submitted to the state's Business Response Center at https://app.smartsheet.com/b/form/2562f1caf5814c46a6bf163762263aa5.

• All other violations related to Proclamation 20-25 can be submitted at https://bit.ly/covid-compliance.