1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DREW MACEWEN ET AL.,

        *Plaintiffs,*

    v.

JAY INSLEE, in his official capacity as the
Governor of Washington,

        *Defendant.*

No. 3:20-cv-05423-BHS

REPLY RE:
PRELIMINARY INJUNCTION

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

# CONTENTS

I. Introduction ............................................................................................. 1

II. Facts in Support of Motion .................................................................... 3

   A. Relevant Data Regarding SARS-CoV-2 And COVID-19. ........................... 3

   B. The Unmentioned Facts Regarding The Mount Vernon Chorale. ................. 5

   C. Actual Relevant Testimony From Dr. Malcom Butler. ................................. 7

III.     Argument ......................................................................................... 8

   A. Plaintiffs' Claims Are Justiciable ................................................................. 8

      1. Plaintiffs Have Standing Because They Have Suffered And Will
         Continue To Suffer Harm ...................................................................... 8

      2. Plaintiffs' Claims Are Ripe .................................................................... 8

      3. Plaintiffs' Claims Are Not Moot .......................................................... 9

      4. The Governor Is A Proper Defendant .................................................. 9

   B. The Proclamations Targeting Religious Exercise Cannot Survive Strict
     Scrutiny ...................................................................................................... 10

      1. Restrictions On Religious Assembly Are Not A Neutral Law Of
         General Application ............................................................................... 10

      2. The Government Does Not Show That The Restrictions Are
         Narrowly Tailored ................................................................................ 12

   C. Property Interests Have Been Unconstitutionally Infringed ....................... 12

      1. Plaintiffs Have Valid Property Interests ............................................. 12

      2. The Proclamations Constitute a Taking ............................................. 13

      3. There Is No Connection Between Prohibiting Eviction And Public
         Health .................................................................................................... 14

      4. There Is No Connection Between Work Restrictions And Public
         Health .................................................................................................... 14

      5. Neither *Jacobsen* nor *Slidewaters* Address the Issues in this Case ................. 14

   D. Defendants Mischaracterize The Relevance of RCW 70.26 ...................... 16

IV. Conclusion ............................................................................................. 17

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

# TABLE OF AUTHORITIES

## Cases

*Ass'n of Am. Med. Colleges v. United States*, 217 F.3d 770, 779-80 (9th Cir. 2000) ........................ 8

*Callahan v. City of Chicago,* 813 F.3d 658 (7th Cir. 2016) ............................................................. 13

*Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990) .................................................................................................................................. 10

*Hudson v. City of Wenatchee*, 94 Wash.App. 990, 974 P.2d 342 (Div. 3 1999) ............................ 12

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) ....................................................................... 14, 15

*Legacy Church, Inc. v. Kunkel*, --- F. Supp. 3d ---, 2020 WL 1905586 (D.N.M. 2020) ..................................................................................................................................... 11

*Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) ......................................... 9

*Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 171 (2015) ............................................................... 10

*Slidewaters LLC v. Wash. Dep't of Labor & Indus.,* No. 2:20-cv-0210-TOR, 2020 WL 3130295 ............................................................................................................... 14, 15

*South Bay United Pentecostal Church v Newsom*, 140 S.Ct. 1613 (2020) ...................................... 10

*Talleywhacker v. Cooper,* —F. Supp. 2d—, 2020 WL 3051207 (E.D. N.C. 2020), ......................... 9

*Thomas v. Anchorage Equal Rights Com'n,* 220 F.3d 1134 (9th Cir. 2000) ..................................... 8

*Westerman v. Cary*, 125 Wash. 2d 277, 292, 892 P.2d 1067 (1994) ............................................... 10

## Statutes

Chapter 70.26 RCW ................................................................................................................ 8, 16

Chapter RCW 70.26 ...................................................................................................................... 7

RCW 43.06.210 ........................................................................................................................... 10

RCW 70.26.010(5) ......................................................................................................................... 7

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

# I.   INTRODUCTION

The Governor bears the heavy burden of showing that his impositions on Constitutionally protected rights of people in Washington are narrowly tailored to address an identified government interest. He must show that he has selected the least restrictive means for addressing any threat to public health posed by persons becoming infected with SARS-CoV-2.[1] He has failed to do so. He demonstrates instead that he has refused to consider equally effective, but less restrictive, alternatives, even those already available in state law. He makes no effort to demonstrate that employing less restrictive means would produce a different outcome compared to his draconian policies. Indeed, the Governor makes little effort to show that his selected policies offer much benefit as compared to doing nothing at all.

Instead, the Governor dissembles, both by omission and commission. The Governor attempts to distract from the actual risk posed to people in Washington by SARS-CoV-2, focusing primarily on predicted rates of infection. The Governor and state Department of Health devote remarkably little attention to the effect on most Washington residents of actually contracting an infection of SARS-CoV-2. His egregious omissions of relevant fact are most notable where the Governor attempts to justify his targeted restrictions on *some* Washingtonians' First Amendment right to peaceably assemble, especially for the exercise of religion. The Governor specifically targets religious gatherings, and defends those restrictions based on an incident in Mount Vernon, Washington that is badly misrepresented by the Governor and has almost nothing to do with religious worship. In actual fact, even a brief review of the facts of that incident demonstrate that attendance at church services poses no different risk to any attendee compared with same person's involvement in any other activity in life. Recognizing that he has singled out religion for adverse

---

[1] Plaintiffs generally follow the current medically accepted syntax of labeling the virus as **SARS-CoV-2**, and labeling ensuing human symptoms, if any, as **COVID-19**.

*See, e.g.,* https://www.mayoclinic.org/diseases-conditions/coronavirus/symptoms-causes/syc-20479963 (last accessed June 18, 2020).

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

treatment, the Governor attempts to defend this discrimination by suggesting that religious worship is somehow particularly dangerous. Nothing could be further from the truth.

The Governor has also spent months preventing public review of actual, detailed death data in Washington, to avoid disclosing the plain fact that the actual risk of serious harm to most people in Washington who become infected with SARS-CoV-2 is near zero, just as it is in the rest of the United States. He has refused to disclose to Washington residents the actual age at death of those whose death is attributable, even in part, to COVID-19. In doing so, he hides the fact that only certain categories of Washingtonians face unusually high risk of serious illness or death from infection with SARS-CoV-2. He has refused to disclose to Washington residents the comorbidities of those whose death his Department of Health attributes to COVID-19, hiding the fact that most people, perhaps over 99% of those whose deaths are attributed to COVID-19, were seriously ill before being infected with SARS-CoV-2. He has, of course, disclosed this precise information to the Centers for Disease Control, a federal agency which does not suffer from his impositions on civil liberties. As to those who challenge him, no information is forthcoming—until after, he says, this Court completes its review. This omission alone is sufficient to grant the Plaintiffs' Motion.

In fact, the Governor has made no serious attempt to show that continuing to impose his restrictions promotes future public health at all. He has made no attempt whatsoever to explain how these gross restrictions on civil liberty are balanced against civil liberty interests, much less that they are more likely to promote public health than less restrictive means already available in state law. Instead of addressing federal constitutional objections to his actions, he attempts to divert the Court's attention with various irrelevant state law discussions, never once attempting to show that compliance with existing Washington statutes and their lesser restrictions on protected liberties would somehow comprise an insufficient response to potential future SARS-CoV-2 infections.

The Governor also presents a series of inapplicable procedural defenses, throwing an entire bowl of spaghetti at the wall in the hopes that some of it will stick, including the claim that the Governor is protected by the 11th amendment from judicial review of his actions.

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

## II.   Facts in Support of Motion

### A.   Relevant Data Regarding SARS-CoV-2 And COVID-19.

The Governor filed over 1500 pages of response, including a nearly 1000 page declaration of exhibits from one attorney. The filing seems intended to evade meaningful review simply by making it impossible for the Court to wade through the scores of white papers and scientific-sounding jargon.

There are actually only a few relevant facts about SARS-CoV-2 and COVID-19 that should inform an evaluation of the Governor's restrictions on constitutional liberty, including the right to earn a living. These few relevant facts allow comparison between the Proclamations (with their serious restrictions on liberty) and the less restrictive means that the state routinely selects to address public health threats that pose comparable risks to the public. Notably, the State has done much to cloud these facts and hide relevant information from the public. These are discussed and analyzed in the Declaration of Vincent Seaman, PhD, submitted as rebuttal to the Governor's thousand plus page evidence drop.

The first relevant fact is the median age at death for a person who dies with COVID-19. The state prefers to report in broad, 20-year tranches, instead of reporting the exact age at death, which would allow better analysis of risk. For counties which have reported the exact age of decedents, it is over 80: for example, the Chelan-Douglas County Health district reported the exact age of all nine deaths in the two county area, showing a median age of 84.[2] Obviously, the State has this data, but it chooses to leave it hidden from the public. Actual disclosure of the data would reveal that COVID-19 poses a serious risk primarily to much older people, not everyone.

The second relevant fact is the presence of comorbidities in COVID-19 decedents. The State does not report this. It has the data, but hides it from the public.[3] Some counties report it, of

---

[2] *See* Chelan-Douglas Health District Application For Movement Beyond Phase 1, June 5, 2020. Attached as Exhibit A to the Reply Declaration of Joel Ard.

[3] Review of the CDC's description of data it has received from Washington strongly suggests that the state does report this data to CDC, where it is included in nationwide reports. It's only hidden from the people of Washington.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

course, as noted in the First Amended Complaint. For counties who make it readily available on public websites, like Pierce[4], Snohomish[5], and Yakima[6], well over 90 percent of decedents had one or more comorbidities. This tracks national data[7], and is no doubt true statewide.

Third, it is relevant to compare the risk of adverse health consequences from COVID-19 to other similar health risks. While these comparisons are in no way perfect, they are reasonably accurate after months of study of COVID-19. As discussed by Dr. Seaman, that comparison reveals that for people under 60 in good health, being infected with SARS-CoV-2 poses slightly less risk of adverse health consequences than being infected with the seasonal flu.

All three of these facts are extremely relevant to constitutional evaluation of the Proclamations. The Proclamations have imposed grave restrictions on the entirety of the state's population, initially justified to prevent overwhelming the hospital system with more infected people in need of beds than were available. Today, they are justified as preventing adverse health outcomes. That justification simply does not hold the weight of the impositions, even if one assumed (contrary to the Governor's evidence) that they continue to have any such effect. In short, heathy people under at least the age of 60 (and more likely even up to age 70) are extremely unlikely to suffer serious long term adverse consequences from being infected with SARS-CoV-2. The younger they are, the less likely they are to even have COVID-19 as a result of infection. For almost the entirety of the state's population, the least restrictive means to prevent adverse health consequences from the unavoidable community prevalence of SARS-CoV-2 is to do nothing at all. The Governor simply cannot show otherwise. It is the unavoidable, un-evadable truth that has been learned from study of the virus over the last six months. Most people face no risk from COVID-19

---

[4] https://www.tpchd.org/healthy-people/diseases/covid-19-pierce-county-cases/

[5] https://www.snohd.org/499/COVID-19-Case-Count-Info

[6] https://www.yakimacounty.us/2404/Data-Summary

[7] *See, e.g.*, CDC Morbidity and Mortality Weekly Report of June 15, 2020, "Coronavirus Disease 2019 Case Surveillance — United States, January 22–May 30, 2020," attached as Ard Decl. Exh. G.

REPLY RE PRELIMINARY INJUNCTION - 4
No. 3:20-cv-05423

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

that is different in scope, kind, or scale from the normal risks of everyday life they have faced without the Governor's Proclamations, year in and year out.

For the older and sicker cohort, plainly, risk mitigation is appropriate. COVID-19 quite obviously kills old and sick people. Taking steps to help identify, quarantine, and protect those vulnerable people is entirely appropriate. The Governor has not done so. Less restrictive means are readily available to him; he refuses to change course.

### B.     The Unmentioned Facts Regarding The Mount Vernon Chorale.

The Governor would have the Court believe that his egregious, special, focused, restrictive impositions on religious assembly are the natural and appropriate response to unique dangers SARS-CoV-2 poses to those who assemble for religious purposes, as opposed to those assembling for other purposes. He hangs his hat on a single incident affecting a choir in Mount Vernon. Even cursory review of the facts shows that the Governor misrepresents every relevant fact about this incident.

The secular assembly in question was unlike nearly any assembly of Americans who come together to exercise First Amendment rights of religious freedom.[8] The 120+ member community choir "includes singers from Skagit, Whatcom, Island and Snohomish counties."[9] In addition to its two annual concerts, the choir has travelled the world to perform. *Id*. It currently rehearses at the Mount Vernon Presbyterian Church. *Id*. At the March 10, 2020 rehearsal that resulted in multiple SARS-CoV-2 infections, 61 choir members sang and socialized together for two and a half hours.[10] They did so in a "large multipurpose room," with part of the practice involving a smaller group of the choir practicing in a smaller room. *Id*. The median age of these 61 singers was 69 years

---

[8] No plaintiff questions the right of any American, or any person in any place or country, to peaceably assemble for any reason, including to practice as part of a 122 member community choir. However, because the Governor makes special imposition on, and claims special reasons for that imposition on, assembling for the specific purpose of exercising the right to assemble for the exercise of religion, this Brief focuses on his complete misrepresentation of the nature of the assembly in Mount Vernon in early March 2020.

[9] *See* Skagit Valley Choral History, attached as Ard Decl. Exh. B.

[10] *See* CDC Morbidity and Mortality Weekly Report of May 12, 2020, "High SARS-CoV-2 Attack Rate Following Exposure at a Choir Practice — Skagit County, Washington, March 2020," attached as Ard Decl. Ex. C.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

old. *Id.* One was already sick with COVID-19. Of the 60 others, 52 developed symptoms. 12 of the sickened singers "had two or more underlying medical conditions." *Id.* Three of those twelve became sick enough to be hospitalized, and two died. One of the two who died was 81 years old.[11]

In brief, a secular organization composed primarily of older Americans, many of whom had underlying comorbidities, met and sang together for two and a half hours in a large multipurpose room. A singer infected with SARS-CoV-2 infected others. Three were made so sick they required hospitalization, and two died. Those who were hospitalized and who died had the key high risk indicators for serious illness resulting from SARS-CoV-2 infection: advanced age and two comorbidities.

Three key facts emerge, all of which undermine the Governor's claimed basis for his unusually strict impositions on assembly for religious purposes, and discussed in the attached Declaration of Dr. Seaman. First, the Mount Vernon assembly had nothing at all to do with religious exercise, and had nothing in common with church attendance for worship. The sole connection to religion is that the large multipurpose room happened to be located on church property. Second, the SARS-CoV-2 infections resulting from the Mount Vernon assembly would apparently have occurred in like manner whether the secular choir assembled in a church (as they happened to do) or instead assembled in a junior high choir room, an American Legion Hall, a union hall, or a spare room in a library. While the choir members no doubt appreciate the generosity of the local church making its space available to them, their election of a practice location has nothing at all to do with religious assembly, the normal course of church worship services, the SARS-CoV-2 infection rate from the event, the COVID-19 death rate, or the Governor's gross impositions on unrelated religious assembly.

Third, and perhaps most important, the actual hospitalization and death rate resulting from the Mount Vernon SARS-CoV-2 infections is not statistically different than the hospitalization and death rate from infections occurring in any other circumstance, situation, or location. The

---

[11] *See* Seattle Times Obituary of Carol Rae Woodmansee, attached as Ard Decl. Ex. D.

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1 Governor's claim that his unique, heightened, and serious impositions on religious assembly can

2 be justified by reference to a secular choir practice that happened to take place in a multipurpose

3 room in a church are particularly unsupportable where the actual health outcomes for the

4 participants are practically indistinguishable from the average health outcomes resulting from

5 SARS-CoV-2 infection in every other circumstance in Washington and the United States. Older

6 people are more at risk; people with comorbidities are more at risk. In Mount Vernon, three people

7 with both characteristics were hospitalized; two died. The secular choir practice posed the same

8 risk to the same group as other potential exposures to SARS-CoV-2. Even had this been religious

9 activity, even if the use of a church multipurpose room somehow makes this choir practice relevant

10 to religious assembly, the facts show that the actual risk was identical to this group as to any other

11 similar group, gathered for any reason.

12    **C.    Actual Relevant Testimony From Dr. Malcom Butler.**

13    The Governor submits excerpts from the deposition of Dr. Malcolm Butler, taken in a

14 different case, in an effort to discredit Plaintiffs' argument that Chapter RCW 70.26 directs that

15 preparation and response to a pandemic "must focus at the local level . . ." RCW 70.26.010(5). A

16 letter prepared by Dr. Butler was included as Exhibit B to the Declaration of Joel Ard submitted in

17 support of the motion for a preliminary injunction, to demonstrate that the Chelan-Douglas Health

18 District was "prepared for and capable of dealing with the threat to public health currently posed

19 by COVID-19." Dkt. # 16-2, at 2. That continues to be Dr. Butler's position.

20    The Governor's counsel scheduled Dr. Butler's deposition in the hope that he would

21 repudiate, or at least retreat from, what he had said in the letter. Dr. Butler expressed

22 disappointment at what he saw as a failure by Douglas County Commissioner Marc Straub to

23 disclose the use to which the letter would be put. But in his deposition, Dr. Butler reviewed each

24 sentence that he had edited until he was satisfied that all eight points expressed his true opinion.

25 Butler depo., 78:17-84:5. He concluded, "although I feel I was a little bit hoodwinked in getting it

26

27

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

into those lawsuits, I don't feel I have any grounds to retract it." Butler depo., 88:19-21.[12] None of Dr. Butler's testimony changes in any way the legal effect of Chapter 70.26 RCW.

### III.   ARGUMENT

#### A.   Plaintiffs' Claims Are Justiciable

##### 1.   Plaintiffs Have Standing Because They Have Suffered And Will Continue To Suffer Harm

While there are aspects of this case that are debatable, the facts that the plaintiffs have suffered harm and will continue to suffer harm from the Governor's Proclamations are not subject to reasonable dispute. The Governor points to *Thomas v. Anchorage Equal Rights Com'n,* 220 F.3d 1134 (9th Cir. 2000), as though it were analogous to this case. In *Thomas* landlords asked for a preliminary injunction against a statute and ordinance that would prevent them from refusing to rent to unmarried couples. The harm they might suffer from the enforcement of the law was purely hypothetical. Here, by contrast, the plaintiffs have already suffered from the enforcement of the Governor's Proclamations. Plaintiffs include religious believers whose exercise of religion has been curtailed, business owners whose livelihoods have been threatened by restrictions on the conditions of operation, and landlords who have been prevented from enforcing the rental contracts with their tenants. Plaintiffs do not challenge a law that might in the future injure them. They are daily suffering from, and will continue to suffer from, the enforcement of the Governor's Proclamations.

##### 2.   Plaintiffs' Claims Are Ripe

Related to the question of standing is whether the claims are ripe for resolution. To satisfy the ripeness requirement, the Plaintiff must establish both the fitness of the issues for judicial decision and the hardship imposed by withholding a decision. *Ass'n of Am. Med. Colleges v. United States*, 217 F.3d 770, 779-80 (9th Cir. 2000). On both criteria, it is appropriate for the Court to reach the issues in this case rather than waiting for further developments. Because the Plaintiffs

---

[12] The entirety of Dr. Butler's deposition transcript is attached as Ard Decl. Exh. E.

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

continue to suffer irreparable harm, and delay in adjudicating the case may prevent meaningful relief, the case is ripe. In a comparable case, *Talleywhacker v. Cooper*, —F. Supp. 2d—, 2020 WL 3051207 (E.D. N.C. 2020), the Court recognized that, even though the decision on the merits ultimately went against the Plaintiffs, the claims brought against the Governor in his official capacity were ripe for adjudication.

### 3.    Plaintiffs' Claims Are Not Moot

A defendant who has voluntarily ceased to engage in the behavior that is challenged by the Plaintiffs can establish mootness only if the defendant can demonstrate that "(1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016). Neither of those conditions is present in the instant case. The Plaintiffs continue to be subject to the Governor's restrictions on their religious worship, their ability to enforce rental agreements, their ability to operate businesses without restriction, and other rights. The case can hardly be described as moot. To be sure, the Governor has withdrawn some of the more egregious restrictions; however, even the "Safe Start Washington" plan promulgated by the Governor contains the warning that if a county that has been moved into a less restrictive phase experiences an increase in COVID-19 disease activity, "the secretary has the authority to return a county to an earlier phase if the county chooses not to do so on its own, and the secretary has identified a need to do so."[13]

### 4.    The Governor Is A Proper Defendant

The Governor claims that the Eleventh Amendment provides him immunity from suit, and that the exception recognized in *Ex Parte Young*, 209 U.S. 123 (1908), does not apply to this this case. Like the other procedural objections to hearing the merits of this case, the Governor presents no persuasive authority for his claim. The cases cited by the Governor, despite language excerpted by the Governor, for the most part permitted suits for injunctive or declaratory relief under *Ex*

---

[13] https://www.governor.wa.gov/sites/default/files/SafeStartPhasedReopening.pdf, page 7.

Reply re Preliminary Injunction - 9
No. 3:20-cv-05423

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

*Parte Young* because the state official had a direct connection to the state action from which the plaintiffs sought relief. Here the Governor's relationship to the enforcement of the Proclamations could not be more direct. The Governor is the author of the Proclamations and related orders that deprive the Plaintiffs of their civil liberties. If the Governor terminated his declaration of a state of emergency, as RCW 43.06.210 requires, the threat of criminal punishment for noncompliance would disappear. Unlike a case in which the state official's relationship to the enforcement of a statute or regulation is tangential, here the Governor is directly responsible for the threat of criminal prosecution that the Plaintiffs face. The Governor's effort to avoid *Ex Parte Young* is unavailing.

**B.     The Proclamations Targeting Religious Exercise Cannot Survive Strict Scrutiny**

Content-based restrictions—those that target speech based on its communicative content—are presumptively unconstitutional and are subject to strict scrutiny. They can be upheld only if government proves that they are narrowly tailored to serve compelling state interests. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015). And a government action affecting a fundamental right is constitutional only if it furthers compelling state interests and is narrowly drawn to serve those interests. *Westerman v. Cary*, 125 Wash. 2d 277, 292, 892 P.2d 1067 (1994).[14]

**1.     Restrictions On Religious Assembly Are Not A Neutral Law Of General Application**

The Governor attempts to avoid strict scrutiny by claiming that his restrictions on religious exercise fall within the protection of *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). The Governor claims that he must survive only a rational basis test, because the Proclamations "impose temporary, broad-based public health measures that do not target

---

[14] The Governor cites the recent case of *South Bay United Pentecostal Church v Newsom*, 140 S.Ct. 1613 (2020) as though it shed light on the merits of this case. Since the language quoted was of one justice only in a concurrence, and the per curiam opinion simply refused the extraordinary remedy of imposing an injunction after the trial court had denied one, it has no bearing on the merits of this case.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

religious conduct or belief and apply to religious and secular gatherings alike." Oppo., 21:9-11. But this is simply not the case. By his own admission, the Governor is applying different rules to gatherings for religious purposes compared to gatherings for comparable purposes.[15] He justifies the adverse treatment of religious worship by citing a single incident of infection to members of a non-religious group that happened to meet at a building owned by a church. From this secular activity, he asks the Court to pretend there exists a heightened danger of infection from religious gatherings. As the Fact section of this brief details, the "choir" rehearsal claimed to be a "religious gathering" was in fact a community choral group of seniors who happened to choose a church building for two separate two and a half hour rehearsals, which included sharing food and drink in close quarters. For purposes of the test to be applied, there can be no question that "religious gatherings" have both been the subject of specific and separate restrictions, and that they have been treated adversely compared to other comparable activities classified as operating "essential" services—such as cannabis and tobacco retailers.

The Governor devotes a footnote to explaining how his Proclamations would survive strict scrutiny. He cites a single case, *Legacy Church, Inc. v. Kunkel*, --- F. Supp. 3d ---, 2020 WL 1905586 (D.N.M. 2020), in which Judge Browning refused to enjoin an order issued by the Secretary of New Mexico's Department of Health less than a week before the opinion was issued. Here, by contrast, the Governor has had months to apply a less restrictive means to deal with the actual threat posed by COVID-19, and to recognize that religious gatherings pose no greater threat than comparable secular activities such as shopping, working at "essential" businesses and services, and other permitted activities. There is no remaining justification for the adverse treatment to which religious exercise has been subjected. Especially when the Governor has permitted—even

---

[15] The Governor actually claims that the discriminatory treatment of religion is more favorable than that given to comparable activities. Oppo., 21:11-13.

1   encouraged—other first amendment activities, such as engaging in political protests without any

2   restrictions,[16] the restrictions on religious activity fail strict scrutiny.

**2.   The Government Does Not Show That The Restrictions Are Narrowly Tailored**

As the evidence cited in the Facts section demonstrates, infection with SARS-CoV-2 presents a serious risk to elderly persons and particularly to the elderly who have co-morbidities. Ordinary church attendance poses a very low risk to those who are neither elderly nor suffer from compromised health status. Public health measures targeted at protecting vulnerable groups are justified, whereas broad prohibitions on a type of activity such as church attendance, without distinction based on actual risk factors, cannot be justified as being narrowly tailored. While the Governor argues that religious activity poses particular high risks that justify particular high restrictions, he has no example of any religious activity that poses such risks, nor an example of an activity *similar* to religious assembly that has unusually high risk.

**C.   Property Interests Have Been Unconstitutionally Infringed**

**1.   Plaintiffs Have Valid Property Interests**

The Governor claims that the Plaintiffs "do not allege that they own any protected property interest burdened by the Proclamations." Oppo., 29:3-4. The Governor simply ignores all allegations and Declarations that he wishes did not exist. The evidence submitted in support of the motion for preliminary injunction demonstrates that numerous plaintiffs own and operate businesses upon which they depend for their livelihoods, and the Governor's Proclamations prevent them from doing so profitably. These include businesses engaged in rental of real property, but also other protected property interests.

In denying the existence of a property right, the Governor cites *Hudson v. City of Wenatchee*, 94 Wash.App. 990, 974 P.2d 342 (Div. 3 1999). In that case the plaintiffs operated a locksmith

---

[16] See the Statement of Governor Inslee issued on May 30, 2020, attached as Exhibit F to the Declaration of Joel Ard: "I fully support the right to free speech and peaceful assembly. . . . If you choose to protest today, please be safe and peaceful."

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

business and claimed that the City injured that right by allowing City police officers to open locked vehicles for their owners. The locksmiths were not in any way prevented from carrying on their trade, but were claiming that they had a right to be free from competition. Not surprisingly, the court found no "right" that was being molested. Here, by contrast, the Plaintiffs operate lawful businesses that they would be operating except for the closures ordered by the Governor. The other case cited by the Governor is similarly inapposite. In *Callahan v. City of Chicago,* 813 F.3d 658 (7th Cir. 2016), a taxi driver claimed that by regulating the fees for mileage and waiting time the City deprived her of a property interest—even though she didn't even own a taxicab.

### 2.     The Proclamations Constitute a Taking

The Governor has taken property in two ways: first, the Governor's Proclamations include a prohibition on eviction of any tenant whose tenancy is subject to the Landlord Tenant Act.[17] Second, he has prohibited some businesses from operating altogether, because they do not qualify as "essential" services. For example, the Declaration of Bruce Russell, Docket # 22, details the devastating impact of being excluded from the category of "essential" businesses and services, resulting in losing 95% of his income and requiring him to furlough 100 employees.

The Governor attempts to minimize the effect of the Proclamations as mere "regulation" subject to the police power. It would be one thing if, similar to the taxi regulations in *Callahan,* the Governor's Proclamations limited the amount of rent that the Plaintiffs could charge their tenants, or imposed health and safety requirements for the buildings which the tenants occupy. But in this case the Governor does not simply impose conditions on the beneficial use of the Plaintiffs' property. Instead, he has for all practical purposes transferred the ownership of the property from the Plaintiffs to their tenants. A more effective, complete, and total taking is hard to imagine.

Similarly, by prohibiting the reopening of businesses not favored by the designation "essential," or by imposing restrictions that are so onerous that the businesses can only open by

---

[17] Proclamation 20-19, prohibiting evictions statewide until April 17, 2020; extended by Proclamation 20-19.1 until June 4, 2020, and by Proclamation 20-19.2 until August 1. 2020.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1  operating at a loss, the Governor has reduced the value of the affected businesses to almost zero.

2  This is not regulation; it is a taking.

3       **3.**     **There Is No Connection Between Prohibiting Eviction And Public**

4            **Health**

5       The Governor makes no attempt to justify the prohibition on eviction as a public health

6  measure. Like the designation of businesses as "essential" and "non-essential," a moratorium on

7  enforcement of rental contracts does not prevent the spread of the virus; instead, the Governor is

8  choosing which sectors of the economy have sufficient value to justify the risks that will be entailed

9  in allowing them to operate. He is literally picking winners and losers. The Governor does not cite

10  any conceivable manner in which preventing the eviction of a tenant moderates or reduces the

11  infection rate of SARS-CoV-2, much less reduces the incidence of serious illness or death from

12  COVID-19. His claim that homeless people will increase spread of the virus is accompanied by

13  nothing more than an invitation for rank speculation. It certainly has no support in actual testing

14  results among Washington's homeless population. Proffered as emergency public health measures,

15  the Governor's restriction on landlord-tenant relations finds cannot be defended on those grounds.

16       **4.**     **There Is No Connection Between Work Restrictions And Public**

17            **Health**

18       Just as with the prohibition on evicting tenants, the designation of "essential" and "non-

19  essential" businesses has no relationship to promoting public health. "Essential" businesses are

20  no less likely to spread the virus than "non-essential" businesses. They are given the freedom to

21  operate only because the Governor deems them to be worthy of exemption. Nor does the Governor

22  offer any public health defense of these distinctions.

23       **5.**     **Neither *Jacobsen* nor *Slidewaters* Address the Issues in this Case**

24       The Governor cites *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) and *Slidewaters LLC v.*

25  *Wash. Dep't of Labor & Indus.,* No. 2:20-cv-0210-TOR, 2020 WL 3130295 as though they dispose

26  of the claim that the Governor's Proclamations unconstitutionally impinge upon the Plaintiffs'

27  right to earn a livelihood. However, both cases are easily distinguished.

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

*Jacobson* addressed a statute duly passed by the Massachusetts Legislature that provided for quarantine and vaccination requirements. These laws were applied equally to all citizens of the state, and were subject to judicial review to insure that they were indeed "applicable equally to all in like condition." 197 U.S. at 30. Here, by contrast, the Governor claims the right to act under an "emergency" in a way that picks winners and losers, without judicial review of whether it has been applied equally. While the constitution permits the state to exercise, by proper legislation, the police power to insure that individuals do not by their conduct endanger the lives or health of others, *Jacobson* cannot be read as justification for a delegation of unlimited power to the Governor to declare an emergency and then for months on end decide which citizens can exercise their constitutional rights and which may not.

Similarly, the decision in *Slidewaters* is of little value here. The Plaintiff brought suit against the state Department of Labor & Industries ("LNI") challenging LNI's restrictions on how Slidewaters could operate its business. Slidewaters claimed that neither LNI nor the Governor had legal authority to declare an emergency or impose restrictions. By contrast, Plaintiffs here have acknowledged that the Governor possesses the state law authority to declare an emergency when one exists, but challenges the federal constitutional limits of the exercise of those powers. The Governor must adopt the least restrictive means to effectuate the public health measures that he deems essential. As the Court noted in *Slidewaters,* "Plaintiff does not argue that the Proclamations and emergency rules are overly broad or unequally applied; instead, Plaintiff's challenge is to the mere existence of the rules." *Id.* at *4. Here, by contrast, Plaintiffs point to the unequal and inconsistent application of the rules as well as unrebutted—and unrebuttable—evidence that the restrictions are not the least restrictive necessary to accomplish any legitimate public health goal.

The Governor has allowed some businesses to open, while others are under orders (backed up with threat of criminal prosecution) to remain closed. The businesses that have been allowed to open enjoy this privileged status not because they pose a lower threat of spreading SARS-Cov-2, but because they are deemed "essential," while those that must remain closed are deemed "non-essential." Such a distinction cannot be justified by a public health concern, and thus cannot be

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

said to be "reasonably related" to the prevention of disease. Moreover, by claiming the power to distinguish "essential" from "non-essential" activities, the Governor deprives ordinary citizens of the due process of law which the constitution guarantees.

**D.      Defendants Mischaracterize The Relevance of RCW 70.26**

Chapter 70.26 RCW  is highly relevant to this Court's inquiry. The Governor attempts to distract from the relevance of that existing Washington statute, rather than confront and explain it.

Simply put, this Court has before it two possible approaches under Washington law for addressing public health concerns posed by SARS-CoV-2. First, the Governor's 100+ day old emergency proclamations, and their web of irrational and unjustifiable impositions on constitutional rights and civil liberties. Second, a pre-existing Washington statute, written to prepare the state for this very eventuality, pursuant to which the Governor's own Department of Health reviewed and approved plans for county health authorities to take a leading role in protecting the public from novel respiratory viruses. For purposes of evaluating this federal constitutional challenge to the option the Governor chose—months of rule by executive fiat—the relevant question is not which state law came first, whether there was really an emergency in March, or any of the other legal chaff the Governor throws in the air. Instead, the question is: did the Governor choose the least restrictive means to advance the identified state interest? The Governor chose greater restrictions (Proclamations) not lesser restrictions (Chapter 70.26 RCW). He can only salvage the choice he made if he can show that it is required. He must prove that the pre-existing law, with its lesser restrictions on constitutional rights, would ***not*** suffice to meet the State's asserted public health interest. He makes no attempt to do so. And how could he? For fourteen years, eight under this administration, the Department of Health has reviewed and approved local response plans under Chapter 70.26. The Governor discarded this work without a moment's thought, and has never once attempted to determine whether his preferred course of rule by Proclamation is better, much less necessary. Faced with a less restrictive, made-to-order,

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

state law alternative to the Proclamations, the Governor fails to show that his election of greater restrictions is necessary for any measure of public health.

## IV.   CONCLUSION

The Governor has failed to provide a persuasive defense of his authority to declare an emergency and thereby ignore, indefinitely, the constitutional rights of Washington citizens. When less restrictive means will satisfy the state's legitimate interest in protecting the public health, the restrictions on assembly for religious purposes, and other constitutional rights, cannot be justified.  The preliminary injunction should therefore issue.

June 19, 2020.

ARD LAW GROUP PLLC

By: _____
Joel B. Ard, WSBA # 40104
P.O. Box 11633
Bainbridge Island, WA 98110
(206) 701-9243
Joel@Ard.law
Attorneys for Plaintiffs

ALBRECHT LAW PLLC

By: _____
David K. DeWolf, WSBA #10875
421 W. Riverside Ave., Ste. 614
Spokane, WA 99201
(509) 495-1246
david@albrechtlawfirm.com
Attorneys for Plaintiffs

REPLY RE PRELIMINARY INJUNCTION - 17
No. 3:20-cv-05423

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

## CERTIFICATE OF SERVICE

I certify under penalty of perjury under the laws of the United States of America that on June 19, 2020, I filed the foregoing Reply in Support of Plaintiffs' Motion for Preliminary Injunction in *MacEwen et al. v. Inslee*, No. 3:20-cv-05423-BHS, together with the associated Declaration of Joel Ard and Declaration of Vincent Seaman, with the Court's CM/ECF system, which will give notice to all parties and counsel of record.

ARD LAW GROUP PLLC

By _____

Joel B. Ard, WSBA # 40104
P.O. Box 11633
Bainbridge Island, WA 98110
(206) 701-9243
Joel@Ard.law

Attorneys for Plaintiffs

CERTIFICATE OF SERVICE
No. 3:20-cv-05423

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243