UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DREW MACEWEN, ANDREW BARKIS,
CHRIS CORRY, BRANDON VICK, KELLY
CHAMBERS, MICHAEL MCKEE, FRAN
WILLS, BRUCE RUSSELL, PHIL
FORTUNATO, DAVE MCMULLAN, AND
ISAAC VELLEKAMP,

        *Plaintiffs*,

     v.

JAY INSLEE, in my official capacity as the
Governor of Washington,

        *Defendant.*

No. 3:20-cv-05423

DECLARATION OF JOEL ARD IN
SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION

I, Joel Ard, make the following declaration under penalty of perjury:

1. I am counsel to Plaintiffs in the above-entitled action and have personal knowledge of the facts stated herein.

2. Attached hereto as Exhibit A is a true and correct copy of the June 5, 2020 Chelan-Douglas Health District Application For Movement Beyond Phase 1, the cover page and pp 22-23 with age of nine decedents.

3. Attached hereto as Exhibit B is a true and correct copy of "Skagit Valley Choral History" printed from https://www.skagitvalleychorale.org/chorale-history on June 18, 2020.

*MACEWEN V. INSLEE*
DECLARATION OF JOEL ARD - 1
No. 3:20-cv-05423

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

4.  Attached hereto as Exhibit C is a true and correct copy of CDC Morbidity and Mortality Weekly Report of May 12, 2020, "High SARS-CoV-2 Attack Rate Following Exposure at a Choir Practice — Skagit County, Washington, March 2020."

5.  Attached hereto as Exhibit D is a true and correct copy of Seattle Times Obituary of Carol Rae Woodmansee.

6.  Attached hereto as Exhibit E is a true and correct copy of the complete transcript of the State's deposition of Dr. Malcolm Butler.

7.  Attached hereto as Exhibit F is a true and correct copy of Governor Inslee's May 30, 2020 statement on George Floyd protests.

8.  Attached hereto as Exhibit G is a true and correct copy of CDC Morbidity and Mortality Weekly Report of June 15, 2020, "Coronavirus Disease 2019 Case Surveillance — United States, January 22–May 30, 2020."


SIGNED June 19, 2020, at Bainbridge Island, Washington.


BY: _____
JOEL B. ARD

*MACEWEN V. INSLEE*
DECLARATION OF JOEL ARD - 2
No. 3:20-CV-05423

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

# Ex.
# A

# CHELAN-DOUGLAS HEALTH DISTRICT
# APPLICATION FOR MOVEMENT BEYOND PHASE 1

Submitted Friday, June 5, 2020

Contact Tracers, we translate everything on our website and all other COVID-19 messaging including social media into Spanish. We have billboards in Spanish and Radio PSA's. We have distributed information at Spanish speaking grocery stores, provided Spanish radio interviews, provided training and education to Spanish speaking groups on proper hand washing and social distancing. We use CDC, DOH, Mexican Consulate and CDHD educational materials. We collaborate with Columbia Valley Community Health and our Community Health Workers to provide COVID-19 education in agricultural settings (orchards, camps, etc.) as well as at local grocery stores and through churches. One of our Board of Health members who is also a Chelan County Commissioner has personally visited almost all of the fruit packing warehouses in the area and have observed their efforts to contain this disease and protect ag workers. CDHD is aware that L&I has been very proactive and has imposed strict guidelines, and CDHD has tracked L&I's efforts to enforce them. Our plan also includes more of the above mentioned (radio, billboards, printed materials) and social media in Spanish. We have recruited and trained a group of 15 Latina community health workers to do on-the-street and in-the-church community education on COVID. In spite of these extensive efforts we are continuing to look for ways to enhance the effectiveness of our messaging to the Hispanic community, and have formed an advisory group of community leaders to help direct our efforts. In just the past few days we have received many letters of concern from an organized group of citizens concerned about this issue – organized in the sense that the letters are nearly identical – and are reaching out to them to welcome them into our efforts and benefit from their help and advice.

Additional information recently received regarding farmworker outreach and the concerns of the Latino community will be submitted within the next 3 days, which we believe will be helpful in making a considered decision about this proposal.

## 11. **Additional Information**

We believe that additional information is needed to evaluate the approach to reopening proposed in this application.

**Morbidity and Mortality** – It is notable that in spite of our relatively high incidence rates we are experiencing relatively low COVID-19 morbidity, mortality and hospital utilization. Although we have had a total of 437 cases, there have been 9 deaths, for a case fatality rate of 2%. During the month of May, when we confirmed 231 cases and saw two deaths, the case fatality rate was 0.87%. Asymptomatic cases make up 31% of our lab confirmed cases. COVID hospital utilization during the month of May has been low in spite of our relatively high population case rate, especially in recent weeks, as the chart on the following page shows. We are not sanguine about the potential of COVID-19 to produce much more severe results, but our health care system is not currently stressed in spite of having had nearly 450 cases so far.

### Deaths to Date:

| sex | age | dx date | | date of death |
|-----|-----|---------|---|---------------|
| M | 91 | 3/23/2020 | Wenatchee | 3/23/2020 |
| F | 84 | 3/26/2020 | Wenatchee | 3/28/2020 |
| M | 92 | 3/29/2020 | Wenatchee | 4/8/2020 |
| M | 84 | 3/23/2020 | Wenatchee | 4/9/2020 |
| F | 93 | 4/6/2020 | Wenatchee | 4/9/2020 |
| M | 91 | 3/23/2020 | E. Wenatchee | 4/12/2020 |

| F | 68 | 5/3/2020 | Bridgeport | 4/26/2020 |
| M | 58 | 5/5/2020 | Wenatchee | 5/9/2020 |
| F | 79 | 5/1/2020 | E. Wenatchee | 5/12/2020 |

CDHD and its health care partners will actively monitor the disease burden in the two counties and, in collaboration with the health care and business sectors, remain ready to reverse proposed reopening measures as needed to respond to significant surges in COVID-19 activity, until the burden of disease again decreases. Our efforts to monitor the course of the epidemic will include the testing of convenience samples (such as the testing ongoing at Confluence of all patients scheduled for procedures), along with others to be determined as testing capacity grows in a reliable manner. The point is not that these samples represent the entire community, but that their fluctuations are likely to reflect trends in the local epidemic.

We are also working to implement a statistically valid prevalence study, but so far this effort has been hampered by the high level of hostility among vocal members of the public. Although these people are a minority, health workers now fear going out into the community to offer testing as part of a random sample. We are working to develop alternative strategies capable of producing a representative sample and hope to collaborate with statewide efforts to develop better estimates of COVID-19 prevalence.



Because of low COVID hospital utilization in recent weeks, CWH has been able to accept overflow patients in its ICU to assist facilities in Yakima.

**A Proactive Business Community Committed to COVID-19 Prevention** The business community in our counties has demonstrated a remarkable level of commitment to safe reopening. The Wenatchee Valley Chamber of Commerce joined with the Chambers of Commerce from other cities in the area to form a Recovery Council for the express purpose of supporting the safe and responsible reopening of local businesses. The Council developed a Reopening Toolkit, drawing on guidance rom DOH, CDC and other reliable sources, and has established an active partnership with CDHD to work with businesses on reopening plans. This is not a business community wanting to undermine COVID-19 prevention

# Ex.
# B



Dr. Adam Burdick - Conductor

Celebrating Our
36th Season

HOME     ABOUT     CONCERTS     SUPPORTERS     CONTACT     MEMBER LOGIN

CHORALE HISTORY



The Skagit Valley Chorale was founded in 1984 by Joan Penney with the support of the Skagit Valley College Foundation and has grown from its original 30 members to over 120 men and women dedicated to performing quality choral music.

Two annual concerts are performed in Mount Vernon at McIntyre Hall, which is considered one of the premier performing arts venues in the state of Washington.  The "Heralding Christmas" concert is presented shortly after Thanksgiving and features classical and contemporary choral works along with a variety of seasonal favorites. The "Celebrating in Song" concert, presented in the spring, features classical choral works as well as a variety of choral music by contemporary composers representing the diversity of world traditions and cultures.

Membership in the Chorale is open on a non-audition basis to anyone wishing to express their singing talent and challenge their vocal skills. Placement within the Chorale is determined by a voice range evaluation. Current membership includes singers from Skagit, Whatcom, Island and Snohomish counties.

Rehearsals are held at the Mount Vernon Presbyterian Church on Tuesday evenings and one monthly Saturday morning.

Since its inception, the Chorale has been privileged to be under the direction of four talented and dedicated Artistic Directors / Conductors.

During the leadership of founder Joan Penney (1984-1993), the Chorale traveled to Carnegie Hall to perform Mozart's Requiem and then the Nina Festival at the Kennedy Center in Washington, D.C.

Under Jim Matthews (1994-2003), a Chorale member and retired award-winning high school choral and instrumental music teacher, the membership grew to its current level.

After Janet Skones Hitt became Conductor (2004-2014), the Chorale participated in McIntyre Hall's 2005 opening season; performed at the 2006 Mozart Choral Festival in Salzburg and Vienna to celebrate the 250th anniversary of the composer's birth; and performed at the Vatican's St. Peter's Basilica as well as other historic Italian cathedrals during the 2011 Rome International Choral Festival.

In 2014, Dr. Adam Burdick became the Chorale's current Artistic Director and Conductor bringing with him a wealth of experience.  To learn more about Dr. Burdick, read his bio.



Proud member of the
greater seattle
CHORAL
consortium

Site photos by John Yaeger - Yaeger, Inc.
Banner photos by Colzie Bettinger

like us on
facebook

Skagit Valley Chorale
P.O. Box 2976, Mount Vernon, WA
© 2019

Become a Chorale Supporter

# Ex.
# C

# High SARS-CoV-2 Attack Rate Following Exposure at a Choir Practice — Skagit County, Washington, March 2020

Lea Hamner, MPH[1]; Polly Dubbel, MPH[1]; Ian Capron[1]; Andy Ross, MPH[1]; Amber Jordan, MPH[1]; Jaxon Lee, MPH[1]; Joanne Lynn[1]; Amelia Ball[1]; Simranjit Narwal, MSc[1]; Sam Russell[1]; Dale Patrick[1]; Howard Leibrand, MD[1]

On May 12, 2020, this report was posted as an MMWR Early Release on the MMWR website (https://www.cdc.gov/mmwr).

On March 17, 2020, a member of a Skagit County, Washington, choir informed Skagit County Public Health (SCPH) that several members of the 122-member choir had become ill. Three persons, two from Skagit County and one from another area, had test results positive for SARS-CoV-2, the virus that causes coronavirus disease 2019 (COVID-19). Another 25 persons had compatible symptoms. SCPH obtained the choir's member list and began an investigation on March 18. Among 61 persons who attended a March 10 choir practice at which one person was known to be symptomatic, 53 cases were identified, including 33 confirmed and 20 probable cases (secondary attack rates of 53.3% among confirmed cases and 86.7% among all cases). Three of the 53 persons who became ill were hospitalized (5.7%), and two died (3.7%). The 2.5-hour singing practice provided several opportunities for droplet and fomite transmission, including members sitting close to one another, sharing snacks, and stacking chairs at the end of the practice. The act of singing, itself, might have contributed to transmission through emission of aerosols, which is affected by loudness of vocalization (1). Certain persons, known as superemitters, who release more aerosol particles during speech than do their peers, might have contributed to this and previously reported COVID-19 superspreading events (2–5). These data demonstrate the high transmissibility of SARS-CoV-2 and the possibility of superemitters contributing to broad transmission in certain unique activities and circumstances. It is recommended that persons avoid face-to-face contact with others, not gather in groups, avoid crowded places, maintain physical distancing of at least 6 feet to reduce transmission, and wear cloth face coverings in public settings where other social distancing measures are difficult to maintain.

## Investigation and Findings

The choir, which included 122 members, met for a 2.5-hour practice every Tuesday evening through March 10. On March 15, the choir director e-mailed the group members to inform them that on March 11 or 12 at least six members had developed fever and that two members had been tested for SARS-CoV-2 and were awaiting results. On March 16, test results for three members were positive for SARS-CoV-2

and were reported to two respective local health jurisdictions, without indication of a common source of exposure. On March 17, the choir director sent a second e-mail stating that 24 members reported that they had developed influenza-like symptoms since March 11, and at least one had received test results positive for SARS-CoV-2. The email emphasized the importance of social distancing and awareness of symptoms suggestive of COVID-19. These two emails led many members to self-isolate or quarantine before a delegated member of the choir notified SCPH on March 17.

All 122 members were interviewed by telephone either during initial investigation of the cluster (March 18–20; 115 members) or a follow-up interview (April 7–10; 117); most persons participated in both interviews. Interviews focused on attendance at practices on March 3 and March 10, as well as attendance at any other events with members during March, other potential exposures, and symptoms of COVID-19. SCPH used Council of State and Territorial Epidemiologists case definitions to classify confirmed and probable cases of COVID-19 (6). Persons who did not have symptoms at the initial interview were instructed to quarantine for 14 days from the last practice they had attended. The odds of becoming ill after attending each practice were computed to ascertain the likelihood of a point-source exposure event.

No choir member reported having had symptoms at the March 3 practice. One person at the March 10 practice had cold-like symptoms beginning March 7. This person, who had also attended the March 3 practice, had a positive laboratory result for SARS-CoV-2 by reverse transcription–polymerase chain reaction (RT-PCR) testing.

In total, 78 members attended the March 3 practice, and 61 attended the March 10 practice (Table 1). Overall, 51 (65.4%) of the March 3 practice attendees became ill; all but one of these persons also attended the March 10 practice. Among 60 attendees at the March 10 practice (excluding the patient who became ill March 7, who also attended), 52 (86.7%) choir members subsequently became ill. Some members exclusively attended one practice; among 21 members who only attended March 3, one became ill and was not tested (4.8%), and among three members who only attended March 10, two became ill (66.7%), with one COVID-19 case being laboratory-confirmed.

## Summary

### What is already known about this topic?

Superspreading events involving SARS-CoV-2, the virus that causes COVID-19, have been reported.

### What is added by this report?

Following a 2.5-hour choir practice attended by 61 persons, including a symptomatic index patient, 32 confirmed and 20 probable secondary COVID-19 cases occurred (attack rate = 53.3% to 86.7%); three patients were hospitalized, and two died. Transmission was likely facilitated by close proximity (within 6 feet) during practice and augmented by the act of singing.

### What are the implications for public health practice?

The potential for superspreader events underscores the importance of physical distancing, including avoiding gathering in large groups, to control spread of COVID-19. Enhancing community awareness can encourage symptomatic persons and contacts of ill persons to isolate or self-quarantine to prevent ongoing transmission.

Because illness onset for 49 (92.5%) patients began during March 11–15 (Figure), a point-source exposure event seemed likely. The median interval from the March 3 practice to symptom onset was 10 days (range = 4–19 days), and from the March 10 practice to symptom onset was 3 days (range = 1–12 days). The odds of becoming ill after the March 3 practice were 17.0 times higher for practice attendees than for those who did not attend (95% confidence interval [CI] = 5.5–52.8), and after the March 10 practice, the odds were 125.7 times greater (95% CI = 31.7–498.9). The clustering of symptom onsets, odds of becoming ill according to practice attendance, and known presence of a symptomatic contagious case at the March 10 practice strongly suggest that date as the more likely point-source exposure event. Therefore, that practice was the focus of the rest of the investigation. Probable cases were defined as persons who attended the March 10 practice and developed clinically compatible COVID-19 symptoms, as defined by Council of State and Territorial Epidemiologists (6). The choir member who was ill beginning March 7 was considered the index patient.

The March 10 choir rehearsal lasted from 6:30 to 9:00 p.m. Several members arrived early to set up chairs in a large multipurpose room. Chairs were arranged in six rows of 20 chairs each, spaced 6–10 inches apart with a center aisle dividing left and right stages. Most choir members sat in their usual rehearsal seats. Sixty-one of the 122 members attended that evening, leaving some members sitting next to empty seats. Attendees practiced together for 40 minutes, then split into two smaller groups for an additional 50-minute practice, with one of the groups moving to a smaller room. At that time, members in the larger room moved to seats next to one another, and members in the smaller room sat next to one another on benches. Attendees then had a 15-minute break, during which cookies and oranges were available at the back of the large room, although many members reported not eating the snacks. The group then reconvened for a final 45-minute session in their original seats. At the end of practice, each member returned their own chair, and in the process congregated around the chair racks. Most attendees left the practice immediately after it concluded. No one reported physical contact between attendees. SCPH assembled a seating chart of the all-choir portion of the March 10 practice (not reported here because of concerns about patient privacy).

Among the 61 choir members who attended the March 10 practice, the median age was 69 years (range = 31–83 years); 84% were women. Median age of those who became ill was 69 years, and 85% of cases occurred in women. Excluding the laboratory-confirmed index patient, 52 (86.7%) of 60 attendees became ill; 32 (61.5%) of these cases were confirmed by RT-PCR testing and 20 (38.5%) persons were considered to have probable infections. These figures correspond to secondary attack rates of 53.3% and 86.7% among confirmed and all cases, respectively. Attendees developed symptoms 1 to 12 days after the practice (median = 3 days). The first SARS-CoV-2 test was performed on March 13. The last person was tested on March 26.

Three of the 53 patients were hospitalized (5.7%), including two who died (3.8%). The mean interval from illness onset to hospitalization was 12 days. The intervals from onset to death were 14 and 15 days for the two patients who died.

SCPH collected information about patient signs and symptoms from patient interviews and hospital records (Table 2). Among persons with confirmed infections, the most common signs and symptoms reported at illness onset and at any time during the course of illness were cough (54.5% and 90.9%, respectively), fever (45.5% and 75.8%), myalgia (27.3% and 75.0%), and headache (21.2%, 60.6%). Several patients later developed gastrointestinal symptoms, including diarrhea (18.8%), nausea (9.4%), and abdominal cramps or pain (6.3%). One person experienced only loss of smell and taste. The most severe complications reported were viral pneumonia (18.2%) and severe hypoxemic respiratory failure (9.1%).

Among the recognized risk factors for severe illness, the most common was age, with 75.5% of patients aged ≥65 years. Most patients (67.9%) did not report any underlying medical conditions, 9.4% had one underlying medical condition, and 22.6% had two or more underlying medical conditions. All three hospitalized patients had two or more underlying medical conditions.

**TABLE 1. Number of choir members with and without COVID-19–compatible symptoms (N = 122)\* and members' choir practice attendance† — Skagit County, Washington, March 3 and 10, 2020**

| | No. (row %) | | | | | |
| | March 3 practice | | | March 10 practice | | |
| Attendance | Total | Symptomatic | Asymptomatic | Total | Symptomatic | Asymptomatic |
|---|---|---|---|---|---|---|
| Attended | 78 | 51 (65.4) | 27 (34.6) | 61 | 53§ (86.9) | 8 (13.1) |
| Did not attend | 40 | 4 (10.0) | 36 (90.0) | 61 | 3 (4.9) | 58 (95.1) |
| Attendance information missing | 4 | 1 (25.0) | 3 (75.0) | 0 | 0 (—) | 0 (—) |
| Attended only one practice | 21 | 1 (4.8) | 20 (95.2) | 3 | 2 (66.7) | 1 (33.3) |

**Abbreviation:** COVID-19 = coronavirus disease 2019.
\* No choir members were symptomatic at the March 3 practice.
† Thirty-seven choir members attended neither practice; two developed symptoms, and 35 remained asymptomatic.
§ Includes index patient; if the index patient excluded, 52 secondary cases occurred among the other 60 attendees (attack rate = 86.7%).

**FIGURE. Confirmed\* and probable† cases of COVID-19 associated with two choir practices, by date of symptom onset (N = 53) — Skagit County, Washington, March 2020**



**Abbreviation:** COVID-19 = coronavirus disease 2019.
\* Positive reverse transcription–polymerase chain reaction test result.
† Attendance at the March 10 practice and clinically compatible symptoms as defined by the Council of State and Territorial Epidemiologists, Interim-20-ID-01: Standardized surveillance case definition and national notification for 2019 novel coronavirus disease (COVID-19). https://cdn.ymaws.com/www.cste.org/resource/resmgr/2020ps/interim-20-id-01_covid-19.pdf.

## Public Health Response

SCPH provided March 10 practice attendees with isolation and quarantine instructions by telephone, email, and postal mail. Contacts of patients were traced and notified of isolation and quarantine guidelines. At initial contact, 15 attendees were quarantined, five of whom developed symptoms during quarantine and notified SCPH.

Before detection of this cluster on March 17, Skagit County had reported seven confirmed COVID-19 cases (5.4 cases per 100,000 population). At the time, SCPH informed residents that likely more community transmission had occurred than indicated by the low case counts.\* On March 21, SCPH issued a press release to describe the outbreak and raise awareness about community transmission.† The press release emphasized

the highly contagious nature of COVID-19 and the importance of following social distancing guidelines to control the spread of the virus.

### Discussion

Multiple reports have documented events involving superspreading of COVID-19 (2–5); however, few have documented a community-based point-source exposure (5). This cluster of 52 secondary cases of COVID-19 presents a unique opportunity for understanding SARS-CoV-2 transmission following a likely point-source exposure event. Persons infected with SARS-CoV-2 are most infectious from 2 days before through 7 days after symptom onset (7). The index patient developed symptoms on March 7, which could have placed the patient within this infectious period during the March 10 practice. Choir members who developed symptoms on March 11 (three) and March 12 (seven) attended both the March 3

\* Skagit County, updated social distancing information. https://skagitcounty.net/departments/home/press/031620.htm.
† Skagit County, public health investigating cluster of related COVID-19 cases. https://skagitcounty.net/departments/home/press/032120.htm.

608     MMWR / May 15, 2020 / Vol. 69 / No. 19     US Department of Health and Human Services/Centers for Disease Control and Prevention

TABLE 2. Signs and symptoms reported at the onset of COVID-19 illness and during the course of illness among persons infected at a choir practice (N = 53)* — Skagit County, Washington, March 2020

| | No. (%) | | no./No. (%) | |
|---|---|---|---|---|
| | Reported at onset of illness | | Reported during course of illness | |
| Sign or symptom | All cases (N = 53) | Confirmed cases (N = 33) | All cases (N = 53) | Confirmed cases (N = 33) |
| Cough | 27 (50.9) | 18 (54.5) | 47/53 (88.7) | 30/33 (90.9) |
| Fever | 28 (52.8) | 15 (45.5) | 36/53 (67.9) | 25/33 (75.8) |
| Myalgia | 13 (24.5) | 9 (27.3) | 34/52 (65.4) | 24/32 (75.0) |
| Headache | 10 (18.9) | 7 (21.2) | 32/53 (60.4) | 20/33 (60.6) |
| Chills or rigors | 7 (13.2) | 6 (18.2) | 23/51 (45.1) | 16/31 (51.6) |
| Congestion | 4 (7.5) | 2 (6.1) | 25/52 (48.1) | 15/32 (46.9) |
| Pharyngitis | 2 (3.8) | 2 (6.1) | 12/52 (23.1) | 8/32 (25.0) |
| Lethargy | 4 (7.5) | 2 (6.1) | 5/52 (9.6) | 3/32 (9.4) |
| Fatigue | 3 (5.7) | 1 (3.0) | 24/52 (46.2) | 15/32 (46.9) |
| Aguesia (loss of taste) | 1 (1.9) | 1 (3.0) | 11/48 (22.9) | 5/28 (17.9) |
| Anosmia (loss of smell) | 1 (1.9) | 1 (3.0) | 10/48 (20.8) | 5/28 (17.9) |
| Chest congestion or tightness | 1 (1.9) | 1 (3.0) | 5/52 (9.6) | 4/32 (12.5) |
| Weakness | 1 (1.9) | 1 (3.0) | 3/52 (5.8) | 2/32 (6.3) |
| Eye ache | 1 (1.9) | 1 (3.0) | 1/52 (1.9) | 1/32 (3.1) |
| Dyspnea | 0 (—) | 0 (—) | 8/51 (15.7) | 8/31 (25.8) |
| Diarrhea | 0 (—) | 0 (—) | 8/52 (15.4) | 6/32 (18.8) |
| Pneumonia | 0 (—) | 0 (—) | 6/53 (11.3) | 6/33 (18.2) |
| Nausea | 0 (—) | 0 (—) | 3/52 (5.8) | 3/32 (9.4) |
| Acute hypoxemic respiratory failure | 0 (—) | 0 (—) | 3/53 (5.7) | 3/33 (9.1) |
| Abdominal pain or cramps | 0 (—) | 0 (—) | 2/52 (3.8) | 2/32 (6.3) |
| Malaise | 1 (1.9) | 0 (—) | 1/52 (1.9) | 0/32 (—) |
| Anorexia | 0 (—) | 0 (—) | 1/52 (1.9) | 0/32 (—) |
| Vomiting | 0 (—) | 0 (—) | 0/52 (—) | 0/32 (—) |

**Abbreviation:** COVID-19 = coronavirus disease 19.
* Including the index patient.

and March 10 practices and thus could have been infected earlier and might have been infectious in the 2 days preceding symptom onset (i.e., as early as March 9). The attack rate in this group (53.3% and 86.7% among confirmed cases and all cases, respectively) was higher than that seen in other clusters, and the March 10 practice could be considered a superspreading event (3,4). The median incubation period of COVID-19 is estimated to be 5.1 days (8). The median interval from exposure during the March 10 practice to onset of illness was 3 days, indicating a more rapid onset.

Choir practice attendees had multiple opportunities for droplet transmission from close contact or fomite transmission (9), and the act of singing itself might have contributed to SARS-CoV-2 transmission. Aerosol emission during speech has been correlated with loudness of vocalization, and certain persons, who release an order of magnitude more particles than their peers, have been referred to as superemitters and have been hypothesized to contribute to superspreading events (1). Members had an intense and prolonged exposure, singing while sitting 6–10 inches from one another, possibly emitting aerosols.

The findings in this report are subject to at least two limitations. First, the seating chart was not reported because of concerns about patient privacy. However, with attack rates of 53.3% and 86.7% among confirmed and all cases, respectively,

and one hour of the practice occurring outside of the seating arrangement, the seating chart does not add substantive additional information. Second, the 19 choir members classified as having probable cases did not seek testing to confirm their illness. One person classified as having probable COVID-19 did seek testing 10 days after symptom onset and received a negative test result. It is possible that persons designated as having probable cases had another illness.

This outbreak of COVID-19 with a high secondary attack rate indicates that SARS-CoV-2 might be highly transmissible in certain settings, including group singing events. This underscores the importance of physical distancing, including maintaining at least 6 feet between persons, avoiding group gatherings and crowded places, and wearing cloth face coverings in public settings where other social distancing measures are difficult to maintain during this pandemic. The choir mitigated further spread by quickly communicating to its members and notifying SCPH of a cluster of cases on March 18. When first contacted by SCPH during March 18–20, nearly all persons who attended the practice reported they were already self-isolating or quarantining. Current CDC recommendations, including maintaining physical distancing of at least 6 feet and wearing cloth face coverings if this is not feasible, washing hands often, covering coughs and sneezes, staying home when ill, and frequently cleaning and disinfecting

high-touch surfaces, remain critical to reducing transmission. Additional information is available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

## Acknowledgments

Patients described in this report; health care personnel who cared for them; Skagit County Public Health staff members and leaders, particularly the Communicable Disease investigators; Washington State Department of Health.

Corresponding author: Lea Hamner, leah@co.skagit.wa.us, 360-416-1500.

[1]Skagit County Public Health, Mount Vernon, Washington.

All authors have completed and submitted the International Committee of Medical Journal Editors form for disclosure of potential conflicts of interest. All authors report receipt of funding through Public Health Emergency Preparedness grant from the Washington State Department of Health during the conduct of the study. No other potential conflicts of interest were disclosed.

## References

1. Asadi S, Wexler AS, Cappa CD, Barreda S, Bouvier NM, Ristenpart WD. Aerosol emission and superemission during human speech increase with voice loudness. Sci Rep 2019;9:2348. https://doi.org/10.1038/s41598-019-38808-z
2. Wang D, Hu B, Hu C, et al. Clinical characteristics of 138 hospitalized patients with 2019 novel coronavirus-infected pneumonia in Wuhan, China. JAMA 2020;323:1061–9. https://doi.org/10.1001/jama.2020.1585
3. McMichael TM, Currie DW, Clark S, et al. Epidemiology of COVID-19 in a long-term care facility in King County, Washington. N Engl J Med 2020;NEJMoa2005412. https://doi.org/10.1056/NEJMoa2005412
4. Ghinai I, Woods S, Ritger KA, et al. Community transmission of SARS-CoV-2 at two family gatherings—Chicago, Illinois, February–March 2020. MMWR Morb Mortal Wkly Rep 2020;69:446–50. https://doi.org/10.15585/mmwr.mm6915e1
5. South Korean city on high alert as coronavirus cases soar at 'cult' church. The Guardian, US Edition. February 20, 2020. https://www.theguardian.com/world/2020/feb/20/south-korean-city-daegu-lockdown-coronavirus-outbreak-cases-soar-at-church-cult-cluster
6. Council of State and Territorial Epidemiologists. Interim-20-ID-01: standardized surveillance case definition and national notification for 2019 novel coronavirus disease (COVID-19). Atlanta, GA: Council of State and Territorial Epidemiologists; 2020. https://cdn.ymaws.com/www.cste.org/resource/resmgr/2020ps/interim-20-id-01_covid-19.pdf
7. He X, Lau EHY, Wu P, et al. Temporal dynamics in viral shedding and transmissibility of COVID-19. Nat Med 2020;26:672–5.
8. Lauer SA, Grantz KH, Bi Q, et al. The incubation period of coronavirus disease 2019 (COVID-19) from publicly reported confirmed cases: estimation and application. Ann Intern Med 2020;172:577. https://doi.org/10.7326/M20-0504
9. van Doremalen N, Bushmaker T, Morris DH, et al. Aerosol and surface stability of SARS-CoV-2 as compared with SARS-CoV-1. N Engl J Med 2020;382:1564–7. https://doi.org/10.1056/NEJMc2004973

# Ex.

# D

**Obituaries**

# The Seattle Times

# Carole Rae Woodmansee, whose life centered on family, faith and music, dies at 81 of coronavirus complications

April 25, 2020 at 5:00 pm | *Updated April 25, 2020 at 6:07 pm*



Carole Rae Woodmansee, whose life was filled with family, church, service and song, died March 27, her 81st birthday, from complications of COVID-19. (Courtesy of Wendy Jensen)

By Moira Macdonald 🐦 f

*Seattle Times arts critic*

*Editor's note: We often hear about the impact of the coronavirus pandemic in numbers of cases and deaths. But each data point represents a human life whose loss is felt by countless other people. We are chronicling some of them in an obituary series called* Lives Remembered. *If someone special to you has died of COVID-19, please tell us about them by emailing* newstips@seattletimes.com *with the subject line "Lives Remembered," or by* filling out the form *at the bottom of this page.*

• • •

Throughout her life, Carole Rae Woodmansee was known for putting others first. In her final days, speaking to her children by telephone from her Mount Vernon hospital

bed, she reassured them, telling them she wasn't afraid and that she was praying for them all. She quoted her favorite hymn, "Blessed Assurance": "This is my story, this is my song / Praising my Savior, all the day long."

"That so was my mom," said her son, Joe Woodmansee. "That's who she was."

A woman for whom family, faith and music were the touchstones of her life, Mrs. Woodmansee died on the morning of March 27 — her 81st birthday — from complications of COVID-19. She contracted the virus, her family believes, from a March 10 rehearsal of the Skagit Valley Chorale, after which several dozen singers became ill. She had been a longtime member of the group.

"I think singing was life, music was life to her," said her youngest daughter, Wendy Jensen. "It's what soothed her, it's what made her happy, it encouraged her."

Her son concurred, saying that his mother believed that music "could draw people closer to God, and help them through hard times."

An alto whose voice harmonized beautifully with others', Mrs. Woodmansee began singing in a trio with friends in high school. It was the first note in a life filled with music: playing and teaching piano, singing, leading choirs (at one point, while living in California, she directed four different choirs at her church), directing children's music camps, and other forms of music ministry. "She loved every aspect of it," said Jensen. "In fact, the last Bible study that she taught was on hymns, the old hymns."

Carole Rae Dean was born in Centralia, and married her high school sweetheart, Elmo James (Jim) Woodmansee, in 1957. The couple, who settled in Mount Vernon in 1977, raised an ever-growing family: four children, 16 grandchildren and 25 great-grandchildren. She "absolutely glowed" around her grandchildren, said her son, and loved family gatherings. All of her children and grandchildren live within 30 minutes of each other in the Skagit Valley, and she was able to see them often.

In recent years, she was employed by two of her grandchildren, Paul and Tim Woodmansee, proudly doing part-time office work for their construction company. "For Mom, that was fun to be part of the family business," her son said.

Widowed since 2003, she led a busy life, filled with family, church (she was an active member of Radius Church in Mount Vernon), service and song.

"She was a go-getter," said her daughter Bonnie Dawson. "I wrote a whole post on

Facebook on how her chair is empty now but it doesn't matter because she never really sat in it before."

Dawson remembered, with a smile evident in her voice, that on the evening she was taken to the hospital, her mother took time to empty the dishwasher. "That's the kind of lady she was."

Mrs. Woodmansee enjoyed travel (her children fondly remember recent trips to the Grand Canyon, and to Phoenix for a NASCAR race), gardening and spending time with those she loved. "Basically," said her son, "she was a friend to anyone she ever met."

Her grandson Paul wrote in an email that while the family was heartbroken that she apparently contracted the virus at her beloved chorale, he was nonetheless finding comfort in "imagining my Grandma singing even till the moment she was destined to leave this earth. I believe there is some beauty in doing the things we love to do until the day we pass away."

# The Seattle Times

*Tell us about someone you know who has died of COVID-19. What were they like?*

*What did you love about them? What will they be remembered for?*

0/1000

## Your contact info

A journalist might reach out to you to follow up.

*Name*          *Email address*          *Phone number*

*ZIP code*

☑ Sign me up for the Morning Brief newsletter

☐ Please don't publish my name

☐ I am over 16 years old

☐ I accept the Terms of Service

<div style="background:#0a6eb4; padding:1em; text-align:center;">
**Submit**
</div>

*By clicking Submit, you agree to The Seattle Times' Privacy Policy and Terms of Service.*

Powered by Hearken | Terms of Service | Privacy Policy

---

**Moira Macdonald:** mmacdonald@seattletimes.com*; on Twitter:* @moiraverse*. Moira Macdonald is the Seattle Times arts critic.*

The Seattle Times occasionally closes comments on particularly sensitive stories. If you would like to share your thoughts or experiences in relation to this story, please email the reporter or submit a letter to be considered for publication in our Opinion section. You can read more about our community policies here.

# Ex.

# E

1     IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

2             FOR THE COUNTY OF CHELAN

3

4   JOSE LUIS CUEVAS, et al,          )
                                      )
5             Plaintiffs,             )
                                      )
6    vs.                              )   No. 20-2-00352-04
                                      )
7   JAY INSLEE, in his official       )
    capacity as Governor,             )
8                                     )
              Defendant.              )
9   _____)

10

11

12          DEPOSITION OF MALCOM D. BUTLER, M.D.

13

          Taken at the instance of the Defendant
14

15

16

                                  June 8, 2020
17
                                  10:00 a.m.
18
                                  139 South Worthen
19
                                  Wenatchee, Washington
20

21

22

23          BRIDGES REPORTING & LEGAL VIDEO
            Certified Shorthand Reporters
24           1312 N. Monroe Street
            Spokane, Washington  99201
25          (509) 456-0586 - (800) 358-2345

## Page 2

```
 1       BE IT REMEMBERED that the deposition of MALCOM
 2  D. BUTLER, M.D., was taken in behalf of the Defendant
 3  pursuant to the Washington Rules of Civil Procedure
 4  before William J. Bridges, Certified Shorthand Reporter
 5  for Washington, Idaho and Oregon, on Monday, the 8th
 6  day of June, 2020, at the Office of the Attorney
 7  General, 139 South Worthen, Suite 100, Wenatchee,
 8  Washington, commencing at the hour of 10:00 a.m.
 9
10          *              *              *
11
12                  APPEARANCES:
13
14
15  For the Plaintiffs:      DAVID K. DeWOLF, ESQ.
                             Albrecht Law PLLC
16  (via Zoom)               Attorneys at Law
                             421 West Riverside Avenue
17                             Suite 614
                             Spokane, WA  99201
18                           (509) 495-1246
                             david@albrechtlawfirm.com
19
20
21  For the Defendant:       ZACHARY PEKELIS JONES, ESQ.
                             Assistant Attorney General
22  (via Zoom)               800 Fifth Avenue
                               Suite 2000
23                           Seattle, WA  98104
                             (206) 332-7089
24                           zach.jones@atg.wa.gov
                             (206) 332-7089
25
```

## Page 3

```
 1              APPEARANCES (Cont'd).
 2
 3
     For the Defendant:      JEFFREY T. EVEN, ESQ.
 4                           Deputy Solicitor General
     (via Zoom)              1125 Washington Street N.E.
 5                           Olympia, WA  98504
                             (360) 586-0728
 6                           jeffrey.even@atg.wa.gov
 7
 8
     For the witness:        CHARLES D. ZIMMERMAN, ESQ.
 9                           Ogden Murphy Wallace
                             Attorneys at Law
10                           1 Fifth Street
                               Suite 200
11                           Wenatchee, WA  98807
                             (509) 662-1954
12                           czimmerman@omwlaw.com
13
14
     Also present:           JENNAH WILLIAMS (via Zoom)
15
16
17
18
19          *              *              *
20
21
22
23
24
25
```

## Page 4

```
 1                    I N D E X:
 2
 3
     JOSE LUIS CUEVAS, et al vs. JAY INSLEE
 4
     No. 20-2-00352-04
 5
     June 8, 2020
 6
 7
 8
 9
10
                    T E S T I M O N Y
11
12  MALCOM D. BUTLER, M.D.                    PAGE NO:
13
        Examination by Mr. Jones             6 - 94
14
15
16
17
18
19              PRODUCTION REQUESTS:
20
21
                      (None)
22
23
24
25
```

## Page 5

```
 1                  E X H I B I T S:
 2
 3   No:          Identification:                    Page:
 4
 5   1    Proclamation by the Governor Amending        18
          Proclamations 20-05, 20-25, 20-25.1,
 6        20-25.2 and 20.25.3 and
          20-25.4, Transition from "State Home - Stay
 7        Healthy" to "Safe Start - Stay Healthy"
          County-by-County phased reopening, Bates
 8        000081 - 85
 9
10   2    E-mail string, 5/14/20, 5/18/20, Lorena      40
          Orozco, Marc Straub, Board of Health,
11        Francis Collins, Malcolm Butler, Tiana
          Rowland; Subject:  BOH Packet for Monday,
12        May 18, 2020, Bates 000201 - 202
13
14   3    Declaration of Marc Straub in Support for    46
          Motion for Temporary Restraining Order,
15        5/28/20, Bates 000059 - 66
16
17   4    E-mail string, 5/14/20, 5/18/20, 5/19/20,    70
          Malcolm Butler, Marc Straub, Lorena
18        Orozco, Board of Health, Francis Collins,
          Tiana Rowland; Subject:  BOH Packet for
19        Monday, May 18, 2020, Bates 000204 - 207
20
21   5    E-mail string, 5/14/20, 5/18/20, 5/19/20,    76
          5/20/20, Marc Straub, Malcolm Butler,
22        Lorena Orozco, Board of Health, Francis
          Collins, Tiana Rowland; Subject: BOH
23        Packet for Monday, May 18, 2020, Bates
          00000196 - 199
24
25   6    E-mail, 5/28/20, Malcolm Butler to Marc      86
          Straub; Subject: Deceit
```

1    (MALCOM D. BUTLER, M.D., called as a witness
2  by the Defendant, being first duly sworn to tell the
3  truth, the whole truth and nothing but the truth, was
4  examined and testified as follows:)
5
6
7                    EXAMINATION
8
9  BY MR. JONES:
10    Q.    Good morning, Dr. Butler.  I just introduced
11  myself earlier.  My name is Zachary Pekelis Jones,
12  P-E-K-E-L-I-S, and I'm an attorney for Governor Inslee
13  in this matter.
14          Have you ever had your deposition taken
15  before in any court proceeding.
16    A.    Yes.
17    Q.    How many times?
18    A.    Gosh, I don't remember.  I think about four
19  in my career.
20    Q.    And what were the nature of those
21  proceedings?
22    A.    Yeah.  They've been a long time ago.  All of
23  them were medically-related.
24          One of them was in my role as staff, what's
25  called medical staff officer at Central Washington

1  just to make sure you understand the question, and that
2  I finish asking it.
3          Otherwise, it could get somewhat confusing
4  and difficult for the court reporter.
5          If there is an objection, either by Mr.
6  DeWolf who represents the plaintiffs in this matter, or
7  by Mr. Zimmerman, who is the Health District's counsel
8  who's present as well, if you understand the question,
9  you are permitted to answer it.
10          And it's only if you are instructed by your
11  attorney not to answer the question on the basis of
12  privilege that you should actually not answer the
13  question.
14          Does that make sense to you?
15    A.    Well, I understand your words.  I guess
16  we'll see how it works out in practice.
17    Q.    Fair enough.  In other words, unless your
18  attorney says "Don't answer it," answer the question if
19  you understand it.
20    A.    Very good.
21    Q.    Please give full and complete answers.  Do
22  you understand the oath that you have taken here
23  today?
24    A.    Yes.
25    Q.    Is there anything about that oath that was

1  Hospital.  And the others would have just been --
2    Q.    I'm sorry.  I couldn't hear what you just
3  said.
4    A.    Okay.  One of them was in my role as a
5  medical staff officer at Central Washington Hospital.
6          And I believe the others were custody type
7  of hearings and those sort of things.
8    Q.    And were you an expert witness in those
9  hearings?
10    A.    I think in all of them, yes.  In no case was
11  I a defendant or a plaintiff.  So I must have been an
12  expert in all of them.
13    Q.    Understood.  So, just some basic ground
14  rules for this deposition.  I understand you have some
15  experience doing this.  But just to make it easier on
16  us today.
17          It is very important that you speak slowly
18  so that the court reporter can take down everything
19  that you say.  Particularly if you're ever reading a
20  document, people tend to speak pretty fast.  So make
21  sure you slow down consciously whenever you're
22  reading.
23          Because this deposition is taking place via
24  Zoom today, it's especially important that you wait
25  after every question in case there is an objection or

1  confusing or ambiguous to you?
2    A.    No.
3    Q.    Okay.  And if you remember something later,
4  you know, a supplement to an answer you've previously
5  given, feel free to let me know and we can go back to
6  that earlier question, if it occurs to you later or
7  during a break, at any time, if you want to clarify or
8  add to a previous answer, feel free to do so.
9          Does that make sense?
10    A.    Yes.
11    Q.    And I don't expect this deposition to take
12  very long.  Perhaps a few hours.  But if for whatever
13  reason you want to break, whether to use the facilities
14  or for some water, please let me know and we can do
15  that.
16          Okay?
17    A.    Yes.
18    Q.    Are you sick today in any way?
19    A.    No.
20    Q.    Are you under a doctor's care for any
21  illness?
22    A.    No.
23    Q.    Have you taken any drugs, alcohol or
24  prescription medications today?
25    A.    No.  Well, actually, Zach, I have asthma.

**Page 10**

1  So I used my asthma inhaler this morning.
2       Q.    Any medications or other substances that
3  might impair or inhibit your ability to understand my
4  questions and answer them truthfully?
5       A.    No.
6       Q.    Okay.  Any other reason why you would be
7  unable to understand my questions or answer them
8  truthfully?
9       A.    Not on my part, no.
10      Q.    Okay.  And did you receive a subpoena and a
11 deposition notice for today's deposition?
12      A.    Yes.
13      Q.    I'd like to just begin talking about
14 your educational and professional background briefly.
15            What are your current professional
16 positions?
17      A.    I'm currently the Chief Medical Officer at
18 Columbia Valley Community Health.  I am a physician
19 with expertise in family medicine.
20      Q.    And how long have you been in that position
21 at Columbia Valley Community Health?
22      A.    27 years.
23      Q.    And are there any other positions that you
24 currently hold professionally?
25      A.    I am currently the health officer for Chelan

**Page 11**

1  and Douglas Counties, local health jurisdiction.
2       Q.    And is that the Chelan-Douglas County Health
3  District?
4       A.    Correct.
5       Q.    So, we may refer to that entity repeatedly
6  today.  Just for short, I'm going to refer to it as the
7  Health District.
8             Does that make sense to you?
9       A.    Yes.
10      Q.    Okay.  And how long have you been in
11 that position as health officer with the Health
12 District?
13      A.    Since April 20, 2020.
14      Q.    April 20th, 2020?
15      A.    Correct.
16      Q.    Any other current professional positions
17 that you hold?
18      A.    I sit on various committees, but none, I
19 wouldn't consider them as sort of professional titled
20 positions or anything like that.
21            I have a faculty appointment at the
22 University of Washington, that sort of thing.
23      Q.    Understood.  You mention that you have an
24 expertise in family medicine.  Could you just describe
25 the educational credentials that you have received in

**Page 12**

1  the course of that practice?
2       A.    I have a B.A. in philosophy from Cornell
3  University.
4       Q.    Uh-huh.
5       A.    I have a Medical Doctorate from the
6  University of Washington.
7             I am board certified in family medicine,
8  having completed a three-year family medicine residency
9  at the University of California, Los Angeles.
10      Q.    Any other education or training in the
11 course of your medical degree -- medical experience?
12      A.    I have had continuous additional training
13 throughout my medical career.
14      Q.    Do you have any training specifically in the
15 field of public health?
16      A.    No.
17      Q.    Okay.  Other than your experience as the
18 Health Officer with the Chelan-Douglas County Health
19 District, do you have experience in the field of public
20 health?
21      A.    In as much as public health relates to a
22 primary care practice in a rural community, yes.
23      Q.    Have you had a specific position in public
24 health management or administration?
25      A.    No.

**Page 13**

1       Q.    Turning to your experience with the Health
2  District, you began relatively recently.
3             Can you describe the circumstances under
4  which you came to occupy the position as Health Officer
5  with the Health District?
6       A.    I was approached by Barry Kling who manages
7  the Health District.  He asked if I would be willing to
8  step up during this pandemic to assist the Health
9  District.
10            The prior health officer is a retired oral
11 surgeon.  And there were concerns about his capacity to
12 actively direct and manage this crisis for the Health
13 District.
14      Q.    And why was that, if you know?
15      A.    Because of his age and time out of practice.
16      Q.    And what was the name of the prior Health
17 Officer?
18      A.    Francis Collins.
19      Q.    And is he still serving in an emeritus
20 capacity for the Health District?
21      A.    Yes.
22      Q.    Could you explain what the hierarchy of the
23 Health District leadership is?  For example, to whom do
24 you report and who reports to you?
25      A.    I report to the Board of Health.  There is

1 nobody who reports to me.

2 Q. And you mentioned Mr. Kling earlier. What
3 is his position with the Health District?

4 A. He is the director.

5 Q. Is he also referred to as the administrator?

6 A. Yes.

7 Q. And to whom does he report?

8 A. He reports to the board.

9 Q. And who reports to him?

10 A. The rest of the agency. If you expect me,
11 Zach, to have those memorized, I'm sorry, I will let
12 you down.

13 Q. That's fine. It's safe to say that all
14 other full-time employees report to Mr. Kling?

15 A. I couldn't say if they were full-time. As
16 far as I'm aware, all other employees through their
17 supervisors report up through and to Mr. Kling.

18 Q. Understood. And you mentioned the Board of
19 Health. Who, if you know, are the members of the Board
20 of Health? Either you can say their specific names, or
21 generally what their positions are.

22 A. Well, Jill Thompson is currently the
23 President of the Board. I believe she is the Mayor of
24 Waterville.

25 Dan Sutton and Marc Straub, Kevin Overbay,

<div align="right">Page 14</div>

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

1 Doug England are all County Commissioners. Two from
2 Douglas County, two from Chelan County.

3 Ruth Esparza is a local attorney, and I
4 believe on the Wenatchee City Council. And there's a
5 woman named Sharon who I know lives in Leavenworth.
6 I'm not sure what her role or other titles might
7 be.

8 Q. Is she an elected official, as well?

9 A. I do not know.

10 Q. And is there also a Mr. John Sterk who's on
11 the board?

12 A. I believe so, yes.

13 Q. Prior to becoming the Health Officer in
14 April of 2020, did you know any of the board members
15 personally?

16 A. No.

17 Q. Do you know if any of the board members is
18 an expert or professional in any medical field?

19 A. I'm not aware that any of them have any
20 medical expertise, no.

21 Q. So, I guess none is an expert in -- none of
22 them expert or professional in epidemiology?

23 A. I'm sorry. I don't know what background any
24 of them have in epidemiology.

25 Q. And do you know whether any of them have a

<div align="right">Page 15</div>

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

1 background in public health?

2 A. I'm not aware that any of them have any type
3 of public health background or training.

4 Q. What about Mr. Kling? Did you know Mr.
5 Kling personally before becoming the Health Officer for
6 the Health District?

7 A. I had interacted with Mr. Kling
8 professionally prior to taking this role. We had no
9 relationship outside of those professional
10 interactions.

11 Q. What were your professional interactions
12 with Mr. Kling?

13 A. Well, two years ago Chelan and Douglas
14 Counties had an accountable health organization
15 developed, or an ACH. So we were the North Central
16 Accountable Care Organization through Medicaid. And
17 that brought a lot of local health care leaders
18 together.

19 The ACH was directed by Senator Parlette.
20 And her team was housed with the Health District.

21 So, I had interactions with that team
22 frequently, both in my role as Chief Medical Officer of
23 a federally qualified health center.

24 I was also asked to head the opioid response
25 for the ACH. In that role I worked fairly closely with

<div align="right">Page 16</div>

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

1 certain team members of the ACH. And we had regular
2 meetings. Various members of the Health District were
3 also participating in various roles. It was largely in
4 that way.

5 As a primary care provider I am mandated to
6 report infectious diseases and other things to the
7 Health District. I have worked with them regularly in
8 that capacity, and in working on contagion throughout
9 the years.

10 Q. Do you know what Mr. Kling's professional
11 training is in?

12 A. I do not know specifically. I know that he
13 previously had a role in the Midwest. I'm aware that
14 he has held similar positions in the past. I do not
15 know what his actual academic work has been.

16 Q. Based on your experience working with him at
17 the Health District and prior, would you describe Mr.
18 Kling as knowledgeable and experienced in the field of
19 public health?

20 A. Yes.

21 Q. So, I would like to turn to our first
22 exhibit today, which is tab H.

23 A. Okay. There are no tabs. How would I find
24 tab H?

25 MR. JONES: Right here (indicating).

<div align="right">Page 17</div>

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

<div align="right">Pages 14 to 17</div>

1    THE WITNESS:  Ah.  Okay.  Tab H.  And
2  there's also no --
3    MR. ZIMMERMAN:  Do you have a Bates
4  stamp number?
5    MR. JONES:  Yes.  It's 880.  000080.
6    THE WITNESS:  Tab H.  Found it.
7    MR. DE WOLF:  Excuse me, Jack.  I think
8  you said 080, or 880?
9    MR. JONES:  000080.
10    MR. DE WOLF:  Number 80?
11    MR. JONES:  Yes.  80.
12    COURT REPORTER:  Do we want to Mark this
13  as Exhibit 1.
14    MR. JONES:  Yes, please.
15    (Deposition Exhibit Number 1 was
16    marked for identification.)
17    Q.    (BY MR. JONES:)  So, Exhibit 1, which you
18  have just been handed, is Proclamation 20-25.4 issued
19  by the Governor of Washington, Jay Inslee.
20    Are you familiar with the Stay Home - Stay
21  Healthy order issued by the Governor?
22    A.    Yes.
23    Q.    I'd like to turn your attention to the first
24  paragraph on page 81, which begins "Whereas, on
25  February 29th, 2020."

Page 18

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

---

1    Q.    So, this second paragraph on page 81 refers
2  to Proclamations 20-25 and amendatory proclamations
3  that prohibit "all people in Washington State from
4  leaving their homes except to participate in essential
5  services or essential work and preventing all
6  non-essential businesses in Washington State from
7  conducting business, within the limitations therein."
8    Is that correct?
9    A.    Yes.
10    Q.    And so I'm going to refer to those
11  proclamations collectively as the Stay Home - Stay
12  Healthy proclamation, or Stay Home - Stay Healthy
13  order.
14    Does that make sense to you?
15    A.    Yes.
16    Q.    Now, based on your medical training and
17  expertise, did you agree with the Governor's decision
18  to issue the Stay Home - Stay Healthy order?
19    A.    Yes.
20    Q.    Why?
21    A.    It was clear that social distancing was the
22  most effective tool we had to combat the transmission
23  of the virus and the COVID-19 pandemic.  It was clear
24  that in order to avoid morbidity and mortality
25  throughout the state the economy had to be sufficiently

Page 20

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

---

1    Do you see that?
2    A.    Yes.
3    Q.    And please just read along as I read aloud.
4  "Whereas, on February 29, 2020, I issued
5  Proclamation 20-05, proclaiming a State of Emergency
6  for all counties throughout the state of Washington as
7  a result of the coronavirus disease 2019 (COVID-19)
8  outbreak in the United States and confirmed person-to-
9  person spread of COVID-19 in Washington State."
10    Do you see where I read that?
11    A.    Yes.
12    Q.    Do you recall on February 29th, 2020,
13  wherein Governor Inslee created a state of emergency
14  due to COVID-19?
15    A.    Yes.
16    Q.    Okay.  Now, turning to the second paragraph
17  which begins "Whereas, as a result of the continued
18  worldwide spread," I'd ask that you just read that
19  paragraph to yourself silently, and let me know once
20  you have finished.
21    Is that all right?
22    A.    Yes.
23    Q.    Thank you.
24    (Pause in the proceedings).
25    A.    All right.

Page 19

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

---

1  curtailed that there was little incentive for
2  individuals to leave their homes.
3    Q.    If you turn your attention to the third
4  Whereas paragraph on page 81, read along silently while
5  I read aloud.  "Whereas, the COVID-19 disease, caused
6  by a virus that spreads easily from person to person
7  which may result in serious illness or death and has
8  been classified by the World Health Organization as a
9  worldwide pandemic, has broadly spread throughout
10  Washington State and remains a significant health risk
11  to all of our people, especially members of our most
12  vulnerable populations."
13    Did I read that correctly?
14    A.    Yes.
15    Q.    Do you agree with this statement by the
16  Governor that COVID-19 remains a significant health
17  risk to all of our people, especially members of our
18  most vulnerable populations?
19    A.    Zach, can I clarify your question?
20    Q.    Sure.
21    A.    You used the word "remains."  Are you
22  referring to what is before me here in this document,
23  or are you referring to today as of January -- June
24  8?
25    Q.    As of today, June 8, would you agree that

Page 21

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

Pages 18 to 21

1  COVID-19 remains a significant health risk to all of
2  our people, especially members of our most vulnerable
3  populations?
4      A.    No.
5      Q.    Why not?
6      A.    Our experience is that in the non-medically
7  vulnerable, it is not a significant health risk.
8      Q.    And is that because of a different
9  fatality -- a different fatality rate for non-medically
10 vulnerable, or because of some other reason?
11     A.    In our local experience approximately 30
12 percent of the people who have tested positive for the
13 virus have had no symptoms at all.  It's hard to
14 describe that as a significant health concern for that
15 30 percent.
16          I believe locally we have had in the range
17 of 20 to 30 people admitted to the hospital over the
18 course of two or three months.
19          Again, that doesn't strike me as a
20 significant illness for the vast majority of the people
21 who have tested positive.
22          Certainly there is a small cohort which I
23 would describe as the medically vulnerable in whom it
24 is extremely dangerous, and I do feel it is appropriate
25 to take the actions necessary to protect that

Page 22

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

1  population from the spread, especially when there is
2  such a large asymptomatic proportion of infectious
3  people.
4      Q.    Do you have an opinion on whether, based on
5  the scientific evidence you have seen, asymptomatic or
6  pre-symptomatic sufferers of COVID-19 can transmit the
7  virus to others?
8      A.    Absolutely.
9      Q.    What is your opinion?
10     A.    What is my opinion on what, Zach?
11     Q.    Sir, my question is whether you have an
12 opinion on --
13     A.    Oh, sorry.
14     Q.    -- that subject.
15     A.    Yes.  So, my opinion is that, yes,
16 absolutely the disease is transmitted by asymptomatic
17 individuals.
18     Q.    And as well as pre-symptomatic individuals,
19 right?
20     A.    Pre-symptomatic are also asymptomatic, yes.
21     Q.    So, in light of that, and the risk that it
22 presents to more vulnerable populations, would you
23 agree, kind of slightly changing the wording of this
24 third Whereas paragraph, would you agree that COVID-19
25 today remains a significant public health risk in

Page 23

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

1  Washington?
2      A.    Yes.
3      Q.    And does it remain a significant public
4  health risk in Chelan County?
5      A.    Yes.
6      Q.    If you will turn to page 82 to the top
7  Whereas paragraph there.
8      A.    (Witness complied).
9      Q.    And would you just read that paragraph at
10 the top to yourself silently, and then I will ask you a
11 question or two about it when you are done.
12                    (Pause in the proceedings).
13     A.    I'm done.
14     Q.    Okay.  Would you agree that modelers
15 continue to agree that fully relaxing social distancing
16 measures will result in a sharp increase in the number
17 of COVID-19 cases?
18     A.    Yes.
19     Q.    Okay.  Turning to the next page, page 83.
20     A.    (Witness complied).
21     Q.    And this is the top full Whereas paragraph
22 on page 83.  Just read along silently as I read
23 aloud.
24          "Whereas, the worldwide COVID-19 pandemic
25 and its progression in Washington State continue to

Page 24

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

1  threaten the life and health of our people as well as
2  the economy of Washington State, and remain a public
3  disaster affecting life, health, property or the public
4  peace."
5          Do you see where I read that?
6      A.    Yes.
7      Q.    Do you agree that the worldwide COVID-19
8  pandemic and its progression in Washington State
9  continue to threaten the life and health of our people
10 as well as the economy of Washington State and remain a
11 public disaster affecting life, health, property or the
12 public peace?
13     A.    Yes.
14     Q.    Setting the document aside now, in your
15 opinion, Dr. Butler, would you say that the state's
16 response to the COVID-19 pandemic has been reasonable
17 in light of the available data and generally accepted
18 public health practices?
19     A.    Can you please explain what you mean by
20 "reasonable"?
21     Q.    Well, is it consistent with the available
22 data and generally accepted public health practices?
23     A.    I believe that the proclamation is
24 consistent and reasonable, based on my knowledge of
25 COVID-19, yes.

Page 25

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

**Page 26**

```
1    Q.   So, what steps did the Health District take
2  under your leadership, so, after April 20th, 2020, in
3  response to the COVID-19 pandemic?
4    A.   Zach, are you asking me to recall over 40
5  hours of work?
6    Q.   Well, just if you could -- I guess I am just
7  asking you to kind of summarize what steps the Health
8  District itself has taken.  It doesn't have to be
9  comprehensive, but sort of an overall summary of what
10  the Health District has done in response to the
11  pandemic.
12    A.   Since I --
13    Q.   With the caveat that -- I'm sorry.  With the
14  caveat that it's been a lot, and I don't expect you to
15  cover every single step taken in the short time that we
16  have today.
17    A.   Very good.  Since I assumed the role of
18  Health Officer I am aware that the Health District has
19  continued a vigorous educational campaign to both the
20  Anglo and Latinx communities.
21         We have coordinated contact tracing.  We
22  have worked closely with the local emergency response
23  teams to coordinate testing and PPE attainment and
24  distribution.
25         We have worked closely with the healthcare
```

**Page 27**

```
1  providers in our jurisdiction to provide mass testings
2  as required.
3         I have worked closely with the health
4  officers of the surrounding counties to create a
5  unified regional testing strategy, and then to
6  communicate that to the individuals in our jurisdiction
7  who are actually performing testing.
8         I have worked closely with Mr. Kling to keep
9  the local business community informed with weekly
10  meetings.  Same with local elected officials with
11  weekly meetings.
12         I have worked with the city of Leavenworth
13  on their city response.
14         A great deal of time has been consumed
15  applying for an initial variance and subsequently a
16  second variance proposal.
17         I have put out multiple --
18    Q.   Could I stop you there?  Those variance
19  proposals were submitted to the Department of Health
20  for the State of Washington?
21    A.   That is correct.
22    Q.   Okay.  Have you coordinated or worked
23  closely with the Department of Health during the
24  COVID-19 crisis?
25    A.   I would not describe it as coordinating or
```

**Page 28**

```
1  working closely with.  I have sought their guidance.  I
2  have participated in communications.
3    Q.   And with whom have you communicated with the
4  State Department of Health?
5    A.   Kathy Lofy, Scott Lindquist, John Weisman,
6  Charisa, whose last name isn't coming to me right now,
7  Medical Director of -- Well, maybe it's -- Anyway,
8  Medical Director of Medicaid.  And a couple of other
9  folks in various capacities that I don't recall.
10    Q.   Has the Health District shared or received
11  data or information from the State Department of
12  Health?
13    A.   I have personally reviewed the State
14  Department of Health web page and absorbed the
15  information that they present there and update daily.
16         I have received multiple communications
17  regarding guidance, both from the CDC and the State
18  DOH.  Many of them communicated through the State
19  DOH.
20         I am aware that the state and the local --
21  our local health jurisdiction are participating in
22  gathering the data local to the state and uploading it
23  to the state database.
24    Q.   And how would you say the resources that the
25  State Department of Health has at its disposal, how
```

**Page 29**

```
1  does that compare to what the Health District has?
2    A.   They appear to have three orders of
3  magnitude more resources than we have at our local
4  Health District.
5    Q.   Has the Health District received any
6  resources from the State?
7    A.   The Health District has taken advantage of
8  contact tracing which has been offered through the
9  state.
10         And then other than the data and the
11  guidance and essentially pushing out guidance, I'm not
12  aware of any other specifics.  But again that really
13  has not been part of my role.
14    Q.   Understood.  What role did the Board of
15  Health play in the Health District response to the
16  COVID-19 pandemic?
17    A.   Since my time in this position?
18    Q.   Yes.
19    A.   Since my time in this position I have
20  participated in two Board of Health meetings, and
21  probably four emergency meetings.
22         My impression at the initial April 20 Board
23  of Health meeting was that they were soliciting
24  information in reports, and that they were venting a
25  very strong desire to bring decision-making and control
```

1  more local.
2           At the second, I believe May 18th board
3  meeting there was a similar very strong desire to alter
4  the application of the Governor's proclamation within
5  our jurisdiction.
6           Outside of -- Oh.  There was an interesting
7  maneuver that was undertaken, I believe it was on May
8  18th, to remove the -- I will back up.
9           On the Chelan-Douglas Health District
10 website on the landing page there is a link for
11 complaints and concerns regarding the proclamation and
12 how it was implemented.
13          That was placed there because -- I
14 understand that was placed there because the Health
15 District was being inundated with phone calls and
16 e-mails.
17          And the hope was that those complaints could
18 be more effectively gathered and then reported back up
19 through the state through a link on the website, on the
20 landing page.
21          I do recall the Board of Health requested
22 that that link be taken down.
23          It was unclear to me how that would be
24 helpful or what the rationale was.  And I was not in a
25 position to raise that question, as just staffing the

Page 30

1           I do recall it was pointed out to the board
2  members at that time that the statutes still empowered
3  the health officer to levy such fines.  But the board
4  still took that action.
5           Outside of those two actions and their
6  directive to create the two variance proposals, I do
7  not recall other direct guidance as regards the
8  management of the pandemic.
9      Q.   Would you describe any tension or conflict
10 or disagreement between the Board of Health and the
11 professional staff of the Health District regarding the
12 response to the COVID-19 pandemic?
13     A.   Will you please repeat the first part of
14 that question?
15     Q.   Sure.  My question is whether you perceived
16 any tension or disagreement or conflict between the
17 Board of Health on the one hand and professional
18 staff in the Health District, such as yourself, on the
19 other hand, regarding the District's response to
20 COVID-19?
21     A.   Yes.
22     Q.   Please describe.
23     A.   During my time in this position it has felt
24 that a great deal of energy has been exerted to address
25 the concerns of the members of the Board of Health,

Page 32

1  Board of Health.
2           They also --
3      Q.   Could I interject a question?
4      A.   Sure.
5      Q.   When you say that you weren't sure how that
6  would be helpful, do you mean how the link itself
7  wouldn't be helpful, or how taking it down wouldn't be
8  helpful?
9      A.   Taking it down.  It felt to me that that was
10 not helping us collect the concerns of the constituency
11 of the Health District.
12     Q.   Understood.  Please continue.
13     A.   I recall also that I believe at the May 18th
14 board meeting a motion was passed to in essence rescind
15 an emergency proclamation that had been taken by the
16 former Health Officer prior to my appointment shortly
17 after the Governor's initial proclamations, which I
18 believe was intended to bring the Health District and
19 its code in line with the Governor's proclamation.
20          I believe a portion of that gave the Health
21 Officer the authority to fine businesses that were out
22 of compliance.
23          And I believe the reason the Board of Health
24 wanted it rescinded was because they felt that was
25 unnecessary and didn't feel it was appropriate.

Page 31

1  that the Governor's proclamation was unnecessary and
2  destroying the local economy without appropriate
3  observable gains.
4           I think there was a tension between the
5  medically prepared and epidemiologically prepared
6  individuals who recognized the potential danger of the
7  pandemic, and I felt that we were continuously required
8  to exert our great concern and repeatedly point out the
9  biology and transmissibility of the virus and the
10 rationale for the Governor's proclamation.
11          Most specifically the elected officials
12 appeared to have an agenda that was very pro-opening of
13 the economy and an effort to minimize the current
14 and future impact of the pandemic within our
15 jurisdiction.
16          It has been quite frustrating, I believe,
17 certainly for myself and I'm aware for Mr. Kling to be
18 put in a position of trying to utilize an extremely
19 small resource in the local Health District to manage
20 an enormous geographic area with a very diverse
21 population in the midst of the most significant
22 worldwide pandemic in a hundred years, and also to
23 be exerting energies to help the Board of Health
24 members appreciate the gravity from a physiologic and
25 medical perspective, the potential gravity of the

Page 33

1   pandemic.
2           Repeatedly it felt to me that since we had
3   not had multiple deaths, since our hospitals were not
4   overwhelmed, since the vast majority of the individuals
5   in our jurisdiction tolerate the infection without
6   significant morbidity, that therefore the Stay Home -
7   Stay Safe order could be rescinded.
8       Q.    That was the view of the Board of Health
9   members you just described?
10      A.    I felt a great deal of energy was extended
11  against that opinion, and that opinion, yes, was of the
12  Board of Health.  Again, not all of them.  Largely, the
13  elected members.
14      Q.    You mention that some of the elected
15  officials had an agenda that was very in favor of
16  opening the economy.
17          Is that right?
18      A.    Correct.
19      Q.    Okay.  At any point did you feel that
20  that agenda made it harder for you to do your job to
21  protect the public health in Chelan County and Douglas
22  County?
23      A.    I felt that I was exerting a great deal of
24  energy to counter that -- their position, inasmuch as I
25  already have a full-time job and don't have much

1   additional effort -- or time, you know, to devote to
2   this.
3           The fact that a great deal of time was
4   consumed in essence managing the firm opinions of the
5   Board of Health, I felt that it was taking my energy
6   and that time away from other efforts that could have
7   been better expended to protect the public health.
8       Q.    Understood.  You referenced earlier the
9   board meeting of May 18th, 2020.  I'd like to discuss
10  that for a moment.
11          So, that meeting on May 18, was that your
12  second board meeting that you attended?
13      A.    Yes.  Well, I'm sorry, Zach.  That was the
14  second regularly scheduled board meeting that I
15  attended.
16      Q.    And that board meeting on May 18 was held
17  remotely via Zoom?
18      A.    Correct.
19      Q.    Did you appear via Zoom?
20      A.    I was present on audio, not on video.
21      Q.    But you could see some people via video, or
22  you were just on your telephone?
23      A.    No.  I was on my computer.  Actually, Zach,
24  I remember the first one was only done by telephone.
25          I believe the second one was done by Zoom.

1           But there have been so many Zoom meetings,
2   that's my current recollection.  But, yes, I was on my
3   computer.
4       Q.    So, could you describe what you remember of
5   that May 18th, 2020 board meeting by Zoom?
6       A.    I believe I already mentioned two motions
7   that I recall from that meeting.
8           The other thing that was most striking to me
9   was when one of the Douglas County Commissioners, it
10  seemed to me out of nowhere, it was not on the agenda,
11  he asked the Chairwoman if he could present a proposal
12  for me as the Health Officer to sign.
13          He described it as a document which included
14  eight points, all of which would be easy to verify and
15  should be easy for me to sign.
16      Q.    Just to interject, who was this that was
17  speaking?
18      A.    Marc Straub.
19      Q.    Thank you.  Please continue.
20      A.    This took me completely aback.  I had no
21  idea what this was about, if this was normal activity.
22  Again, I was new in my role, four weeks.  This was only
23  to --
24          Well, I had had very limited interactions
25  with the board members up until this point.

1           I will say my initial concern was that they
2   were interested in better understanding my personal
3   view of our capacity to further open the economy and
4   how that would affect our healthcare system.
5           And it felt awkward, it felt extremely
6   awkward to be asked by elected officials while I was
7   essentially brand-new in my role in a public meeting to
8   sign a document which I had not been -- which had not
9   been brought to my attention prior to the public
10  meeting, had in no way been reviewed with me or my
11  opinions asked about it prior to the public meeting.
12          So, I felt quite uncomfortable in that
13  moment.  I remained silent.  Several questions were
14  asked.  I do not recall by whom.  What was this for?
15  What was it about?  Why would the Health Officer need
16  to sign it?
17          What I recall was Mr. Straub stating
18  that the Douglas County Commissioners wanted this
19  statement to allow them to review all options at their
20  disposal.
21          Eventually somebody said, "Well, what does
22  Malcolm think about this?"
23          And I said, "Well" --
24          I'm sorry.  And he read, I believe he read
25  the eight points to the meeting.  Several of them did

1  not make sense to me.  Again, it seemed odd to me to
2  bring forward a statement with eight points already
3  laid out.
4          Again, in my mind I thought he was -- or the
5  perhaps Douglas County Commissioners, or at least his
6  constituency, were interested to know what my position
7  was on this.
8          I felt I had been fully transparent about my
9  position prior to this meeting, and was happy to
10 discuss my position should I be asked.
11         But instead they came forth with these eight
12 individual statements.
13         I told Mr. Straub that I would be happy to
14 review the document, and after review, I would offer my
15 opinion as to whether it was something I could sign.
16         He sounded satisfied with that.  And we
17 proceeded after that.
18         Again, it was such an unusual situation and
19 directed most specifically at me in my new role in a
20 public forum that that is most of what I recall of that
21 meeting.  It was for me the most emotionally ladened
22 portion of that meeting.
23     Q.   Why do you indicate emotionally ladened?
24     A.   Well, as I have described, I was new in my
25 role.  I did feel an obligation to the constituency of

1  our Health District to serve them well, to appear
2  professional and helpful.
3          I certainly did not want to appear
4  obstreperous or defensive.
5          I will share, I of course felt defensive.
6          I feel it would have been more appropriate
7  with a person in my professional capacity who has
8  stepped up in the midst of a pandemic to communicate
9  with me prior to the board meeting about such a
10 document, to let me review it and provide my opinion as
11 to its merits and whether I could sign it.
12         As I mentioned, that did not happen.
13         So, I think the emotions I had were surprise
14 and frustration and concern.  And "confusion" is the
15 wrong word, but sort of a question of, you know, where
16 on earth is this going and am I about to walk into a
17 mine field?
18         I will share with you that I have never
19 served before in any type of a public capacity, outside
20 of the Chief of Staff of the local hospital, which is
21 still in a professional capacity.  I have rarely
22 been -- rarely spoken at such public forums.  Certainly
23 not by Zoom.
24         I will share I think all of this has been
25 compromised by Zoom.  I think if I had been sitting

1  right next to Marc Straub and he could have pushed the
2  document to me, it would have been a very different
3  type of an interaction.
4          It certainly felt quite removed, somewhat --
5  well, very impersonal.
6          So, those are the emotions I felt.
7      Q.   Knowing what you know now and looking back,
8  do you have the sense that Mr. Straub was trying to
9  take advantage of the newness of your position in
10 asking you to sign that eight point document?
11     A.   I do not believe he had a -- I do not
12 believe it was a pre-meditated understanding of the
13 awkwardness of my being new in my position.  I don't
14 believe he thought about that, no.
15     Q.   Okay.  I'd like you to turn to Exhibit Q --
16 well, tab Q, which will be as Exhibit 2.
17     A.   Can you give me a page number?
18     Q.   One moment.  It's 200.
19     A.   And you would like me to mark tab Q as
20 Exhibit 2?
21     Q.   Yes, please.  And Q will be Exhibit 2.
22              (Deposition Exhibit Number 2 was
23              marked for identification.)
24     Q.   (BY MR. JONES:)  So, Dr. Butler, do you have
25 Exhibit 2 in front of you?

1      A.   Yes.
2      Q.   And this is an e-mail from Marc Straub to
3  Lorena Orozco and the Board of Health and others, as
4  well as you, Malcolm Butler, sent on Monday, May 18,
5  2020, at 3:48 p.m.
6          Is that right?
7      A.   Yes.
8      Q.   Okay.  And in this e-mail Mr. Straub writes,
9  "Good afternoon.  Per discussion, I have attached the
10 document that outlines the eight points the Douglas
11 BOCC would request that our Regional Health Officer
12 prepare as a signed statement."
13         Did I read that correctly?
14     A.   Yes.
15     Q.   And do you recall whether this e-mail was
16 sent during the May 18th board meeting or shortly
17 thereafter?
18     A.   Yes.
19     Q.   All right.
20     A.   I do recall, and, yes, it was sent either
21 during or very close to the end of or shortly
22 thereafter.  The meeting started at 3 p.m., I believe.
23 Yeah.  This was sent at 3:48.
24     Q.   Understood.  And if you will turn to page
25 202, you will see the attachment to this e-mail.  And

1   it's an eight point document.
2        If you would take a moment, please, read
3   those eight points silently to yourself and let me know
4   once you have finished.
5            (Pause in the proceedings).
6     A.   Finished.
7     Q.   Okay.  So, is this attached document on page
8   202 of Exhibit 2, is this consistent with your
9   recollection of what Mr. Straub read aloud during the
10  Zoom meeting?
11     A.   Yes.
12     Q.   Okay.  So, at the time of this Zoom meeting
13  were you aware that Mr. Straub was contemplating
14  becoming a plaintiff in a lawsuit against the
15  Governor?
16     A.   No.
17     Q.   Did Mr. Straub say anything about a
18  potential lawsuit or any of the pending lawsuits
19  relating to the Stay Home - Stay Healthy proclamation?
20     A.   He did not mention a lawsuit.  He did
21  mention that the Douglas County Board of Commissioners,
22  I believe that's what the BOCC stands for, wanted
23  to use it essentially to evaluate what options they
24  had.
25     Q.   Did he mention what options specifically the

1   County Commissioners of Douglas County were
2   contemplating?
3     A.   He did not.
4     Q.   Also at this time, May 18, were you aware
5   that board member Dan Sutton was also contemplating
6   becoming a party to a lawsuit to challenge the
7   proclamation?
8     A.   I was not aware of that, no.
9     Q.   Were you aware on May 18th that Ruth Esparza
10  was contemplating becoming a party to a pending
11  lawsuit, challenging the Governor's Stay Home - Stay
12  Healthy order?
13     A.   No.
14     Q.   So, at that meeting none of those three
15  board members said anything about a potential lawsuit
16  or challenging or contesting the Governor's Stay Home -
17  Stay Healthy order?
18     A.   That is correct.
19     Q.   Do you think they should have disclosed that
20  to you?
21     A.   I feel it would have been -- Well, I'm going
22  to back up again.  I have ignorance about public
23  meetings.
24     I am now aware that as a public officer, as
25  soon as I sign a document and return it to an elected

1   official, it becomes a public document.  I was not
2   aware of that on May 18th.
3     When I look at how this document was
4   composed, in light of the fact that I am now aware of
5   the pending lawsuit, and having read through at least
6   one of the two pending lawsuits, it is clear to me that
7   this document had been created prior to the meeting
8   specifically to support a future lawsuit, as much as
9   the eight points parallel the points which are made in
10  the lawsuit.
11     That would also explain the unusual
12  presentation of eight individual points, and would also
13  explain why they referred to an influenza -- a document
14  related to an influenza pandemic which to my initial
15  read made absolutely no sense, since this is not an
16  influenza pandemic, but that plan and a rationale
17  regarding how it could potentially at least in a
18  dictionary relate to COVID-19.
19     So, in retrospect, if our team is to work
20  closely together in the future, yes, it would have been
21  appropriate for them to share with me that this
22  document was being developed to support a lawsuit.
23     Q.   Had they shared that, would you have reacted
24  differently?
25     A.   Again, my understanding that this document

1   was going to be used by the elected officials in their
2   elected capacities as the Douglas County Board of
3   Commissioners, I felt as a public now person in my
4   public role I was willing to support them in those
5   efforts.
6     I think the -- Well, will you repeat your
7   question again, Zach?
8     Q.   My question is, had you known at the time,
9   on May 18th, that the eight point document was being
10  solicited or requested for use in a lawsuit by private
11  individuals against the Governor's stay at home order,
12  had you known that, how would you have reacted to the
13  request?
14     A.   I think that's an important point you're
15  making.
16     At no time was it intimated in any way that
17  this might be used by private individuals.  At all
18  times it was represented to me as in their public
19  roles.
20     I believe if I was aware that this document
21  was to be used in a lawsuit, I would have consulted
22  counsel prior to signing the document.
23     MR. JONES:  So, I think this would
24  probably be a good time to take a break, for water, use
25  the restroom.  I know your time is valuable so I don't

1  want to take any longer of a break than you would like.
2  So, five minutes, 10 minutes.
3        We can go off the record.
4        THE WITNESS:  Okay.  Five minutes is
5  great.
6                              (Short recess).
7        MR. JONES:  We are back on the record
8  after a short break.
9     Q.    Dr. Butler, I'd like you to find tab D,
10 which we're going to mark as Exhibit 3.  It begins on
11 page 58.  And don't put Exhibit 2 too far away because
12 we're going to come back to it.
13    A.    Tab D, page 58 marked as Exhibit 3.  So
14 marked.
15                    (Deposition Exhibit Number 3 was
16                    marked for identification.)
17    Q.    (BY MR. JONES:)  Okay.  And Exhibit 3, Dr.
18 Butler, is labeled a "Declaration of Marc Straub in
19 Support of Motion For Temporary Restraining Order."
20       Do you see that?
21    A.    Yes.
22    Q.    Okay.  Have you ever seen this document
23 before?
24    A.    No.
25    Q.    Okay.  Why don't you take a chance to --

                                          Page 46

1  just read through actually the entirety of the
2  declaration so that you have a sense of what it says as
3  a whole, and let me know once you are finished and then
4  we will talk about it.
5                    (Pause in the proceedings).
6     A.    I have finished the declaration.
7     Q.    Okay.  Thank you, Dr. Butler.  So, you will
8  see that this declaration from Mr. Straub attaches
9  various exhibits, A, B, C and D.
10       Do you see that?
11    A.    Yes.
12    Q.    Okay.  So, this can get a little confusing.
13 So now we will have exhibits within an exhibit.  In
14 addition, the lettered exhibits attached to Mr.
15 Straub's declaration are out of order.  So, and they're
16 written in his writing with quotation marks, Exhibit A
17 and Exhibit B, etc.
18       So I'm going to try to refer to those sub
19 exhibits as Sub-Exhibit A, Sub-Exhibit B, or
20 handwritten exhibit, but just so we know and so the
21 record is clear, that's how I'm going to refer to these
22 exhibits within Exhibit 3.
23       Does that make sense?
24    A.    Yes.
25    Q.    Okay.  So, if you will turn to Exhibit B,

                                          Page 47

1  Sub-Exhibit B on page 63 --
2     A.    Yes.
3     Q.    -- of Exhibit 3.  So this is an e-mail from
4  you to Mr. Straub on, dated May 18, 2020 at 4:34 p.m.
5  Is that right?
6     A.    Yes.
7     Q.    And this is in response to Mr. Straub's
8  e-mail at 3:48 p.m., which is on page 64, and we also
9  discussed it in Exhibit 2, in which he attached the
10 eight point document that he says the Douglas Board of
11 County Commissioners requested you to sign.
12       Is that right?
13    A.    Yes.
14    Q.    Okay.  So, in this e-mail that you sent at
15 4:34 p.m., you wrote, and just follow along while I
16 read aloud, "Please provide some clarification:
17       "#2 - I am unaware of a plan for dealing
18 with endemic influenza, and unclear how that relates at
19 all to COVID-19.  Can you explain how #2 adds strength
20 to the document?"
21       Did I read that right?
22    A.    Yes.
23    Q.    So, what did you mean that you were unclear
24 how that relates at all to COVID-19?
25    A.    At that time I was unaware that the Health

                                          Page 48

1  District had a Pandemic Influenza Plan.  I also
2  couldn't imagine how it was important that we had such
3  a plan since COVID-19 is not influenza.
4        From a medical perspective, they are
5  extremely different.  Extremely?  They are very
6  different.
7        And again, my impression at the time was
8  that he was trying to build a case regarding my
9  impression of our local capacity to tolerate further
10 opening the economy, and I couldn't understand how
11 mentioning that we had a Pandemic Influenza Plan would
12 be helpful in that regard.
13    Q.    When you say influenza and COVID-19 are
14 very different from a medical perspective, what do you
15 mean?
16    A.    Influenza, at least in the strains we were
17 most accustomed to, is well-known to us, we now have
18 vaccinations against it.  We understand its
19 transmission well.
20       COVID-19, even though it's an old virus,
21 this novel form of the coronavirus is very poorly
22 understood to us.  We do not understand -- we did not
23 at that time, bit by bit we are learning more, but we
24 essentially do not understand well how it is
25 transmitted.

                                          Page 49

1      There are no immunizations available to us.
2          Certainly both our viral infections, both as
3  far as we knew at that time were transmitted primarily
4  in a respiratory route via droplets.
5          It appeared at that time and still that
6  COVID-19 is dramatically more infectious. I've seen
7  reports between three and 12 times more infectious.
8          I am not aware that typical influenza
9  strains have a significant asymptomatic transmission or
10 significant portion of the population who are
11 asymptomatic throughout.
12         I would say that we haven't studied that.
13 It could be true. But since we have a very different
14 approach to influenza, we have not needed to study that
15 to date.
16         So, again, to my medical mind they are very
17 different viruses which create a very different
18 infection, and especially once people get very sick in
19 the hospital, it's an entirely different infection.
20     Q.   Why do you say it's an entirely different
21 infection once they're sick in the hospital?
22     A.   COVID-19 in a small subset of patients,
23 typically the elderly and medically frail, appears to
24 cause a massive immune response, and it is that immune
25 response that in essence causes multisystem organ

Page 50

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

1  failure.
2          I have never heard of that previously with
3  viral infections. I have certainly never heard of it
4  related to influenza.
5          In my career, I have cared for hundreds and
6  hundreds of individuals with influenza. Within the
7  hospital I have certainly cared for dozens of elderly
8  sick people with influenza.
9          And I have never cared for a patient with
10 influenza who has had an illness course similar to what
11 I have read about with COVID-19.
12     Q.   Thank you, Doctor. When you say "massive
13 immune response," are you referring to a cytokine
14 storm?
15     A.   Yes.
16     Q.   Have cytokine storms been observed in
17 COVID-19 patients who are not medically frail and not
18 elderly?
19     A.   I believe that has occurred. I have not
20 attempted to keep up with that particular literature.
21     Q.   Okay. So, you mentioned that at the time
22 you were not aware of the Health District's Pandemic
23 Influenza Plan.
24         Is that right?
25     A.   Correct.

Page 51

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

1      Q.   Are you now aware of it?
2      A.   I'm aware that it exists, yes.
3      Q.   Have you familiarized yourself with it?
4      A.   No.
5      Q.   Okay. Returning to your e-mail at 4:34
6  p.m., this Sub-Exhibit B in Exhibit 3 --
7      A.   Yes.
8      Q.   -- I'm going to continue reading. Just read
9  along silently as I read aloud.
10         "#6 - Would you please clarify what you mean
11 by 'our pandemic plan'? I have not seen a written
12 pandemic plan? Could you send it to me?"
13         Did I read that correctly?
14     A.   Yes.
15     Q.   Did Mr. Straub eventually send you the
16 pandemic plan -- the Influenza Pandemic Plan?
17     A.   Yes.
18     Q.   Okay. Continuing with this e-mail, number
19 8, just continue to read along silently while I read
20 aloud.
21         "#8 - I think what you are looking for is a
22 statement that right now, from a health system
23 standpoint, we have plenty of capacity to experiment
24 with various levels of/types of reopening. I agree
25 with that. To say 'we are prepared for and capable of

Page 52

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

1  dealing with the current threat of public health posed
2  by COVID-19, as well as any other present and
3  anticipated public health threats,' feels a little
4  expansive."
5          Could you explain why you thought that
6  that sentence felt a bit expansive or a little
7  expansive?
8      A.   Because COVID-19 is novel and we have no
9  prior experience, we are very much learning on the run
10 in coping with new challenges as they are presented to
11 us.
12         So, when the statement reads "we are
13 prepared for and capable of dealing with the current
14 threat," I could affirm that with my understanding of
15 the current threat, that is, the threat as it had
16 already become apparent to me, I could agree with that
17 statement.
18         However, certainly I might be ignorant of
19 aspects of the current threat.
20         And then it goes on, "as well as any other
21 present and anticipated public health threats."
22         And for me that is just a bridge too far. I
23 cannot anticipate any other present and anticipated
24 health threats.
25         And I was unwilling to say that I was, you

Page 53

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

Pages 50 to 53

1    know, that our healthcare system could accommodate
2    them, because, again, that's just -- it's too much.
3    It's too broad, too expansive.
4        Q.    Thank you, Doctor.  So, the next few
5    sentences of your e-mail, this is at the top of page 64
6    of Exhibit 3, you write, "I actually do NOT," capital
7    NOT, "feel comfortable that I fully understand the
8    present health threat.  I am learning more about it
9    every day.  It is the 'tip of the iceberg' analogy.  I
10   have no way to assess (today) how much of the iceberg I
11   can see."
12           What did you mean by the tip of the iceberg
13   analogy?
14       A.    Well, I think all of us are probably
15   familiar with that analogy.
16           I have made in many of the educational talks
17   and meetings I have had with local health care
18   officials and business members and on the local radio
19   that the COVID infection within our community, we can
20   only see the tip of that iceberg, and that is made
21   apparent to us through testing.
22           We can see the number of people who have
23   tested positive.  We cannot easily see all of the rest
24   of the population who's carrying the virus and
25   contagion within the population.

                                              Page 54

1            So, I am describing that as the portion of
2    the iceberg which is under water and invisible to us.
3            So, similarly, even though we can see the
4    current health impacts and the way they are currently
5    impacting our healthcare system, we are not fully aware
6    of the burden of disease within our jurisdiction and
7    just how it could potentially impact our healthcare
8    system.
9        Q.    Are you familiar with the term super-
10   spreader?
11       A.    Yes.
12       Q.    What does it mean to you?
13       A.    To my mind a super-spreader would be an
14   individual who manages to transmit the virus to a
15   number of other individuals far above the standard R
16   value.
17           So, typically the examples I'm aware of
18   would be an individual who attends a choir practice
19   where there are 60 odd individuals present, who one of
20   whom is present and two hours later I believe 50 odd
21   are positive.
22           So, in a closed room while singing for
23   several hours, one individual can spread the virus
24   broadly to multiple other individuals.
25           I believe that is what's meant by the term

                                              Page 55

1    super-spreader.
2        Q.    And does part of the tip of the iceberg
3    analogy encompass that potential where despite what you
4    think you know at a given time, that everything can
5    sort of turn on a dime in terms of the response to the
6    virus, and based on one or maybe even two super-
7    spreader events, that can change the entire trajectory
8    of the public health conditions and response needed?
9            Is that -- Are you in agreement with that?
10       A.    Yes.  I am mostly in agreement with, that
11   things can turn on a dime, that we can rapidly
12   encounter things that we've never seen before and we
13   need to cope with.
14           A super-spreader would be an example of
15   that, although that was not -- that specific example
16   was not in my mind as I wrote this e-mail.
17       Q.    Understood.  Turning to sub-Exhibit C, which
18   is before Exhibit B on page 63 of Exhibit 3.  Let me
19   know when you see where sub-Exhibit C is.
20       A.    I'm with you.  Yes.
21       Q.    Thank you.  So, Mr. Straub responds to
22   you, "Thank you, Dr. Butler.  I've attached the CDHD
23   Pandemic Flu Plan that originated - as I understand -
24   as a result of legislation in 2006."
25           Do you see that?

                                              Page 56

1        A.    Yes.
2        Q.    And do you recall whether he did attach that
3    Pandemic Flu Plan into this e-mail?
4        A.    Yes, he did.
5        Q.    Okay.  Now if you could turn to -- I'm
6    sorry.  This e-mail, Exhibit C, was sent on Monday, May
7    18th, 2020 at 6:13 p.m.
8            Do you see that?
9        A.    Yes.
10       Q.    Okay.  Now if you would turn to sub-Exhibit
11   D on the next page, page 64 of Exhibit C.
12       A.    Yeah.  I believe you're on 65.
13       Q.    Thank you.  65 and 66 actually of Exhibit
14   C -- of Exhibit 3.  I knew this would get confusing.
15           So, this is an e-mail -- Sorry.  Please turn
16   to page 66, which is also part of Sub-Exhibit D.
17       A.    Okay.
18       Q.    And this is an e-mail from you saying "Here
19   you go!"  And it indicates that there's an attachment,
20   MBMB Statement for MS 5.20.2020.
21           What was this e-mail, if you recall?
22       A.    This was me delivering to Mr. Straub the
23   final iteration of the eight point document that he had
24   created for me to sign.
25       Q.    Understood.  And if you look at the e-mail

                                              Page 57

1  thread below that e-mail as well as on page 65, take a
2  second to familiarize yourself with those few e-mails
3  there in sub-Exhibit D.  And let me know once you have
4  finished.
5               (Pause in the proceedings).
6       A.   Okay.  So, I have reviewed all of them.
7  They are a little bit out of order, I believe.  But
8  carry on.
9       Q.   They are.  So, I guess, you know, it looks
10 like, somehow between May 18th at 6:13 p.m. in Exhibit
11 C, when Mr. Straub e-mails you the Pandemic Flu Plan,
12 and May 20th -- excuse me -- yeah, May 20th, 2:38 p.m.
13 when you provide the eight point document, somehow in
14 between those two events you had agreed to provide the
15 eight point document.
16      Is that correct?
17      A.   Yes.
18      Q.   So, in reviewing these sub-Exhibits B, C and
19 D, based on your recollection do these constitute the
20 entirety of the e-mails between you and Mr. Straub on
21 this subject?
22      A.   My recollection is that on the day of the
23 board meeting he sent me his eight point plan.
24      I reviewed it.  I sent back the questions
25 that you read through.  I asked him if he could provide

                                            Page 58

1  the pandemic plan.
2       He did that.
3       Thereafter, again, because I felt he was
4  interested to know my personal position, I created a
5  statement that outlined my personal position, and I
6  sent that to him, hoping that it would meet the
7  need.
8       Again, the eight points felt very awkward.
9  I could not understand again how that would be as
10 helpful as having my narrative.  So I provided that to
11 him.
12      To my surprise he responded, "Thank you.  I
13 appreciate that, and would you still sign the eight
14 point plan?"
15      And, again, I did not know this had been
16 built specifically to support a lawsuit.  Now I am
17 aware that that is the case, or it certainly has
18 appeared to me that that is the case.  And it appears
19 to me that that was the reason why he was not
20 interested in my actual narrative.
21      So, I again, hoping to please the
22 Commissioners who are now my new supervisors in this
23 role, I went through and edited the eight point
24 document in a way that I felt I could sign.  I did --
25 I sent it back to him.  He looked at it.  He

                                            Page 59

1  said, "That looks fine."
2       I said, "Do you want it on letterhead or
3  signature or what?"
4       He said, "Fine, on letterhead, with a
5  digital signature."
6       And I provided that back to him.
7       I do recall that there seemed to be some
8  time pressure.  Again, to my mind that didn't make good
9  sense.  He wanted this I believe by Tuesday or
10 Wednesday.
11      One of the issues I had with the pandemic
12 plan that he sent me was that in total it was over 300
13 pages long.  I did not feel I could adequately review
14 it in 48 hours.
15      But I do remember being curious as to the
16 time pressure that was involved.
17      Nonetheless, I was hoping to be as
18 forthright, transparent and helpful as possible.  And
19 so we worked on and I finally signed the final product
20 that was provided to him.
21      Q.   Okay.  So, I'll represent to you that the
22 lawsuit to which Mr. Straub was the plaintiff, Sutton
23 vs. Inslee in Douglas County, was filed on May 22nd,
24 2020.
25      Knowing that, does that make more sense to

                                            Page 60

1  you now as to the time constraints that were apparently
2  being brought to bear?
3       A.   Yes, absolutely.
4       Q.   Let's turn to Sub-Exhibit A of Exhibit 3.
5       A.   On what page?
6            MR. ZIMMERMAN:  62.
7       Q.   (BY MR. JONES:)  It's on page 62.
8       A.   Thank you.
9       Q.   So, what is this document, sub-Exhibit A?
10      A.   This is the final product of the eight point
11 plan that I returned to Mr. Straub on my Columbia
12 Valley Community Health letterhead with my digital
13 signature.
14      Q.   Okay.  I'd like to just go over some of
15 these points in here.
16      Point number 2 on page 62, sub-Exhibit A,
17 says "I am aware that, pursuant to Chapter 70.26 RCW,
18 the Chelan-Douglas Health District developed a plan for
19 dealing with pandemic influenza in 2008.
20      Do you see that?
21      A.   Yes.
22      Q.   And what was that statement based on?
23      A.   Again, I had been presented an eight point
24 plan.  The second point of that original -- plan?
25 Sorry.  Document.

                                            Page 61

1   The second point of that original document
2   referenced this Pandemic Flu Plan.  I had been made
3   aware that it existed, and Mr. Straub appeared to want
4   this in the document.
5   Again, it was unclear to me why it was
6   helpful.  But I was willing to provide it as it is a
7   true and correct statement.
8   Q.   Okay.  When you say "it is a true and
9   correct statement," was your statement based on
10   anything other than the information that Mr. Straub had
11   provided?
12   A.   At some point I did confirm with Barry
13   Kling, the administrator of our Health District, that
14   the Health District had created an Influenza Pandemic
15   Plan.  It was a brief, less than one minute
16   conversation and in a much longer conversation, and he
17   confirmed it.  I do not recall the date of that
18   conversation.
19   But there was that conversation, and the
20   fact that I had the document in hand that made that a
21   true and correct statement.
22   Q.   Understood.  If you look at point number 6
23   where you raise, "Based on current knowledge, we do not
24   anticipate a shortage of hospital or other health care
25   resources to deal with the COVID-19 pandemic."

1   Do you see that?
2   A.   Yes.
3   Q.   Why did you include "based on current
4   knowledge" in there?
5   A.   Very similar to the discussion we just had
6   about the iceberg.  I wanted to clarify, or at least
7   fortify my position, protect myself, by clarifying that
8   based on what I know right now I am comfortable making
9   this statement.  But I could not predict what might
10   happen later today or tomorrow.
11   Q.   And point number 7 says "If permission were
12   granted, our office would impose fewer restrictions on
13   residents within the boundaries of the Chelan-Douglas
14   Health District that are currently imposed by the
15   Governor's proclamations."
16   Do you see that?
17   A.   Yes.
18   Q.   What did you understand that sentence to
19   mean?
20   A.   What was very clear to me as I composed
21   this, and still today, is that we are operating under
22   an emergency order of the Governor.  That is, as I
23   understand it, the law.  And I need to operate within
24   that proclamation, that law, if you will.
25   We have repeatedly and persistently had

1   pressure from our local community, from the members of
2   the Board of Health to operate outside that guidance,
3   to make exceptions.
4   And I will point out, it's probably clear to
5   all, the Governor's proclamation was a one-size-fits-
6   all, and it has not fit particularly well in my local
7   health jurisdiction.  And I am absolutely empathic
8   to the disparities and unfairness as it has been
9   imposed.
10   However, I'm equally clear that that is the
11   law in effect, and therefore I preface number 7
12   different from the original way it was written, "If
13   permission were granted."
14   I do, I did, I still do believe that our
15   office would impose fewer restrictions on residents
16   within our boundaries than are currently in the Stay
17   Home - Stay Safe proclamation.
18   Q.   Stay Home - Stay Healthy?
19   A.   Thank you.
20   Q.   When you say the proclamation is a one-size-
21   fits-all, are you aware that there's a variance program
22   and a reopening program, and now well over half of
23   Washington counties, the vast majority, in fact, are
24   operating in different stages of reopening?
25   A.   Yes.  I am aware of that.

1   Q.   So, is it really fair to say it's a one-
2   size-fits-all proclamation?
3   A.   Yes.
4   Q.   Why is that?
5   A.   The proclamation has various phases and
6   stages to which different counties can move, based
7   initially on a transmission rate of less than -- Well,
8   based initially on the county's population needing to
9   be less than 75,000, and subsequently on the number of
10   positives and the transmission rate within the
11   county.
12   What is clear to me is that the disease is
13   behaving differently in Western Washington than in
14   Eastern Washington.
15   In Eastern Washington, although we have had
16   a lot of transmission, we have not had a similar amount
17   of morbidity, as has been seen in the western side of
18   the state.  We have happily had very few hospital
19   admissions and very few deaths.
20   I cannot explain why it is behaving
21   differently in our rural populations than in the more
22   urban western side of the state.  But it is fairly
23   clear that it is.
24   We did apply, even though we did not qualify
25   for the initial variance, we made an application which

1  was promptly returned to us.  And we have subsequently,
2  on Friday last, two days ago, submitted a second
3  variance proposal.
4      Q.    And you're aware that under the phased
5  reopening plan, there's no population requirements in
6  terms of which counties are eligible.
7            Correct?
8      A.    In the current iteration, that is correct.
9      Q.    And the variance proposals allow for
10 tailoring and tinkering based on local conditions,
11 wouldn't you agree?
12     A.    No.  The current variance proposal allows
13 for that, not the proposals.  Right, Zach?  The first
14 one did not allow for tailoring --
15     Q.    No.  My question is just that, for example,
16 the proposal that Douglas, that Chelan-Douglas
17 submitted, it doesn't exactly map onto phase 1, phase
18 2, phase 3.
19            It's some features of phase 1 and some
20 features of phase 2, isn't that correct?
21     A.    That is correct.
22     Q.    So, wouldn't that reflect tailoring to local
23 conditions for that individual variance plan?
24     A.    Well, inasmuch as it was rejected, it would
25 have --

Page 66

1      Q.    I'm talking about the second -- I'm talking
2  about the second proposal.
3      A.    Yes.  If the second proposal is approved,
4  then I agree with your statement, it does allow for a
5  degree of tailoring, yes.
6      Q.    So, in going back to this point 7 where you
7  say "our office would impose fewer restrictions on
8  residents within the boundaries of the Chelan-Douglas
9  Health District than are currently imposed by the
10 Governor's proclamations," is that comparison to what
11 the current status quo is for Chelan and Douglas
12 Counties, or to what the conditions would be if the
13 variance proposal is accepted?
14     A.    I'm sorry, I do not recall the date of the
15 initial variance proposal being submitted.
16            When I constructed this document, it was
17 meant to mean that there would be fewer restrictions
18 than were currently in place at the time I constructed
19 it.
20     Q.    Understood.  So, in a world, hypothetically,
21 if the current pending Health District variance
22 proposal is accepted, would that represent what the
23 Health District would do, kind of left to its own
24 devices?
25     A.    Zach, I don't think I can answer that with a

Page 67

1  yes or a no.  I would say the current variance
2  proposal, we were provided a fairly strict template to
3  follow in completing that.  And we were provided fairly
4  specific examples that we might choose from.
5            I think it was -- It's very reasonable the
6  way it was presented to us.  And I think the examples
7  were quite reasonable.
8            Had it not been presented in that way, I
9  do not think we would have returned it written as we
10 did.
11            For example, it says things like, you know,
12 certain businesses will be allowed at 25 percent
13 occupancy.
14            We probably would not have used that
15 parameter in our document.
16            It would have been largely similar, yes.  It
17 would not have been just the same, no.
18     Q.    Understood.  Well, let me change the
19 hypothetical slightly.  Let's say the variance proposal
20 is adopted, and then the Governor's proclamation is
21 lifted.
22            Can you identify a specific change that the
23 Health District would adopt in its own reopening plan,
24 compared to what the variance proposal reflects?
25     A.    Well, there's a lot of hypotheticals here,

Page 68

1  Zach.
2      Q.    Understood.
3      A.    And let's just all agree that we're talking
4  in hypotheticals here, and I hope they are valuable to
5  you in some way.
6            If I was allowed to make changes that I felt
7  were best -- would best fit our community, I would not
8  have allowed large box stores such as Target or Costco
9  to remain open, selling all of their wears, simply
10 because they also sold groceries, which are considered
11 essential.
12            That has put a huge volume of the population
13 inside those constrained spaces, and has not allowed
14 other retailers of other materials sold by Target and
15 Costco to also be open to the public.
16            That is overtly unfair.  And that I think
17 has caused a great deal of -- It has made it difficult
18 for the population to keep itself safe by embracing the
19 Governor's proclamation.
20            I feel that if people saw that it was more
21 fairly imposed, and especially enforced, there would be
22 much greater acceptance.
23            And unfortunately, we're left with a lot of
24 anger and backlash to the point where people aren't
25 willing to even follow what I think are medically very

Page 69

Pages 66 to 69

1 easy and justifiable precautions, such as wearing a
2 mask, because they're trying to make an act of civil
3 disobedience to their own peril.
4     Q.    Would you say that the Stay Home - Stay
5 Healthy proclamation has been widely complied with in
6 Chelan and Douglas County?
7     A.    "Widely" is a vague term.  But I would say
8 if by widely, you mean more than half the population, I
9 would say yes.
10    Q.    Thank you, Doctor.  Sir, I'd like you to
11 turn now to what's tab R, and I hear a little bit of
12 background noise.  I'm not sure if one of the
13 participants isn't on mute.  But I do hear some strange
14 background noise.  It looks like everyone is.  But I
15 don't know what it is.
16    A.    I am going to make sure -- No.  It says
17 telephone.  Can you hear me still?
18    Q.    No, I can't hear you.
19    A.    Okay.  So, tab R will be Exhibit 4.
20         MR. ZIMMERMAN:  Page?
21         MR. JONES:  Page 204, the pages begin
22 203 is where the exhibit tab is.
23         THE WITNESS:  Tab R is Exhibit 4, page
24 203.  So labeled.
25         (Deposition Exhibit Number 4 was

Page 70

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

---

1            marked for identification).
2    Q.    (BY MR. JONES:)  Okay.  So, Exhibit 4, which
3 you have in front of you, is an e-mail from you to Mr.
4 Straub on May 19th at 5:03 p.m.
5         Please take a look at this e-mail at the top
6 there and let me know once you have finished reviewing
7 it.
8                     (Pause in the proceedings).
9    A.    All right.
10    Q.    So, this e-mail is in the same e-mail thread
11 that we looked at in Exhibit 2 and 3.
12         Correct?
13    A.    Yes.
14    Q.    But this e-mail from you and its attachment
15 is not contained in either Exhibit 2 or Exhibit 3, is
16 it?
17    A.    I believe the attachment is on page 207.
18    Q.    Sorry.  My question is, this e-mail from you
19 on May 19th --
20    A.    Okay.
21    Q.    -- is not contain in either the earlier
22 exhibits we were discussing, Exhibit 2 or Exhibit
23 3?
24    A.    Okay.  I believe that is correct.  Yes.
25    Q.    So, even though it was part of the same

Page 71

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

---

1 e-mail thread, this was omitted from the e-mails in Mr.
2 Straub's declaration?
3    A.    I know nothing about that.  I don't know
4 what or why the prior exhibits were submitted or how
5 they got ordered in that way.  But this does not look
6 like it is contained in anything we've looked at so
7 far.
8    Q.    Understood.  So, at the top of this e-mail
9 you write, "Marc, the attached is for your eyes only.
10 I would like to share with you my full and honest
11 approach to this pandemic.  I am hoping that this will
12 fill the needs of those who you were representing when
13 you suggested the eight points for me to sign."
14         Why did you write that "I am hoping that
15 this will fill the needs of those who you were
16 representing when you suggested the eight points for me
17 to sign"?
18    A.    Yes.  As I've mentioned previously, it
19 was -- I mean, I was blindsided at the meeting by
20 the eight point document.  I had no idea what it was
21 for.
22         Mr. Straub explained it was so that the
23 Douglas County Board of Commissioners could use it in
24 their future work.
25         My suspicion was that he was interested to

Page 72

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

---

1 know my actual position on things.  It was the only
2 reason I could think of.
3         Again, in retrospect, that's not what he was
4 after.  The document appears to have been
5 pre-constructed specifically to support his lawsuit.
6         But when I wrote this e-mail I presented to
7 him my full narrative and my approach to where we were
8 at that moment.
9    Q.    And in the next sentence you wrote "I am
10 trusting you not to take advantage of my being
11 vulnerable in this way with you."
12         What did you mean by being vulnerable?
13    A.    Well, if you read the attachment, you will
14 see that I talk about a need to tolerate a certain
15 amount of mortality and morbidity.
16         And I think that taken out of context could
17 reflect very badly on me.
18         Within the context, I believe it is correct
19 and accurate.  But it certainly, he could have taken
20 advantage of me by releasing portions of that document
21 out of context.
22    Q.    Understood.  So, at the bottom of the
23 e-mail you saw -- Oh.  I'm sorry.  Sorry.  Before I get
24 there.
25         So, what was the paper that you attached?

Page 73

DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

1   Why did you attach the paper that you describe as a
2   physician paper?
3        A.    Again, it was my belief that Marc and his
4   constituents were interested in discovering my view of
5   the pandemic and our capacity, our local capacity, to
6   further open the economy.
7        Q.    And then you wrote, "If it weren't -- "If we
8   weren't in the midst of this craziness, I would invite
9   you out for a beer to discuss all of this more fully.
10  Without that, it would be best for the two of us to
11  discuss this by phone prior to involving others.
12        "You could call me tonight at 509," and then
13  your phone number's in there, and we have redacted your
14  phone number, just in case this document makes it into
15  a public court filing at any point.
16        So, did you ever speak with Mr. Straub by
17  telephone?
18        A.    Yes.
19        Q.    What did you discuss?
20        A.    It's probably apparent just based on all
21  these documents when it happened, and I'm not
22  remembering right now.
23        But in essence I just wanted to talk through
24  with him the problems I had with the eight point
25  document.

                                        Page 74

1        That's right.  This e-mail came following my
2   capacity -- following my having reviewed the Pandemic
3   Flu Plan.  It was 300 pages long.  There was no way I
4   was going to do that.
5        I said, you know what, he's got these eight
6   points.  In order to put my signature on that document,
7   I would need to have read the 300 pages.  I can't do
8   that.  So, I provided, here's my statement of how I
9   actually feel.
10        But I knew I was fishing.  There was
11  something going on here, and it was unclear to me why
12  this was happening the way it was.
13        And the point I was trying to make was,
14  let's just talk about this.  Tell me what you need, let
15  me be helpful.  Because it felt to me like I wasn't
16  hearing everything that he needed, everything that was
17  on his mind or on his plate or what his constituents
18  needed from him or whatever.
19        Certainly it is my practice, and in the
20  clinic that I have built, this is how we communicate.
21  We talk to each other.  We have high degrees of trust.
22  And we work together cohesively as a team for the good
23  of the population we serve.
24        It was my expectation that Mr. Straub would
25  be interested in doing the same thing.

                                        Page 75

1        And, so, yes, we did have a phone call.
2        He said, again, "I just need you to sign the
3   eight points."
4        And I went through and said, "It's going to
5   look kind of stupid, because none of these really make
6   good sense."
7        He said, "Just write whatever you can,
8   something that you can sign and support, and get it to
9   me.  And if you can get it to me by Wednesday, that
10  will be great," or something to that effect.
11        Q.    Okay.  But you did speak with him on the
12  telephone?
13        A.    Yes.
14        Q.    And in your call on the phone did he provide
15  the additional context of the potential of the new
16  lawsuit being filed with him as a party?
17        A.    Not at all.  No.  He actually had very good
18  opportunity to do exactly that, and he did not take
19  advantage of that opportunity.
20        Q.    If you will turn to another exhibit, this is
21  tab P, it will be Exhibit 5.
22        A.    Give me a page when you have it.
23        Q.    195.
24        A.    Tab P, page 195 is Exhibit 5.  So marked.
25            (Deposition Exhibit Number 5 was

                                        Page 76

1            marked for identification).
2        Q.    (BY MR. JONES:)  Okay.  So.  Dr. Butler, you
3   have Exhibit 5 in front of you.
4        Right?
5        A.    Correct.
6        Q.    And this is an e-mail from Mr. Straub to you
7   dated Wednesday, May 20th, 12:07 p.m.  And it is a
8   response to your e-mail that we just discussed in
9   Exhibit 4 where you attach the position paper
10  describing your own thoughts on the pandemic.
11        Is that right?
12        A.    Yes.
13        Q.    Okay.  And if you will look below, let's
14  see, kind of in the middle of the page with the
15  paragraph beginning "We're simply asking."
16        Do you see that?
17        A.    Yes.
18        Q.    Okay.  And he writes, "We're simply asking
19  that - as the CDHD Medical Officer - you sign a
20  statement that includes the following points to the
21  extent you're comfortable."
22        And then below there, there's those eight
23  points again that's written into the body of the
24  e-mail.
25        Do you see that?

                                        Page 77

1      A.    Yes.

2      Q.    Okay.  So, what I'd like to do is I'd like

3 to take those eight points and compare those to the

4 final letter that you signed which is in Exhibit 3.

5 So, if you can grab Exhibit 3 again.

6      A.    Can you give me a page number?

7      Q.    Yes.  That's page 62.

8      A.    I have it.

9      Q.    And I just want to compare those two

10 documents side by side to look at the changes that were

11 made before the final version of that letter.

12                  (Pause in the proceedings).

13      A.    Okay.

14      Q.    Okay.  So, the first point, it looks like in

15 Exhibit 5 Mr. Straub wrote "I am the Regional Health

16 Officer for the Chelan-Douglas Health District."

17            And then on Exhibit 3, point 1, you write,

18 "I am the Health Officer for the Chelan-Douglas Health

19 District."

20            So you deleted the word "Regional."  Is that

21 right?

22      A.    Yes.

23      Q.    Why did you do that?

24      A.    My correct title is Health Officer, not

25 Regional Health Officer.

                                        Page 78

1      Q.    Okay.  So, turning to point 2.  In Exhibit 5

2 Mr. Straub wrote "Pursuant to Chapter 70.26 RCW, the

3 Chelan/Douglas Health District developed a plan for

4 dealing with pandemic influenza."

5            And then if you turn to Exhibit 3, point 2,

6 it is the same sentence, except you add "in 2008" at

7 the end.

8            Do you know why you did that?

9      A.    I also added "I am aware that."

10      Q.    Hmm.  Thank you.

11      A.    I did both of those, because later it

12 refers back to this document, and I wanted to clarify

13 that I had not written nor was I familiar with the

14 contents of the document, but I could attest that it

15 existed.

16            Also on the cover of the document the date

17 of creation is 2008.

18            And I put that in there honestly in an

19 effort to point out that this document is 12 years old.

20 Because, again, to my mind it makes no sense to be

21 referring back to this document.

22      Q.    Understood.  Point 3 you write -- Well,

23 excuse me.

24            Point 3 in Exhibit 5 Mr. Straub

25 wrote "COVID-19 is 'a new virus' that 'causes serious

                                        Page 79

illness, and then spreads easily from person to
person'."

3            And it look where you wrote in Exhibit 3, or

4 point 3 is the same but without the quotation marks.

5            Is that right?

6      A.    Yes.

7      Q.    Do you know why you deleted the quotation

8 marks?

9      A.    They are unnecessary and they make -- would

10 make me appear uneducated.

11      Q.    Understood.  Number 4.  Excuse me.  I'm

12 going to skip over 4.

13            And let's go to 5.  Point 5 from Exhibit 5,

14 Mr. Straub -- Actually, I think it would be easiest if

15 you would just read point 5 to yourself, and then read

16 point 5 in Exhibit 3 to yourself, and then we will talk

17 about them.

18            Does that make sense?

19      A.    Yes.

20      Q.    Okay.  Let me know when you are finished.

21                  (Pause in the proceedings).

22      A.    Okay.

23      Q.    So, it appears, comparing these two

24 documents, that in Exhibit 3 for the final version you

25 deleted in point 5 quote "our health care resources at

                                        Page 80

present are adequate to deal with the expected number
of COVID-19 cases," and replaced it with, "our health

3 care resources at present are adequate to begin

4 reopening our economy."

5            Did I read that right?

6      A.    Correct.

7      Q.    Why did you do that?

8      A.    To make it more specific and less expansive.

9 I can state that our health care resources at present

10 are adequate.  But I have no foreknowledge of how many

11 COVID-19 cases should be expected into the future.

12            I felt the goal of this document was to

13 support reopening the economy, and I did and still do

14 feel that our health care resources are adequate to

15 begin reopening the economy.

16            I was uncomfortable attesting that our

17 health care resources at present are adequate to deal

18 with the expected number of COVID-19 cases, because I

19 do not know what the expected numbers are.

20      Q.    Understood.  Point 6 in Exhibit 5 Mr. Straub

21 wrote, "If our pandemic plan is followed, we do not

22 anticipate a shortage of hospital or other health care

23 resources to deal with the COVID-19 pandemic."

24            And you replaced that with, you deleted the

25 reference to the pandemic plan and said in Exhibit 3,

                                        Page 81

1 "based upon current knowledge, we do not anticipate a
2 shortage of hospital or other health care resources to
3 deal with the COVID-19 pandemic."
4         Is that right?
5     A.    Yes.
6     Q.    Why did you delete "If our pandemic plan is
7 followed" and replace it with "Based upon current
8 knowledge"?
9     A.    Yeah.  In short, not to look stupid.  Again,
10 we've discussed this previously.  I had no knowledge
11 and had not had the time to review the Influenza
12 Pandemic Plan, which is what I believe he was referring
13 to in number 6.  And thus I couldn't comment on whether
14 following that plan would keep us safe.
15         But also it felt, from a medical standpoint,
16 it was ridiculous to refer to an Influenza Pandemic
17 Plan as we are confronting a novel virus and thus a
18 novel pandemic.
19         So, I tried to rephrase that in a way which
20 I could attest to, which was that based upon our
21 current knowledge we do not anticipate a shortage of
22 hospital or other health care resources to deal with
23 the COVID-19 pandemic.
24     Q.    Thank you.  And in point 7 you also deleted
25 Mr. Straub's reference to the pandemic plan, is that

                                         Page 82

1 right?
2     A.    Yes.
3     Q.    And did you do that for similar reasons?
4     A.    Yes.
5     Q.    Finally, in point 8 it appears as though you
6 deleted from Mr. Straub's version in Exhibit 5,
7 quote, "As well as any other present and anticipated
8 public health threats," and replaced it with in Exhibit
9 3, "as well as the additional threat posed by a phased
10 reopening of the economy."
11         Is that correct?
12     A.    Yes.
13     Q.    Why did you make that edit?
14     A.    As we have discussed previously, number 8 to
15 my mind was too expansive.
16         In medicine we learn, always remember never
17 say "always" or "never."  I'm sorry.  Right.  Always
18 remember never say "always" or "never."
19         And that just rings of that.  Here we are,
20 "any other present or anticipated," that to me goes
21 against some of the maxims of medicine, and certainly
22 against the maxim of a pandemic.
23         So I removed that expansive statement and
24 replaced it with something I could support.
25         Again, I felt this was to support the

                                         Page 83

1 Douglas County Board of Commissioners' efforts to
2 reopen the economy, which is why I added that, because
3 I thought that was a threat that they were coping with,
4 "the additional threat posed by a phased reopening of
5 our economy.
6     Q.    Thank you, Doctor.  At some point did you
7 learn that your signed statement here in Exhibit 3,
8 Sub-Exhibit A, was used in multiple pending lawsuits?
9     A.    Yes.
10     Q.    Do you recall when you did learn that the
11 statement was used in various lawsuits?
12     A.    Without looking at a calender, I couldn't
13 tell you the date.  I can tell you it was at about nine
14 o'clock in the evening when one of my providers
15 messaged me with a concern that a Facebook post had
16 been sent to her.  I believe it came out of Cashmere,
17 Washington.
18         And somebody had reported Chelan and Douglas
19 Counties had sued the Governor and that Dr. Butler was
20 supportive of this action.
21         And my provider understood that that would
22 not have been the case, and thus brought it to my
23 attention, because she was concerned that now on
24 social media I was being represented as supportive of
25 the lawsuit which had been brought against the

                                         Page 84

1 Governor.
2     Q.    Understood.  And what did you do when you
3 found that out?
4     A.    I responded first to my provider.  I thanked
5 her and said I would look into it.
6         Then of course everything became blindingly
7 apparent.  You know, the way this was brought forward,
8 the eight points, the unwillingness to accept my
9 narrative.
10         Declarative statements in favor of going
11 back to the eight points made much more sense.
12         So, for whatever reason I thought that it
13 was Dan Sutton who had brought the initial proposal
14 forward.
15         Without going back to check any notes, I
16 e-mailed Dan and asked him if he had used my statement
17 in a personal lawsuit brought by him against the
18 Governor.
19         And he responded to me that he had never
20 handled that document.
21         And at that point I forget exactly what I
22 did.  I must have looked back in some way and realized
23 that it was Marc Straub.
24         I know what.  I went back and looked at the
25 e-mail exchange that we had had, realized that the

                                         Page 85

1  e-mail exchange was with Marc.
2          And then I sent the same e-mail to Marc,
3  asking him if he had used the declaration that I had
4  provided to him in his public capacity in a private
5  lawsuit that he had brought as an individual citizen
6  against the governor.
7      Q.   And did he respond to that e-mail?
8      A.   He did not respond directly to me.  He
9  subsequently launched an e-mail to the entire Board of
10 Directors, which included a copy of that e-mail.
11     Q.   This is the last document I want to bring up
12 with you.  Sometimes those can be famous last words.
13 But this is tab ZZZ.  This is the one that was loose.
14 So it was just printed earlier this morning.  And it's
15 unnumbered.  So, this will be Exhibit 6.
16     A.   So marked.
17               (Deposition Exhibit Number 6 was
18               marked for identification).
19     Q.   (BY MR. JONES:)  Okay.  Great.  You're a pro
20 at this now, Dr. Butler.
21          Is this an e-mail that you were just
22 referring to, that you sent to Mr. Straub?
23     A.   Yes.
24     Q.   And the subject line of this e-mail is
25 "Deceit"?

1  I feel are responsible for the public health of our
2  community in such an awkward, back-handed manner.
3          Again, we're in the age of COVID-19.  I've
4  never met Mr. Straub.  If we'd been at board meetings
5  together, it'd be different.  Maybe nothing would have
6  happened the same way.
7          But in the current circumstances, what is
8  most upsetting and frustrating to me is the way that
9  the information was gained from me with clear
10 forethought and planning to be used in a way that was
11 not made clear to me.
12         Knowing what I know now, would I retract it?
13 I think I can probably get over the
14 disappointment I feel in the way that Mr. Straub
15 behaved.
16         But the public as I now understand is -- I'm
17 sorry, the document as I now understand is a public
18 document, and I stand by its contents.
19         So, no, although I feel I was a little bit
20 hoodwinked in getting it into those lawsuits, I don't
21 feel I have any grounds to retract it.
22     Q.   Do you have any concerns that the statement
23 even as revised might be taken out of context to
24 suggest facts that aren't necessarily true?
25     A.   I'm concerned that it reflects my support of

1      A.   Yes.
2      Q.   Why did you chose that phrase for a subject
3  line?
4      A.   It was my impression on that evening that
5  Marc, Mr. Straub, had had multiple opportunities to
6  clarify his intentions to me.  That if we were
7  colleagues, working as a cohesive team for the good of
8  our local health jurisdiction, he would have approached
9  me individually, made clear the needs that he had for
10 his personal lawsuit, and asked me if I could support
11 it.
12         Instead, what appears to have happened was
13 that he deceived me into believing that he needed this
14 statement to support work that was being conducted by
15 the Douglas County Board of Commissioners.  That is why
16 I used the word "deceit."
17     Q.   Understood.  Knowing what you know now, that
18 your statement was used in actually three lawsuits of
19 which I am aware, brought by private individuals
20 against the Governor's proclamation, would you, if you
21 could, retract the statement from the record?
22     A.   I believe that the statement is true and
23 correct as signed.
24         What is difficult for me, number one, is I
25 am not accustomed to working with other individuals who

1  a lawsuit against the Governor and his proclamation,
2  and I would not participate knowingly in such a lawsuit
3  as a private citizen.
4      Q.   Why?
5      A.   Why?
6      Q.   Why not?
7      A.   I feel the Governor's actions have been
8  thoughtful and correct.
9          I am frustrated that they have not been
10 enforced fairly.  And I feel that there unfortunately
11 has not been enough plasticities as the pandemic has
12 rolled out to allow us locally to be as nimble as we
13 would have wanted to be.
14         That said, I believe the governor acted with
15 the best information available to him, and I have no
16 concerns about the Governor's actions.  So, I would not
17 have brought a lawsuit against him.
18     Q.   Understood.  I know I mentioned that your
19 statement had been used in at least three lawsuits
20 challenging the Governor's proclamations.
21         Have you, other than what we have reviewed
22 today, have you reviewed any of the pleadings, the
23 legal papers in those lawsuits or otherwise
24 familiarized yourself with the subject matter of those
25 lawsuits?

1    A.    The only document I reviewed was Cuevas vs.
2  Jay Inslee, and I believe that was the Chelan County
3  document.  That's the only one I have seen.
4    Q.    And did you review the Complaint in that
5  lawsuit?
6    A.    If they were -- If the Complaint was
7  included in the verbiage of the document, then, yes, I
8  would have reviewed it.
9    Q.    Okay.  Turning to Exhibit 3 again, your
10 statement in number 2 which says, it references Chapter
11 70.26 RCW.
12         Do you see that?
13   A.    Can you tell me what page you are on, Zach?
14   Q.    Oh, I am sorry.  It's page 62 from Exhibit
15 3.
16   A.    Yes.
17   Q.    And do you see in point 2 there is a
18 reference to that chapter of the Washington -- the
19 Revised Code of Washington, 70.26?
20   A.    I see that, yes.
21   Q.    Did you ever review that chapter of the
22 code?
23   A.    No.
24   Q.    Okay.  So, I'll represent to you that this
25 is a chapter of the Revised Code of Washington entitled

1  seen the local Public Health District emasculated, torn
2  apart.  It's probably one-quarter of the size it used
3  to be.
4         There is just no conceivable way that our
5  local health jurisdiction could have the resources
6  required to understand or manage a pandemic like this.
7         I believe that the State Department of
8  Health does have access to those resources.  It has
9  full-time prepared epidemiologists and public health
10 officers working closely with academic institutions on
11 modeling and guidance which is something that as a
12 family physician I couldn't begin to approximate.
13        So, there is no way that I would be prepared
14 at a local level to manage a county-by-county for my
15 two counties response without enormous support provided
16 by the State Department of Health.
17        MR. JONES:  I think I may be done, but
18 I'd like to have five minutes to review my material.
19 So, I realize I've gone a little bit longer than I
20 said, but if you will just indulge me for five more
21 minutes to go over my notes.
22        THE WITNESS:  Could we take a time-out?
23        MR. JONES:  Yes.  Thank you.  We will go
24 off the record now.
25                              (Short recess).

1  Pandemic Influenza Preparedness.
2         And I think it's a fair summary of this
3  lawsuit -- of several of the lawsuits in which
4  plaintiffs are challenging the proclamations, that
5  their view, plaintiffs' view, that this chapter
6  displaces or lessens the Governor's authority under his
7  executive, general executive powers to issue the
8  proclamation.
9         Does that make sense?  Do you understand
10 that description?
11   A.    Yes.
12         MR. DE WOLF:  Excuse me.  I'll object to
13 the form of the question as misstating the plaintiffs'
14 position, but you can go ahead and answer.
15         THE WITNESS:  Yes.
16   Q.    (BY MR. JONES:)  Okay.  So, setting aside
17 the legal questions, we don't expect you to interpret
18 the statute for us, setting aside the legal question,
19 in your medical and professional opinion, would a
20 county-by-county approach to the COVID-19 pandemic be a
21 reasonable and effective strategy for preventing or
22 slowing the spread of the disease?
23   A.    No.
24   Q.    Why not?
25   A.    Over the last 27 years of my career I have

1         MR. JONES:  Okay.  Let's go back on the
2  record.
3    Q.    Dr. Butler, I have just one or a few more
4  questions.
5         We talked a bit about the Health District's
6  Pandemic Influenza Plan.
7         Do you recall that?
8    A.    Yes.
9    Q.    I think I know what the answer to this next
10 question's going to be, but I have to ask it anyway.
11        Has the Health District Pandemic Influenza
12 Plan governed the Health District's response to
13 COVID-19?
14   A.    My understanding is that prior to assuming
15 my current position, that plan was used to set up the
16 initial phases of our response.
17        During my time in this role I have not seen
18 it referred to.
19   Q.    And what was that understanding based off
20 of?
21   A.    I believe a discussion I had with Mr. Kling,
22 and he stated that the Pandemic Flu Plan had been very
23 helpful since they were beginning to school up and
24 decide how they were going to structure themselves to
25 confront this pandemic.

**Page 94**

```
1         MR. JONES:  Thank you, Dr. Butler, for
2  your time and for your service to your community.
3         THE WITNESS:  Thanks, Zach.
4         MR. JONES:  I don't have any additional
5  questions at this time.
6         MR. DE WOLF:  I don't have any
7  questions.  I do want to thank Dr. Butler for speaking
8  slowly and clearly.  It was very easy to follow him.
9  And you would make an excellent witness.
10        THE WITNESS:  Thank you.
11        MR. JONES:  For the record, I concur.
12        COURT REPORTER:  Zach, are you ordering
13 a copy?  Are you ordering this?
14        MR. JONES:  Yes, we were.
15        COURT REPORTER:  Okay.  Mr. DeWolf, do
16 you wish a copy?
17        MR. DE WOLF:  Let me reserve that one.
18 I'll get back that you.
19        COURT REPORTER:  Okay.  Thank you.
20
21                              (1:00 p.m.)
22
23
24
25

                              Page 94
        DR. BUTLER - by Mr. Jones
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345
```

**Page 95**

```
1  STATE OF WASHINGTON     )
                           ) ss.
2  County of Spokane       )
3
4       I, William J. Bridges, do hereby certify that
5  at the time and place heretofore mentioned in the
6  caption of the foregoing matter, I was a Certified
7  Shorthand Reporter for the State of Washington, and
8  pursuant to RCW 5.28.010, am authorized to administer
9  oaths and affirmations in and for the State of
10 Washington; that at said time and place I reported in
11 stenotype all testimony adduced and proceedings had in
12 the foregoing matter; that thereafter my notes were
13 reduced to typewriting and that the foregoing
14 transcript consisting of 94 typewritten pages is a true
15 and correct transcript of all such testimony adduced
16 and proceedings had and of the whole thereof.
17      I further certify that I am herewith securely
18 sealing the original deposition transcript and promptly
19 delivering the same to Attorney Zachary Pekelis Jones.
20          Witness my hand at Spokane, Washington, on
21 this _____ day of June, 2020.
22
23          _____
24          William J. Bridges
            CSR NO. 2421
            Certified Shorthand Reporter
25          My commission expires:  11-1-20

                              Page 95
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345
```

**Page 96**

```
1                          CERTIFICATE OF WITNESS
2
3  STATE OF WASHINGTON     )
                           )
4  COUNTY OF CHELAN        )
5
6       I, MALCOLM D. BUTLER, declare under penalty of
7  perjury under the laws of the State of Washington, that
8  I am the witness named in the foregoing deposition and
9  that I have read the questions and answers thereon as
10 contained in the foregoing deposition, consisting of
11 pages 6 through 94; that the answers are true and
12 correct as given by me at the time of taking the
13 deposition, except as indicated on the correction
14 sheet.
15
16
17          _____
            MALCOLM D. BUTLER
18
19
20
21      Executed on the _____ day of _____,
   2020, at _____, _____.
22          (City)            (State)
23
24 JOSE LUIS CUEVAS, et al vs. JAY INSLEE
   June 8, 2020
                              Page 96
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345
```

**Page 97**

```
1  Page: _____, Line: _____;
2
3  Page: _____, Line: _____;
4
5  Page: _____, Line: _____;
6
7  Page: _____, Line: _____;
8
9  Page: _____, Line: _____;
10
11 Page: _____, Line: _____;
12
13 Page: _____, Line: _____;
14
15 Page: _____, Line: _____;
16
17 Page: _____, Line: _____;
18
19 Page: _____, Line: _____;
20
21 Page: _____, Line: _____;
22
23 Page: _____, Line: _____;
24
25 Page: _____, Line: _____;

                              Page 97
(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345
```

Pages 94 to 97

1
2     Page: _____, Line: _____;

3
4     Page: _____, Line: _____;

5
6     Page: _____, Line: _____;

7
8     Page: _____, Line: _____;

9
10    Page: _____, Line: _____;

11
12    Page: _____, Line: _____;

13
14    Page: _____, Line: _____;

15
16    Page: _____, Line: _____;

17
18    Page: _____, Line: _____;

19
20    Page: _____, Line: _____;

21
22    Page: _____, Line: _____;

23
24    Page: _____, Line: _____;

25    Page: _____, Line: _____;

Page 98

(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

1     Page: _____, Line: _____;
2
3     Page: _____, Line: _____;
4
5     Page: _____, Line: _____;
6
7     Page: _____, Line: _____;
8
9     Page: _____, Line: _____;
10
11    Page: _____, Line: _____;
12
13    Page: _____, Line: _____;
14
15    Page: _____, Line: _____;
16
17    Page: _____, Line: _____;
18
19    Page: _____, Line: _____;
20
21    Page: _____, Line: _____;
22
23
24

25              _____
                  MALCOLM D. BUTLER

Page 99

(509) 456-0586  BRIDGES REPORTING & LEGAL VIDEO (800) 358-2345

Pages 98 to 99

Ex. F

# COVID-19

**For the latest COVID-19 health guidance, statistics and resources, visit Coronavirus.wa.gov.**

## Washington Governor - Jay Inslee

# Inslee statement on Saturday protests

May 30, 2020

## Story

"As people gather today to protest the unjust death of George Floyd, I hope they do so peacefully and safely. Everyone has the freedom - and the right - to demonstrate and speak their mind. However, violence and destruction have no place in Washington state or our country.

"Together, we grieve for the death of George Floyd, and many, many others. The events in Minnesota and across the nation the past few nights have been stunning and illustrate how inequity causes people to lose faith in their public institutions.

"The trauma inflicted on generations of people of color must be acknowledged, and more must be done to correct it. Feeling second-class in one's own community does not make people feel safe. Insecurity hardens into anger.

"I fully support the right to free speech and peaceful assembly. I applaud every Washingtonian standing for what they believe in, but we must do so in a way that allows space for these important and necessary discussions, not in a way that inspires fear.

"If you choose to protest today, please be safe and peaceful. These are important issues that deserve our full attention, without distraction from violence and destruction. Without solutions to inequity, the long road to justice will run even longer."

## Media Contact

Public and constituent inquiries | 360.902.4111
Press inquiries | 360.902.4136

# Ex.

# G



*Centers for Disease Control and Prevention*

Morbidity and Mortality Weekly Report

Early Release / Vol. 69                              June 15, 2020

# Coronavirus Disease 2019 Case Surveillance — United States, January 22–May 30, 2020

Erin K. Stokes, MPH[1,*]; Laura D. Zambrano, PhD[1,*]; Kayla N. Anderson, PhD[1]; Ellyn P. Marder, DrPH[1]; Kala M. Raz, MPH[1];
Suad El Burai Felix, MPH[1]; Yunfeng Tie, PhD[1]; Kathleen E. Fullerton, MPH[1]

The coronavirus disease 2019 (COVID-19) pandemic resulted in 5,817,385 reported cases and 362,705 deaths worldwide through May, 30, 2020,[†] including 1,761,503 aggregated reported cases and 103,700 deaths in the United States.[§] Previous analyses during February–early April 2020 indicated that age ≥65 years and underlying health conditions were associated with a higher risk for severe outcomes, which were less common among children aged <18 years (*1–3*). This report describes demographic characteristics, underlying health conditions, symptoms, and outcomes among 1,320,488 laboratory-confirmed COVID-19 cases individually reported to CDC during January 22–May 30, 2020. Cumulative incidence, 403.6 cases per 100,000 persons,[¶] was similar among males (401.1) and females (406.0) and highest among persons aged ≥80 years (902.0). Among 599,636 (45%) cases with known information, 33% of persons were Hispanic or Latino of any race (Hispanic), 22% were non-Hispanic black (black), and 1.3% were non-Hispanic American Indian or Alaska Native (AI/AN). Among 287,320 (22%) cases with sufficient data on underlying health conditions, the most common were cardiovascular disease (32%), diabetes (30%), and chronic lung disease (18%). Overall, 184,673 (14%) patients were hospitalized, 29,837 (2%) were admitted to an intensive care unit (ICU), and 71,116 (5%) died. Hospitalizations were six times higher among patients with a reported underlying condition (45.4%) than those without reported underlying conditions (7.6%). Deaths were 12 times higher among patients with reported underlying conditions (19.5%) compared with those without underlying conditions (1.6%). The COVID-19 pandemic continues to be severe, particularly in certain population groups. These preliminary findings underscore the need to build on current efforts to collect and analyze case data, especially among those with underlying health conditions. These data are used to monitor trends in COVID-19 illness, identify and respond to localized incidence increase, and inform policies and practices designed to reduce transmission in the United States.

State and territorial health departments report daily aggregate counts of COVID-19 cases and deaths to CDC; these were tabulated according to date of report to examine reporting trends during January 22–May 30. In addition to aggregate counts, individual COVID-19 case reports were submitted via a CDC COVID-19 case report form[**] and the National Notifiable Diseases Surveillance System (NNDSS).[††]

\* These authors contributed equally to this report.
† https://www.who.int/emergencies/diseases/novel-coronavirus-2019/situation-reports.
§ CDC official counts of cases and deaths, released daily on https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html, are aggregate counts from reporting jurisdictions. Throughout the COVID-19 pandemic, CDC has been tracking both aggregate and individual (i.e., line-list) counts of cases and deaths. For aggregate counts, from January 22 to March 2, 2020, CDC provided laboratory confirmation for all U.S. confirmed cases. Starting March 3, jurisdiction partners validated aggregate counts each night for report out at 12 p.m. the following day by CDC. For individual counts, jurisdiction partners electronically submit standardized information for individual cases of COVID-19 to CDC. From April 14, aggregate and individual counts included confirmed and probable cases and deaths, according to the Council of State and Territorial Epidemiologists position statement Interim 20-ID-01 (https://cdn.ymaws.com/www.cste.org/resource/resmgr/2020ps/interim-20-id-01_covid-19.pdf; https://wwwn.cdc.gov/nndss/conditions/coronavirus-disease-2019-covid-19/case-definition/2020/).
¶ Incidence was calculated per 100,000 population using 2018 U.S. Census population estimates for U.S. states and the District of Columbia obtained from CDC WONDER (https://wonder.cdc.gov/single-race-population.html).

** https://www.cdc.gov/coronavirus/2019-ncov/php/reporting-pui.html.
†† https://wwwn.cdc.gov/nndss; https://wwwn.cdc.gov/nndss/covid-19-response.html.



**U.S. Department of Health and Human Services**
Centers for Disease Control and Prevention

Jurisdictions voluntarily report confirmed and probable[§§] cases from reports submitted by health care providers and laboratories. A laboratory-confirmed COVID-19 case was defined as a person with a positive test result for SARS-CoV-2, the virus that causes COVID-19, from a respiratory specimen, using real-time reverse transcription–polymerase chain reaction testing. COVID-19 case data reported from 50 states, New York City, and the District of Columbia[¶¶] were analyzed to examine reported demographic characteristics, underlying health conditions, clinical signs and symptoms, and severe outcomes, including hospitalization, ICU admission, and death. Data were missing for age, sex, and race or ethnicity in <1%, 1%, and 55% of reports, respectively.[***] Cases reported without sex or age data were excluded from this analysis as were cases meeting only the probable case definition, along with persons repatriated to the United States from Wuhan, China, or the Diamond Princess cruise ship. Cumulative incidence was estimated using 2018 population estimates. Because of the high prevalence of missing race and ethnicity data, estimates of incidence and proportions of underlying health conditions, symptoms, and severe outcomes by race and ethnicity were not described. Analyses are descriptive and statistical comparisons were not performed.

CDC received notification of the first case of laboratory-confirmed COVID-19 in the United States on January 22, 2020.[†††] As of May 30, an aggregate 1,761,503 U.S. COVID-19 cases and 103,700 deaths had been reported (Figure).[§§§] The 7-day moving average number[¶¶¶] of new daily cases peaked on April 12 (31,994) and deaths peaked on April 21 (2,856). As of May 30, the 7-day moving average numbers of new cases were 19,913 per day and deaths were 950 per day.

---

[§§] According to the Council of State and Territorial Epidemiologists position statement Interim 20-ID-01, a probable case must 1) meet clinical criteria and epidemiologic criteria with no confirmatory laboratory testing performed; 2) have presumptive laboratory evidence, including detection of specific antigen or antibody in a clinical specimen, and meet clinical criteria or epidemiologic criteria; or 3) meet vital records criteria with no confirmatory laboratory testing performed. (https://cdn.ymaws.com/www.cste.org/resource/resmgr/2020ps/interim-20-id-01_covid-19.pdf)

[¶¶] Cases reported from U.S. territories were not included in the analysis because of limited case reporting and lack of available demographically stratified census data. Cases excluded from this analysis include those reported from Guam (116), the Northern Mariana Islands (16), Puerto Rico (one), and the U.S. Virgin Islands (71).

[***] Cases reported as Hispanic were categorized as "Hispanic or Latino persons of any race" regardless of availability of race data.

[†††] The first laboratory-confirmed case of COVID-19 in the United States was confirmed on January 20, 2020, and reported to CDC on January 22, 2020. The upper quartile of the lag between onset date and reporting to CDC was 15 days.

[§§§] From April 15 to May 30, 2020, these aggregate counts include both confirmed and probable cases and deaths. Overall, <1% of cases and 3.1% of deaths were classified as probable.

[¶¶¶] The 7-day moving average of new cases and deaths (current day + 6 preceding days / 7) was calculated to smooth expected variations in daily counts.

Among the 1,761,503 aggregate cases reported to CDC during January 22–May 30, individual case reports for 1,406,098 were submitted to CDC case surveillance. After exclusions, data for 1,320,488 (94%) cases were analyzed. Median age was 48 years (interquartile range = 33–63 years). Incidence was 403.6 cases per 100,000 population (Table 1) and was similar among females (406.0) and males (401.1).[****] Incidence was higher among persons aged 40–49 years (541.6) and 50–59 years (550.5) than among those aged 60–69 years (478.4) and 70–79 years (464.2). Incidence was highest among persons aged ≥80 years (902.0)[††††] and lowest among children aged ≤9 years (51.1). Among the 599,636 (45%) cases with information on both race and ethnicity, 36% of persons were non-Hispanic white, 33% were Hispanic, 22% were black, 4% were non-Hispanic Asian, 4% were non-Hispanic, other or multiple race, 1.3% were AI/AN, and <1% were non-Hispanic Native Hawaiian or other Pacific Islander.

Symptom status (symptomatic versus asymptomatic) was reported for 616,541 (47%) cases; among these, 22,007 (4%) were asymptomatic. Among 373,883 (28%) cases with data on individual symptoms, 70% noted fever, cough, or shortness of breath; 36% reported muscle aches, and 34% reported headache (Table 2). Overall, 31,191 (8%) persons reported loss of smell or taste.[§§§§] Among patients aged ≥80 years, 60% reported fever, cough, or shortness of breath. No other symptoms were reported by >10% of persons in this age group.

Among 287,320 (22%) cases with data on individual underlying health conditions, those most frequently reported were cardiovascular disease (32%), diabetes (30%), and chronic lung disease (18%) (Table 2); the reported proportions were similar among males and females. The frequency of conditions reported varied by age group: cardiovascular disease was uncommon among those aged ≤39 years but was reported in approximately half of the cases among persons aged ≥70 years. Among 63,896 females aged 15–44 years with known pregnancy status, 6,708 (11%) were reported to be pregnant.

Among the 1,320,488 cases, outcomes for hospitalization, ICU admission, and death were available for 46%, 14%, and 36%, respectively. Overall, 184,673 (14%) patients were hospitalized, including 29,837 (2%) admitted to the ICU; 71,116 (5%) patients died (Table 3). Severe outcomes were more commonly reported for patients with reported underlying conditions. Hospitalizations were six times higher among patients with a reported underlying condition than those without

---

[****] In some age groups, males had higher incidence, and in some age groups, females had higher incidence.

[††††] Among those aged ≥85 years, incidence was 1,138 per 100,000.

[§§§§] Responses include data from standardized fields supplemented with data from free-text fields; therefore, persons exhibiting this symptom might be underreported.

**FIGURE. Daily number of COVID-19 cases\*,†,§,¶ (A) and COVID-19–associated deaths\*\* (B) reported to CDC — United States, January 22–May 30, 2020**



**Abbreviation:** COVID-19 = coronavirus disease 2019.
 \* From April 14, 2020, aggregate case counts reported by CDC included deaths attributable to both confirmed and probable COVID-19 as classified by reporting jurisdictions, using the Council of State and Territorial Epidemiologists position statement Interim-ID-20-01 (https://cdn.ymaws.com/www.cste.org/resource/resmgr/2020ps/interim-20-id-01_covid-19.pdf).
 † The upper quartile of the lag between onset date and reporting to CDC was 15 days.
 § The daily number of deaths reported by jurisdictions on April 14 includes 4,141 deaths newly classified as probable.
 ¶ Overall <1% of cases reported in aggregate to CDC were classified as probable.
\*\* Overall 3.1% of deaths reported in aggregate to CDC were classified as occuring in persons with probable cases.

reported underlying conditions (45.4% versus 7.6%). Deaths were 12 times higher among patients with reported underlying conditions compared with those without reported underlying conditions (19.5% versus 1.6%). The percentages of males who were hospitalized (16%), admitted to the ICU (3%), and who died (6%) were higher than were those for females (12%, 2%, and 5%, respectively). The percentage of ICU admissions was highest among persons with reported underlying conditions aged 60–69 years (11%) and 70–79 years (12%). Death was most commonly reported among persons aged ≥80 years regardless of the presence of underlying conditions (with underlying conditions 50%; without 30%).

**TABLE 1. Reported laboratory-confirmed COVID-19 cases and estimated cumulative incidence,\* by sex† and age group — United States, January 22–May 30, 2020**

| Age group (yrs) | Males No. (%) | Males Cumulative incidence* | Females No. (%) | Females Cumulative incidence* | Total No. (%) | Total Cumulative incidence* |
|---|---|---|---|---|---|---|
| 0–9 | 10,743 (1.7) | 52.5 | 9,715 (1.4) | 49.7 | 20,458 (1.5) | 51.1 |
| 10–19 | 24,302 (3.8) | 113.4 | 24,943 (3.7) | 121.4 | 49,245 (3.7) | 117.3 |
| 20–29 | 85,913 (13.3) | 370.0 | 96,556 (14.3) | 434.6 | 182,469 (13.8) | 401.6 |
| 30–39 | 108,319 (16.8) | 492.8 | 106,530 (15.8) | 490.5 | 214,849 (16.3) | 491.6 |
| 40–49 | 109,745 (17.0) | 547.0 | 109,394 (16.2) | 536.2 | 219,139 (16.6) | 541.6 |
| 50–59 | 119,152 (18.4) | 568.8 | 116,622 (17.3) | 533.0 | 235,774 (17.9) | 550.5 |
| 60–69 | 93,596 (14.5) | 526.9 | 85,411 (12.7) | 434.6 | 179,007 (13.6) | 478.4 |
| 70–79 | 53,194 (8.2) | 513.7 | 52,058 (7.7) | 422.7 | 105,252 (8.0) | 464.2 |
| ≥80 | 41,394 (6.4) | 842.0 | 72,901 (10.8) | 940.0 | 114,295 (8.7) | 902.0 |
| **All ages** | 646,358 (100.0) | 401.1 | 674,130 (100.0) | 406.0 | 1,320,488 (100.0) | 403.6 |

**Abbreviation:** COVID-19 = coronavirus disease 2019.
\* Per 100,000 population.
† The analytic dataset excludes cases reported through case surveillance that were missing information on sex (n = 19,918) or age (n = 2,379).

**TABLE 2. Reported underlying health conditions\* and symptoms† among persons with laboratory-confirmed COVID-19, by sex and age group — United States, January 22–May 30, 2020**

| | No. (%) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Sex | | Age group (yrs) | | | | | | | | |
| Characteristic | Total | Male | Female | ≤9 | 10–19 | 20–29 | 30–39 | 40–49 | 50–59 | 60–69 | 70–79 | ≥80 |
| **Total population** | 1,320,488 | 646,358 | 674,130 | 20,458 | 49,245 | 182,469 | 214,849 | 219,139 | 235,774 | 179,007 | 105,252 | 114,295 |
| **Underlying health condition§** | | | | | | | | | | | | |
| Known underlying medical condition status* | 287,320 (21.8) | 138,887 (21.5) | 148,433 (22.0) | 2,896 (14.2) | 7,123 (14.5) | 27,436 (15.0) | 33,483 (15.6) | 40,572 (18.5) | 54,717 (23.2) | 50,125 (28.0) | 34,400 (32.7) | 36,568 (32.0) |
| Any cardiovascular disease¶ | 92,546 (32.2) | 47,567 (34.2) | 44,979 (30.3) | 78 (2.7) | 164 (2.3) | 1,177 (4.3) | 3,588 (10.7) | 8,198 (20.2) | 16,954 (31.0) | 21,466 (42.8) | 18,763 (54.5) | 22,158 (60.6) |
| Any chronic lung disease | 50,148 (17.5) | 20,930 (15.1) | 29,218 (19.7) | 363 (12.5) | 1,285 (18) | 4,537 (16.5) | 5,110 (15.3) | 6,127 (15.1) | 8,722 (15.9) | 9,200 (18.4) | 7,436 (21.6) | 7,368 (20.1) |
| Renal disease | 21,908 (7.6) | 12,144 (8.7) | 9,764 (6.6) | 21 (0.7) | 34 (0.5) | 204 (0.7) | 587 (1.8) | 1,273 (3.1) | 2,789 (5.1) | 4,764 (9.5) | 5,401 (15.7) | 6,835 (18.7) |
| Diabetes | 86,737 (30.2) | 45,089 (32.5) | 41,648 (28.1) | 12 (0.4) | 225 (3.2) | 1,409 (5.1) | 4,106 (12.3) | 9,636 (23.8) | 19,589 (35.8) | 22,314 (44.5) | 16,594 (48.2) | 12,852 (35.1) |
| Liver disease | 3,953 (1.4) | 2,439 (1.8) | 1,514 (1.0) | 5 (0.2) | 19 (0.3) | 132 (0.5) | 390 (1.2) | 573 (1.4) | 878 (1.6) | 1,074 (2.1) | 583 (1.7) | 299 (0.8) |
| Immunocompromised | 15,265 (5.3) | 7,345 (5.3) | 7,920 (5.3) | 61 (2.1) | 146 (2.0) | 646 (2.4) | 1,253 (3.7) | 2,005 (4.9) | 3,190 (5.8) | 3,421 (6.8) | 2,486 (7.2) | 2,057 (5.6) |
| Neurologic/ Neurodevelopmental disability | 13,665 (4.8) | 6,193 (4.5) | 7,472 (5.0) | 41 (1.4) | 113 (1.6) | 395 (1.4) | 533 (1.6) | 734 (1.8) | 1,338 (2.4) | 2,006 (4.0) | 2,759 (8.0) | 5,746 (15.7) |
| **Symptom§** | | | | | | | | | | | | |
| Known symptom status† | 373,883 (28.3) | 178,223 (27.6) | 195,660 (29.0) | 5,188 (25.4) | 12,689 (25.8) | 51,464 (28.2) | 59,951 (27.9) | 62,643 (28.6) | 70,040 (29.7) | 52,178 (29.1) | 28,583 (27.2) | 31,147 (27.3) |
| Fever, cough, or shortness of breath** | 260,706 (69.7) | 125,768 (70.6) | 134,938 (69.0) | 3,278 (63.2) | 7,584 (59.8) | 35,072 (68.1) | 42,016 (70.1) | 45,361 (72.4) | 51,283 (73.2) | 37,701 (72.3) | 19,583 (68.5) | 18,828 (60.4) |
| Fever†† | 161,071 (43.1) | 80,578 (45.2) | 80,493 (41.1) | 2,404 (46.3) | 4,443 (35.0) | 20,381 (39.6) | 25,887 (43.2) | 28,407 (45.3) | 32,375 (46.2) | 23,591 (45.2) | 12,190 (42.6) | 11,393 (36.6) |
| Cough | 187,953 (50.3) | 89,178 (50.0) | 98,775 (50.5) | 1,912 (36.9) | 5,257 (41.4) | 26,284 (51.1) | 31,313 (52.2) | 34,031 (54.3) | 38,305 (54.7) | 27,150 (52.0) | 12,837 (44.9) | 10,864 (34.9) |
| Shortness of breath | 106,387 (28.5) | 49,834 (28.0) | 56,553 (28.9) | 339 (6.5) | 2,070 (16.3) | 13,649 (26.5) | 16,851 (28.1) | 18,978 (30.3) | 21,527 (30.7) | 16,018 (30.7) | 8,971 (31.4) | 8,184 (26.3) |
| Myalgia | 135,026 (36.1) | 61,922 (34.7) | 73,104 (37.4) | 537 (10.4) | 3,737 (29.4) | 21,153 (41.1) | 26,464 (44.1) | 28,064 (44.8) | 28,594 (40.8) | 17,360 (33.3) | 6,015 (21.0) | 3,102 (10.0) |
| Runny nose | 22,710 (6.1) | 9,900 (5.6) | 12,810 (6.5) | 354 (6.8) | 1,025 (8.1) | 4,591 (8.9) | 4,406 (7.3) | 4,141 (6.6) | 4,100 (5.9) | 2,671 (5.1) | 923 (3.2) | 499 (1.6) |
| Sore throat | 74,840 (20.0) | 31,244 (17.5) | 43,596 (22.3) | 664 (12.8) | 3,628 (28.6) | 14,493 (28.2) | 14,855 (24.8) | 14,490 (23.1) | 13,930 (19.9) | 8,192 (15.7) | 2,867 (10.0) | 1,721 (5.5) |
| Headache | 128,560 (34.4) | 54,721 (30.7) | 73,839 (37.7) | 785 (15.1) | 5,315 (41.9) | 23,723 (46.1) | 26,142 (43.6) | 26,245 (41.9) | 26,057 (37.2) | 14,735 (28.2) | 4,163 (14.6) | 1,395 (4.5) |
| Nausea/Vomiting | 42,813 (11.5) | 16,549 (9.3) | 26,264 (13.4) | 506 (9.8) | 1,314 (10.4) | 6,648 (12.9) | 7,661 (12.8) | 8,091 (12.9) | 8,737 (12.5) | 5,953 (11.4) | 2,380 (8.3) | 1,523 (4.9) |
| Abdominal pain | 28,443 (7.6) | 11,553 (6.5) | 16,890 (8.6) | 349 (6.7) | 978 (7.7) | 4,211 (8.2) | 5,150 (8.6) | 5,531 (8.8) | 6,134 (8.8) | 3,809 (7.3) | 1,449 (5.1) | 832 (2.7) |
| Diarrhea | 72,039 (19.3) | 32,093 (18.0) | 39,946 (20.4) | 704 (13.6) | 1,712 (13.5) | 9,867 (19.2) | 12,769 (21.3) | 13,958 (22.3) | 15,536 (22.2) | 10,349 (19.8) | 4,402 (15.4) | 2,742 (8.8) |
| Loss of smell or taste | 31,191 (8.3) | 12,717 (7.1) | 18,474 (9.4) | 67 (1.5) | 1,257 (9.9) | 6,828 (13.3) | 6,907 (11.5) | 6,361 (10.2) | 5,828 (8.3) | 2,930 (5.6) | 775 (2.7) | 238 (0.8) |

**Abbreviation:** COVID-19 = coronavirus disease 2019.
\* Status of underlying health conditions known for 287,320 persons. Status was classified as "known" if any of the following conditions were reported as present or absent: diabetes mellitus, cardiovascular disease (including hypertension), severe obesity (body mass index ≥40 kg/m²), chronic renal disease, chronic liver disease, chronic lung disease, immunocompromising condition, autoimmune condition, neurologic condition (including neurodevelopmental, intellectual, physical, visual, or hearing impairment), psychologic/psychiatric condition, and other underlying medical condition not otherwise specified.
† Symptom status was known for 373,883 persons. Status was classified as "known" if any of the following symptoms were reported as present or absent: fever (measured >100.4°F [38°C] or subjective), cough, shortness of breath, wheezing, difficulty breathing, chills, rigors, myalgia, rhinorrhea, sore throat, chest pain, nausea or vomiting, abdominal pain, headache, fatigue, diarrhea (≥3 loose stools in a 24-hour period), or other symptom not otherwise specified on the form.
§ Responses include data from standardized fields supplemented with data from free-text fields. Information for persons with loss of smell or taste was exclusively extracted from a free-text field; therefore, persons exhibiting this symptom were likely underreported.
¶ Includes persons with reported hypertension.
\*\* Includes all persons with at least one of these symptoms reported.
†† Persons were considered to have a fever if information on either measured or subjective fever variables if "yes" was reported for either variable.

**TABLE 3. Reported hospitalizations,\*,† intensive care unit (ICU) admissions,§ and deaths¶ among laboratory-confirmed COVID-19 patients with and without reported underlying health conditions,\*\* by sex and age — United States, January 22–May 30, 2020**

| Characteristic (no.) | Outcome, no./total no. (%)†† | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Reported hospitalizations\*,† (including ICU) | | | Reported ICU admission§ | | | Reported deaths¶ | | |
| | Among all patients | Among patients with reported underlying health conditions | Among patients with no reported underlying health conditions | Among all patients | Among patients with reported underlying health conditions | Among patients with no reported underlying health conditions | Among all patients | Among patients with reported underlying health conditions | Among patients with no reported underlying health conditions |
| **Sex** | | | | | | | | | |
| Male (646,358) | 101,133/646,358 (15.6) | 49,503/96,839 (51.1) | 3,596/42,048 (8.6) | 18,394/646,358 (2.8) | 10,302/96,839 (10.6) | 864/42,048 (2.1) | 38,773/646,358 (6.0) | 21,667/96,839 (22.4) | 724/42,048 (1.7) |
| Female (674,130) | 83,540/674,130 (12.4) | 40,698/102,040 (39.9) | 3,087/46,393 (6.7) | 11,443/674,130 (1.7) | 6,672/102,040 (6.5) | 479/46,393 (1.0) | 32,343/674,130 (4.8) | 17,145/102,040 (16.8) | 707/46,393 (1.5) |
| **Age group (yrs)** | | | | | | | | | |
| ≤9 (20,458) | 848/20,458 (4.1) | 138/619 (22.3) | 84/2,277 (3.7) | 141/20,458 (0.7) | 31/619 (5.0) | 16/2,277 (0.7) | 13/20,458 (0.1) | 4/619 (0.6) | 2/2,277 (0.1) |
| 10–19 (49,245) | 1,234/49,245 (2.5) | 309/2,076 (14.9) | 115/5,047 (2.3) | 216/49,245 (0.4) | 72/2,076 (3.5) | 17/5,047 (0.3) | 33/49,245 (0.1) | 16/2,076 (0.8) | 4/5,047 (0.1) |
| 20–29 (182,469) | 6,704/182,469 (3.7) | 1,559/8,906 (17.5) | 498/18,530 (2.7) | 864/182,469 (0.5) | 300/8,906 (3.4) | 56/18,530 (0.3) | 273/182,469 (0.1) | 122/8,906 (1.4) | 24/18,530 (0.1) |
| 30–39 (214,849) | 12,570/214,849 (5.9) | 3,596/14,854 (24.2) | 828/18,629 (4.4) | 1,879/214,849 (0.9) | 787/14,854 (5.3) | 135/18,629 (0.7) | 852/214,849 (0.4) | 411/14,854 (2.8) | 21/18,629 (0.1) |
| 40–49 (219,139) | 19,318/219,139 (8.8) | 7,151/24,161 (29.6) | 1,057/16,411 (6.4) | 3,316/219,139 (1.5) | 1,540/24,161 (6.4) | 208/16,411 (1.3) | 2,083/219,139 (1.0) | 1,077/24,161 (4.5) | 58/16,411 (0.4) |
| 50–59 (235,774) | 31,588/235,774 (13.4) | 14,639/40,297 (36.3) | 1,380/14,420 (9.6) | 5,986/235,774 (2.5) | 3,335/40,297 (8.3) | 296/14,420 (2.1) | 5,639/235,774 (2.4) | 3,158/40,297 (7.8) | 131/14,420 (0.9) |
| 60–69 (179,007) | 39,422/179,007 (22.0) | 21,064/42,206 (49.9) | 1,216/7,919 (15.4) | 7,403/179,007 (4.1) | 4,588/42,206 (10.9) | 291/7,919 (3.7) | 11,947/179,007 (6.7) | 7,050/42,206 (16.7) | 187/7,919 (2.4) |
| 70–79 (105,252) | 35,844/105,252 (34.1) | 20,451/31,601 (64.7) | 780/2,799 (27.9) | 5,939/105,252 (5.6) | 3,771/31,601 (11.9) | 199/2,799 (7.1) | 17,510/105,252 (16.6) | 10,008/31,601 (31.7) | 286/2,799 (10.2) |
| ≥80 (114,295) | 37,145/114,295 (32.5) | 21,294/34,159 (62.3) | 725/2,409 (30.1) | 4,093/114,295 (3.6) | 2,550/34,159 (7.5) | 125/2,409 (5.2) | 32,766/114,295 (28.7) | 16,966/34,159 (49.7) | 718/2,409 (29.8) |
| **Total (1,320,488)** | 184,673/1,320,488 (14.0) | 90,201/198,879 (45.4) | 6,683/88,441 (7.6) | 29,837/1,320,488 (2.3) | 16,974/198,879 (8.5) | 1,343/88,441 (1.5) | 71,116/1,320,488 (5.4) | 38,812/198,879 (19.5) | 1,431/88,441 (1.6) |

**Abbreviation:** COVID-19 = coronavirus disease 2019.

\* Hospitalization status was known for 600,860 (46%). Among 184,673 hospitalized patients, the presence of underlying health conditions was known for 96,884 (53%).

† Includes reported ICU admissions.

§ ICU admission status was known for 186,563 (14%) patients among the total case population, representing 34% of hospitalized patients. Among 29,837 patients admitted to the ICU, the status of underlying health conditions was known for 18,317 (61%).

¶ Death outcomes were known for 480,565 (36%) patients. Among 71,116 reported deaths through case surveillance, the status of underlying health conditions was absent for 40,243 (57%) patients.

\*\* Status of underlying health conditions was known for 287,320 (22%) patients. Status was classified as "known" if any of the following conditions were noted as present or absent: diabetes mellitus, cardiovascular disease including hypertension, severe obesity body mass index ≥40 kg/m², chronic renal disease, chronic liver disease, chronic lung disease, any immunocompromising condition, any autoimmune condition, any neurologic condition including neurodevelopmental, intellectual, physical, visual, or hearing impairment, any psychologic/psychiatric condition, and any other underlying medical condition not otherwise specified.

†† Outcomes were calculated as the proportion of persons reported to be hospitalized, admitted to an ICU, or who died among total in the demographic group. Outcome underreporting could result from outcomes that occurred but were not reported through national case surveillance or through clinical progression to severe outcomes that occurred after time of report.

## Discussion

As of May 30, a total of 1,761,503 aggregate U.S. cases of COVID-19 and 103,700 associated deaths were reported to CDC. Although average daily reported cases and deaths are declining, 7-day moving averages of daily incidence of COVID-19 cases indicate ongoing community transmission.¶¶¶¶

The COVID-19 case data summarized here are essential statistics for the pandemic response and rely on information systems developed at the local, state, and federal level over decades for communicable disease surveillance that were rapidly adapted to meet an enormous, new public health threat. CDC aggregate counts are consistent with those presented through the Johns Hopkins University (JHU) Coronavirus Resource Center, which reported a cumulative total of 1,770,165 U.S. cases and 103,776 U.S. deaths on May 30, 2020.\*\*\*\*\* Differences in aggregate counts between CDC and JHU might be attributable to differences in reporting practices to CDC and jurisdictional websites accessed by JHU.

Reported cumulative incidence in the case surveillance population among persons aged ≥20 years is notably higher than that among younger persons. The lower incidence in persons aged ≤19 years could be attributable to undiagnosed milder or asymptomatic illnesses among this age group that

---

¶¶¶¶ Community transmission is defined by states and reflects varying conditions at the local and state levels.

\*\*\*\*\* COVID-19 Dashboard by the Center for Systems Science and Engineering at Johns Hopkins University is a publicly available data tracker that extracts data from state, territorial, and local public health websites (https://coronavirus.jhu.edu/us-map). Data are archived in GitHub (https://github.com/CSSEGISandData/COVID-19/blob/master/csse_covid_19_data/csse_covid_19_daily_reports_us/05-30-2020.csv).

were not reported. Incidence in persons aged ≥80 years was nearly double that in persons aged 70–79 years.

Among cases with known race and ethnicity, 33% of persons were Hispanic, 22% were black, and 1.3% were AI/AN. These findings suggest that persons in these groups, who account for 18%, 13%, and 0.7% of the U.S. population, respectively, are disproportionately affected by the COVID-19 pandemic. The proportion of missing race and ethnicity data limits the conclusions that can be drawn from descriptive analyses; however, these findings are consistent with an analysis of COVID-19–Associated Hospitalization Surveillance Network (COVID-NET)[†††††] data that found higher proportions of black and Hispanic persons among hospitalized COVID-19 patients than were in the overall population (4). The completeness of race and ethnicity variables in case surveillance has increased from 20% to >40% from April 2 to June 2. Although reporting of race and ethnicity continues to improve, more complete data might be available in aggregate on jurisdictional websites or through sources like the COVID Tracking Project's COVID Racial Data Tracker.[§§§§§]

The data in this report show that the prevalence of reported symptoms varied by age group but was similar among males and females. Fewer than 5% of persons were reported to be asymptomatic when symptom data were submitted. Persons without symptoms might be less likely to be tested for COVID-19 because initial guidance recommended testing of only symptomatic persons and was hospital-based. Guidance on testing has evolved throughout the response.[¶¶¶¶¶] Whereas incidence among males and females was similar overall, severe outcomes were more commonly reported among males. Prevalence of reported severe outcomes increased with age; the percentages of hospitalizations, ICU admissions, and deaths were highest among persons aged ≥70 years, regardless of underlying conditions, and lowest among those aged ≤19 years. Hospitalizations were six times higher and deaths 12 times higher among those with reported underlying conditions compared with those with none reported. These findings are consistent with previous reports that found that severe outcomes increased with age and underlying condition, and males were hospitalized at a higher rate than were females (2,4,5).

The findings in this report are subject to at least three limitations. First, case surveillance data represent a subset of the total cases of COVID-19 in the United States; not every case in the community is captured through testing and information

**Summary**

**What is already known about this topic?**

Surveillance data reported to CDC through April 2020 indicated that COVID-19 leads to severe outcomes in older adults and those with underlying health conditions.

**What is added by this report?**

As of May 30, 2020, among COVID-19 cases, the most common underlying health conditions were cardiovascular disease (32%), diabetes (30%), and chronic lung disease (18%). Hospitalizations were six times higher and deaths 12 times higher among those with reported underlying conditions compared with those with none reported.

**What are the implications for public health practice?**

Surveillance at all levels of government, and its continued modernization, is critical for monitoring COVID-19 trends and identifying groups at risk for infection and severe outcomes. These findings highlight the continued need for community mitigation strategies, especially for vulnerable populations, to slow COVID-19 transmission.

collected might be limited if persons are unavailable or unwilling to participate in case investigations or if medical records are unavailable for data extraction. Reported cumulative incidence, although comparable across age and sex groups within the case surveillance population, are underestimates of the U.S. cumulative incidence of COVID-19. Second, reported frequencies of individual symptoms and underlying health conditions presented from case surveillance likely underestimate the true prevalence because of missing data. Finally, asymptomatic cases are not captured well in case surveillance. Asymptomatic persons are unlikely to seek testing unless they are identified through active screening (e.g., contact tracing), and, because of limitations in testing capacity and in accordance with guidance, investigation of symptomatic persons is prioritized. Increased identification and reporting of asymptomatic cases could affect patterns described in this report.

Similar to earlier reports on COVID-19 case surveillance, severe outcomes were more commonly reported among persons who were older and those with underlying health conditions (1). Findings in this report align with demographic and severe outcome trends identified through COVID-NET (4). Findings from case surveillance are evaluated along with enhanced surveillance data and serologic survey results to provide a comprehensive picture of COVID-19 trends, and differences in proportion of cases by racial and ethnic groups should continue to be examined in enhanced surveillance to better understand populations at highest risk.

Since the U.S. COVID-19 response began in January, CDC has built on existing surveillance capacity to monitor the impact of illness nationally. Collection of detailed case

[†††††] COVID-Net is a population-based surveillance system that collects data on laboratory-confirmed COVID-19–associated hospitalizations (https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covid-net/purpose-methods.html).

[§§§§§] The COVID Tracking Project is *The Atlantic*'s volunteer project to collect and publish U.S. COVID-19 data (https://covidtracking.com/race/dashboard).

[¶¶¶¶¶] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/testing.html.

data is a resource-intensive public health activity, regardless of disease incidence. The high incidence of COVID-19 has highlighted limitations of traditional public health case surveillance approaches to provide real-time intelligence and supports the need for continued innovation and modernization. Despite limitations, national case surveillance of COVID-19 serves a critical role in the U.S. COVID-19 response: these data demonstrate that the COVID-19 pandemic is an ongoing public health crisis in the United States that continues to affect all populations and result in severe outcomes including death. National case surveillance findings provide important information for targeted enhanced surveillance efforts and development of interventions critical to the U.S. COVID-19 response.

## Acknowledgements

State, local, and territorial health department personnel; Sarah Collier, Stacy Crim, CDC; Aaron Aranas, Aileen Artus, Neha Balachandran, Lyndsay Bottichio, Virginia Bowen, Daniel Bowen, Bobbi Bryant, Eleanor Burnett, Andrea Carmichael, Sharon Caslin, Sana Charania, Nancy Chow, Amanda Conrad, Aaron Curns, Daniel Dewey-Mattia, Kasey Diebold, William (Chris) Edens, Brian Emerson, Hannah Fast, Pei-Jean Feng, Kaitlin Forsberg, Ryan Gierke, Kadeja Hughes, Michelle Hughes, Emily Jenkins, Ramakrishna Kakara, Aybuke Koyuncu, Benjamin Laffoon, Florence Lee, Matt Lerick, Zachary Marsh, Clint McDaniel, Maria Negron, Cheryl Ocfemia, John Person, Marissa Person, Tamara Pilishvili, Rachael Porter, Emily Prezzato, Daniel Pollock, Matthew Ritchey, Nicki Roth, Katherine Roguski, Loredana Santo, Tara Serio, Kelly Shaw, Benjamin Silk, Rachel Silver, Tami Skoff, Caroline Stamatakis, Penelope Strid, Thomas Sukalac, Danielle Tack, Mitsuru Toda, Emily Ussery, Michael Vasser, Andrew Willmore, Kathryn Wingler, CDC Case Surveillance Task Force.

Corresponding author: Erin K. Stokes, Estokes@cdc.gov, 404-718-1175.

---

[1]CDC COVID-19 Emergency Response.

All authors have completed and submitted the International Committee of Medical Journal Editors form for disclosure of potential conflicts of interest. No potential conflicts of interest were disclosed.

## References

1. Bialek S, Boundy E, Bowen V, et al.; CDC COVID-19 Response Team. Severe outcomes among patients with coronavirus disease 2019 (COVID-19)—United States, February 12–March 16, 2020. MMWR Morb Mortal Wkly Rep 2020;69:343–6. https://doi.org/10.15585/mmwr.mm6912e2

2. Chow N, Fleming-Dutra K, Gierke R, et al.; CDC COVID-19 Response Team. Preliminary estimates of the prevalence of selected underlying health conditions among patients with coronavirus disease 2019—United States, February 12–March 28, 2020. MMWR Morb Mortal Wkly Rep 2020;69:382–6. https://doi.org/10.15585/mmwr.mm6913e2

3. Bialek S, Gierke R, Hughes M, McNamara LA, Pilishvili T, Skoff T; CDC COVID-19 Response Team. Coronavirus disease 2019 in children—United States, February 12–April 2, 2020. MMWR Morb Mortal Wkly Rep 2020;69:422–6. https://doi.org/10.15585/mmwr.mm6914e4

4. Garg S, Kim L, Whitaker M, et al. Hospitalization rates and characteristics of patients hospitalized with laboratory-confirmed coronavirus disease 2019—COVID-NET, 14 states, March 1–30, 2020. MMWR Morb Mortal Wkly Rep 2020;69:458–64. https://doi.org/10.15585/mmwr.mm6915e3

5. Lu X, Zhang L, Du H, et al.; Chinese Pediatric Novel Coronavirus Study Team. SARS-CoV-2 infection in children. N Engl J Med 2020;382:1663–5. https://doi.org/10.1056/NEJMc2005073

Readers who have difficulty accessing this PDF file may access the HTML file at https://www.cdc.gov/mmwr/volumes/69/wr/mm6924e2.htm?s_cid=mm6924e2_w. Address all inquiries about the *MMWR* Series, including material to be considered for publication, to Editor, *MMWR* Series, Mailstop E-90, CDC, 1600 Clifton Rd., N.E., Atlanta, GA 30329-4027 or to mmwrq@cdc.gov.